UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

JENNIFER SHARKEY,

                    Plaintiff,                    10 Civ. 3824

     -against-                                    OPINION

J.P. MORGAN CHASE & CO., JOE KENNEY,
ADAM GREEN, and LESLIE LASSITER in
their official and individual
capacities,

                    Defendants.

------------------------------------X

A P P E A R A N C E S:

          Attorney for Plaintiff

          THOMPSON WIGDOR & GILLY LLP
          85 Fifth Avenue
          New York, NY 10003
          By:  Douglas H. Wigdor, Esq.

          Attorneys for Defendants

          ARNOLD & PORTER LLP
          399 Park Avenue
          New York, NY 10022
          By:  Michael D. Schissel, Esq.
               Lucy S. McMillan, Esq.

**Sweet, D.J.**

Defendants J.P. Morgan Chase & Co. ("JPMC") and Joe Kenney ("Kenney"), Adam Green ("Green") and Leslie Lassiter ("Lassiter") (the "Individual Defendants") have moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Complaint filed by Plaintiff Jennifer Sharkey ("Sharkey" or "Plaintiff"). Based on the conclusions set forth below, the motion is granted in part and the Complaint dismissed with leave granted to replead.

**Prior Proceedings**

Sharkey filed her Complaint on May 5, 2010, alleging claims under Section 806 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX"), 18 U.S.C. § 1514, and for breach of contract.

The Complaint alleges that from October 2006 until her termination on August 5, 2009, Sharkey worked as a Vice President and Wealth Manager in JPMC's Private Wealth Management department. (Compl. ¶ 9.) In this capacity, she managed more than 75 "High Net Worth Client" relationships, the assets of which totaled more than $500 million, and was the second highest

producer in her department. (Id. ¶ 10.) In January 2009,
Lassiter, Sharkey's direct supervisor, assigned Sharkey to
manage a long term client of JPMC (hereinafter the "Client").
(Id. ¶ 18.) The Client had been a client of JPMC for more than
20 years and generated quarterly returns of approximately
$150,000 for JPMC. (Id.)

Almost immediately after Sharkey was assigned to
manage the Client, JPMC's compliance and risk management team
contacted Sharkey to express their concerns regarding the
Client's involvement in illegal activities, including
allegations of mail fraud, bank fraud, and money laundering,
which Sharkey immediately conveyed to Lassiter. (Id. ¶ 19.) Over
the next few weeks, Sharkey conducted independent research into
the Client's activities and communicated with JPMC's compliance
and risk management departments to determine whether the Client
was violating federal securities laws. (Id. ¶ 20.) Based on her
research, Sharkey formed a belief that the Client was engaged in
such illegal activities and that, as a result, JPMC should
terminate the client relationship. (Id.) When Sharkey conveyed
the conclusions of her research and her recommendation to the
Individual Defendants, they ignored her concerns and
recommendation. (Id. ¶¶ 20-21.) Instead, the Individual

2

Defendants allegedly downplayed and dismissed Sharkey's concerns, both because they directly contradicted their own conclusions and because Sharkey's concerns exposed weaknesses in JPMC's risk processing procedures, particularly since JPMC had been doing business with the Client for more than 20 years. (Id. ¶ 25.) When Sharkey refused the Individual Defendants' pressure to condone the Client's business activities, the Individual Defendants allegedly began to retaliate against her by removing her from several client accounts, excluding her from important meetings involving her own clients, refusing to pay her a bonus for 2009 and ultimately terminating her employment with JPMC. (Id. ¶¶ 24, 26-29, 32.)

Following the Individual Defendants refusal to take any action regarding Sharkey's concerns that the Client was violating federal securities laws, Sharkey contacted JPMC's compliance department to begin a "Know Your Client" assessment process (the "KYC Process") on the Client's account. (Id. ¶ 22.) The KYC Process operated as an internal audit of a client, the purpose of which is to ensure that JPMC and its clients remain at all times in compliance with federal securities laws and regulations. (Id.) On July 30, 2009, Sharkey submitted her final KYC report regarding the Client, which included her

recommendation that J.P. Morgan immediately terminate its relationship with the Client. (Id. ¶ 23.) While Sharkey's report was submitted to the compliance and risk management department, the Individual Defendants also received copies of her report and were aware of her recommendation to the compliance and risk management department. (Id.) Six days later, on August 5, 2010, Sharkey's employment with JPMC was terminated without warning or prior notice. (Id. ¶¶ 24, 33.) When Sharkey inquired as to the reasons for her termination, the JPMC Human Resources employee that communicated the decision to her stated that, "[i]t was an abrupt decision that has nothing to do with your performance, but instead was made by Lassiter because she feels she cannot trust you anymore." (Id. ¶ 32.)

