UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

JENNIFER SHARKEY,

                Plaintiff,

     -against-

J.P. MORGAN CHASE & CO., JOE KENNEY,
ADAM GREEN, and LESLIE LASSITER in their
official and individual capacities,

                Defendants.

------------------------------------------------------------- X

No. 10 Civ. 3824 (RWS)

**AMENDED COMPLAINT**

Jennifer Sharkey ("Plaintiff" or "Ms. Sharkey") by and through her attorneys, Thompson Wigdor and Gilly LLP, as and for her Amended Complaint against J.P. Morgan Chase & Co. ("J.P. Morgan"), Joe Kenney ("Mr. Kenney"), Adam Green ("Mr. Green"), and Leslie Lassiter ("Ms. Lassiter") (collectively, "Defendants"), hereby alleges as follows:

## NATURE OF ACTION

1.     On August 5, 2009, Ms. Sharkey was terminated from her position as a Vice President and Wealth Manager at J.P. Morgan because she caused an investigation and assisted in the investigation into allegations of a long term J.P. Morgan client's involvement in fraud, money laundering, mail fraud, bank fraud, and/or violating federal securities laws (hereinafter, the "Suspect Client").  Starting in January 2009 when she was first assigned to the Suspect Client and learned of his potentially unlawful conduct, Ms. Sharkey repeatedly informed her superiors of the potential unlawful activities of the Suspect Client, but Defendants ignored her concerns. Following J.P. Morgan procedure, Ms. Sharkey initiated an internal audit of the Suspect Client's activities, and on July 30, 2009, after the completion of the audit, recommended to Defendants

that J.P. Morgan's relationship with the Suspect Client be terminated.  Instead, less than one week later, J.P. Morgan unlawfully terminated Ms. Sharkey's employment without notice and for no performance-related reason.

2.      Ms. Sharkey accordingly brings this action to recover damages arising from the Defendants' unlawful termination of her employment in retaliation for her protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act").

## JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

3.      Jurisdiction is conferred on this Court by 18 U.S.C § 1514A and 28 U.S.C. § 1331.

4.      Venue is appropriate in this District under 28 U.S.C. § 1391(a) as the acts which give rise to this Complaint, as well as certain of the transactions, practices and courses of conduct constituting violations of the federal securities laws, took place in this District.

5.      On October 22, 2009, Plaintiff timely filed a Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the "whistleblower" provisions of the Sarbanes-Oxley Act (hereinafter, the "Administrative Complaint").

6.      By letter dated April 12, 2010, OSHA issued its findings and preliminary order.

7.      OSHA did not issue a final decision on Plaintiff's Administrative Complaint within 180 days of the Administrative Complaint's filing.  Accordingly, pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to seek *de novo* review of her Complaint from this Court.

8.      By letter dated April 22, 2010, Plaintiff informed OSHA, the U.S. Department of Labor and the Office of the Chief Administrative Law Judge of the U.S. Department of Labor

that Plaintiff intended to seek *de novo* review in this Court rather than continue to seek relief through OSHA's procedural mechanisms.

## PARTIES

9.     From October 2006 until her termination on August 5, 2009, Ms. Sharkey worked as a Vice President and Wealth Manager in J.P. Morgan's Private Wealth Management group. At all relevant times, Ms. Sharkey worked at J.P. Morgan's New York branch office, located at 345 Park Avenue, New York, New York 10154.

10.     In this role, Ms. Sharkey managed more than 75 "High Net Worth Client" relationships, the assets of which totaled more than $500 million.  Ms. Sharkey excelled in this role and, prior to her termination, she was ranked the second highest producer in her department.

11.     Defendant J.P. Morgan is one of the world's largest financial advisory and asset management firms, with offices in more than 50 locations worldwide.  As a publicly held corporation, J.P. Morgan issues multiple classes of securities required to be registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).  At all relevant times, J.P. Morgan maintained a New York branch office located at 345 Park Avenue, New York, New York 10154.

