UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

JENNIFER SHARKEY,

               Plaintiff,               10 Civ. 3824

   -against-                      OPINION

J.P. MORGAN CHASE & CO., JOE KENNEY,
ADAM GREEN, and LESLIE LASSITER in
their official and individual
capacities,

               Defendants.

------------------------------------------X

A P P E A R A N C E S:

        Attorney for Plaintiff

        THOMPSON WIGDOR & GILLY LLP
        85 Fifth Avenue
        New York, NY  10003
        By:  Douglas H. Wigdor, Esq.

        Attorney for Defendants

        ARNOLD & PORTER LLP
        399 Park Avenue
        New York, NY  10022
        By:  Michael D. Schissel, Esq.
            Lucy S. McMillan, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-19-11

**Sweet, D.J.**

Defendants J.P. Morgan Chase & Co. ("JPMC"), Joe Kenney ("Kenney"), Adam Green ("Green") and Leslie Lassiter ("Lassiter") (collectively, "Defendants") have moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Amended Complaint dated February 3, 2011 (the "AC"), filed by Plaintiff Jennifer Sharkey ("Plaintiff" or "Sharkey"). Based on the conclusions set forth below, Defendants' motion to dismiss is denied.

## Prior Proceedings

On October 22, 2009, Sharkey filed a timely complaint with the Occupational Safety and Health Administration of the U.S. Department of Labor ("OSHA") alleging violations of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514 ("Sarbanes-Oxley" or "SOX"). On or about April 12, 2010, OSHA issued its findings and preliminary order dismissing her complaint. Sharkey filed her complaint with this court on May 10, 2010, alleging claims under SOX.

1

The Defendants moved to dismiss the complaint. The Opinion and Order dated January 14, 2011 of this court (the "January 14 Order") held that Sharkey engaged in a protected activity under SOX when reporting with respect to a third party, the Suspect Client, but that the illegal activity reported was not adequately alleged in the original complaint. Sharkey, 2011 WL 135026, at *4-8. Plaintiff's state law breach of contract claim was dismissed with prejudice, and Sharkey was granted leave to replead her SOX claims. Sharkey filed the AC on February 14, 2011.

The AC alleges multiple occasions on which Plaintiff reported her concerns of fraudulent and illegal activity on the part of the Suspect Client to one or more of the Defendants. (AC ¶¶ 1, 17, 20, 26, 39, 40-41, 43-44.) The AC contains twelve paragraphs alleging that Sharkey believed the Suspect Client was violating one or more of the enumerated SOX statutes in addition to money laundering (AC ¶¶ 1, 17, 20, 26-27, 36-38, 43-44, 52, 57), and thirty paragraphs and subparagraphs outlining the factual basis that that gave rise to that belief (AC ¶¶ 25.a-25.g, 27.a-27.q., 28-37).

2

The Defendants filed the instant motion on the grounds that (1) this court lacks jurisdiction because the newly pled allegations in the AC were not contained in Sharkey's OSHA complaint, (2) while the AC contains additional factual allegations regarding the purported suspicious activities of JPMC's client, it fails to state with any level of specificity what it is she allegedly reported to JPMC supervisors that constituted whistleblowing, (3) the AC does not meet the pleading requirements of Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) because Sharkey still does not identify which statute enumerated in SOX she believes JPMC's client violated, and (4) the AC fails to allege that Defendants knew or should have known that she engaged in protected activity because the AC fails to disclose which purported communications or disclosures constituted her alleged whistleblowing.

Defendants' motion was marked fully submitted on March 30, 2011.

**Facts Alleged**

3

Knowledge of the general facts of this case and the prior proceedings is assumed.  The following allegations are drawn from the Amended Complaint unless otherwise noted.

Shortly after Sharkey was assigned to the Suspect Client's account, members of J.P. Morgan's compliance and risk management team contacted her to express concerns regarding the Suspect Client's alleged involvement in illegal activities, including mail fraud, bank fraud and money laundering. (AC ¶ 20.)  Around the same time in the first half of 2009, the Office of the Comptroller of the Currency, a bureau of the U.S. Department of the Treasury conducted an audit of J.P. Morgan's Northeast Region's Private Wealth Management group and J.P. Morgan's compliance with Know Your Customer ('KYC')[1] requirements.  (Id. ¶ 20.)  The AC alleges that upon information and belief, "OCC's investigation and audit was focused in great part on the Suspect Client, several Private Wealth Management accounts that the Suspect Client created, and J.P. Morgan's compliance - or lack thereof - with respect to KYC requirements on these accounts." (Id. ¶ 21-22.)

