UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER SHARKEY,

          Plaintiff,

          v.

J.P. MORGAN CHASE & CO., JOE
KENNEY, ADAM GREEN, and LESLIE
LASSITER, in their official and individual
capacities,

          Defendants.

Civil Action No. 10-civ-3824 (RWS)

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................1

FACTS ...............................................................................................................2

ARGUMENT ........................................................................................................11

I.  PLAINTIFF DID NOT ENGAGE IN PROTECTED ACTIVITY BECAUSE
    SHE DID NOT HAVE A REASONABLE BELIEF OF ILLEGAL
    ACTIVITY................................................................................................12

    A.  Plaintiff's Purported Belief that Client A Was Engaging in Illegal
        Activities Was Not Objectively Reasonable.........................................13

    B.  Plaintiff's Purported Belief that Client A Was Engaging in Illegal
        Activities Was Not Subjectively Reasonable .......................................15

II. PLAINTIFF'S STATEMENTS TO JPMC ABOUT CLIENT A WERE NOT
    A CONTRIBUTING FACTOR IN HER TERMINATION...............................16

III. PLAINTIFF WAS TERMINATED FOR DISHONESTY, LOSS OF TRUST
     AND PERFORMANCE PROBLEMS ..........................................................18

CONCLUSION.....................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

<b>Page(s)</b>

<u>C<span style="font-size:smaller">ASES</span></u>:

*Andaya v. Atlas Air, Inc.*,
No. 10 CV 7878, 2012 WL 1871511 (S.D.N.Y. Apr. 30, 2012) ...........................11, 12, 14, 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................11

*Bechtel v. Administrative Review Board, U.S. Dep't of Labor*,
710 F.3d 443 (2d Cir. 2013)......................................................................................11, 16

*Fraser v. Fiduciary Trust Co. Int'l*,
396 F. App'x 734 (2d Cir. 2010) .......................................................................................12

*Fraser v. Fiduciary Trust Co., Int'l*,
No. 04 Civ. 6958 (PAC), 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009),
*aff'd*, 396 F. App'x 734 (2d Cir. 2010)..............................................................................16

*Halloum v. Intel Corp.*,
ARB Case No. 04-068, 2006 WL 618383 (ARB Jan. 31, 2006)........................................18

*Kim v. Boeing Co.*,
487 F. App'x 356 (9th Cir. 2012) ....................................................................................18

*Nielsen v. Aecom Tech. Corp.*,
No. 12 Civ. 5163, 2012 WL 6200613 (S.D.N.Y. Dec. 11, 2012)..............................12, 13, 15

*Pardy v. Gray*,
No. 07 Civ. 6324, 2008 WL 2756331 (S.D.N.Y. July 15, 2008) ....................................16, 18

*Riddle v. First Tenn. Nat'l Bank, N.A.*,
497 F. App'x 588 (6th Cir. 2012) .....................................................................................19

*Sharkey v. J.P. Morgan Chase & Co.*,
10 Civ. 3824, 2011 WL 135026 (S.D.N.Y. Jan. 14, 2011)...............................................10, 12

*Sharkey v. J.P. Morgan Chase & Co.*,
805 F. Supp. 2d 45 (S.D.N.Y. 2011)..............................................................................12, 14

*Vodopia v. Koninklijke Phillips Elecs., N.V.*,
398 F. App'x 659 (2d Cir. 2010) .......................................................................................12

*W. Word Ins. Co. v. Stack Oil, Inc.*,
922 F.2d 118 (2d Cit. 1990)..............................................................................................11

*Weinstock v. Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)...............................................................................11

*Welch v. Chao*,
    536 F.3d 269 (4th Cir. 2008) .........................................................................12

**STATUTES AND RULES:**

18 U.S.C. § 1341 ..............................................................................................12, 14

18 U.S.C. § 1343 ..............................................................................................12, 14

18 U.S.C. § 1344 ..............................................................................................12, 14

18 U.S.C. § 1348 ..............................................................................................12, 14

18 U.S.C. § 1514A ............................................................................................ *passim*

18 U.S.C. § 1514A(a)(1)...................................................................................14, 15

Fed. R. Civ. P. 56 ....................................................................................................1

Fed. R. Civ. P. 56(a) .............................................................................................11

Defendants J.P. Morgan Chase & Co. ("JPMC"), Joe Kenney, Adam Green and Leslie Lassiter (collectively with JPMC, the "Defendants") submit this Memorandum of Law in Support of their Motion for Summary Judgment, pursuant to Fed. R. Civ. P. 56, on the remaining claim of Plaintiff Jennifer Sharkey ("Plaintiff").

