UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER SHARKEY,

               Plaintiff,

               v.

J.P. MORGAN CHASE & CO., JOE
KENNEY, ADAM GREEN, and LESLIE
LASSITER, in their official and individual
capacities,

               Defendants.

Civil Action No. 10-civ-3824 (RWS)

---

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, defendants J.P. Morgan Chase & Co. ("JPMC"), Joe Kenney, Adam Green and Leslie Lassiter respectfully submit this statement of undisputed material facts in support of their motion for summary judgment on Plaintiff's claim for alleged violation of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, asserted in her First Amended Complaint ("AC").

**The Parties**

1.      Plaintiff was employed as a Private Wealth Manager in JPMC's Private Wealth Management ("PWM") division from the spring of 2008 until she was terminated on August 5, 2009.  AC ¶ 9 (Ex. A to the Declaration of Michael Schissel, dated August 12, 2013 ("Schissel Decl.")); Lassiter Dep. Tr. 85 (Schissel Decl. Ex. D).  Prior to her employment at JPMC, Plaintiff had been in the banking industry for 11 years and had been employed at Citibank and First Republic Bank, where she had received training on due diligence procedures, the Know Your Client ("KYC") process, identifying suspicious account activity and reviewing information provided by clients.  Sharkey Dep. Tr. 17-20 (Schissel Decl. Ex. B); Defendant's Ex. 1 (Schissel Decl. Ex. C).

2.      In the spring of 2008, Defendant Leslie Lassiter became the head of the PWM unit in which Plaintiff was employed.  AC ¶ 14 (Schissel Decl. Ex. A); Sharkey Dep. Tr. 22 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 8 (Schissel Decl. Ex. D).  At all relevant times, Plaintiff reported directly to Ms. Lassiter.

3.      Ms. Lassiter reported to Defendant Adam Green, then the head of the Northeast Region of PWM.  AC ¶ 13 (Schissel Decl. Ex. A); Green Dep. Tr. 13 (Schissel Decl. Ex. E).

4.      Mr. Green reported to Defendant Joseph (Joe) Kenney, then the Chief Executive

Officer of PWM.  AC ¶ 12 (Schissel Decl. Ex. A); Green Dep. Tr. 13 (Schissel Decl. Ex. E);

Kenney Dep. Tr. 15 (Schissel Decl. Ex. F).

**Private Wealth Managers**

5.      As a Private Wealth Manager, Plaintiff's responsibilities included understanding

JPMC's various financial products, generating new business and managing existing clients.

Sharkey Dep. Tr. 26 (Schissel Decl. Ex. B); Green Dep. Tr. 25-26 (Schissel Decl. Ex. E).

Private Wealth Managers also oversee and complete KYC due diligence and associated forms for

each of their clients.  Sharkey Dep. Tr. 26-28 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 84

(Schissel Decl. Ex. D); Green Dep. Tr. 29 (Schissel Decl. Ex. E).

6.      The KYC process includes collecting information such as incorporation

documents and clients' source(s) of wealth.  Sharkey Dep. Tr. 76, 108 (Schissel Decl. Ex. B);

Lassiter Dep. Tr. 18-20 (Schissel Decl. Ex. D).  The KYC process also identifies potential "high

risk factors" associated with clients.  Gruszczyk Dep. Tr. 21 (Schissel Decl. Ex. G).

**Client A**

7.      Client A has been a client of JPMC for 20 years and remains a client today.  He is

engaged in the gem, real estate, telecommunications, medical technology and pre-paid calling

cards businesses.  Defendant's Ex. 2 (Schissel Decl. Ex. H).

8.      In early 2009, Plaintiff was assigned to be the Private Wealth Manager for Client

A's accounts.  Sharkey Dep. Tr. 32 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 11 (Schissel Decl.

Ex. D).

**The KYC Process for Client A Prior to Plaintiff's Involvement**

9.      Other JPMC employees began the KYC process for Client A and identified risk factors pertaining to that client as of the time Plaintiff was assigned to his accounts.  Sharkey Dep. Tr. 205-206 (Schissel Decl. Ex. B); Gruszczyk Dep. Tr. 51-52, 222 (Schissel Decl. Ex. G).