On October 22, 2009, Sharkey filed a timely complaint with the Occupational Safety and Health Administration of the U.S. Department of Labor ("OSHA") alleging violations of SOX. (Id. ¶ 5.) On or about April 12, 2010, OSHA issued its findings and preliminary order. (Id. ¶ 8.) Plaintiff now seeks de novo review of OSHA's finding and preliminary order.

The instant motion was heard on September 15, 2010.

4

**The Applicable Standard**

On a motion to dismiss pursuant to Rule 12, all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36 (1974)).

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). Plaintiffs must allege sufficient facts to

"nudge[ ] their claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Subsequent to Twombly, the Supreme Court clarified any doubt about a heightened pleading standard by reiterating that to satisfy Rule 8(a)(2) "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 550 U.S. at 555). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly given rise to an entitlement to relief." Iqbal, 129 S. Ct. at 1950. However, "[t]here must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense)." Dallio v. Hebert, 678 F. Supp. 2d 35, 53 (N.D.N.Y. 2009).

Where, as here, the complaint "fail[s] to state a claim upon which relief can be granted," it must be dismissed.

6

Fed. R. Civ. P. 12(b)(6); Iqbal, 129 S. Ct. at 1940. "[A]
plaintiff's obligation to provide the 'grounds' of his
'entitle[ment] to relief' requires more than labels and
conclusions, and a formulaic recitation of the elements of a
cause of action with not do." Twombly, 550 U.S. at 555 (citation
omitted). And, "[t]hreadbare recitals of the elements of a cause
of action, supported by mere conclusory statements, do not
suffice." Iqbal, 129 S. Ct. at 1940; see also Vaughn v. Air Line
Pilots Ass'n, Int'l, 604 F.3d 703, 709 (2d Cir. 2010); Portes v.
Wyeth Pharms., Inc., No. 06 Civ. 2689 (WHP), 2007 WL 2363356, at
*2 (S.D.N.Y. Aug. 20, 2007) (applying standards to a SOX
whistleblower claim).

        As set forth below, the complaint fails to meet the
above standards and therefore is dismissed.


**The Sarbanes-Oxley Claim Is Dismissed**


        The whistleblower provisions of SOX provide, in
relevant part:

        No company with a class of securities registered under
        section 12 of the Securities Exchange Act of 1934
        . . . or that is required to file reports under
        section 15(d) of the Securities Exchange Act . . ., or
        any officer, employee . . . or agent of such company,
        may discharge, demote, suspend, threaten, harass, or

7

in any other manner discriminate against an employee
in the terms and conditions of employment because of
any lawful act done by the employee —

(1)   to provide information, cause information to be
      provided, or otherwise assist in any
      investigation regarding any conduct which the
      employee reasonably believes constitutes a
      violation of section 1341, 1343, 1344, or 1348,
      any rule or regulation of the Securities and
      Exchange commission, or any provision of Federal
      law relating to fraud against shareholders, when
      the information or assistance is provided to or
      the investigation is conducted by —

      (C)   a person with supervisory authority over the
            employee (or such other person working for
            the employer who has the authority to
            investigate, discover, or terminate
            misconduct).

18 U.S.C. § 1514A(a).


To state a claim under the SOX whistleblower

provision, Plaintiff must make a prima facie showing that: (a)

she engaged in protected activity; (b) JPMC or the Individual

Defendants knew or suspected that Plaintiff engaged in protected

activity; (c) Plaintiff suffered an unfavorable employment

action; and (d) the circumstances are sufficient to raise an

inference that the protected activity contributed to the

unfavorable employment action. 29 C.F.R. § 1980.104(b)(1)(i-iv);

see also Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d

310, 322 (S.D.N.Y. 2006).