12.     Mr. Kenney was, at all relevant times, the Chief Executive Officer for J.P. Morgan's Private Wealth Management department.

13.     Mr. Green was, at all relevant times, the Northeast Regional Director for J.P. Morgan's Private Wealth Management department.

14.     Ms. Lassiter was, at all relevant times, a Managing Director and a Market Director for J.P. Morgan's Private Wealth Management department in New York City.  As Ms. Sharkey's

direct supervisor, Ms. Lassiter conducted semi-annual performance evaluations and repeatedly gave Ms. Sharkey positive reviews.

15.    Mr. Kenney, Mr. Green, and Ms. Lassiter all worked for J.P. Morgan at its New York office located at 345 Park Avenue, New York, New York 10154.

16.    At all relevant times, Mr. Kenney, Mr. Green, and Ms. Lassiter had supervisory authority over Ms. Sharkey and had the power to investigate, discover, or terminate misconduct as alleged herein and are otherwise covered by the provisions of 18 U.S.C. § 1514A.

17.    As set forth in more detail below, during her employment, Ms. Sharkey provided information to Mr. Kenney, Mr. Green, Ms. Lassiter, and other members of senior management that serious violations of fraud, money laundering, mail fraud, bank fraud, and/or federal securities laws were occurring on an ongoing basis.

## PLAINTIFF'S PROTECTED ACTIVITY

18.    On or about January 2009, following the departure of one of Ms. Sharkey's colleagues, Ms. Lassiter assigned Ms. Sharkey to the Suspect Client, who was a high-revenue producing foreign client.  For more than 20 years, J.P. Morgan had managed the Suspect Client's account, which generated quarterly returns of approximately $150,000.

19.    In general, Ms. Sharkey's general job duties and responsibilities consisted of: managing a portfolio of high net worth clients; acquiring, developing and managing new client relationships; working on managing a team of dedicated product specialists and a client service team to cross-sell and provided exceptional depth of wealth management products and solutions; and assisting clients in achieving their financial goals by providing consistent communication, focusing on growing, managing and sustaining their wealth, and leveraging internal partnerships with other divisions of J.P. Morgan.

20.     Mere days after Ms. Sharkey was assigned to the Suspect Client's account, members of J.P. Morgan's compliance and risk management team contacted Ms. Sharkey to express their concerns regarding the Suspect Client's alleged involvement in illegal activities, including allegations of mail fraud, bank fraud and money laundering, despite the fact that such investigations were not a part of Ms. Sharkey's general job duties and responsibilities.  Ms. Sharkey immediately relayed this information to Ms. Lassiter.

21.     At or around the same time in the first half of 2009, the Office of the Comptroller of the Currency ("OCC"), an independent bureau of the U.S. Department of the Treasury tasked to charter, regulate and supervise all national banks, was conducting an audit of J.P. Morgan's Northeast Region's Private Wealth Management group and J.P. Morgan's compliance with Know Your Customer ("KYC") requirements.

22.     Upon information and belief, OCC's investigation and audit was focused in great part on the Suspect Client, several Private Wealth Management accounts that the Suspect Client created, and J.P. Morgan's compliance – or lack thereof – with respect to KYC requirements on these accounts.

23.     Generally, KYC is the due diligence that financial institutions must perform to identify their clients and ascertain relevant information pertinent to doing financial business with them.

24.     More specifically, KYC is a policy implemented by banks to conform to a Customer Identification Program ("CIP") mandated by the Bank Secrecy Act, Title III of the USA PATRIOT Act, and federal regulations to prevent, *inter alia*, money laundering and terrorist financing.  See, e.g., 31 CFR 103.121.