---

[1]    As Plaintiff describes, "KYC is a policy implemented by banks to conform to a Customer Identification Program . . . mandated by the Bank Secrecy Act, Title III of the USA PATRIOT Act, and federal regulations to prevent, inter alia, money laundering and terrorist financing."  (AC ¶ 44 (citing 31 CFR 103.121).)

Sharkey alleges that she learned that the Suspect Client "should not have opened an account under Private Wealth Management, where oversight is less stringent" as he had (id. ¶ 23a), and that "[p]rior attempts by others to ensure compliance with KYC requirements for the Suspect Client were either never completed or met with avoidance and/or obfuscation." (Id. ¶ 23c.)  Sharkey could not determine the source of the Suspect Client's wealth, "which combined with the fact that most of his accounts and/or businesses involved a heavy cash flow, raised serious concerns of potential money laundering." (Id. ¶ 23e.) Sharkey was further aware of "allegations that the Suspect Client, through a prior corporation, was involved in the unexplained disappearance of millions of dollars of the product that was the basis for his purported legitimate business."  (Id. ¶ 23f.)  The Suspect Client had financial ledgers that did not correspond with the company's financial statements, and he purchased products from a company controlled by one or more of his brothers (also signatories on various Suspect Client accounts), at high prices in undocumented transactions, transferring and advancing funds and products to this company without collecting for long periods. (Id.)

The AC alleges that Plaintiff "believed that the
Suspect Client was engaging in fraud, money laundering, mail
fraud, bank fraud, and/or federal securities laws violations,
based on" based upon the following allegations:

- The Suspect Client, when he would provide requested documentation, would use unusual or suspicious identification documents that could not be readily verified, such as foreign passports or documents in foreign languages. (Id. ¶ 27a.)
- The Suspect Client refused to provide complete information about the nature and purpose of its business, anticipated account activity, prior banking relationships, the names of its officers and directors, or information on its business locations, or tax returns. (Id. ¶ 27b.)
- The Suspect Client would make frequent or large transactions with no record of past or present employment experience. (Id. ¶ 27c.)
- Some of the Suspect Client's accounts, at times, acted as a trust or shell company, and the Suspect Client was reluctant to provide information on controlling parties and/or signatories on these accounts. (Id. ¶ 27d.)
- The Suspect Client either refused or was reluctant to provide Plaintiff with information needed to complete the mandatory KYC report. (Id. ¶ 27e.)
- Funds transfer activities in the Suspect Client's accounts were unexplained, repetitive, and/or would show unusual patterns. (Id. ¶ 27f.)
- Payments or receipts with no apparent links to legitimate contracts, goods, or services would be received in the Suspect Client's accounts. (Id. ¶ 27g.)
- Funds transfers would be sent or received within and between the Suspect Client's own accounts. (Id. ¶ 27h.)
- Unusual transfers of funds would occur among the Suspect Client's related accounts or among accounts that involved the same or related principals. (Id. ¶ 27i.)
- The Suspect Client would secure loans or margins by deposits or other readily marketable assets, such as securities. (Id. ¶ 27j.)

- The Suspect Client was involved in potentially higher-risk activities, including activities that may be subject to export/import restrictions.  (Id. ¶ 27k.)
- Plaintiff was unable to obtain from the Suspect Client sufficient information to positively identify originators, beneficiaries and/or signatories of accounts.  (Id. ¶ 27l.)
- Payments to or from the Suspect Client's accounts and/or companies would have no stated or legitimate business purpose.  (Id. ¶ 27m.)
- The Suspect Client's transacting businesses, although not similar in their lines of business, would share the same address and/or exhibited other address inconsistencies, such as not in fact maintaining an office where one was listed.  (Id. ¶ 27n.)
- The Suspect Client maintained accounts and transacted deposits through multiple branches of J.P. Morgan across various geographical areas.  (Id. ¶ 27o.)
- The Suspect Client established multiple accounts in various corporate or individual names that lacked sufficient business purpose for the account complexities and/or appeared to be an effort to hide the beneficial ownership from J.P. Morgan.  (Id. ¶ 27p.)
- The Suspect Client would maintain several accounts with a zero balance, but would refuse to allow them to be closed. (Id. ¶ 27q.)

Sharkey alleges that Suspect Client set up an account in the name of a law firm, which she was told was established as an escrow account to hold licensing fees associated with one of the Suspect Client's businesses. (Id. ¶ 28.)  However, Suspect Client would trade securities in and from this account and would wire transfer the proceeds from the trade to personal checking accounts maintained by the Suspect Client at various J.P. Morgan commercial branches, without authorization or knowledge of the law firm. (Id. ¶ 29.)  Under this same account, the Suspect

7

Client purchased several million dollars worth of securities on margin, i.e., on a loan from J.P. Morgan. (Id. ¶ 30.)