## PRELIMINARY STATEMENT

Plaintiff's First Amended Complaint ("Amended Complaint") contains a single claim for an alleged violation of the whistleblower provision of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"). Plaintiff claims she blew the whistle on a JPMC client ("Client A"), for which JPMC retaliated by terminating Plaintiff's employment. But, after ten depositions and thousands of pages of document discovery, the record could not be more clear: there has been no violation of SOX and Plaintiff was a poor performer who ultimately was terminated for lying to her supervisor.

First, Plaintiff did not engage in protected activity because, on the undisputed material facts, Plaintiff's purported belief that Client A was violating one of the enumerated SOX statutes (mail fraud, wire fraud, bank fraud or securities fraud), or any other federal law concerning fraud against shareholders, was not objectively or subjectively reasonable.

Second, Plaintiff's alleged protected activity was not a contributing factor in JPMC's decision to terminate Plaintiff's employment. The JPMC employees who decided to terminate Plaintiff testified that they reached that decision because Plaintiff was an underperforming employee who lied to her supervisor. On the undisputed record, Client A or Plaintiff's views of Client A never entered the discussions leading to Plaintiff's termination.

Third, even if Plaintiff could satisfy all elements of a SOX claim (which she cannot), on the undisputed material facts, JPMC terminated Plaintiff for dishonesty and because her supervisor

had lost trust and confidence in Plaintiff.  Under JPMC's Corrective Action Policy, dishonesty is grounds for immediate termination, and it was JPMC's prerogative to follow that policy. Plaintiff's misconduct was completely separate and apart from any alleged whistleblowing.

## FACTS

The facts set forth are undisputed, as set forth in *Defendants' Statement of Undisputed Material Facts Regarding Plaintiff's Claims Pursuant to Local Rule 56.1* ("*Stmt.*").

### The Parties

Plaintiff was a Private Wealth Manager in JPMC's Private Wealth Management ("PWM") line of business from the spring of 2008 through August 5, 2009.  *Stmt.* ¶ 1.  In the spring of 2008, Ms. Lassiter became Plaintiff's supervisor and the head of the New York PWM business.  *Id.* at ¶ 2.  At all relevant times, Mr. Green was the PWM Northeast Regional Director and Mr. Kenney was the Chief Executive Officer of PWM.  *Id.* at ¶¶ 3-4.

Plaintiff, prior to her employment at JPMC, had been in the banking industry for eleven years, and had been previously employed by Citigroup and First Republic Bank.  *Id.* at ¶ 1.  During her tenure at those banks, she had received training on the Know Your Client ("KYC") process, completing due diligence and looking for suspicious account activity.  *Id.*

### The KYC Process and Client A

Client A is a client of JPMC engaged in multiple businesses.  *Id.* at ¶ 7.  In early 2009, Plaintiff was assigned to be the Private Wealth Manager for Client A.  *Id.* at ¶ 8.

As a Private Wealth Manager, one of Plaintiff's responsibilities was, for each client, to oversee and complete the KYC due diligence process and associated forms.  *Id.* at ¶ 5.  This process is used, in part, to identify potential "high risk factors" associated with JPMC clients.  *Id.* at ¶ 6.

2

The KYC process for Client A had already begun when Plaintiff was assigned Client A in early 2009.  *Id.* at ¶ 9.  Prior to Plaintiff's involvement with Client A, the JPMC Risk Department had identified potential risk factors related to the client.  *Id.* at ¶¶ 9-10.  In April 2009, Kathie Gruszczyk, a JPMC Risk Manager, sent Plaintiff a memorandum summarizing these potential risks for Plaintiff's follow-up.  *Id.* at ¶ 10.  Most of the information in that memorandum was collected by the Risk Department before Plaintiff was ever assigned to Client A.  *Id.* at ¶ 9.  Plaintiff testified that, to her, the most significant information in the memorandum was the following:

- Client A and his businesses had 50 bank accounts, some of which had zero balances;

- Client A was in the diamond and prepaid calling card businesses;

- Corporate documents for some of Client A's businesses were not in JPMC's files;

- No records for one Client A entity were found during a background check performed in 2007;

- One of Client A's businesses was incorporated in Israel;

- Client A had made requests to wire money from Colombia;

- Client A had not provided all documentation requested by prior bankers; and

- Client A had been involved in businesses that went bankrupt in the mid-1990s.

*Id.* at ¶ 11.  She also testified that the following additional information contributed to her belief regarding Client A:

- Client A executed trades in an escrow account owned by a law firm (the "Ostrager Account") and Plaintiff was unable to corroborate Client A's statement that he was authorized to trade in that account;

- Client A failed to provide all documents requested by Plaintiff; and

- Plaintiff was unable to confirm addresses for some Client A businesses.