10.     In April 2009, Kathleen Gruszczyk of the JPMC Risk Department sent Plaintiff an email summarizing information the Risk Department had collected about Client A and setting forth "risk concerns" with regard to Client A.  Sharkey Dep. Tr. 69-70 (Schissel Decl. Ex. B); Defendant's Ex. 2 (Schissel Decl. Ex. H); Gruszczyk Dep. Tr. 221-222 (Schissel Decl. Ex. G). Ms. Gruszczyk used the term "risk concerns" to "either point out something unusual about the client or some more information we need to get from the client."  Gruszczyk Dep. Tr. 199 (Schissel Decl. Ex. G).

**Plaintiff's Alleged Concerns about Client A**

11.     Plaintiff contends she had concerns about Client A based on the following factors. Sharkey Dep. Tr. 285-92 (Schissel Decl. Ex. B).  They were contained in the April 2009 memorandum that Ms. Gruszczyk sent to Plaintiff:

> a.  Client A and his businesses had 50 bank accounts, some of which had zero balances;
>
> b.  Client A was in the diamond and prepaid calling card businesses;
>
> c.  Corporate documents for some of Client A's businesses were not in JPMC's files;
>
> d.  No records for one Client A entity were found during a background check performed in 2007;
>
> e.  One of Client A's businesses was incorporated in Israel;
>
> f.  Client A had made requests to wire money from Colombia;

g.  Client A had not provided all documentation requested by prior
    bankers; and

h.  Client A had been involved in businesses that went bankrupt in
    the mid-1990s.

*Id.*; Defendant's Ex. 2 (Schissel Decl. Ex. H).  Ms. Sharkey also testified that she deemed the

following additional factors important:

i.  Client A's execution of trades in an escrow account at JPMC
    owned by a law firm (the "Ostrager Firm") and Plaintiff's
    inability to corroborate Client A's statement that he was
    authorized to trade in that account;

j.  Client A's failure to provide all documents Plaintiff requested;
    and

k.  Plaintiff's inability to confirm addresses for some of Client A's
    businesses.

Sharkey Dep. Tr. 81-82, 84, 100, 130, 177, 292 (Schissel Decl. Ex. B).

**The Ostrager Firm Account**

12.     The Ostrager Firm represented and still represents Client A in multiple litigations

relating to the infringement of patents owned by Client A.  Declaration of Glenn F. Ostrager ¶¶ 2,

4 (Jan. 8, 2013) ("Ostrager Decl.") (Schissel Decl. Ex. I).  The Ostrager Firm deposited proceeds

from the litigations into an escrow account.  Ostrager Decl. at ¶ 4 (Schissel Decl. Ex. I).  Client

A was authorized to execute trades using the funds held in that escrow account.  *Id.*; Sharkey

Dep. Tr. 98-99 (Schissel Decl. Ex. B).

13.     When Plaintiff informed Ms. Lassiter about the escrow account, Ms. Lassiter

asked her "to find out what -- why this existed, why was it, and what were the reasons for it, and

to make sure we had appropriate documentation."  Lassiter Dep. Tr. 75 (Schissel Decl. Ex. D).

14.     Plaintiff asked Client A whether he had authorization to trade in the account.

Sharkey Dep. Tr. 98 (Schissel Decl. Ex. B).  He replied that the funds were proceeds from the

patent litigations and he was authorized to trade in the account, as it was his money.  Sharkey

Dep. Tr. 98, 126, 128 (Schissel Decl. Ex. B).  Plaintiff could not locate a written authorization

for these trades.  Sharkey Dep. Tr. 97 (Schissel Decl. Ex. B).

15.     Plaintiff contacted the Ostrager Firm to confirm the authorization, and spoke with

someone at the Ostrager Firm who told her to speak with another individual at the firm.  Sharkey

Dep. Tr. 97-98, 128 (Schissel Decl. Ex. B).  Plaintiff did not speak with the other individual, but

testified that she left him a couple of messages and could not recall whether she ever sent him an

email.  *Id.*

**Plaintiff's Recommendation Regarding Client A**

16.     Plaintiff testified that she suggested to Ms. Lassiter and Ms. Gruszczyk, sometime

after she was assigned to Client A, that she was concerned about the relationship with Client A

and that PWM should exit the relationship.  Sharkey Dep. Tr. 62-63, 146, 172-74 (Schissel Decl.