8

Further, "SOX protects employees who provide information, which the employee 'reasonably believes constitutes a violation' of any SEC rule or regulation or 'Federal law relating to fraud against shareholders.'" Fraser, 417 F. Supp. 2d at 322 (quoting Collins v. Beazer Homes USA, Inc., 334 F. Supp. 2d 1365, 1375 (N.D. Ga. 2004)).

A.    Sharkey Engaged in Protected Activity

According to Defendants, because Plaintiff claims to have reported illegal activities in which a JPMC client was engaged, not illegal activities on the part of JPMC, her actions do not constitute "protected activity" under SOX. Moreover, the Complaint does not allege that JPMC knew of any protected activity covered by SOX. Thus, according to Defendants, the absence of any allegation that JPMC was violating any of the statutes or regulations enumerated in the SOX statute is fatal to the Complaint.

Defendants have noted that courts and administrative law judges consistently emphasize that the SOX whistleblower provision is designed to protect employees of public companies

9

from retaliation for reporting that their employers engaged in a violation of one of the enumerated statutes or regulations. See Fraser v. Fiduciary Trust Int'l, No. 04 Civ. 6958 (PAC), 2009 WL 2601389, at *5 (S.D.N.Y. Aug. 25, 2009) (hereinafter "Fraser II") (to qualify as protected activity, "the complaining employee's belief that his employer's conduct violated one of the enumerated categories must be both objectively and subjectively reasonable") (citation omitted); Portes, 2007 WL 2363356, at *4 ("Where a communication 'is barren of any allegations of conduct that would alert [a defendant] that [the plaintiff] believed the company was violating any federal rule or law related to fraud against shareholders,' the reporting is not protected by SOX.") (quoting Fraser, 417 F. Supp. 2d at 322); Pardy v. Gray, No. 07 Civ. 6324 (LAP), 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008) ("It is sufficient for a plaintiff to show that she reasonably believed . . . that her employer was violating the applicable federal law."); Allen v. Admin. Review Bd., 514 F.3d 468, 477 (5th Cir. 2008) ("[A]n employee's reasonable but mistaken belief that an employer engaged in conduct that constitutes a violation of one of the six enumerated categories is protected.").

10

It is Plaintiff's view that reporting violations of federal law by third parties other than the employer is covered by SOX. The parties agree that no decisions have been reported with respect to this contention or Defendants' contrary view.

SOX was enacted in the wake of Enron's collapse, to provide greater protection to shareholders of public companies. See S. Rep. No. 107-146, as reprinted in 2002 WL 863249, at *2 (May 6, 2002). In an effort to uncover corporate fraud, Congress included a whistleblower provision to "encourage and protect [employees] who report fraudulent activity that can damage innocent investors in publicly traded companies." Id. at *19; see also 18 U.S.C. § 1514A. An employee who reports his reasonable belief that the company is engaged in mail fraud, wire fraud, bank fraud, securities fraud, a violation of any rule or regulation of the Securities Exchange Commission, or any provision of Federal law relating to fraud against shareholders, is protected against retaliation. See Portes, 2007 WL 2363356, at *4.

Because SOX is a statute designed to promote corporate ethics by protecting whistleblowers from retaliation, it should not be read narrowly. See Mahony v. Keyspan Corp., No. 04 Civ.

11

554, 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) ("Given that SOX is a statute designed to promote corporate ethics by protecting whistleblowers from retaliation, it is reasonable to construe the statute broadly."). Indeed, a broad reading of the whistleblower provisions can be said to comply with Congressional intent. See 149 Cong. Rec. S1725 (Jan. 29, 2003) (statement of Sen. Leahy) ("The law was intentionally written to sweep broadly, protecting an employee of a publicly traded company who took reasonable action to try to protect investors and the market.").

The legislative history concerning the SOX whistleblower provision indicated that Sarbanes-Oxley was enacted to counteract a corporate culture that "discourages employees from reporting fraudulent behavior not only to the proper authorities such as the FBI and the SEC, but even internally. This 'corporate code of silence' not only hampers investigations, but also creates a climate where ongoing wrongdoing can occur with virtual impunity. The consequences of this corporate code of silence for investors in publicly traded companies, in particular, and for the stock market, in general, are serious and adverse, and they must be remedied." S. Rep. No. 107-146, at *5.