5

25.    In light of both the OCC audit and the concerns of J.P. Morgan's own compliance and risk management team, Ms. Sharkey came to learn that:

    a.   Although his account was handled by Private Wealth Management, the Suspect Client – whose dealings were more akin to a business account and not a personal account – should not have opened an account under Private Wealth Management, where oversight is less stringent than in Commercial Banking.

    b.   The number, names and types of accounts opened under the Suspect Client's name raised suspicions and would need to be investigated.

    c.   Prior attempts by others to ensure compliance with KYC requirements for the Suspect Client were either never completed or met with avoidance and/or obfuscation.

    d.   As such, much of the necessary documentation needed to ensure compliance with KYC requirements for the Suspect Client was either missing or incomplete.

    e.   The source of the Suspect Client's wealth could not be determined, which combined with the fact that most of his accounts and/or businesses involved a heavy cash flow, raised serious concerns of potential money laundering.

    f.   There were concerns that the Suspect Client had previously been involved in a business dealing which resulted in a loss of several million dollars by another bank.

    g.   There were also known allegations that the Suspect Client, through a prior corporation, was involved in the unexplained disappearance of millions of dollars of the product that was the basis for his purported legitimate business.  Moreover, it became known to Ms. Sharkey that the Suspect Client, through a prior

corporation, had financial ledgers that did not correspond with the company's
financial statements.  It also became known to Ms. Sharkey that the Suspect
Client purchased products from a company then controlled by one or more of the
Suspect Client's brothers, who were also at the time of Ms. Sharkey's
investigation signatories on various Suspect Client accounts, at very high prices in
undocumented transactions, transferring and advancing funds and products to this
company without bothering to collect for long periods.

26.    With this information, despite the fact that this did not arise in the course of her
normal job duties, Ms. Sharkey and several other individuals assigned to the Suspect Client
account conducted research and communicated with J.P. Morgan's compliance and risk
management departments to determine whether the Suspect Client was engaging in fraud, money
laundering, mail fraud, bank fraud, and/or violating federal securities laws, as suspected.  Based
on her research, Ms. Sharkey formed a reasonable belief that the Suspect Client was engaged in
fraud, money laundering, mail fraud, bank fraud, and/or violating federal securities laws, and that
J.P. Morgan should immediately terminate the client relationship.  Ms. Sharkey shared her
conclusions with Mr. Kenney, Mr. Green, and Ms. Lassiter, both in the form of verbal and
written recommendations.

27.    More specifically, Ms. Sharkey reasonably believed that the Suspect Client was
engaging in fraud, money laundering, mail fraud, bank fraud, and/or federal securities laws
violations, based on the following suspicious and/or illegal activities, all of which can be found
in, for example only, the Federal Financial Institutions Examination Council ("FFIEC") Bank
Secrecy Act/Anti-Money Laundering InfoBase, Appendix F – Money Laundering and Terrorist
Financing "Red Flags," http://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_106.htm:

a. The Suspect Client, on the rare occasion when he would provide requested documentation, would use unusual or suspicious identification documents that could not be readily verified, such as foreign passports or documents in foreign languages.

b. The Suspect Client refused, with regard to either existing or new accounts, to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business locations, or tax returns.

c. The Suspect Client would make frequent or large transactions with no record of past or present employment experience.

d. Some of the Suspect Client's accounts, at times, acted as a trust or shell company, and the Suspect Client was reluctant to provide information on controlling parties and/or signatories on these accounts.

e. The Suspect Client either refused or was reluctant to provide Ms. Sharkey with information needed to complete the mandatory KYC report.

f. Funds transfer activities in the Suspect Client's accounts were unexplained, repetitive, and/or would show unusual patterns.

g. Payments or receipts with no apparent links to legitimate contracts, goods, or services would be received in the Suspect Client's accounts.

h. Funds transfers would be sent or received within and between the Suspect Client's own accounts.

i. Unusual transfers of funds would occur among the Suspect Client's related accounts or among accounts that involved the same or related principals.

j.   The Suspect Client would secure loans or margins by deposits or other readily marketable assets, such as securities, which in effect would put J.P. Morgan and its shareholders at risk if any of said loans or margins defaulted.