Plaintiff alleges that she inquired with "established figures in the business area that the Suspect Client was involved" but none of them had heard of the Suspect Client or his businesses. (Id. ¶ 31.) Plaintiff learned that one of the Suspect Client's businesses dealt in merchandise from Columbia, a nation with which she states J.P. Morgan was not supposed to transact any business. (Id. ¶ 32.)  Suspect Client established a limited liability corporation with respect to two properties in Westchester, New York, but never provided, despite Plaintiff's repeated requests, corporate formation documents, property deeds, purchase contracts, mortgage documentation, tax returns, or necessary proof of income.  (Id. ¶ 33.)  Suspect Client's son requested that J.P. Morgan, through Ms. Sharkey, provide a mortgage for his primary residence located at one those addresses, but the Suspect Client and his son refused to provide proper documentation to secure the mortgage and, on one or more occasions, provided Plaintiff with suspect and potentially false documentation regarding proof of income, resulting in Plaintiff denying the request. (Id. ¶ 34.)  Suspect Client's son suggested that Plaintiff issue him a loan secured against a high-balance

account maintained by his father, such as the law firm escrow
account discussed above. (Id. ¶ 36.)

Plaintiff further alleges that the Suspect Client's
"attempts to avoid or hinder Ms. Sharkey's efforts to conduct
her investigation and/or comply with KYC requirements, which are
in turn requirements mandated by, inter alia, the Bank Secrecy
Act, the USA PATRIOT Act, and/or other federal securities laws,
constituted additional violations of law for which J.P. Morgan
and its shareholders could be liable if it is proven that J.P.
Morgan condoned or was complicit in avoiding KYC requirements."
(Id. ¶ 37.)

Sharkey maintains that she communicated her complaints
regarding the illegal and/or suspicious activities alleged above
to Kenney, Green and Lassiter over an extended period of time
(id. ¶ 39.), by way of e-mail, telephone calls, telephone
conferences, and in-person meetings. (Id. ¶ 40.)

**The 12(b)(1) & 12(b)(6) Standards**

A case may be dismissed for lack of subject-matter
jurisdiction under Rule 12(b)(1) "when the district court lacks

9

the statutory or constitutional power to adjudicate it."
Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  A
plaintiff bears the burden of proving by a preponderance of the
evidence that jurisdiction exists. Id.; see also Malik v.
Meissner, 82 F.3d 560, 562 (2d Cir. 1996).


        On a motion to dismiss pursuant to Rule 12, all
factual allegations in the complaint are accepted as true, and
all inferences are drawn in favor of the pleader. Mills v. Polar
Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). The issue
"is not whether a plaintiff will ultimately prevail but whether
the claimant is entitled to offer evidence to support the
claims." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378
(2d Cir. 1995) (quoting Scheuer v. Rhodes, 416 U.S. 232, 235-36
(1974)).


        To survive a motion to dismiss pursuant to Rule
12(b)(6), "a complaint must contain sufficient factual matter,
accepted as true, to 'state a claim to relief that is plausible
on its face.'" Ashcroft v. Iqbal, -- U.S. --, 129 S. Ct. 1937,
1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,
570 (2007)). Plaintiffs must allege sufficient facts to "nudge[]
their claims across the line from conceivable to plausible."

Twombly, 550 U.S. at 570. Though the court must accept the factual allegations of a complaint as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555).

## The Court Has Jurisdiction Over the Facts Alleged in the Amended Complaint

"Before an employee can assert a cause of action in federal court under the Sarbanes Oxley Act, the employee must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively." Willis v. Vie Financial Group, Inc., No. 04 Civ. 436, 2004 WL 1774575, at *6 (E.D.Pa. Aug. 6, 2004) (citing 18 U.S.C. § 1514(b)(1)(A)).  "A person who alleges discharge or other discrimination by any person in violation of [Section 806] may seek relief . . . if [OSHA] has not issued a final decision within 180 days of the filing of the complaint and there is no showing that such delay is due to the bad faith of the claimant, [by] bringing an action at law or equity for de novo review in the appropriate district court of the United States . . . ." 18 U.S.C. § 1514A(b)(1)(B). "[A] federal court can only conduct a de novo review of those

11

[SOX whistleblower] claims that have been administratively exhausted." Fraser v. Fiduciary Trust Co. Int'l, No. 04 Civ. 6958, 2005 WL 6328596, at *6 (S.D.N.Y. June 23, 2005) ("Fraser I"); see also Lebron v. Am. Int'l Group, Inc., No. 09 Civ. 4285, 2009 WL 3365039, at *7 (S.D.N.Y. Oct. 19, 2009) ("Under section 1514A, OSHA has exclusive jurisdiction over SOX whistleblower claims for 180 days.").