*Id.*

### **The Ostrager Account**

In the course of the KYC process, Plaintiff learned that Client A had been executing trades in an escrow account, the Ostrager Account, at JPMC that was owned by a law firm (the "Ostrager Firm").  *Id.* at ¶¶ 12-13.  The Ostrager Firm represented and still represents Client A in multiple litigations concerning the infringement of patents owned by Client A.  *Id.* at ¶ 12.  The Ostrager Firm deposited proceeds from those litigations into the escrow account.  *Id.*  There is no dispute in this case that the Ostrager Firm authorized Client A to enter into trades with funds from the escrow account.  When Plaintiff brought Client A's trading in that account to Ms. Lassiter's attention, Ms. Lassiter told Plaintiff "to find out . . . what were the reasons for it, and to make sure we had appropriate documentation."  *Id.* at ¶ 13.  Plaintiff could not locate a written authorization, but she asked Client A if he was authorized to trade in the account.  *Id.* at ¶ 14.  Client A explained to Plaintiff that the funds in the escrow account were proceeds from patent litigations, and that the Ostrager Firm had authorized him to trade in the account.  *Id.*  Plaintiff attempted to contact the Ostrager Firm to confirm such authorization.  *Id.* at ¶ 15.  She then was told to contact a specific individual at the firm.  *Id.*  She did not reach him, but left a couple of messages and could not recall if she sent an email to him as well.  *Id.*  After Plaintiff was terminated, JPMC had no trouble confirming with the Ostrager Firm that Client A was authorized to trade in the escrow account; and JPMC employees located the written authorization in JPMC's files that Plaintiff contended she could not find.  *Id.* at ¶¶ 25-26.

In addition, Plaintiff contends that she asked Client A to provide certain corporate documentation and information required by the KYC process, and that Client A produced some,

but not all, of that information.  *Id.* at ¶ 20.  Plaintiff cannot, however, identify what information Client A had not produced.  Again, after Plaintiff was terminated, JPMC had no trouble obtaining KYC information from Client A.  *Id.* at ¶ 25.

**Plaintiff's Purported Concerns about Client A and Her Recommendation to Exit**

Based on the above information about Client A, Plaintiff claims she became concerned that Client A was possibly engaging in illegal activity, and voiced those concerns to her supervisor Ms. Lassiter and to Ms. Gruszczyk in the JPMC Risk Department.  *Id.* at ¶ 16.  Plaintiff also began to suggest to Ms. Lassiter that the PWM Department at JPMC exit its relationship with Client A.  *Id.* When Ms. Lassiter asked Plaintiff for the reasons, she responded primarily by saying that Client A was in the gem business, he was Israeli, he had not provided all KYC information, he had multiple bank accounts and he was trading in the Ostrager Firm account.  *Id.* at ¶ 16.  Ms. Lassiter urged Plaintiff to obtain the missing KYC information and confirmation from the Ostrager Firm, and told her that more information was necessary, given that the other facts, without further specifics, were insufficient to exit a client.  *Id.* at ¶ 17.

Ms. Lassiter and the Risk Department repeatedly urged Plaintiff to complete her KYCs, including the ones for Client A.  *Id.* at ¶ 18.  Plaintiff was one of the worst performers under Ms. Lassiter's supervision with regard to completing KYC forms in a timely manner.  *Id.*

**Plaintiff's Written Recommendation Regarding Client A**

Ms. Lassiter asked Plaintiff to put in writing by the end of July 2009 any concerns she had about Client A and her recommended course of action.  *Id.* at ¶ 19.  On July 24, 2009, Plaintiff sent an email to Ms. Gruszczyk, Ms. Lassiter and three others (but not Mr. Green or Mr. Kenney), stating that the information collected felt "uncomfortable regarding the [Client A] family relations and the nature of its businesses as well as its related entities," and that she had not received "all

documentation and identification needed to satisfy our standard Know Your Client requirements." *Id.* at ¶ 20.  Plaintiff recommended "that we discuss a simple way to detach the relationship from the PWM metro business." *Id.*  Plaintiff did not recommend that all lines of business at JPMC sever their relationships with Client A.  *Id.*  To the contrary, Plaintiff emphasized that other lines of business might want to continue doing business with Client A:  "I want to be mindful of the fact that other LOB's [lines of business] within the firm have relationships with this client and/or its related entities and may wish to retain some or all of their business." *Id.*  Moreover, Plaintiff did not mention any illegal conduct or specific unlawful activity in which she suspected Client A might be engaged.  *Id.*

After receiving that email, Ms. Lassiter and Ms. Gruszczyk discussed it with Plaintiff.  *Id.* at ¶ 21.  Ms. Lassiter agreed to terminate JPMC's relationship with Client A in reliance on Plaintiff's representation that Client A had not provided all KYC documentation that Plaintiff claimed she requested.  *Id.*  Ms. Gruszczyk later sent Plaintiff sample letters used by JPMC to exit client relationships.  *Id.* at ¶ 22.