Ex. B); Lassiter Dep. Tr. 111-12, 137, 141-42 (Schissel Decl. Ex. D).  When Ms. Lassiter asked

Plaintiff for the reasons, she responded primarily by saying that Client A was in the gem

business, he was Israeli, he had not provided all KYC information, he had multiple bank

accounts and he was trading in the Ostrager Firm escrow account.  Sharkey Dep. Tr. 172-74

(Schissel Decl. Ex. B); Lassiter Dep. Tr. 12, 37-38, 143 (Schissel Decl. Ex. D).

17.     When Plaintiff conveyed her concerns about Client A to Ms. Lassiter, Ms.

Lassiter replied that Plaintiff should investigate Client A further, telling her "[Plaintiff], you need

to give me something more specific than lack of comfort, please tell me exactly [w]hat's there

that is cause for terminating the client."  Lassiter Dep. Tr. 154-55 (Schissel Decl. Ex. D); *see*

*also* Sharkey Dep. Tr. 97, 166, 171-74 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 75, 97, 108, 111-

12, 137, 141 (Schissel Decl. Ex. D); Gruszczyk Dep. Tr. 56 (Schissel Decl. Ex. G).   Ms.

Gruszczyk of JPMC's Risk Department also made similar suggestions to Plaintiff.  Gruszczyk Dep. Tr. 122 (Schissel Decl. Ex. G).

18.     Ms. Lassiter and JPMC's Risk Department urged Plaintiff to complete her KYCs, including the ones associated with Client A.  Lassiter Dep. Tr. 97, 111-12 (Schissel Decl. Ex. D); Gruszczyk Dep. Tr. 41-42 (Schissel Decl. Ex. G).   In fact, Plaintiff was one of the worst performers under Ms. Lassiter's supervision with regard to completing KYC forms in a timely manner.  Lassiter Dep. Tr. 152 (Schissel Decl. Ex. D); Plaintiff's Ex. 51 (Schissel Decl. Ex. J); Plaintiff's Ex. 7, ¶ 17 (Schissel Decl. Ex. K); Plaintiff's Ex. 60 (Schissel Decl. Ex. L).

19.     Ms. Lassiter asked Plaintiff to make a formal recommendation regarding Client A by the end of July.  Sharkey Dep. Tr. 161 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 106-107 (Schissel Decl. Ex. D).

20.     On July 24, 2009, Plaintiff sent an email to Ms. Gruszczyk, Ms. Lassiter and three others stating that "all of the information that we have accumulated during the KYC remediation process feels uncomfortable regarding the [Client A] family relationship and the nature of its businesses as well as its related entities ([Client A1, Client A2, Client A3], etc).  After many conversations with the client(s) and attempts to acquire the proper documentation, we still have not received all documentation and identification needed to satisfy our standard Know Your Client requirements.  Since this is a complicated and long-term relationship that we inherited, I recommend that we discuss a simple way to detach the relationship from the PWM metro business.  I want to be mindful of the fact that other LOB's within the firm have relationships with this client and/or its related entities and may wish to retain some or all of their business." Plaintiff's Ex. 74 (Schissel Decl. Ex. M).

21.     Shortly thereafter, Plaintiff, Ms. Lassiter and Ms. Gruszczyk met to discuss Client A.  Sharkey Dep. Tr. 169 (Schissel Decl. Ex. B).  During the meeting, Plaintiff, Ms. Lassiter and Ms. Gruszczyk agreed to exit any JPMC relationship with Client A, regardless of the line of business associated with an account, given Plaintiff's representation that Client A had failed to provide all KYC documentation in response to her requests.  Lassiter Dep. Tr. 298 (Schissel Decl. Ex. D); Gruszczyk Dep. Tr. 65-66 (Schissel Decl. Ex. G); Plaintiff's Ex. 93 (Schissel Decl. Ex. N).

22.     Following the meeting, Ms. Gruszczyk sent Plaintiff sample letters used to exit client relationships.  Sharkey Dep. Tr. 198-200 (Schissel Decl. Ex. B); Gruszczyk Dep. Tr. 65 (Schissel Decl. Ex. G); July 28, 2009 Email from Kathleen Gruszczyk (Schissel Decl. Ex. O).