12

SOX precludes an employer from retaliating against any employee who provides information or otherwise assists in an investigation regarding conduct which the employee reasonably believes constitutes a violation of "section 1341 [Frauds and Swindles], 1343 [Fraud by Wire, Radio or Television], 1344 [Bank Fraud], or 1348 [Securities and Commodities Fraud], any rule or regulation of the [SEC], or any provision of Federal law relating to fraud against shareholders." 18 U.S.C. 1514A(a)(1). The statute by its terms does not require that the fraudulent conduct or violation of federal securities law be committed directly by the employer that takes the retaliatory action.

In each of the cases cited by Defendants, the plaintiffs alleged that their employer had been the entity which engaged in the conduct which was believed to have violated one of the enumerated categories of 18 U.S.C. § 1514A(a)(1). However, none of these cases stand for the proposition that the SOX protections are limited only to those employees that report that their employer engaged in conduct prohibited by those statutes referenced in 18 U.S.C. § 1514A(a)(1). See, e.g., Fraser II, 2009 WL 2601389, at *5; Portes, 2007 WL 2363356, at *4; Pardy, 2008 WL 2756331, at *5; Allen, 514 F.3d at 476-77.

13

In light of the language of the statute and the legislative history, Plaintiff has properly pled that she engaged in conduct protected by 18 U.S.C. § 1514A when she repeatedly reported her concerns regarding the Client's illegal activity to the Individual Defendants and JPMC's risk and compliance team.

B.   The Illegal Activity Was Not Adequately Alleged

To state a whistleblower claim under SOX, a "plaintiff need not show an actual violation of the law." Fraser, 417 F. Supp. 2d at 322. Instead, "SOX protects employees who provide information which the employee 'reasonably believes constitutes a violation' of any SEC rule or regulation or "Federal law relating to fraud against shareholders.'" Id. (citing 18 U.S.C. § 1514A(a)(1)).

A whistleblower "need not 'cite a code section he believes was violated' in his communication to his employer, but the employee's communications must identify the specific conduct that the employee believes to be illegal." Welch v. Chao, 536 F.3d 269, 276 (4th Cir. 2008) (citing Fraser, 417 F. Supp. 2d at

14

322), cert. denied 129 S. Ct. 1985 (2009). Courts have held the "protected activity must implicate the substantive law protected in Sarbanes-Oxley 'definitely and specifically.'" Fraser, 417 F. Supp. 2d at 322. However, contrary to Defendants' position, the "'definitely and specifically' language clearly does not impose a heightened pleading standard in Sarbanes-Oxley whistleblower cases." Welch, 536 F.3d at 277. Rather, "for the whistleblower to be protected by [SOX], the reported information must have a certain degree of specificity [and] must state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." Fraser, 417 F. Supp. 2d at 322 (quoting Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8, 2004 WL 5030304, at *11 (U.S. Dept. of Labor June 15, 2004)).  The information reported must be sufficiently specific to "identify a respondent's conduct that the complainant believes to be illegal." Id.

     To have engaged in protected activity, a plaintiff must have complained of activity "definitively and specifically relate[d] to one of the six enumerated categories of misconduct contained in SOX § 806, i.e. mail fraud, wire fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to fraud against

15

shareholders." <u>Fraser II</u>, 2009 WL 2601389, at *5 (quoting <u>Allen</u>, 514 F.3d at 476-77); <u>see also</u> 18 U.S.C. § 1514A(a)(1).

In addition, "the complaining employee's belief that his employer's conduct violated one of the enumerated categories must be both objectively and subjectively reasonable." <u>Fraser II</u>, 2009 WL 2601389, at *5 (citation omitted). "Thus, the employee must show both that he actually believed the conduct complained of constituted a violation of pertinent law and that 'a reasonable person in his position would have believed that the conduct constituted a violation.'" <u>Welch</u>, 536 F.3d at 278 n.4 (quoting <u>Livingston v. Wyeth, Inc.</u>, 520 F.3d 344, 352 (4th Cir. 2008)).

In assessing the reasonableness of a plaintiff's belief regarding the illegality of the particular conduct at issue, courts look to the "basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." <u>See</u> <u>Mahony</u>, 2007 WL 805813, at *5. The legislative history of SOX indicates that the reasonableness test "is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts." Legislative History of Title VIII of HR 2673: The

16

Sarbanes-Oxley Act of 2002, 148 Cong. Rec. S7418, 7420 (daily
ed. July 26, 2002). "The threshold is intended to include all
good faith and reasonable reporting of fraud, and there should
be no presumption that reporting is otherwise, absent specific
evidence." Id.