k.   The Suspect Client was involved in potentially higher-risk activities, including activities that may be subject to export/import restrictions.

l.   Ms. Sharkey was unable to obtain from the Suspect Client sufficient information to positively identify originators, beneficiaries and/or signatories of accounts.

m.  Payments to or from the Suspect Client's accounts and/or companies would have no stated or legitimate business purpose.

n.   The Suspect Client's transacting businesses, although not similar in their lines of business, would share the same address and/or exhibited other address inconsistencies, such as not in fact maintaining an office where one was listed.

o.   The Suspect Client maintained accounts and transacted deposits through multiple branches of J.P. Morgan across various geographical areas.

p.   The Suspect Client established multiple accounts in various corporate or individual names that lacked sufficient business purpose for the account complexities and/or appeared to be an effort to hide the beneficial ownership from J.P. Morgan.

q.   The Suspect Client would maintain several accounts with a zero balance, but would refuse to allow them to be closed.

28.   Of particular concern to Ms. Sharkey was a several million dollar account that the Suspect Client had set up in the name of a law firm, which she was told was supposedly set up as an escrow account to hold licensing fees associated with one of the Suspect Client's businesses.

29.    However, although she was informed that this account was set up as an escrow account, the Suspect Client would trade securities in and from this account for his own benefit and, once the trade settled, the Suspect Client would wire transfer the proceeds from the trade to personal checking accounts maintained by the Suspect Client at various J.P. Morgan commercial branches, without authorization or knowledge of the law firm, and which Private Wealth Management had no means of tracking.

30.    Moreover, under this same purported escrow account, the Suspect Client purchased several million dollars worth of securities on margin, i.e., on a loan from J.P. Morgan for which it and its shareholders would bear the risk.

31.    Ms. Sharkey also inquired with established figures in the business area that the Suspect Client was involved, none of whom had ever heard of the Suspect Client or his various businesses.

32.    Furthermore, Ms. Sharkey learned that one of the Suspect Client's purported businesses dealt in merchandise from Columbia, a nation with which J.P. Morgan was not supposed to transact any business.

33.    Ms. Sharkey discovered that the Suspect Client established a limited liability corporation with respect to two properties in Westchester, New York, but, despite repeated requests, never received corporate formation documents, property deeds, purchase contracts, mortgage documentation, tax returns, or necessary proof of income.

34.    Moreover, when the Suspect Client's son requested that J.P. Morgan, through Ms. Sharkey, provide a mortgage for his "primary residence" located at one of the property addresses referenced above, the Suspect Client and his son refused to provide proper documentation to secure the mortgage and, on one or more occasions, provided Ms. Sharkey with suspect and

potentially false documentation regarding proof of income, thus resulting in Ms. Sharkey denying the request.

35.     Thereafter, the Suspect Client's son suggested to Ms. Sharkey that she issue to him a loan secured against a high-balance account maintained by his father, such as the aforementioned law firm "escrow account," which Ms. Sharkey also denied.

36.     In sum, the aforementioned activities constitute either direct or circumstantial evidence that warranted Ms. Sharkey's conclusion that the Suspect Client may have been engaged in fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations.

37.     Moreover, the Suspect Client's attempts to avoid or hinder Ms. Sharkey's efforts to conduct her investigation and/or comply with KYC requirements, which are in turn requirements mandated by, *inter alia*, the Bank Secrecy Act, the USA PATRIOT Act, and/or other federal securities laws, constituted additional violations of law for which J.P. Morgan and its shareholders could be liable if it is proven that J.P. Morgan condoned or was complicit in avoiding KYC requirements.

38.     The results of Ms. Sharkey's investigation of the Suspect Client caused her to form an actual, good faith belief that the Suspect Client's conduct constituted fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations, and the myriad of suspicious conduct alleged above would have caused a reasonable person in Ms. Sharkey's position to believe that the Suspect Client's conduct constituted similar violations.