        According to Defendants, the new factual allegations set forth in Paragraphs 25-36 of the AC deprive the court of jurisdiction, as these facts were not contained in Sharkey's OSHA complaint. For this proposition they cite Fraser I, 2005 WL 6328596, at *6; Trusz v. UBS Realty Investors, LLC, No. 3:09 Civ. 268, 2010 WL 1287148, at *4 (D. Conn. Mar. 30, 2010) ("[A]ll facts raised in a SOX claim in federal court must first be presented to OSHA, so that OSHA can adequately fulfill its statutory and regulatory review obligations."); and Willis v. Vie Fin. Grp., Inc., No. Civ. A. 04-435, 2004 WL 1774575, at *3 (E.D. Pa. Aug. 6, 2004) ("Before an employee can assert a cause of action in federal court under the Sarbanes Oxley Act, the employee must file a complaint with [OSHA] and afford OSHA the opportunity to resolve the allegations administratively."). (Def. Mem. 6-7.)

12

According to Sharkey, the allegations in paragraph 25 of the AC, including all subparts, are simply more detailed recitations of the allegation in paragraph 12 of the OSHA complaint and are an extension or amplification of paragraph 13 of that complaint. (Pl. Mem. in Opp. 13.)  Plaintiff contends that these allegations are reasonably related to the OSHA charges under EEOC precedents and that therefore jurisdiction is not defeated. (Id.)

In Fraser I, upon which Defendants rely, the defendants argued that the court did not have jurisdiction over claims against the individual defendants as well as a distinct claim of retaliation based on protected activity contained within a "confidential memo," because that allegation was not raised before OSHA. Fraser I, 2005 WL 6328596, at *6.  The "confidential memo" claim was a part of the first of plaintiff's four separate instances of alleged protected activity. Id.  In Fraser I, the court found that "[t]he parties have not submitted Plaintiff's original OSHA complaint, and Plaintiff has failed to allege (or persuasively argue) that he has satisfied Section 806's exhaustion requirement with respect to his claims against the Individuals Defendants, or with respect to claims arising

13

out of the Confidential Memo," id., but proceeded to assume
jurisdiction over the remaining portion of the first instance of
protected activity as well as the entirety of the second, third,
and fourth instances. Id. at *7-*9.

       After the plaintiff was granted leave to amend his
complaint to cure deficiencies in his claims in Fraser I,
defendants again moved to dismiss. Accordingly, in Fraser v.
Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310 (S.D.N.Y. 2006)
("Fraser II"), the court had the opportunity to consider the
plaintiff's four instances of alleged protected activity,
including the sub-instance regarding the "confidential memo."
Noting that it now had the opportunity to review the
"confidential memo," the court went on to assume jurisdiction
over the "confidential memo" claim. Id. at 322, 325. The court
thereafter ruled on the substantive legal sufficiency of that
claim, finding that it did "not rise to the level of
whistleblowing and [is] more reflective of [plaintiff's]
complaints that [d]efendants did not follow his investment
advice." Id. at 322, 325. The Fraser court's ultimate
jurisdictional decision, then, supports Plaintiff.

14

In Trusz v. UBS Realty Investors, No. 3:09 Civ. 268,
2010 WL 1287148 (D. Conn. Mar. 30, 2010) and Willis v. Vie Fin.
Grp., Inc., No. Civ.A 04-435, 2004 WL 1774575 (E.D. Pa. Aug. 6,
2004), both cited by the Defendants, the courts were essentially
presented with the question as to whether the SOX exhaustion
requirement "precludes recovery for a discrete act of
retaliation that arose after the filing of the Administrative
Complaint but was never presented to the administrative agency
for investigation." Willis, 2004 WL 1774575, at *1.  In each
case, the plaintiff alleged in his federal action an additional
act of retaliation (termination) after the filing of his OSHA
complaint.  In Willis, the plaintiff failed to amend his
administrative complaint to allege the later claim of
retaliatory termination, and thus he was "precluded from
pursuing his retaliatory termination claim in [Federal] Court,"
but permitted to pursue his claims of retaliation based on an
earlier threat of termination and the loss of job
responsibilities. Id. at *6-7.  Conversely, in Trusz, the
plaintiff filed an amended complaint before OSHA, alleging new
acts of retaliation as well as his termination, which occurred
after the filing of the original OSHA complaint.  Trusz, 2010 WL
1287148, at *3.  The court denied defendants' motion to dismiss
for lack of subject matter jurisdiction because Trusz "waited

15

the requisite 180 days from filing of his initial complaint, and OSHA divested itself of jurisdiction over his claim, Trusz has fulfilled the jurisdictional prerequisites for this Court to hear his federal SOX claim." Trusz, 2010 WL 1287148, at *3-5. In the instant action, there is no adverse employment action that arose after the filing of Plaintiff's OSHA Complaint or was not pled in it that Plaintiff seeks to complain of before this court.