JPMC never exited its relationship with Client A because, after JPMC terminated Plaintiff, JPMC learned that Plaintiff had not informed Client A that KYC documents were still outstanding. *Id.* at ¶ 24.  Client A was surprised to learn that JPMC believed Client A still owed KYC documents to the bank.  *Id.*  Promptly after learning that documentation was missing, Client A provided all information necessary to complete the KYC process.  *Id.* at ¶ 25.  Given that the documentation issues noted by Plaintiff in her July email had been resolved, Ms. Lassiter reversed the decision to exit the client.  *Id.* at ¶ 27.  Client A remains a client of JPMC today.  *Id.* at ¶ 7.

**Plaintiff's Performance Problems**

Private Wealth Managers are expected to understand JPMC's array of financial products, generate new business for JPMC, and complete the KYC process for new and existing clients. *Id.* at ¶¶ 5-6.  Less than a year after Plaintiff became a Private Wealth Manager, her supervisors began noting issues with her performance. *Id.* at ¶ 28.  For example, Mr. Green was concerned about Plaintiff's insufficient knowledge and understanding of various JPMC financial products, as well as the informal nature of her interactions with clients. *Id.*  During the 2009 mid-year talent review of the hundreds of employees within PWM, Mr. Green placed Plaintiff on a "watch list," consisting of "a list of people who were struggling." *Id.* at ¶ 30.  Additionally, during that talent review, Mr. Green recalled being concerned about Plaintiff's continued failure

> to demonstrate a sufficient grasp of our investments product set or skill to communicate that well with clients and prospects.  She had shown sloppy work.  She continued to, in the case of some client relationships, approach[] them in an overly casual way, which we thought resulted in those relationships developing less quickly or well than we hoped. And she had exercised poor judgment . . . [in] her selection of an invitee to a client event.

*Id.* at ¶ 28.

Mr. Kenney too was concerned about Plaintiff's invitation of a non-JPMC mortgage broker to a major JPMC-hosted client event. *Id.*  By bringing a mortgage broker to the event, Mr. Kenney believed Plaintiff exercised poor judgment, given that JPMC is

> already in the mortgage business, and bringing somebody in that stands between us and our clients is something that doesn't make sense at all, because we do mortgages, we're one of the best out there at doing it, and bringing in a mortgage broker to then either go shop it or just step in between, trying to get paid for us doing business with our normal clients doesn't make any sense whatsoever.

*Id.*  While Mr. Green and Mr. Kenney were prepared to consider Plaintiff's termination during the mid-year talent review, Ms. Lassiter "was in favor of more time to evaluate. . . . She was generally more supportive and more optimistic about [Plaintiff]'s potential than" Mr. Green or Mr. Kenney. *Id.* at ¶ 31.

Plaintiff also was unable to pass the Series 7 exam on her first two attempts despite repeated discussions with Ms. Lassiter on the topic.  *Id.* at ¶ 28.  Ms. Lassiter found that Plaintiff failed to perform adequate KYC due diligence and possessed a casual attitude toward her job responsibilities, her KYCs in general, and her approach to the Client A KYC specifically.  *Id.* Moreover, Ms. Lassiter was concerned that Plaintiff's revenue generation over-estimated her efforts in developing business, and was distressed by the lack of confidence Plaintiff's fellow co-workers had in her efforts, especially in Plaintiff's ability to follow-up with clients.  *Id.*

In April and May 2009, Ms. Lassiter had at least two meetings with Plaintiff to discuss these performance issues.  *Id.* at ¶ 29.  During one of those meetings, Ms. Lassiter asked Plaintiff to work on these issues with the hope that Plaintiff would remedy them with the assistance of Ms. Lassiter.  *Id.*

**Plaintiff's Termination**

The event that immediately precipitated Plaintiff's termination concerned Plaintiff's dishonesty to Ms. Lassiter over a client issue, which arose shortly after the mid-year talent review. In late July 2009, the office manager of a significant PWM client ("Manager T") contacted Ms. Lassiter.  *Id.* at ¶ 32.  Manager T complained to Ms. Lassiter that she had been unable to contact Plaintiff and that Plaintiff had not returned her calls, going so far as to refer to Plaintiff as a "phantom."  *Id.*