**Completion of the KYC Process for Client A after Plaintiff's Termination**

23.     After Ms. Sharkey's termination, members of Ms. Lassiter's PWM group worked to complete the exit from the Client A relationship.  Plaintiff's Ex. 32 (Schissel Decl. Ex. P); Plaintiff's Ex. 35 (Schissel Decl. Ex. Q); Plaintiff's Ex. 78 (Schissel Decl. Ex. R).

24.     Ms. Lassiter informed Client A that they were missing information relating to the KYC process, and he responded that he was unaware documents were outstanding.  Lassiter Dep. Tr. 157, 263-64 (Schissel Decl. Ex. D); Plaintiff's Ex. 53 (Schissel Decl. Ex. S).

25.     Client A provided JPMC with the necessary information to complete the KYC process.  Plaintiff's Ex. 53 (Schissel Decl. Ex. S); Plaintiff's Ex. 47 (Schissel Decl. Ex. T); Lassiter Dep. Tr. 33, 63 (Schissel Decl. Ex. D).

26.     Individuals from JPMC contacted the Ostrager Firm and received confirmation that Client A was authorized to trade in the escrow account.  Plaintiff's Ex. 38 (Schissel Decl. Ex. U); Lassiter Dep. Tr. 80-81 (Schissel Decl. Ex. D).  They also located the written authorization in

JPMC's files that Plaintiff contended she could not find.  Lassiter Dep. Tr. 80-81 (Schissel Decl. Ex. D).

27.     Ms. Lassiter then reversed the decision to exit the client.  Lassiter Dep. Tr. 62-63 (Schissel Decl. Ex. D).

**Plaintiff's Performance Issues**

28.     After Plaintiff became a Private Wealth Manager, Ms. Lassiter, Mr. Green and Mr. Kenney noted issues with her performance.  For Ms. Lassiter, these issues included: Plaintiff's failure to pass the Series 7 examination on her first two tries; her inability to perform adequate KYC due diligence; her casual attitude towards her job and KYC responsibilities; her casual approach to the Client A KYC specifically; Plaintiff's revenue generation over-estimated her efforts in developing business; and the lack of confidence in her abilities expressed by Plaintiff's colleagues, especially regarding Plaintiff's follow-up with clients.  Lassiter Dep. Tr. 150-52, 154-55, 197-200 (Schissel Decl. Ex. D); Grande Dep. Tr. 187 (Schissel Decl. Ex. Z). Mr. Green also was concerned about the informal nature of Plaintiff's interactions with clients, as well as her inadequate knowledge and understanding of various JPMC products and her chosen invitee to a client event.  Green Dep. Tr. 24-25, 58-59 (Schissel Decl. Ex. E).  Mr. Kenney was also troubled by Plaintiff's invitation of a non-JPMC mortgage broker to a major JPMC hosted client event, believing that it demonstrated poor judgment, given JPMC's involvement in the mortgage business.  Kenney Dep. Tr. 39-40, 147 (Schissel Decl. Ex. F); *see also* Grande Dep. Tr. 168 (Schissel Decl. Ex. Z).

29.     Ms. Lassiter expressed some of these concerns in at least two meetings with Plaintiff.  Lassiter Dep. Tr. 159, 196-201 (Schissel Decl. Ex. D); Plaintiff's Ex. 60 (Schissel

Decl. Ex. L); Grande Dep. Tr. 101 (Schissel Decl. Ex. Z).  She asked Plaintiff to work on these

issues.  Plaintiff's Ex. 60 (Schissel Decl. Ex. L); Lassiter Dep. Tr. 160 (Schissel Decl. Ex. D).

30.     During a mid-year talent review of the hundreds of employees within PWM in

2009, Mr. Green placed Plaintiff on a "watch list" of "people who were struggling."  Grande

Dep. Tr. 117, 119 (Schissel Decl. Ex. Z); Green Dep. Tr. 71 (Schissel Decl. Ex. E).

31.     During that talent review, Mr. Kenney and Mr. Green were prepared to consider

Plaintiff's termination, but Ms. Lassiter "was in favor of more time to evaluate.  . . . She was

generally more supportive and more optimistic about [Plaintiff]'s potential than" Mr. Green or

Mr. Kenney.  Green Dep. Tr. 124-25, 129 (Schissel Decl. Ex. E).