Plaintiff has alleged that members of JPMC's
compliance and risk management team had contacted her to express
concerns that the Client was involved in illegal activities,
including mail fraud, bank fraud and money laundering, and that
Sharkey had conducted independent research to determine whether
Client was engaged in such illegal activities. (See Compl.
¶¶ 19-20.) Based on this information, Plaintiff has alleged that
"she reasonably believed that the client was violating federal
securities laws" and was engaged in "illegal activities,
including mail fraud, bank fraud and money laundering." (See id.
¶¶ 20, 22.)  Sharkey has alleged that she informed her superiors
that she "belie[ved] the [client] was engaged in illegal
activities" and that JPMC should "exit the relationship" with
the client. (Compl. ¶¶ 20, 23.)

The Complaint has alleged that Defendants' "actions
were taken in unlawful retaliation for Sharkey's efforts to

17

report and prevent what Sharkey reasonably believed to be
Defendants' violations of the applicable securities regulations
and laws, including without limitation, the federal securities
fraud statutes . . . and 18 U.S.C. §§ 1341, 1343 and 1348."
(Compl. ¶ 36.)

Defendants argue that even if Plaintiff's reporting
the Client's alleged illegal activities were a protected
activity under SOX, the Complaint fails because it only refers
to "illegal activities" and does not "specifically or
definitively" state how the Client allegedly violated any of the
laws or regulations enumerated in SOX. See Portes, 2007 WL
2363356, at *4.

Defendants also argue that Plaintiff has failed to
allege facts supporting her "reasonable belief" that illegal
activities occurred.  Defendants' citations in this regard are
limited to cases in which the court had the benefit of a fully
developed record from which to determine the reasonableness of
the plaintiff's belief that the conduct at issue violated
federal fraud or securities laws. See Harp v. Charter Commc'ns,
Inc., 558 F.3d 722, 723-26 (7th Cir. 2009) (summary judgment);

18

Allen, 514 F.3d at 476 (review of order of U.S. Dep't of Labor's
Administrative Review Board).

Sharkey has conceded in her Opposition Brief that to
state a SOX whistleblower claim, "the employee's communications
must identify the specific conduct that the employee believes to
be illegal." (Pl. Br. 14 (citing Welch, 536 F.3d at 276).)
Plaintiff concedes in her brief that "the Complaint does not
specifically state that Ms. Sharkey notified the Individual
Defendants that she believed the Suspect Client had actually
violated federal securities laws. . . ." (Id. 15.)

Plaintiff has contended that "it is reasonable to
infer that the conclusions and recommendations that Ms. Sharkey
shared with the Individual Defendants referenced her reasonable,
good faith belief that [JPMC's] Client was engaged in mail
fraud, bank fraud, money laundering and violations of federal
securities laws." (Id.) However, Sharkey has not identified the
allegedly illegal conduct that forms the basis of her
whistleblower complaint.

Because of the SOX requirement that specific
violations must be the subject of the whistle blowing and

19

because of the absence of such specificity, the Complaint fails to state a SOX claim.

## The Contract Claim Is Dismissed

The breach of contract claim is based on the theory that JPMC's Code of Conduct, which contains a non-retaliation policy, created an implied contract of employment. (Compl. ¶ 43.) However, the Code of Conduct specifically states that it "does not create any rights to continued employment and is not an employment contract." (Compl., Ex. B at 1.)

In the Second Circuit, "an employee alleging a breach of implied contract must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the employee detrimentally relied on the policy in accepting or continuing employment." Baron v. Port Authority of New York and New Jersey, 271 F.3d 81, 85 (2d Cir. 2001) (citing Lobosco v. New York Tel. Co./NYNEX, 96 N.Y.2d 312, 316 (2001)). The Second Circuit in Baron further explained that "[t]he New York Court of Appeals has admonished that this is a 'difficult pleading burden' and

20

that '[r]outinely issued employee manuals, handbooks and policy statements should not lightly be converted into binding employment agreements.'" Id. (internal citations and footnote omitted).