39.     Ms. Sharkey communicated her complaints regarding the illegal and/or suspicious activities alleged above to Mr. Kenney, Mr. Green and Ms. Lassiter over an extended period of time.

40.    Ms. Sharkey communicated her complaints regarding the illegal and/or suspicious activities alleged above to Mr. Kenney, Mr. Green and Ms. Lassiter via e-mail, telephone calls, telephone conferences, and in-person meetings.

41.    Despite Ms. Sharkey communicating her complaints regarding the illegal and/or suspicious activities alleged above to Mr. Kenney, Mr. Green and Ms. Lassiter, these complaints were continually ignored.

42.    Thus, not only was Ms. Sharkey hindered from completing her KYC report on the Suspect Client by his repeated failure to provide required documentation and information, but she was now also concerned – based on the investigation she conducted above – that a continued relationship with the Suspect Client was placing J.P. Morgan and its shareholders at risk.

43.    With no other recourse, and because she reasonably believed that the Suspect Client was engaging in fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations, Ms. Sharkey informed J.P. Morgan's compliance department of her good faith belief that the Suspect Client was, based on the information above, engaged in fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations.  Thus, J.P. Morgan's compliance department was also aware of the results of Ms. Sharkey's investigation and her reasonable belief that the Suspect Client was engaged in the illegal activity detailed above.

44.    On July 30, 2009, Ms. Sharkey submitted her final KYC report, which contained her recommendation that J.P. Morgan immediately exit the relationship with the Suspect Client. Mr. Kenney, Mr. Green, Ms. Lassiter, and members of J.P. Morgan's compliance and risk management departments received a copy of Ms. Sharkey's completed KYC audit on the Suspect Client's account.  Additionally, as stated above, prior to submitting the KYC report, Ms. Sharkey had already complained to Mr. Kenney, Mr. Green, and Ms. Lassiter, as well as compliance,

about her reasonable belief that the Suspect Client was engaged in fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations.

45.     Six days later, on August 5, 2009, Defendants unlawfully terminated Ms. Sharkey's employment.

### DEFENDANTS' UNLAWFUL RETALIATION

46.     Mr. Kenney, Mr. Green and Ms. Lassiter downplayed the extent of Ms. Sharkey's complaints and views because they directly contradicted their own and they believed Ms. Sharkey's complaints would expose weaknesses in J.P. Morgan's risk processing procedures, particularly since J.P. Morgan had continued a very lucrative relationship with the Suspect Client for more than 20 years.

47.     Mr. Kenney, Mr. Green and Ms. Lassiter pressured Ms. Sharkey to condone the Suspect Client's practices and when she refused, they retaliated against Ms. Sharkey in a blatant attempt to silence her.

48.     Specifically, beginning in June 2009, Ms. Lassiter retaliated against Ms. Sharkey by removing her from several client accounts and assigning complex relationships to junior, less experienced colleagues.  This decision was nothing more than a further attempt to isolate Ms. Sharkey within J.P. Morgan and to stunt her professional growth.

49.     In that same month, Ms. Lassiter also excluded Ms. Sharkey from important meetings involving Ms. Sharkey's own clients.  Ms. Lassiter's exclusion of Ms. Sharkey's attendance at these meetings was nothing more than another blatant attempt to retaliate against Ms. Sharkey because of her complaints regarding the Suspect Client's accounts.

50.     In a further act of retaliation, J.P. Morgan has refused to pay Ms. Sharkey her 2009 bonus.

51.   Mr. Kenney and Mr. Green also retaliated against Ms. Sharkey, as they both were integrally involved with all of the aforementioned actions by Ms. Lassiter.

52.   This marginalization of Ms. Sharkey adversely and materially affected the terms and conditions of her employment with J.P. Morgan, and was done in retaliation for Ms. Sharkey's reporting of potential violations of fraud, money laundering, mail fraud, bank fraud, and federal securities laws, which was itself a transparent effort by J.P. Morgan and the individual defendants to keep other members of senior management in the dark about the unlawful activity.