The appropriate inquiry under SOX is not whether every fact forming the basis for the belief that gave rise to a plaintiff's protected activity was previously administratively pled, but whether each separate and distinct claim was pled before the agency.[2]  The cases cited by Defendants act upon the assumption that such is the case.  See Willis, 2004 WL 1774575 (finding claim of "discrete act of retaliation" not pled before OSHA defeats jurisdiction over that claim in federal suit); Trusz, 2010 WL 1287148 (wrongful termination claim pled in amended OSHA complaint creates jurisdiction); Fraser I, 2005 WL 6328596, at *6 (distinct claim of retaliation based upon

---

[2]    To assert a prima facia claim under SOX, a claimant must show that: (i) she engaged in protected activity; (ii) the employer knew of or suspected, actually or constructively, the protected activity; (iii) she suffered an unfavorable personnel action; and (iv) circumstances exist to suggest that the protected activity was a contributing factor to the unfavorable action. 29 C.F.R. § 1980.104(b)(1).

communication in confidential memo).  Defendants cite no
authority holding that jurisdiction is improper over allegations
amplifying the factual basis for an employee's belief that
illegal conduct was occurring in a SOX case or other analogous
context.

Moreover, a refusal by this court to consider the
facts alleged in the AC would be inappropriate as "no particular
form of complaint" is required to trigger a claim before OSHA,
29 C.F.R. § 1980.103(b), and the heightened pleading standards
of this court do not apply to SOX claims filed there.  See
Sylvester v. Paraxel, ARB No. 07-123, ALJ Nos. 2007-SOX-039, -
042, slip op. at 12-13 (May 25, 2011) (en banc) (holding
heightened pleading standards to no apply to SOX claims
initiated with OSHA).[3]

Accordingly, where Plaintiff's claims, including
specific adverse employment actions, protected activity, and the
general nature of the facts that formed Plaintiff's belief in

---

[3]     The Department of Labor has explained that "OSHA believes that it would
be overly restrictive to require a complaint to include detailed analyses
when the purpose of the complaint is to trigger an investigation to determine
whether evidence of discrimination exists."  Department of Labor Rules and
Regulations: Procedures for the Handling of Discrimination Complaints under
Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002,
Title VII of the Sarbanes-Oxley Act of 2002, 29 C.F.R. 1980, 69 Fed. Reg.
52104, 52106 (Aug. 24 2004).

violations of the enumerated statutes giving rise to the

protected activity, were timely presented in her OSHA Complaint,

and where more specific allegations naturally originating from

those assertions have been alleged in the AC in direct response

to this Court's decision to grant Plaintiff leave to do so, the

entirety of the AC is appropriately subject to the jurisdiction

of this Court.[4]

## A Claim Under The Sarbanes-Oxley Whistleblower Provision Has Been Stated

The whistleblower provision of SOX provide, in

relevant part:

> No company with a class of securities registered under
> section 12 of the Securities Exchange Act of 1934 . .
> . or that is required to file reports under section

---

[4]    That jurisdiction is proper here is additionally affirmed by analogy to Title IIV case law, under which failure of this court to consider the additional facts pled in the AC would constitute reversible error.  See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 177-78 (2d Cir. 2005) (reversing lower court for its decision not to consider related adverse employment actions not pled in EEOC charge and noting that the circuit has recognized "'that claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.'" (quoting Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)).  The scope of an action under Title VII has "generally been construed to be limited not to the words of the charge but to the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge of discrimination."  Smith v. Am. President Lines, Ltd., 571 F.2d 102, 108 n.10 (2d Cir. 1978); Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970) ("the specific words of the charge of discrimination [before the EEOC] need not presage with literary exactitude the judicial pleadings which may follow").  Sharkey's additional allegations are encompassed in the scope of the investigation that could reasonably be expected to grow out of her administrative complaint.  Indeed, Plaintiff does not make additional claims before this court, only amplifies factual allegations for claims administratively pled.

18

15(d) of the Securities Exchange Act . . ., or any
officer, employee . . . or agent of such company,
may discharge, demote, suspend, threaten, harass, or in
any other manner discriminate against an employee in
the terms and conditions of employment because of any
lawful act done by the employee – (1) to provide
information, cause information to be provided, or
otherwise assist in any investigation regarding any
conduct which the employee reasonably believes
constitutes a violation of section 1341 [mail fraud],
1343 [wire fraud], 1344 [bank fraud], or 1348
[securities fraud], any rule or regulation of the
Securities and Exchange Commission, or any provision
of Federal law relating to fraud against shareholders,
when the information or assistance is provided to or
the investigation is conducted by -- (C) a person with
supervisory authority over the employee (or such
other person working for the employer who has the
authority to investigate, discover, or terminate
misconduct).