Obviously concerned that a client was unhappy, Ms. Lassiter described the conversation to Plaintiff and asked Plaintiff whether she had returned Manager T's calls. *Id.* at ¶ 33. Plaintiff responded that she had in fact returned Manager T's calls. *Id.* Believing Plaintiff, Ms. Lassiter called Manager T, who was vehement that she had never spoken to Plaintiff. *Id.* at ¶ 34. After her second conversation with Manager T, Ms. Lassiter asked Plaintiff again whether she had spoken with Manager T. *Id.* at ¶ 35. Plaintiff again said that she had. *Id.* But when Ms. Lassiter pressed Plaintiff, she finally admitted that she had *not* returned Manager T's calls. *Id.* at ¶ 36. Thus, Plaintiff admitted she had lied to Ms. Lassiter about this incident, creating an embarrassing situation with an important client, and causing Ms. Lassiter to further lose trust and confidence in Plaintiff. *Id.* at ¶¶ 37, 41.

Ms. Lassiter, upset that Plaintiff had lied to her, called Steven Grande, the Human Resources manager responsible for the northeast region's PWM business. *Id.* at ¶ 37. She informed Mr. Grande of the Manager T incident. *Id.* Mr. Grande advised Ms. Lassiter that, under JPMC's written personnel policy, dishonesty was grounds for termination. *Id.* at ¶ 38.

Following their conversation, Mr. Grande consulted with his supervisor Lee Gatten, as well as Linda Padilla in JPMC's Employee Relations Group, and Mr. Green. *Id.* at ¶ 39. He also engaged in further discussions with Ms. Lassiter. *Id.* This group collectively decided that Plaintiff's conduct merited termination. *Id.* at ¶ 41. During their conversations, neither Client A nor any concerns Plaintiff had expressed about Client A in the past were mentioned. *Id.* at ¶ 40. The discussion concerned only whether, in light of Plaintiff's dishonesty and past performance problems, her employment should be terminated. *Id.* at ¶ 41. According to Ms. Lassiter, Plaintiff's final act of dishonesty "was the straw that broke the camel's back. That there had been

issues before, and now she had been untruthful, and I just didn't see how we could move forward." *Id.* at ¶ 41.

On August 5, 2009, Ms. Lassiter informed Plaintiff of her termination for lack of judgment, JPMC's loss of confidence in her, and her untruthfulness related to the Manager T incident. *Id.* at ¶ 42. Mr. Grande had a similar conversation with Plaintiff. *Id.* During these conversations, Plaintiff did not mention Client A or the KYC process. *Id.* at ¶ 43. Nor did she deny that she had lied to Ms. Lassiter. *Id.*

**OSHA and Federal Court Proceedings**

On October 22, 2009, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor. On April 12, 2010, after a full investigation—including document production and witness interviews—OSHA issued preliminary findings and an order dismissing the complaint because "Complainant did not engage in protected activity under SOX."[1]

On May 10, 2010, Plaintiff filed her original Complaint in this Court alleging violations of the SOX whistleblower statute and breach of contract.[2] In an Opinion dated January 14, 2011, this Court dismissed the whistleblower claim, finding that "Sharkey has not identified the allegedly illegal conduct that forms the basis of her whistleblower complaint." *Sharkey v. J.P. Morgan Chase & Co.*, 10 Civ. 3824, 2011 WL 135026, at *8 (S.D.N.Y. Jan. 14, 2011) ("*Sharkey I*"). The Court also dismissed the breach of contract claim. *Id.* at *10. On February 3, 2011, Plaintiff filed her Amended Complaint. *See* Schissel Decl. Ex. A. Now, after ten depositions and thousands of

---

[1]   OSHA Order (Apr. 12, 2010) (Ex. AA to the Declaration of Michael D. Schissel, dated August 12, 2013 ("Schissel Decl.")).

[2]   Dkt. Entry #1.

pages of document discovery, Plaintiff's allegations of whistleblowing have, once again, failed to materialize.

## ARGUMENT

Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A court may construe the facts and inferences in favor of the party opposing the motion, but mere speculation and conjecture are insufficient to preclude granting the motion.  *See W. Word Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990).  "Unsupported allegations do not create a material issue of fact."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).  Moreover, "[t]he mere existence of a scintilla of evidence in support of the nonmoving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for" Plaintiff.  *Andaya v. Atlas Air, Inc.*, No. 10 CV 7878, 2012 WL 1871511, at *2 (S.D.N.Y. Apr. 30, 2012).