**Plaintiff's Termination**

32.     In late July 2009, a client's office manager ("Manager T") phoned Ms. Lassiter

and told Ms. Lassiter that she could not contact Plaintiff, Plaintiff had not returned her calls and

Plaintiff was a "phantom."  Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63

(Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108

(Schissel Decl. Ex. W).

33.     Ms. Lassiter then asked Plaintiff whether she had ever spoken to Manager T, and

Plaintiff replied yes.  Sharkey Dep. Tr. 219 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 165-169

(Schissel Decl. Ex. D); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108

(Schissel Decl. Ex. W).

34.     Ms. Lassiter then called Manager T back, and Manager T maintained that she had

never spoken to Plaintiff.  Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63

(Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108

(Schissel Decl. Ex. W).

35.     Ms. Lassiter asked Plaintiff again whether she had called Manager T, and Plaintiff replied yes.  Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

36.     Ms. Lassiter asked again, and Plaintiff stated that she had not called Manager T. Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

37.     Upset that Plaintiff had lied to her, Ms. Lassiter then called Steven Grande, the "HR business partner covering the northeast PWM business" to inform him that she had multiple conversations with both Manager T and Plaintiff, and that it took those multiple conversations for Plaintiff to admit that she had not spoken to Manager T.  Lassiter Dep. Tr. 183-184 (Schissel Decl. Ex. D); Grande Dep. Tr. 20, 129-30, 140 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

38.     Mr. Grande informed Ms. Lassiter that, under JPMC's policies, "dishonesty could result in termination."  Grande Dep. Tr. 145 (Schissel Decl. Ex. Z); *see also* JPMC Corrective Action Policy (Schissel Decl. Ex. X).

39.     Following his conversation with Ms. Lassiter, Mr. Grande primarily consulted with four individuals regarding possible courses of action in response to Plaintiff's lie:  Linda Padilla in JPMC's Employee Relations Group, his supervisor Lee Gatten in JPMC's Human Resources Group, Mr. Green and Ms. Lassiter.  Grande Dep. Tr. 141-42, 201-202 (Schissel Decl. Ex. Z).

40.     During these conversations, none of the individuals mentioned Client A or any of Plaintiff's purported concerns regarding Client A.  Grande Dep. Tr. 202-03 (Schissel Decl. Ex.

Z); Green Dep. Tr. 137-38 (Schissel Decl. Ex. E).  The conversations were focused on whether

Plaintiff should be terminated.  Lassiter Dep. Tr. 174-75, 179-81 (Schissel Decl. Ex. D).

41.     Collectively, the group decided that Plaintiff should be terminated for a loss of

trust and confidence and for being untruthful to Ms. Lassiter.  Grande Dep. Tr. 143-144, 148-149,

152-53 (Schissel Decl. Ex. Z); Lassiter Dep. Tr. 174-75, 185 (Schissel Decl. Ex. S).

42.     On August 5, 2009, Ms. Lassiter and Mr. Grande separately informed Plaintiff

that she was being terminated due to a lack of judgment and untruthfulness related to the Manager

T incident.  Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Lassiter Dep. Tr. 188 (Schissel Decl. Ex. D);

Sharkey Dep. Tr. 215-216, 224-225 (Schissel Decl. Ex. B); Defendant's Ex. 13 (Schissel Decl.

Ex. Y); Grande Dep. Tr. 180, 189 (Schissel Decl. Ex. Z).

43.     Plaintiff did not mention Client A or the KYC process during either of these

conversations, and did not deny that she lied to Ms. Lassiter.  Lassiter Dep. Tr. 188-92 (Schissel

Decl. Ex. D); Grande Dep. Tr. 180-81, 199-201 (Schissel Decl. Ex. Z); Sharkey Dep. Tr. 215-216,

224-225 (Schissel Decl. Ex. B).

Dated:     New York, New York
           August 12, 2013

                                   ARNOLD & PORTER LLP



                         By:    /s/ Michael D. Schissel
                                Michael D. Schissel
                                399 Park Avenue
                                New York, NY  10022-4690
                                Tel: 212.715.1000
                                Fax: 212.715.1399
                                michael.schissel@aporter.com
                                *Attorneys for Defendants*