Under New York law "an employment relationship is presumed to be a hiring at will, terminable at any time by either party." Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 333 (1987) (citation omitted). "[T]here is no exception for firings that violate public policy such as, for example, discharge for exposing an employer's illegal activities." Lobosco, 96 N.Y.2d at 315 (citation omitted). Where a manual or policy statement contains a disclaimer that nothing in the manual is intended to create a contract, an employee cannot bring a breach of contract claim based on the manual or policy statement. See, e.g., Baron v. Port Authority of New York and New Jersey, 271 F.3d 81, 85-86 (2d Cir. 2001).

In Lobosco the Court found that the NYNEX Code of Conduct did not create contractual rights despite a provision in the code stating that the Company would not retaliate against employees who report violations of the code. 96 N.Y.2d at 315-16. In reaching its conclusion, the Court focused on a provision

21

in the code expressly stating, like JPMC's Code of Conduct, that it did not create contractual employment rights. Id. The Court noted that converting an employee manual or Code of Conduct into a binding employment agreement would "subject employers who have developed written policies to liability for breach of employment contracts upon the mere allegation of reliance on a particular provision." Id. at 317. The Court concluded that such an interpretation could not stand, "especially in light of conspicuous disclaiming language." Id. In other words, "[a]n employee seeking to rely on a provision arguably creating a promise must also be held to reliance on the disclaimer." Id.

Here, the disclaimer on the first page of JPMC's Code of Conduct "prevents the creation of a contract and negates any protection from termination plaintiff may have inferred from the manual's no-reprisal provision." Id.; see also Fraser II, 2009 WL 2601389, at * 9-10; Pardy, 2008 WL 2756331, at *4 (dismissing Plaintiff's breach of contract claims relating to her termination for allegedly reporting a SOX violation, because Plaintiff was an at-will employee and "under New York State law, her contract claims must be dismissed").

22

Plaintiff's reliance on Brady v. Calyon Secs. (USA), No. 05 Civ. 3470 (GEL), 2007 WL 4440926, at *6 (S.D.N.Y. Dec. 17, 2007), is misplaced. While Brady contains dicta indicating that whistleblower provisions in employment manuals can create "an 'express limitation' on an employer's ability to discharge its employees," the court did not decide that issue. The cases cited by the Brady court, as well as the additional cases cited by Plaintiff, hold that an anti-retaliation provision can create an implied contractual right of employment, but only when an employee relies on that provision, either in rejecting other offers of employment or when reporting alleged misconduct to his or her employer. See, e.g., McKeever v. New York Med. Coll., No. 96 Civ. 7066 (BSJ), 1999 WL 179376, at *13 (S.D.N.Y. Mar. 31, 1999) (plaintiff "contends not only that he was aware of and relied upon the existence of the three-step process for disciplinary actions, but that the defendants also considered the disciplinary policy to be mandatory") (citations omitted); Gorman v. Nat'l Med. Care, Inc., No. 103604-95, 1998 WL 1050970, at *2 (Sup. Ct. N.Y. Co. Aug. 13, 1998) (reliance is a "necessary element" of a breach of contract claim).

While Plaintiff alleges that the non-retaliation policy constitutes an express written policy limiting the

23

employer's right of discharge, the Complaint contains no allegation that Plaintiff relied on the anti-retaliation provision in allegedly deciding to report unspecified illegal activities of a JPMC client. Moreover, all of the cases cited in the Brady decision, and by Plaintiff, predate Lobosco and Baron. See Brady, 2007 WL 4440926, at *6.

Even if Plaintiff had alleged the elements of a breach of implied contract claim under New York law, Plaintiff cannot negate the express disclaimer of contractual rights contained on the first page and in the first section of the Code: the Code "does not create any rights to continued employment and is not an employment contract." (See Compl. Ex. B at 1.5.) The disclaimer is unambiguous in its meaning and is conspicuously placed on the first page of the Code. Accordingly, Plaintiff's breach of contract claim must be dismissed with prejudice. See Baron, 271 F.3d at 87-88; Lobosco, 96 N.Y.2d at 312.

## Conclusion

Based upon the conclusions set forth above, the motion of Defendants to dismiss the Complaint is granted with leave granted to replead within twenty days.

24

It is so ordered.

New York, NY
January /4/, 2010

ROBERT W. SWEET
U.S.D.J.