## DEFENDANTS' UNLAWFUL TERMINATION OF MS. SHARKEY

53.   Defendants' mistreatment of Ms. Sharkey culminated when, on August 5, 2009, Steven Grande summoned Ms. Sharkey to his office.  Mr. Grande is a Vice President of Human Resources in the Private Wealth Management department.  During this meeting, Mr. Grande informed Ms. Sharkey that Defendants had decided to terminate her employment.  When Ms. Sharkey asked why she was being terminated, Mr. Grande stated, "It was an abrupt decision that has nothing to do with your performance, but instead was made by Ms. Lassiter because she feels she cannot trust you anymore."

54.   Ms. Sharkey's termination was without warning or prior notice and had no performance-based justification.

55.   Mr. Kenney and Mr. Green both were aware of Ms. Lassiter's unlawful decision to terminate Ms. Sharkey.

56.   As is clear from the foregoing, Ms. Sharkey engaged in lawful activity protected under § 806 of the Sarbanes-Oxley Act.  Defendants were aware of such activity and unlawfully

14

retaliated against Ms. Sharkey by adversely altering the terms and conditions of her employment, denying her a bonus payment, and ultimately terminating her employment.

57.     These actions were taken in unlawful retaliation for Ms. Sharkey's efforts to report and prevent what Ms. Sharkey reasonably believed constituted fraud and to be violations of the applicable money laundering, mail fraud, bank fraud and federal securities laws, including without limitation, the federal securities fraud statutes; the USA PATRIOT Act, 31 U.S.C. § 5328; and 18 U.S.C. §§ 1341, 1343 and 1348.

58.     The pervasive and ongoing retaliation to which Ms. Sharkey was subjected has no conceivable legitimate explanation.

59.     Defendants' unlawful retaliation and otherwise unlawful conduct has caused Ms. Sharkey to suffer severe emotional distress and mental anguish, as well as substantial economic damages and harm to her professional reputation and career progression.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Sarbanes-Oxley Act Violation: All Defendants)**

60.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

61.     As set forth above, Defendants violated the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, by taking adverse employment actions against Ms. Sharkey, including, but not limited to, termination, in retaliation for Ms. Sharkey's lawful conduct in providing information, causing information to be provided, or otherwise assisting in investigations of the Suspect Client's accounts with J.P. Morgan.

62.     As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer severe financial, mental and emotional hardship and injury

including the loss of compensation, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorneys' fees, costs and disbursements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that an award be issued in her favor containing the following relief:

A.   Reinstatement;

B.   Back pay, raises, bonuses, deferred compensation, benefits, reinstatement of seniority and tenure, and other orders necessary to make Plaintiff whole;

C.   An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Sarbanes-Oxley Act;

D.   An order expunging Plaintiff's termination and ordering Defendants to remove any records of termination against Plaintiff;

E.   An order prohibiting Defendants from disclosing any disparaging information about Plaintiff to prospective employees, or otherwise interfering with any applications she might make in the future;

F.   Compensatory monetary damages in an amount determined to be fair and equitable compensation for Plaintiff's emotional distress and loss of reputation;

G.   Pre-judgment interest on all amounts due;

H.   An award of costs and expenses, as well as reasonable attorneys' fees, incurred by Plaintiff in this action to the fullest extent permitted by law; and

I.   Such other and further relief as the Court may deem just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

16

Dated:  New York, New York
       February 3, 2011

                           Respectfully submitted,

                           THOMPSON WIGDOR & GILLY LLP

                           By: _____
                                 Douglas H. Wigdor
                                 dwigdor@twglaw.com
                               Basil C. Sitaras
                               bsitaras@twglaw.com

                           85 Fifth Avenue
                           New York, NY  10003
                           Telephone:  (212) 257-6800
                           Facsimile:  (212) 257-6845

                           *COUNSEL FOR PLAINTIFF*