18 U.S.C. § 1514A(a).


    To assert a whistleblower claim under SOX, Sharkey

must show that: (i) she engaged in protected activity; (ii) the

employer knew of the protected activity; (iii) she suffered an

unfavorable personnel action; and (iv) circumstances exist to

suggest that the protected activity was a contributing factor to

the unfavorable action.  See Fraser II, 417 F. Supp. 2d at 322

(quoting Collins v. Beazer Homes USA, Inc., 334 F.Supp.2d 1365,

1375 (N.D. Ga. 2004)).


    Defendants contend that the AC fails to allege which

statute Plaintiff believed the Suspect Client violated, that it

fails to allege protected activity because it does not specify
the illegal conduct Plaintiff allegedly reported to Defendants,
and that J.P. Morgan did not know that Plaintiff engaged in a
protected activity.   The two latter arguments will be addressed
together.

## A. The AC Adequately Alleges Violations of Enumerated SOX Statutes

In order to state a whistleblower claim under SOX,
"[a] plaintiff need not show an actual violation of the law, nor
must a plaintiff cite a particular statute that he believed was
being violated." Mahoney v. Keyspan Corp., No. 04 Civ. 554,
2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) (citing Collins,
334 F. Supp. 2d at 1375); see also Fraser II, 417 F. Supp. 2d at
322 (demonstration of violation of law not necessary).   Instead,
"SOX protects employees who provide information which the
employee 'reasonably believes constitutes a violation' of any
SEC rule or regulation or 'Federal law relating to fraud against
shareholders.'" Fraser II, 417 F. Supp. 2d at 322 (citing 18
U.S.C. § 1514A(a)(1)).

20

In assessing the reasonableness of a plaintiff's belief regarding the illegality of the particular conduct at issue, courts look to the "'basis of knowledge available to a reasonable person in the circumstances with the employee's training and experience.'" Mahoney v. Keyspan Corp., No. 04 Civ. 554, 2007 WL 805813, at *5 (E.D.N.Y. Mar. 12, 2007) (quoting Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8, 2004 DOLSOX LEXIS 65, at *33-34 (Dep't Labor June 15, 2004)).   The legislative history of SOX provides that the reasonableness test "is intended to impose the normal reasonable person standard used and interpreted in a wide variety of legal contexts." Legislative History of Title VII of HR 2673: The Sarbanes-Oxley Act of 2002, 148 CONG. REC. S7418, S7420 (July 26, 2002). "The threshold is intended to include all good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence." Id.

Defendants argue that Plaintiff "lumps together all the enumerated statues from SOX," and thus J.P. Morgan "is left trying to determine which statute could apply." (Def. Mem. 13.) Defendants maintain that "Plaintiff attempts to mask the fact that her allegations do not constitute a claim by alleging in the most conclusory manner that all of Client A's actions caused

21

her to believe that Client A was violating each of the statutes
enumerated in the SOX whistleblower provision and the money
laundering statutes." (Def. Reply Mem. 10.)

However, "[a]ccording to § 1514A, plaintiff is only
required to have reasonably believed that the problem about
which he was complaining constituted 'a violation of . . . [a]
provision of Federal law relating to fraud against
shareholders.'" Smith v. Corning Inc., 496 F. Supp. 2d 244, 248
(W.D.N.Y. 2007) (emphasis in original); see also Welch v. Chao,
536 F.3d 269, 277 (4th Cir. 2008) (noting that the
Administrative Review Board "has squarely held that § 1514A
protects an employee's communications based on a reasonable, but
mistaken, belief that conduct constitutes a securities
violation.") (citing Halloum v. Intel Corp., ARB Case No. 04-
068, 24 IER Cases 50, slip op. at 6 (ARB Jan. 31, 2006); Allen
v. Admin. Review Bd., 514 F.3d 468, 477 (5th Cir. 2008)).

Here, Plaintiff has alleged a myriad of allegations
that when taken together prevent a finding, at this stage, that
Sharkey's belief that Suspect Client was engaged in violations
of the enumerated SOX statutes was unreasonable.

22

These allegations include that Suspect Client had
financial ledgers that did not correspond with the company's
financial statements; that he used unusual or suspicious
identification documents that could not be readily verified;
that he refused to provide complete information about the nature
and purpose of its business, anticipated account activity, prior
banking relationships, the names of its officers and directors,
or information on its business locations, or tax returns; that
funds transfer activities in his accounts were unexplained and
would show unusual patterns; that his accounts received payments
with no apparent links to legitimate contracts, goods, or
services; that unusual transfers of funds would occur among the
Suspect Client's related accounts; that Plaintiff was unable to
obtain from the Suspect Client sufficient information to
positively identify originators, beneficiaries and/or
signatories of his accounts; and that Suspect Client's
transacting businesses would share the same address and
exhibited other address inconsistencies, such as not in fact
maintaining an office where one was listed.  Sharkey also
alleges that Suspect Client would secure loans or margins by
readily marketable assets, which would put J.P. Morgan and its
shareholders at risk if any of those loans or margins defaulted.