Here, Plaintiff has alleged a claim of retaliation in violation of SOX.  *See* Amended Complaint at ¶¶ 60-62.  To succeed, she "must prove by a preponderance of the evidence that (1) [she] engaged in a protected activity; (2) [JPMC] knew that [she] engaged in the protected activity; (3) [she] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.  If [she] proves these four elements, [JPMC] may rebut this prima facie case with clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of the protected behavior."  *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 451 (2d Cir. 2013) (citations omitted).

On the undisputed material facts here, (1) Plaintiff did not engage in protected activity because Plaintiff did not reasonably believe that Client A was violating one of SOX's enumerated statutes, (2) Plaintiff's comments about Client A were not a contributing factor in JPMC's decision to terminate Plaintiff and (3) JPMC would have terminated Plaintiff in the absence of her alleged protected activity, in view of her performance problems and dishonesty toward Ms. Lassiter.

## I.   PLAINTIFF DID NOT ENGAGE IN PROTECTED ACTIVITY BECAUSE SHE DID NOT HAVE A REASONABLE BELIEF OF ILLEGAL ACTIVITY

To constitute "protected activity" under SOX, Plaintiff must have communicated to JPMC a "reasonable belief" that Client A was engaged in illegal activity; namely, a violation of one of the enumerated statutes in SOX.  *See Vodopia v. Koninklijke Phillips Elecs., N.V.*, 398 F. App'x 659, 662-63 (2d Cir. 2010) ("Section 1514A defines protected activity to include the provision of information regarding conduct the employee 'reasonably believes constitutes' a violation of: (1) 18 U.S.C. §§ 1341, 1343, 1344, or 1348; (2) 'any rule or regulation of the [SEC],' or (3) 'any provision of Federal law relating to fraud against shareholders.'"); *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp. 2d 45, 55 (S.D.N.Y. 2011) ("*Sharkey II*").  Plaintiff's belief must be both objectively and subjectively reasonable.  *Fraser v. Fiduciary Trust Co. Int'l*, 396 F. App'x 734, 735 (2d Cir. 2010); *Andaya*, 2012 WL 1871551, at *3.  In other words, "[Plaintiff] must show both that [s]he actually believed the conduct complained of constituted a violation of pertinent law and that a reasonable person in [her] position would have believed that the conduct constituted a violation."  *Welch v. Chao*, 536 F.3d 269, 278 n. 4 (4th Cir. 2008); *Nielsen v. Aecom Tech. Corp.*, No. 12 Civ. 5163, 2012 WL 6200613, at *5 (S.D.N.Y. Dec. 11, 2012).

A.     **Plaintiff's Purported Belief that Client A Was Engaging in Illegal Activities Was Not Objectively Reasonable**

To determine whether an employee's belief is objectively reasonable, the Court must "look to the bases of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." *Sharkey I*, 2011 WL 135026, at *6. "To have an objectively reasonable belief that there has been [a violation of an enumerated statute], the complaining employee's theory of such [violation] must at least approximate the basic elements of a claim of [a violation of the statute]." *Nielsen*, 2012 WL 6200613, at *6.

On the record in this case—including testimony from Plaintiff elicited by her own counsel—Plaintiff's belief that Client A was violating an enumerated statute was based entirely on the following:

- The information JPMC's Risk Department provided to Plaintiff in April 2009 when Plaintiff first took over the Client A account:

  - Client A and his businesses had 50 bank accounts, some of which had zero balances;

  - Client A was in the diamond and prepaid calling card businesses;

  - Corporate documents for some of Client A's businesses were not in JPMC's files;

  - No records for one Client A entity were found during a background check performed in 2007;

  - One of Client A's businesses was incorporated in Israel;

  - Client A had made requests to wire money from Colombia;

  - Client A had not provided all documentation requested by prior bankers; and

  - Client A had been involved in businesses that went bankrupt in the mid-1990s;

- Client A was trading in the Ostrager Firm's escrow account, Client A told Plaintiff he had authorization, and Plaintiff failed

> to contact the correct person at the Ostrager Firm to confirm such authorization;
>
> - Client A did not provide all documents Plaintiff requested; and
>
> - Plaintiff was unable to confirm addresses for some of Client A's businesses.

*See Stmt.* at ¶¶ 11; 14-15.

It is not objectively reasonable that Plaintiff believed any of these facts (either separately or together) constituted a violation of an enumerated statute.  The enumerated statutes in SOX consist of mail fraud, wire fraud, bank fraud and any "Federal law relating to fraud against shareholders." 18 U.S.C. § 1514A(a)(1); *Sharkey II*, 805 F. Supp. 2d at 55.  Mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344) and securities fraud (18 U.S.C. § 1348) all require a "scheme or artifice to defraud."  Securities fraud further requires fraud in connection with the purchase or sale of publicly traded securities.