23

Sharkey maintains that Suspect Client set up a purported escrow account in the name of a law firm, but would trade securities in and from this account and wire proceeds to personal checking accounts without authorization of the law firm. Under this same account, the Suspect Client purchased several million dollars worth of securities on margin, i.e., on a loan from J.P. Morgan. Plaintiff further alleges that the Suspect Client's attempts to avoid or hinder Plaintiff's efforts to conduct her investigation and comply with KYC requirements, which are mandated by the Bank Secrecy Act, the USA PATRIOT Act, and other federal securities laws, constituted additional violations for which J.P. Morgan and its shareholders could be liable if J.P. Morgan condoned or was complicit in avoiding those KYC requirements. Plaintiff additionally alleges that Suspect Client's businesses dealt in merchandise from Columbia, a nation with which she states J.P. Morgan was not supposed to transact any business.

SOX prohibits an employer from retaliating against an employee who complains about any of the six enumerated categories of misconduct. Sylvester, ARB No. 07-123, slip op. at 19 (citing 18 U.S.C. § 1514A). Here, Plaintiff has surpassed that bar and adequately pled that she formed a reasonable belief

24

that the Suspect Client was engaged in one or more violations of
the SOX enumerated categories of misconduct and, as described
below, that she complained to Defendants about each of these.

### B. The AC Adequately Alleges the Conduct Plaintiff Reported to Defendant J.P. Morgan and That Defendant Knew About Plaintiff's Protected Activity

Defendants maintain that the AC does not specify which
of the allegations in paragraphs 27-36 of the AC, "if any, were
conveyed to which [J.P. Morgan] supervisor or when." (Def. Mem.
10.) Defendants also contend that the AC is not specific enough
to "assess whether Plaintiff's unspecified 'complaints' to [J.P.
Morgan] 'definitively and specifically relate[d] to one of the
six enumerated categories of misconduct contained in SOX §
806.'" (Def. Mem. 11) (quoting Fraser v. Fiduciary Trust Co.
Int'l, No. 04 Civ. 6958 (PAC), 2009 WL 2601389, at *5 (S.D.N.Y.
Aug. 25, 2009) ("Fraser III"). However, a whistleblower "need
not 'cite a code section he believes was violated' in his
communication to his employer, but the employee's communications
must identify the specific conduct that the employee believes to
be illegal." Welch v. Chao, 536 F.3d 269, 276 (4th Cir. 2008)
(citing Fraser II, 417 F. Supp. 2d at 322), cert. denied 129 S.

25

Ct. 1985 (2009); see also Sylvester, ARB No. 07-123, slip op. at
17 (holding that applying the 'definitively and specifically'
standard from case law under the Energy Reorganization Act to
SOX claims is "not only inappropriate, but it also presents a
potential conflict with the express statutory authority of §
1514A, which prohibits a publicly traded company from
discharging or in any other manner discriminating against an
employee for providing information regarding conduct that the
employee 'reasonably believes' constitutes a SOX violation.").
Here, "Plaintiff has properly pled that she engaged in conduct
protected by 18 U.S.C. § 1514A when she repeatedly reported her
concerns regarding the [Suspect] Client's illegal activity to
the Individual Defendants and JPMC's risk and compliance team."
Sharkey, 2011 WL 135026 at *6.

     Plaintiff's communications regarding the Suspect
Client culminated in Sharkey's communication to Defendants on
July 30, 2009 – via her final KYC report – that J.P. Morgan exit
its relationship with the Suspect Client due to the concerns
Sharkey had previously reported.  The prior reports are alleged
in Paragraphs 27-36 of the AC.  These allegations include, as
described more fully above, that the Suspect Client would secure
loans or margins by deposits or other readily marketable assets,

26

such as securities, which in effect would put J.P. Morgan and
its shareholders at risk if any of said loans or margins
defaulted; the Suspect Client was involved in potentially
higher-risk activities, including activities that may be subject
to export/import restrictions; under the several million dollar
purported escrow account, the Suspect Client purchased several
million dollars worth of securities on margin, i.e., on a loan
from J.P. Morgan for which it and its shareholders would bear
the risk. (AC ¶¶ 27.j-27.k, 28-29). By alleging that she
communicated these concerns to Defendants, Sharkey properly
asserts that she informed J.P. Morgan and the Individual
Defendants of the suspected fraudulent and illegal activity
perpetrated by the Suspect Client against the Company. This was
protected activity under SOX.