None of the facts on which Plaintiff relied suggest a scheme or artifice to defraud, nor do they suggest any fraudulent intent.  *See Andaya*, 2012 WL 1871511, at *4 ("What is missing from these allegations is criminal conduct, shareholder fraud, or fraudulent intent").  Instead, the opposite is true.  When Plaintiff asked Client A if he was authorized to trade in the Ostrager Firm's escrow account, he explained that the funds were proceeds from his patent litigations, and that the Ostrager Firm had authorized him to trade in that account.  *See Stmt.* at ¶ 14.  Moreover, missing documentation, multiple bank accounts and wire transfers to Colombia cannot, in and of themselves, provide a reasonable basis for allegations of fraud.  Finally, and most importantly, Plaintiff *still* has not indicated who she thought was being defrauded by Client A, and she has never identified the nature of the supposed fraud.

The recent decision in *Andaya* is instructive here.  2012 WL 1871511.  In that case, a Project Manager claimed that he believed that employees' discussions about the company's stock price implicated shareholder fraud or violations of the securities laws.  While the court "credit[ed] that plaintiff may have believed such actions . . . implicated the securities law[,]" the court held that "[s]uch belief . . . was not reasonable."  *Id.* at *5.  Similarly, in *Nielsen*, the court held that a Fire Engineering Manager's statement that a direct report erroneously approved numerous fire safety designs, did not constitute protected activity, even though the manager claimed he believed the conduct constituted shareholder fraud, mail fraud and wire fraud.  2012 WL 6200613.  The court found that "an 'objectively reasonable' employee could not believe that plaintiff's communications 'directly and specifically' related to any of the enumerated federal laws in 18 U.S.C. § 1514A(a)(1)."  *Id.* at *6.

Here, as in those cases, it is simply not reasonable for a Private Wealth Manager with Plaintiff's training and experience to believe that Client A was engaged in fraudulent activity, based on the facts known to Plaintiff at the time of her alleged reporting.  Thus, as a matter of law, Plaintiff's belief was not objectively reasonable.

### B.  Plaintiff's Purported Belief that Client A Was Engaging in Illegal Activities Was Not Subjectively Reasonable

In addition to not being objectively reasonable, Plaintiff's belief that Client A was engaged in some type of fraud was not *subjectively* reasonable.  First, as noted above, Plaintiff cannot identify—and has never identified—what fraud she reasonably believed was being perpetrated by Client A.

Second, when Plaintiff reported her alleged belief to her supervisor, she did not state that she believed Client A was engaged in anything illegal, nor did she advocate, or even suggest, that

JPMC, in its entirety, should stop doing business with Client A.  Instead, Plaintiff simply stated that the information she had collected felt "uncomfortable regarding the [Client A] family relationship and the nature of its businesses as well as its related entities" and recommended "that we discuss a simple way to detach the relationship from the *PWM metro business*."  *Stmt.* at ¶ 20 (emphasis added).  Notably, Plaintiff went on to say:  "I want to be mindful of the fact that other LOB's [lines of business] within the firm have relationships with this client and/or related entities *and may wish to retain some or all of their business*."  *Id.* (emphasis added).  It is simply not realistic that had Plaintiff, a Private Wealth Manager with 11 years of experience in the financial services industry, believed a client was engaging in fraud, she would have stated to her supervisor that other lines of business might wish to retain Client A's business.  *See Fraser v. Fiduciary Trust Co., Int'l*, No. 04 Civ. 6958 (PAC), 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009) (in granting summary judgment for employer, court noted that employee's three-month delay between drafting and sending email complaining of activity "casts doubt on [his] subjective belief that the [complained-of-activity] constituted a violation."), *aff'd*, 396 F. App'x 734 (2d Cir. 2010).

Despite Plaintiff's claims to the contrary, the record demonstrates that Plaintiff did not possess a subjectively reasonable belief that Client A was engaged in fraudulent activities.

## II.   PLAINTIFF'S STATEMENTS TO JPMC ABOUT CLIENT A WERE NOT A CONTRIBUTING FACTOR IN HER TERMINATION

To establish a SOX whistleblower claim, Plaintiff must prove that her alleged protected activity—statements to JPMC about Client A—contributed to her termination. *See Bechtel*, 710 F.3d at 451; *Pardy v. Gray*, No. 07 Civ. 6324, 2008 WL 2756331, at *5 (S.D.N.Y. July 15, 2008) ("'[A] contributing factor' means any factor which, alone or in connection with other factors[,]

tends to affect in any way the outcome of the decision.").  On the record here, Plaintiff cannot meet that burden.