The authority cited by Defendants is distinguishable.
Fraser III was decided on summary judgment, and thus the court
had a full record and different standards by which to evaluate
the plaintiff's claims. 2009 WL 2601389, at *1. In Fraser II,
two of the plaintiff's whistle-blowing instances were permitted
to proceed to discovery, while those instances which pertained
only to "a complaint that [plaintiff's] advice was not being
followed but contain[ed] no communication from [plaintiff] to

any of the Defendants indicating that [plaintiff] believed the
company to be violating any provision related to fraud on
shareholders" were properly dismissed. 417 F. Supp. 2d at 323.
Unlike in Fraser II, here, all of the communications alleged in
the AC between Plaintiff and Defendants regarded the Suspect
Client and the likelihood that he was in violation of several of
the SOX enumerated statutes, as well as possibility that the
Company's stockholders could be at risk.  Finally, Portes, upon
which Defendants rely, is inapposite given that in that case
"[t]he purported violations involved [a] Consent Decree, FDA
Regulations, EU regulations, and other drug manufacturing
guidelines, not SEC rules or other federal law related to fraud
against shareholders." Portes v. Wyeth Pharms., Inc., No. 06
Civ. 2689, 2007 U.S. Dist. LEXIS 60824, at *4 (S.D.N.Y. Aug. 20,
2007).


        The Defendants further contend that Plaintiff fails to
allege that Defendant J.P. Morgan "knew or should have known
that Plaintiff engaged in such [protected] activity."  (Def.
Mem. 14.)  However, the AC alleges how, when and to whom
Plaintiff reported her concerns of fraudulent and illegal
activity on the part of the Suspect Client. (AC ¶¶ 1, 17, 20,
26, 39, 40-41, 43-44).  This includes Plaintiff's allegations

28

that "[s]tarting in January 2009 . . . [Plaintiff] repeatedly
informed her superiors of the potential unlawful activities of
the Suspect Client" (id. ¶ 1); within days of Plaintiff being
assigned to the Suspect Client's account, "members of J.P.
Morgan's compliance and risk management team contacted Ms.
Sharkey to express their concerns regarding the Suspect Client's
alleged involvement in illegal activities, including allegations
of mail fraud, bank fraud and money laundering" and that
Plaintiff "immediately relayed this information" to Lassiter
(id. ¶ 20); Plaintiff shared her conclusions regarding her
research into and belief that "Suspect Client was engaged in
fraud, money laundering, mail fraud, bank fraud, and/or
violating federal securities laws" with Kenny, Green, and
Lassier (id. ¶ 26); Plaintiff "informed J.P. Morgan's compliance
department of her good fail believe that the Suspect Client was
. . . engaged in fraud, money laundering, bank fraud, mail
fraud, and/or federal securities laws violations" (id. ¶ 43);
and on July 30, 2009 she submitted a Know Your Client audit on
the Suspect Client's account, which Kenny, Green, and Lassiter
received, that recommended that J.P. Morgan terminate its
relationship with the Suspect Client (id. ¶ 1, 44).  Plaintiff
further alleges that prior to submission of that report she
repeatedly "communicated her complaints regarding the illegal

and/or suspicious activities" of the Suspect Client (id. ¶ 39) to Defendants "via email, telephone calls, telephone conferences, and in-person meetings." (id. ¶¶ 40, 44.)

As such, Defendant J.P. Morgan's claim that "Plaintiff still has not provided any detail about what she supposedly reported to [J.P. Morgan] . . . [and that] the Amended Complaint also fails to allege that [J.P. Morgan] knew or should have known about Plaintiff's alleged whistleblowing . . ." is contrary to the facts alleged in the AC. See Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) ("Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement [under Title VII], anything more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity.") (citing Alston v. New York City Transit Auth., 14 F. Supp. 2d 308, 311 (S.D.N.Y. 1998) ("In order to satisfy the second prong of her retaliation claim, plaintiff need not show that individual decision-makers within the NYCTA knew that she had filed . . . [an] EEOC complaint."); Reed v. A.W. Lawrence & Co., 95 F. 3d 1170, 1178 (2d. Cir. 1996) (holding that a plaintiff's complaint to an officer of the company communicated her concerns to the company as a whole)).

30

Accordingly, Plaintiff adequately alleges conduct she reported to Defendants and that Defendants had knowledge of Sharkey's protected activity.

**CONCLUSION**

Based on the conclusions set forth above, Defendants' motion to dismiss is denied.

It is so ordered.

New York, NY
August /7, 2011

_____
ROBERT W. SWEET
U.S.D.J.

31