As set forth above at pages 8-10, several people were involved in the decision to terminate Plaintiff:  in particular, Ms. Lassiter, Mr. Green and Mr. Grande.  All of them were deposed.  All of them testified that Client A was never mentioned in the discussions about whether to terminate Plaintiff.  They testified that Plaintiff was terminated for lying to her immediate supervisor, following a history of performance-related problems.

Further confirming that Plaintiff's statements about Client A had nothing to do with her termination, as of August 5, 2009 (when Plaintiff was terminated), JPMC was taking steps to follow through on its decision to exit Client A.  *See Stmt.* at ¶¶ 22-23.  JPMC reversed that decision only after learning that Plaintiff had been untruthful about attempting to obtain the outstanding KYC documents. *See id.* at ¶¶ 24-27.

Plaintiff knew exactly why she was being terminated and never challenged the reason.  It is undisputed that she *never* mentioned Client A in conjunction with her termination on August 5, 2009, even in her conversation with Mr. Grande, a Human Resources employee uninvolved in the KYC process.  *See Stmt.* at ¶ 43.  She understood she was being terminated for lying to her supervisor.  *See id.*  Moreover, prior to her termination, Plaintiff's recommendation to detach the Client A relationship from JPMC's PWM business was *supported* and expanded by Ms. Lassiter.  There is no dispute that steps were already being taken to exit the relationship when Plaintiff was terminated for her dishonesty.

Plaintiff has not, and cannot, show that her work on Client A *in any way* contributed to her termination.  For this reason, her claim must be dismissed.

### III.   PLAINTIFF WAS TERMINATED FOR DISHONESTY, LOSS OF TRUST AND PERFORMANCE PROBLEMS

Even if Plaintiff was able to establish a *prima facie* case for whistleblowing (and she cannot), on the undisputed record, JPMC terminated Plaintiff for reasons unrelated to her alleged protected activity:  namely, she was an underperforming employee who lied to her supervisor, Ms. Lassiter.  *See Halloum v. Intel Corp.*, ARB Case No. 04-068, 2006 WL 618383, at *6 (ARB Jan. 31, 2006) (finding that although employee proved all four elements of whistleblower claim, employer "demonstrated that [employee] did not integrate himself into [employer's] workforce and that he failed to perform up to expectations.  These were sufficient, non-discriminatory reasons to seek his termination as an employee.  The record also indicates that [employer] could have fired [employee] immediately after learning that he had surreptitiously recorded conversations with employees." (citations omitted)).

Here, once it was established that Plaintiff lied, Ms. Lassiter, along with her supervisors, members of JPMC's Human Resources Department and individuals in the Employee Relations Department, determined that the appropriate response was termination.  Dishonesty is grounds for immediate termination under JPMC's personnel policies and it was JPMC's prerogative to terminate Plaintiff for such misconduct, and therefore summary judgment should be granted.  *See, e.g., Pardy*, 2008 WL 2756331, at *6 (granting employer's summary judgment motion where employer proved by clear and convincing evidence that employee was terminated for reasons separate from alleged protected activity); *see also Kim v. Boeing Co.*, 487 F. App'x 356, 357 (9th Cir. 2012) ("Because [employer] presented clear and convincing evidence of its belief that [employee] had been insubordinate and was subject to discharge on that basis we need not reach the question of whether [employee] made out a *prima facie* case.  Although [plaintiff] denied he

was insubordinate, he presented no evidence giving a materially different account of his conduct."); *Riddle v. First Tenn. Nat'l Bank, N.A.*, 497 F. App'x 588, 596 (6th Cir. 2012) ("Absent intentional discrimination, this Court cannot sit as a super personnel department [] to second guess an employer's facially legitimate business decisions.   Clearly, [employer] decided to end [plaintiff]'s employment only after he repeatedly exercised questionable judgment, the incidences of which are well-documented." (citation and quotation omitted)).

The termination decision had nothing to do with Plaintiff's alleged protected activity. None of the discussions about Plaintiff's termination made any reference to Client A or Plaintiff's complaints about Client A.   And, at the time Plaintiff was terminated, Ms. Lassiter *agreed with* Plaintiff to terminate JPMC's relationship with Client A based on a lack of KYC documentation.

For these reasons, JPMC has proven by clear and convincing evidence that Plaintiff was terminated for reasons separate from her alleged protected activity, and her claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment in Defendants' favor dismissing Plaintiff's claim in its entirety.

Dated: New York, New York
        August 12, 2013

ARNOLD & PORTER LLP

By:     /s/ Michael D. Schissel
        Michael D. Schissel
        399 Park Avenue
        New York, NY  10022-4690
        Tel: 212.715.1000
        Fax: 212.715.1399
        michael.schissel@aporter.com
        *Attorneys for Defendants*