**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
JENNIFER SHARKEY,                                 :
                                                  :
                             Plaintiff,           :
                                                  :
            v.                                    :  Civil Action No.: 10-CIV-3824 (RWS)
                                                  :
J.P. MORGAN CHASE & CO., JOE KENNEY,              :
ADAM GREEN, and LESLIE LASSITER, in their         :
official and individual capacities,               :
                                                  :
                             Defendants.          :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THOMPSON WIGDOR LLP

Douglas H. Wigdor
Lawrence M. Pearson
Michael J. Willemin
85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................................................................................ii

PRELIMINARY STATEMENT .............................................................................................1

FACTS....................................................................................................................................2

   I.    SHARKEY'S EMPLOYMENT AND TRAINING REGARDING FRAUD..............2

   II.   SHARKEY'S REASONABLE BELIEF REGARDING POTENTIAL MONEY
       LAUNDERING, FRAUD AND VIOLATIONS OF FEDERAL LAW ......................4

   III.  SHARKEY'S PROTECTED ACTIVITY ...................................................................7

   IV.  SHARKEY WAS TERMINATED FOR ENGAGING IN PROTECTED
       ACTIVITY ..................................................................................................................9

   V.   FACTUAL DISPUTES CONCERNING SHARKEY'S PERFORMANCE..............11

   VI.  LASSITER AND JPMC RETAIN CLIENT A ..........................................................13

ARGUMENT..........................................................................................................................13

   I.    LEGAL STANDARD AND SOX SECTION 806 ANALYSIS.................................13

   II.   PLAINTIFF ENGAGED IN PROTECTED ACTIVITY...........................................15

       A. Plaintiff's Objectively Reasonable Belief ......................................................15

       B. Plaintiff's Subjectively Reasonable Belief .....................................................18

   III.  PLAINTIFF'S PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR....20

   IV.  THERE IS NO EVIDENCE THAT PLAINTIFF WOULD HAVE BEEN FIRED
       IN THE ABSENCE OF HER PROTCTED ACTIVITY ...........................................23

CONCLUSION .......................................................................................................................26

## TABLE OF AUTHORITIES

Andaya v. Atlas Air, Inc.,
    10 Civ. 7878 (VB), 2012 WL 1871511 (April 30, 2012) ............................................ 17, 18

Barker v. UBS AG,
    3:09 Civ. 2084 (CFD), 2011 WL 283993 (D. Conn. Jan. 26, 2011) ............... 14, 20, 21, 24

Bechtel v. Administrative Review Bd., United States Dep't of Labor,
    710 F.3d 443 (2d Cir. 2013) .......................................................................... 14, 23, 24, 25

Cityspec, Inc. v. Smith,
    617 F. Supp. 2d 161 (E.D.N.Y. 2009) .............................................................................. 13

Fraser v. Fiduciary Trust Co. Int'l,
    04 Civ. 6958 (PAC), 2009 WL 2601389 (S.D.N.Y. Aug. 25, 2009) ................................ 20

Fraser v. Fiduciary Trust Co. Int'l,
    417 F. Supp. 2d 310 (S.D.N.Y. 2006) .............................................................................. 15

Fraser v Fiduciary Trust Co. Int'l,
    04 Civ. 6958 (RMB)(GWG), 2005 WL 6328596 (S.D.N.Y. June 23, 2005) .................... 11

Guyden v. Aetna, Inc.,
    544 F.3d 376 (2d Cir. 2008) ............................................................................................ 16

Halloum v. Intel Corp.,
    ARB Case No. 04-068, 2006 WL 618383 (ARB Jan. 31, 2006) ....................................... 25

Jeffreys v. City of New York,
    426 F.3d 549 (2d Cir. 2005) ............................................................................................ 14

Kim v. Boeing Co.,
    487 F. App'x 356 (9th Cir. 2012) .................................................................................... 25

Leshinsky v. Telvent GIT, S.A.,
    10 Civ. 4511 (JPO), 2013 WL 1811877 (S.D.N.Y. May 1, 2013) ............................. passim

Mahony v. KeySpan Corp.,
    04 Civ. 554 (SJ), 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007) ................................. passim

Nielsen v. Aecom Tech. Corp.,
    No. 12 Civ. 5163 (KBF), 2012 WL 6200613 (S.D.N.Y. Dec. 11, 2012) .......................... 18

Nichik v. New York City Transit Auth.,
    10 Civ. 5260 (JG), 2013 WL 142372 (E.D.N.Y. Jan. 11, 2013) ....................................... 24

Pardy v. Gray,
  07 Civ. 6324 (LAP), 2008 WL 2756331 (S.D.N.Y. July 15, 2008)....................................25

Perez v. Progenics Pharm., Inc.,
  10 Civ. 8278 (KMK), 2013 WL 3835199 (S.D.N.Y. July 24, 2013)........................*passim*

Riddle v. First Tenn. Nat'l Bank, N.A.,
  497 F. App'x 588 (6th Cir. 2012).....................................................................................25

Sharkey v. J.P. Morgan Chase & Co.,
  805 F. Supp. 2d 45 (S.D.N.Y. 2011) ....................................................................15, 16, 19

Sonnentheil v. Christian Moerlein Brewing Co.,
  172 U.S. 401 (1899) .........................................................................................................23

Tomassi v. Insignia Financial Group, Inc.,
  478 F.3d 111 (2d Cir. 2007) .............................................................................................19

Weiss v. JPMorgan Chase & Co.,
  332 F. App'x 659 (2d Cir. 2009)........................................................................................23

Welch v. Chao,
  536 F.3d 269 (4th Cir. 2008) .....................................................................................15, 19

## STATUTES AND OTHER AUTHORTIES

Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A ......................................................................*passim*

Federal Rule of Civil Procedure 56 ...............................................................................................1

Legislative History of Title VII of HR 2673: The Sarbanes-Oxley Act of 2002,
  148 CONG. REC. S7418, S7420 (July 26, 2002) ........................................................................19

Plaintiff Jennifer Sharkey ("Plaintiff" or "Sharkey") respectfully submits this memorandum of law in opposition to the motion for summary judgment of J.P. Morgan Chase & Co. ("JPMC"), Joe Kenney, Adam Green and Leslie Lassiter (collectively, "Defendants"). Defendants' motion should be denied and Sharkey's claims under Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. 1514A ("SOX") should proceed to trial.

**PRELIMINARY STATEMENT**

Defendants' brief is no more than a series of unsupported arguments that disregards the legion disputes of material fact in this case. Plaintiff formed an eminently reasonable belief that Client A may have been engaged in unlawful activity, including money laundering and various species of fraud, which placed JPMC in a position of noncompliance with the Patriot Act and other laws. This belief was based upon a raft of evidence, including dozens of recognized risk factors and unmistakable indicators of unlawful activity and persistent refusal to provide documentation required to fulfill federal Know Your Client ("KYC") requirements. Sharkey's belief was validated by others at JPMC (including a Risk Management Officer), who stated, *inter alia*, that they "wouldn't touch this guy," "I hope we exit," and that Client A had told JPMC "lies." Sharkey cited various "red flags" to Lassiter and JPMC management, both in early reports regarding Client A and her July 2009 recommendation to exit the relationship. These "red flags" correspond to "high risk" factors identified as suggestive of money laundering and fraud by JPMC's training programs and Risk Management unit, as well as by expert witness Anne Marchetti. Therefore, Sharkey's complaints regarding Client A's possible unlawful activity were protected under SOX as they were sincere and objectively reasonable.

Sharkey was fired on August 5, 2009, **within a week of her recommendation** that JPMC exit its relationship with Client A due to suspected unlawful activity and KYC noncompliance.

Defendants offer a flimsy rationale for her firing, consisting of belated and disputed performance criticism and/or Lassiter's claim that Sharkey admitted she had not called a client after saying she had, which Sharkey denies. The retaliatory nature of her termination is further emphasized by the fact that Sharkey was terminated the same week that she was to send exit letters to Client A. The fact that Sharkey's protected activity triggered her termination also is demonstrated by significant evidence of animus, including an email between Defendants Green and Kenney seemingly delighting in a pretext to fire her (they had been waiting for her "to step on [her] own feet"), as well as the fact that Lassiter and JPMC took no steps to implement, and later reversed, the supposed adoption of Sharkey's recommendation to exit the relationship with Client A.

Defendants' motion must be denied, as it relies upon disputed factual contentions and fails to address this very strong evidence. The record demonstrates that Sharkey easily fulfills and can prove the elements of her SOX claims at trial. Discovery has only borne out the allegations of the Amended Complaint ("AC"), which the Court previously found, in denying Defendants' second motion to dismiss, alleges facts sufficient to establish protected activity.

**FACTS**

## I.    SHARKEY'S EMPLOYMENT AND TRAINING

Sharkey was hired by JPMC in November 2006.  ¶1.[1]  From the spring of 2008 through August 5, 2009, she was employed as a Private Wealth Manager in JPMC's Private Wealth Management division ("PWM"). Def. 56.1 at ¶1. From the spring of 2008 through August 5, 2009, Sharkey was supervised by Lassiter, who was the head of the PWM unit in which Plaintiff worked. Id. at ¶2. Lassiter reported to Green, then the head of PWM's Northeast Region, who in turn reported to Kenney, then the Chief Executive Officer of PWM. Id. at ¶¶3, 4. Prior to

---

[1] "¶_" citations are to "RESPONSE" Paragraphs in Plaintiff's Rule 56.1 Counterstatement.  Paragraphs of Defendants' Rule 56.1 Statement are referred to as "Def. at ¶_." Defendants' Memorandum of Law is referred to as "DB."

joining JPMC, Plaintiff had received training on due diligence procedures, the KYC process, identifying suspicious account activity and reviewing information provided by clients. Id. at ¶1.

Plaintiff's primary responsibilities included generating new business and managing existing clients. ¶5; Def. 56.1 at ¶5. Sharkey also oversaw and completed the KYC due diligence process for her clients. Def. 56.1 at ¶5. The KYC process includes collecting documents relating to a client-entities' incorporation, tax returns and financial statements, as well as information concerning a client's sources of wealth and the locations where a client conducts business. Def. 56.1 at ¶6; ¶6. The purpose of the KYC program is to, *inter alia*, "detect suspicious activities, such as money laundering or other violations of the USA Patriot Act." ¶6. JPMC is required to conduct KYC due diligence by the U.S.A. Patriot Act, the Bank Secrecy Act and "various rules and statutes that govern banking in the United States." ¶¶6, 47, 48.

Sharkey received training from JPMC that included identifying "red flags" that indicate possible client involvement in money laundering. ¶46. These red flags include, *inter alia*: (i) the client provides insufficient or suspicious information; (ii) the client is reluctant to provide information needed to file a mandatory report (such as the KYC); (iii) unusual or unexplained account activity; and/or (iv) the client has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities or appear to be an effort to hide the beneficial ownership from the bank. Id. Other documents and testimony, including from Defendants' witnesses established additional risk factors, including:

    (v)   a client's involvement in the diamond/gem or pre-paid calling card businesses;

    (vi)  a lack of documentation concerning a client's businesses;

    (vii) a client being guarded and not forthcoming when asked about his or her businesses;

(viii) a lack of clear information concerning whether a client's businesses are foreign or domestic, how a client's businesses interact with each other, who owns the businesses and what their sources of wealth are;

(ix) a client maintaining numerous accounts with zero or low balances and no activity, and refusing to close these accounts;

(x) a client's businesses are shell companies; and/or

(xi) a client conducts business in Colombia.

¶¶10, 11, 44, 45; see also ¶¶10, 11, 44, 45, 46 (containing a complete list of "red flags").

## II.   SHARKEY'S REASONABLE BELIEF REGARDING POTENTIAL MONEY LAUNDERING, FRAUD AND VIOLATIONS OF FEDERAL LAW

Defendants do not present a full list of the factors underlying Sharkey's belief that Client A may have been engaged in money laundering and attendant bank fraud, wire fraud and mail fraud, and that JPMC was potentially violating the Patriot Act and other federal laws if the relationship were to continue.  The full range of factors indisputably supports Sharkey's belief:

(i) Client A had 25 sources of Effectively Connected Income and 50 accounts;

(ii) Many accounts had zero or low balances and no activity, and Client A refused to close them, which is indicative of money laundering;

(iii) A background screen on one of Client A's major businesses in 2007 returned no records of the corporation;

(iv) Certain of Client A's businesses were doing business in the name of other Client A businesses, certain businesses were shell companies and many businesses had the exact same address.  Client A would refuse to provide information and documents concerning these businesses;

(v) "Many business accounts [had] been opened [by Client A], but apparently there [were] no legal documents for the entities in the client's file," which JPMC Risk Management Officer Kathleen Gruszczyk stated was a "risk concern";

(vi) It was unclear whether Client A's businesses were foreign or domestic, which Gruszczyk stated was a "risk concern";

(vii) It was unclear how Client A's businesses interacted with each other, which Gruszczyk stated was a "risk concern";

(viii)   It was unclear who owned Client A's businesses, which was a "risk concern";

(ix)   The occupation of the principals of Client A's businesses was unknown, which Gruszczyk stated was a "risk concern";

(x)   The source of wealth of the principals of Client A's businesses was unknown, which Gruszczyk stated was a "risk concern";

(xi)   One owner/signer on certain Client A accounts is a "Politically exposed person," which Gruszczyk stated was a "risk concern";

(xii)   Various bankers had noted that Client A was "guarded and not forthcoming when asked about the businesses," which Gruszczyk stated was a "risk concern";

(xiii)   When Sharkey was put in charge of the relationship, neither Client A nor JPMC was in compliance with the KYC process, mandated by, *inter alia*, the Patriot Act;

(xiv)   Although Client A was supposedly be interested in cooperating with Sharkey, after the first or second time she spoke with him, he "was unable to get to the phone, he wouldn't return [her] phone calls [and JPMC] couldn't get the information" to fulfill KYC requirements;

(xv)   JPMC's file on Client A was notable for its lack of information and identification cards that were indiscernible;

(xvi)   Sharkey asked for numerous pieces of information from Client A, including information concerning how Client A made his money, its source and where the businesses he ran were domiciled.  The answers to these questions were never provided, and Sharkey's attempts to collect related documents such as financial statements and tax returns were ignored by Client A;

(xvii)   As admitted by Gruszczyk, JPMC had caught Client A in "lies," and he was giving Sharkey the "run around;"

(xviii)   As admitted by Gruszczyk, Client A had judgments/liens filed against him for over $33,000,000, and banks that worked with Client A claimed over $50,000,000 in losses when a business run by Client A was forced into bankruptcy;

(xix)   As admitted by Gruszczyk, prior to being forced into bankruptcy, this business run by Client A was sued for $30,000,000 allegedly owed to Merrill Lynch;

JPMC Risk Officer Janice Barnes noted that Merrill Lynch alleged Client A's business engaged in "systematic manipulation of its books" and "substantial fraud," producing "an account of disappearing assets that read[ ] like a whodunit mystery."

(xx)   Client A was in "the diamond/gem business – considered potentially high risk from an [anti-money laundering] prospective;"

(xxi)   Gruszczyk noted, "[o]ther [of Client A's] interests appear to include . . . pre-paid calling cards system (Note: pre-paid calling card is also a high risk business);"

(xxii)   Client A had requested wire transfers from Colombia for the sale of emeralds, which was considered a very high risk country to do business with, and there was no indication that the proper approval had been received;

(xxiii)   Client A's wife requested that JPMC reimburse her for money that another individual took out of an account that she and he jointly owned, despite the fact that he had the full authority to do so.  Client A's wife claimed that the other individual was engaged in unlawful activity; and

(xxiv)   Client A was engaged in very unusual account activity indicating potential money laundering, including transferring money between his own accounts, withdrawing sums of money and soon thereafter depositing the money into the same or different accounts and using Chase branches to conduct certain activity in a way that made it very difficult for JPMC to track his activity.

¶¶11, 44, 45.

One of the factors underlying Sharkey's belief that Client A was potentially engaged in money laundering or other unlawful financial activity was that he was transacting business in an escrow account held in the name of a law firm (the "Ostrager Account"), seemingly without authorization.  ¶12.  Lassiter admitted that this was concerning: "there was an escrow account [the Ostrager Account] and we did not appear to have at the time appropriate authorities from [Client A] to be trading in that account.  That was a concern to me."  Id.[2]  Before her termination, Sharkey tried repeatedly to determine whether Client A was authorized to trade in the account, including by asking him for an authorization, looking through JPMC's files for same and leaving numerous messages with the Ostrager Firm to determine whether Client A was authorized to

---

[2] Despite her purported concern, Lassiter dismissed Sharkey's concerns about the Ostrager account, stating: "Oh, Jennifer, I'm sure there's an explanation, try to figure out what it is."  ¶13.

trade in the account. Id. It is undisputed that neither Sharkey nor anyone else was able to determine that Client A had authority to trade in the account prior to her termination. Id.[3]

Sharkey was confronted with a client who exhibited textbook red flags for money laundering and attendant fraud, and was trading in an escrow account in someone else's name without known authorization despite repeated efforts to confirm it. The client was evasive in response to Sharkey's efforts to gather basic material that JPMC was required to collect under federal laws such as the Patriot and Bank Secrecy Acts. ¶6, 10-12, 44-48. He completely failed to produce these materials, which raised Sharkey's suspicions of unlawful activity and put JPMC at risk of violating these laws.[4]

## III.   SHARKEY'S PROTECTED ACTIVITY

Defendants inexcusably ignore the testimony of Sharkey concerning specific statements she made to Lassiter, and instead cherry-pick an incomplete selection of conveyed concerns. Sharkey specifically told Lassiter numerous times that she believed Client A was engaged in illegal activity, including **"the illegal activities that [she] thought might be going on and [her] reasonable belief that . . . there was . . . fraud going on and maybe bank fraud, mail fraud, wire fraud."** ¶16 (emphasis added). Sharkey raised all of the issues listed supra pp. 4-7 with Lassiter, including that JPMC was not in compliance with the requirements of the Patriot Act: "we, over the months, had discussed exactly what I thought was going on in the accounts, and why I thought it was suspicious, and why I thought it was illegal, and why I thought we weren't

---

[3] It was not until October 2009 – months after Sharkey was fired – that the authorization was found and/or received, confirming that Client A was being evasive and brushing off Sharkey's requests. ¶12. This does not indicate that "JPMC had no trouble" (DB at p. 4) confirming authorization. If JPMC possessed the authorization, it was under the control of Lassiter's subordinate on the investor's desk, not Sharkey. ¶26. Lassiter testified: "[i]t would have been nice to have [it] sooner, but the people on the desk felt that they had an understanding of the situation." Id.
[4] Defendants' assertion – without citation – that Sharkey could not identify specific information is a blatant misrepresentation. DB at p. 5. When deposed, Sharkey explained that the information missing was, inter alia, that required to complete the KYC and determine Client A's source of wealth. ¶49. Sharkey offered to provide further information during her deposition, but defense counsel declined. Id.

in compliance, and why I thought we were violating certain laws over the many months." Id. Sharkey also explained "how it's feasible that [Client A] could be laundering money." Id.

Thus, the record is clear that Sharkey informed Lassiter that she believed Client A may have been engaged in "mail fraud, wire fraud, violations of securities laws, money laundering and violations of the Patriot Act." Id. On July 28, 2009, Sharkey, Lassiter and Gruszczyk had a discussion during which Sharkey again articulated her concerns and recommended that JPMC exit its relationship with Client A. ¶16. This recommendation was based on all of the factors enumerated supra pp.4-7, which were discussed with Lassiter during that meeting and/or numerous other times, and not solely on Client A's failure to provide KYC documentation. ¶21. During the meeting, Lassiter "was very dismissive of the facts" and stated "Oh, c'mon, Jennifer, you're – you know – you don't have proof of that." ¶17. Lassiter had previously requested a recommendation regarding PWM's relationship with Client A by the end of July 2009. ¶¶17, 19.

Accordingly, at the end of July 2009, Sharkey formally recommended that PWM exit its relationship with Client A in a final KYC report. ¶16.[5] Sharkey made the same recommendation in a contemporaneous email to Kenney, Green and Lassiter. ¶51. Kenney discussed the recommendation with Lassiter and Gruszczyk, and stated that it was a good decision. ¶52. Gruszczyk had been in support of exiting the relationship all along:

(i)   on April 29, 2009 Gruszczyk wrote: (a) "[T]he supporting bankers are trying to build a strong case to exit" the Client A relationship, and (b) "They doubt they will get the docs **which is another reason to close**" the Client A relationship;

---

[5] Defendants focus on a July 24, 2009 email from Sharkey to Lassiter, but ignore numerous conversations between Sharkey and Lassiter during which Client A's red flags and potential unlawful activity were discussed. Whether the email recommends that JPMC lines of business other than PWM exit the relationship is a red herring. DB at p. 6. Sharkey only had authority to make recommendations regarding PWM, and it was not within her authority to recommend exit for other areas of JPMC. ¶50. Defendants' disputed assertion that Sharkey's recommendation to exit was not sincere because it did not encompass all of JPMC demonstrates the case's vast array of factual disputes.

    (ii)      on June 4, 2009, she wrote that Client A was giving Sharkey the "**run around and sometimes bad info.** And we have still not gotten all the business docs. The Market Manager [Lassiter] is still not ready to exit the relationship – although a Middle Market banker said they **wouldn't touch this guy.**";

    (iii)    on July 1, 2009 Gruszczyk wrote: **"We've caught [Client A] telling us lies so I hope we exit."**; and,

    (iv)    on October 9, 2009, Gruszczyk described Lassiter's decision to reverse the decision to exit and keep Client A as a **"bummer!"**

¶10 (emphasis added).  Gruszczyk was so suspicious of Client A that she referred the matter to

JPMC's **Anti-Money Laundering ("AML") division**, which she admitted was "beyond [ ] the

norm" of due diligence.  Id.  Defendants' contention that the facts as known to Sharkey did not

support her suspicions of money laundering and related unlawful acts is, therefore, specious.

      Expert witness Anne M. Marchetti has over 20 years compliance experience, including

SOX compliance implementation, design and analysis of internal control systems, as well as risk

management.  ¶53.  She concluded, *inter alia*, that: (i) the record contains "sufficient, competent

evidential matter to support a reasonable belief that [Client A] was engaging in fraud, money

laundering, as well as violating federal security laws;" and (ii) "[there is] significant direct and/or

circumstantial evidence to support concerns regarding potential illegal activity perpetrated by

[Client A] including fraud, money laundering and security law violations."  Id.

## IV.    SHARKEY WAS TERMINATED FOR ENGAGING IN PROTECTED ACTIVITY

      Sharkey was terminated less than a week after making her formal recommendation to exit

PWM's relationship with Client A.  ¶41.  Defendants have provided blatantly false, shifting and

inconsistent purported justifications for her firing.  Id.  Defendants' current purported rationale

for Sharkey's termination concerns an incident that never occurred — that she "admitted she had

lied to Lassiter" (DB at p. 9) concerning a telephone call to an office manager of a JPMC client

("Manager T").  In a transparent attempt to lead the Court astray, Defendants ignore the fact that

Sharkey disputes Lassiter's account of the so-called "Manager T incident." ¶36. She simply did not lie or admit to lying. She was asked if she had spoken with Manager T, responded truthfully that she had, and never recanted or stated that she had not spoken with Manager T:

> Q:    At any point during that back and forth with Lassiter about this client, did you tell her that you had not, in fact, contacted this client?
>
> A:    I don't know what you're referring to. I had spoken to [Manager T] a few times.

Id. Even if Lassiter's account is credited – and it cannot be for the purposes of this motion – it is undisputed that the decision to terminate Sharkey was not made when the purported dishonesty was discovered. By Kenney's admission, the decision to terminate Sharkey was not made until early August, approximately two weeks later and much closer in time to Sharkey's recommendation to exit Client A. ¶41. The disputed Manager T incident is further revealed as pretext by email between Kenney and Green on July 21, 2009, the purported date of the incident:

> [Green to Kenney]: FYI, just as I was running out, Leslie posted me on an incident regarding Jennifer Sharkey. I sent her to Grande, but it is highly likely we terminate her right away. As you recall, she is ranked yellow and watch list.
>
> [Response]: **Okay. Sometimes it doesn't take long for people to step on their own feet.**

Id. (emphasis added). This email demonstrates that Defendants were looking for a pretext to terminate Sharkey. Moreover, Lassiter is aware of at least three other employees who lied to her and/or other members of PWM, but were not terminated. Id.

Defendants have not provided a consistent explanation for the termination decision. When Sharkey was fired, she was told by both Lassiter and Grande that the decision didn't have anything to do with her performance. Id.[6] Defendants now seem to rely on performance to justify her termination (e.g., DB at pp. 7-8, 18), but at times revert to the Manager T-only

---

[6] At deposition, Lassiter first confirmed that the purported reason for Sharkey's firing was solely the purported Manager T incident: "[Q.] And with respect to Sharkey, ... why did you make the decision to terminate her employment?" [A] Because she was untruthful." ¶41. It was not until after a break in her deposition that she said that the purported dishonesty was the "straw that broke the camel's back," and invoked performance as a factor. Id.

rationale (e.g., DB at p. 1; Def. 56.1 at ¶41).  Defendants' confused explanations for the firing

highlight the disputed nature of the decision, and suggest neither the supposed incident nor

performance were sufficient to trigger termination.

Finally, Gruszczyk wrote that, at the "[e]nd of July" 2009, "Sharkey said she wanted to

exit the client, Lassiter agreed – **which appeared to be** in support of her banker," in a timeline

she prepared no earlier than December 10, 2009 (after Sharkey's termination and Lassiter's

eventual decision to retain Client A).  ¶41 (emphasis added).  Even Gruszczyk, in light of events,

realized that, at the very least, Lassiter's actions after July 2009 did not seem to "support"

Sharkey or her recommendation to exit the relationship with Client A.[7]

## V.    **FACTUAL DISPUTES CONCERNING SHARKEY'S PERFORMANCE**

Defendants' vague claims concerning Sharkey's performance are disputed.  Defendants'

story has shifted as prior versions have proven false, including their admittedly false initial

version of their critique of Sharkey's choice of invitee for an August 2008 U.S. Open event (a

year before her firing).  ¶28.  Defendants know Sharkey invited a client, as directed, and yet

baselessly attack her.  Defendants' insistence on raising this event despite its remoteness in time

and the falsity of their initial story reveals the attacks on Sharkey's performance to be spurious.

Although Plaintiff took the Series 7 examination three times, she was forced by Lassiter

to leave one of these sessions to tend to a client emergency.  Id.  Lassiter denies knowledge that

Sharkey had to walk out of a session, despite the fact that she called her out of it, demonstrating

that this purported "performance issue" is fabricated and immaterial.  Id.  Sharkey's revenue

---

[7] Defendants note that Plaintiff's OSHA complaint was dismissed.  As explained infra pp. 15-20, Sharkey engaged in protected activity and has adduced evidentiary support for the allegations in the Amended Complaint that this Court held were sufficient to state a claim.  The OSHA decision was made without the benefit of discovery and, in any event, a district court's review of an administratively exhausted SOX claim is "de novo" Fraser v Fiduciary Trust Co., Int'l., 04 Civ. 6958 (RMB)(GWG), 2005 WL 6328596 (S.D.N.Y. June 23, 2005).

generation did not overstate her efforts. Lassiter said "her metrics were fine" when asked if sales or client development played a part in the firing. Id. Lassiter also admitted that Sharkey had developed "significant client relationships," and Green admitted, "By the middle of 2009, [Sharkey's] performance versus metrics exceeded expectations." Id. Sharkey's revenue generation and other documents show she was a top performer. Id. The assertion that Sharkey's colleagues lacked confidence in her relies on hearsay and speculation. Sharkey's subordinates and peers sought her out for advice and client meetings due to their confidence in her. Id.

The claim that Sharkey had performance issues completing KYCs also is false. Sharkey completed every aspect of her KYCs permitted by the cooperation of her clients, and Defendants are aware that Client A repeatedly failed to provide required documents and information, despite promising to do so, and was dodging her phone calls. ¶18. Others who had worked on the account all confirmed that Client A had refused to provide the materials for years. Id. Gruszczyk admitted that Client A was giving Sharkey the "run around and sometimes bad info," and that he was "guarded and not forthcoming" even with other bankers. Id. She also stated: "We've caught [Client A] telling us lies." Id. Even Lassiter stated regarding the delayed KYC reports: "It is just a difficult time...too much on our plates." Id. At least two other individuals reporting to Lassiter were behind on KYCs, but were counseled, not terminated. Id.

That Sharkey was purportedly placed on a "watch list" is irrelevant. No one testified that firing was merited when she was put on the list (Green and Kenney said they did not advocate for termination), and Sharkey was not given written or verbal warning that there was a chance she would be fired. ¶30. After her termination, the "watch list" stated that Sharkey would be reviewed again in September 2009, showing there was no plan to terminate her. Id. Grande testified he was unaware whether anyone on the watch list was fired other than Sharkey. Id.

## VI.    LASSITER AND JPMC RETAIN CLIENT A

Defendants contend that they initially agreed to exit the relationship with Client A. However, the record confirms that there was never any *bona fide* intent to exit, and Lassiter fabricated certain events to support the false assertion that JPMC took steps to exit.  For instance, Lassiter testified that she spoke with Client A and told him JPMC was prepared to exit.  ¶21. However, Jonathan Spira (Associate on the Client A accounts) and Client A contradicted this testimony.  Id.  Lassiter purports to have prepared exit letters to Client A, but these purported letters were never produced, and it is undisputed that no exit letters were sent.  Id.  Spira testified that he was unaware of anyone ever recommending that JPMC exit its relationship with Client A, and that he never spoke about exiting the relationship with Lassiter.  Id.  By contrast, Sharkey sent an email the day before her termination announcing her intent to send an exit letter to Client A.  ¶22.  Finally, documents produced by Defendants in August 2013 expressly outline plans by PWM management to **expand** the relationship with Client A.  ¶7.[8]

### ARGUMENT

## I.    LEGAL STANDARD AND SOX SECTION 806 ANALYSIS

Summary judgment cannot be granted unless there is "no genuine issue as to any material fact."  F.R.C.P. 56(c); see also Cityspec, Inc. v. Smith, 617 F. Supp.2d 161, 168 (E.D.N.Y. 2009).  In making this determination, "the Court must view all evidence and facts in the light most favorable to non-moving party and draw all reasonable inferences in its favor."  Leshinsky v. Telvent GIT, S.A., 10 Civ. 4511(JPO), 2013 WL 1811877 at *6 (S.D.N.Y. May 1, 2013).

On a motion for summary judgment on a SOX whistleblower relation claim, the plaintiff "bears the initial burden of making a prima facie showing of retaliatory discrimination."

---

[8] Defendants' reliance on Client A's testimony that he purportedly was surprised to learn that JPMC believed that he still owed KYC documents to JPMC is bizarre.  It is undisputed that the documents and information provided by Client A were not sufficient and did not comply with Sharkey's requests.  ¶24.

Leshinsky, 2013 WL 1811877 at *6 (citations omitted). In order to do so, an employee must demonstrate that "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" Leshinsky, 2013 WL 1811877 at *6 (quoting Bechtel v. Administrative Review Bd., United States Dep't of Labor, 710 F.3d 443, 447 (2d Cir.2013)). At this stage, a plaintiff need only demonstrate that a jury "could" determine that he has made his *prima facie* case. Leshinsky, 2013 WL 1811877 at *6; see also Barker v. UBS AG, 3:09 Civ. 2084(CFD), 2011 WL 283993 at *4 (D. Conn. Jan. 26, 2011) ("The contributing factor test is broad and is a relatively low burden for a plaintiff to meet.").

"Once a plaintiff has made its *prima facie* case, a defendant employer prevails only if 'it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior.'" Id. (quoting Bechtel 710 F.3d at 447)). Summary judgment on a SOX retaliation claim is an extraordinary measure: "[t]he defendant's burden under Section 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition." Leshinsky, 2013 WL 1811877 at *6.

Finally, "[a]t the summary judgment stage, 'it is undoubtedly the duty of district courts not to weigh the credibility of the parties.'" Perez v. Progenics Pharm., Inc., 10 Civ. 8278(KMK), 2013 WL 3835199 at *7 (S.D.N.Y. July 24, 2013) (quoting Jeffreys v. City of New York, 426 F.3d 549, 54 (2d Cir. 2005)). Thus, Defendants' repetitive assertion of their disputed factual and legal positions is unavailing and does not support summary judgment.[9]

---

[9] Defendants do not challenge that Sharkey's communications would be protected if they had a reasonable basis. Any such challenge would be fruitless, as Sharkey communicated with Lassiter concerning her belief that Client A may have been involved in money laundering, attendant fraud and/or violations of the Patriot Act. Supra pp. 7-8.

II.   **PLAINTIFF ENGAGED IN PROTECTED ACTIVITY**

    To demonstrate that a plaintiff engaged in a protected activity, she must show "both a subjective belief and an objectively reasonable belief that the conduct [s]he complained of constituted a violation of relevant law." Leshinsky, 2013 WL 1811877 at *8. Defendants misrepresent the record and, with scant citation to legal authority, claim in conclusory fashion that there was no reasonable basis for Sharkey's belief that Client A was potentially engaged in money laundering, attendant fraud, and violations of, *inter alia*, the Patriot Act.

    A.   **Plaintiff's Objectively Reasonable Belief**

    Objective reasonableness is a "'mixed question of law and fact,' meaning that it should be decided by the Court only if there is no genuine issue of material fact as to the belief's reasonableness." Leshinsky, 2013 WL 1811877 at *9 (citing Welch v. Chao, 536 F.3d 269, 278 (4th Cir. 2008)). In order to state a retaliation claim under SOX, a "plaintiff need not show an actual violation of the law;" rather, "SOX protects employees who provide information which the employee 'reasonably believes constitutes a violation'" of enumerated law. Fraser v. Fiduciary Trust Co. Int'l, 417 F. Supp. 2d 310, 322 (S.D.N.Y. 2006). Specifically, a plaintiff must demonstrate a reasonable belief of mail fraud, wire fraud, bank fraud, securities fraud or any violation of any rule or regulation of the Securities and Exchange Commission or Federal law relating to shareholder fraud. See Sharkey v. J.P. Morgan Chase & Co., 805 F. Supp. 2d 45, 54 (S.D.N.Y. 2011). Considerations include the "basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience." Id. at 55.

    Defendants' contention that Sharkey's belief was not objectively reasonable, based on their incomplete recitation of the factors considered, and that the facts do not "suggest a scheme or artifice to defraud" betrays a misapprehension of applicable standards. DB at p. 14. "'[A]

whistleblower need not show that the corporate defendant committed fraud . . . The statute only requires the employee to prove that [she] 'reasonably believe[d]' that the defendant's conduct violated federal law.'" Perez, 2013 WL 3835199 at *9 n. 12 (citing Guyden v. Aetna, Inc., 544 F.3d 376, 384 (2d Cir.2008)).  Defendants ignore all of the evidence adduced (supra pp. 2-7) that establishes the allegations in the AC that Client A exhibited every red flag for money laundering, many of which are admitted by Defendants.[10]  See Sharkey, 805 F. Supp. 2d at 57 ("all of the communications alleged in the AC between Plaintiff and Defendants regarded the Suspect Client and the likelihood that he was in violation of several of the SOX enumerated statutes, as well as [the] possibility that the Company's stockholders could be at risk").

JPMC's training materials, documents and witnesses all identified as red flags for money laundering nearly every single factor cited by Sharkey in her reports and complaints to PWM management.  Supra pp. 2-7.  Defendants' own witnesses and documents confirm that Sharkey's belief was shared by others at JPMC, including Gruszczyk, who repeatedly expressed her hopes that JPMC would exit the relationship, said that Client A was telling "lies" to JPMC, and reported that another banker said that he/she "wouldn't touch this guy [Client A]."  Supra pp. 8-9.  Expert witness Anne Marchetti also confirmed that, *inter alia*, that there was "sufficient, competent evidential matter to support a reasonable belief that the suspect client was engaging in fraud, money laundering, as well as violating federal security laws."  ¶53.

In denying Defendants' second motion to dismiss, this Court found that Plaintiff alleged sufficient facts to support her reasonable belief, including by alleging that Client A: (i) refused to provide complete business and financial information; (ii) traded in the Ostrager Account without

---

[10] That Gruszczyk informed Sharkey of many red flags is irrelevant.  See Mahony v. KeySpan Corp., 04 Civ. 554 (SJ), 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007) (denying summary judgment where basis for belief that unlawful activity may be occurring derived from information provided by another employee).

proper authorization; (iii) stymied Plaintiff's efforts to comply with KYC requirements under the Bank Secrecy Act, Patriot Act, and other federal securities laws, exposing JPMC and its shareholders to potential liability; and (iv) dealt in merchandise from Colombia. Sharkey, 805 F. Supp. 2d at 55-56. Discovery yielded evidence establishing that these and many other concerns were real and there is no reason for the Court to deviate from its prior decision. Client A's conduct involved a pattern of electronic, wire and bank transactions and evasion of legally required due diligence that, to all appearances, was meant to hide the source and destination of his money. Supra pp. 4-7.

SOX retaliation claims have survived summary judgment with far less evidence. For example, in Leshinsky, the plaintiff was present for a single conversation involving the defendant's response to a request for proposal, during which an individual suggested using two different overhead rates in the bid. Leshinsky 2013 WL 1811877 at *2. Based on this alone, the plaintiff reported that he "thought ... the two overhead strategy ... was unethical, certainly immoral and may even be illegal." Id. at *3. In Mahony, summary judgment was denied where the plaintiff "admit[ted] he had neither personal knowledge of the fraud nor the educational background to discovery the fraud on his own." Mahony, 2007 WL 805813 at *5-6. Other cases have found plaintiffs may rely on the same type of evidence as Sharkey in coming to her belief regarding money laundering, attendant fraud and violations of the Patriot Act. See Perez, 2013 WL 3835199 at *9 ("In light of Plaintiff's training, education, and experience, a reasonable jury could find that it was objectively reasonable for Plaintiff to rely on conversations with colleagues, his review of the Wyeth Update, as well as his own work to form his belief.").

The allegations in Andaya are not comparable to the instant case. The Andaya plaintiff's reports "largely related to internal corporate policies concerning corporate waste, personnel

matters, and relationships with vendors," subjects not covered by SOX, as well as "optimistic statements by executives regarding stock prices," rather than potential insider trading, and therefore did not support a reasonable belief of potential unlawful conduct under SOX. Andaya v. Atlas Air, Inc., 10 Civ. 7878 (VB), 2012 WL 1871511 at *5 (April 30, 2012). The Andaya court, far from endorsing Defendants' incorrectly narrow view of protected activity, pointed out that SOX "should be construed broadly so as to protect whistleblowers," even where such reports relate only to potential wrongdoing or legal violations. Id. The Nielsen case relied upon by Defendants also is inapposite, as the decision dismissed claims under F.R.C.P. 12(b)(6) (motion to dismiss, not summary judgment) and concerned a plaintiff reporting improper approvals of fire safety designs. Nielsen v. Aecom Tech. Corp., No. 12 Civ. 5163 (KBF), 2012 WL 6200613 at *5-6 (S.D.N.Y. Dec. 11, 2012). These cases bear no relation to Sharkey's reports concerning potential money laundering, fraud and violations of federal laws such as the Patriot Act.

Finally, Gruszczyk, based on the same information available to Sharkey, referred Client A's matter to JPMC's anti-money laundering division. Supra p. 9. Client A was engaged in conduct that implicated every major red flag for money laundering, conduct that JPMC's Risk Management Officers and training materials identified as "high risk," and refused to provide documents JPMC needed to comply with the Patriot and Bank Secrecy Acts. Thus, Sharkey's belief that Client A may have been engaged in money laundering, wire, bank and/or mail fraud and/or securities fraud, and that JPMC was not in compliance with requirements of the Patriot and Bank Secrecy Acts (laws designed to prevent money laundering), was reasonable.

### B.   Plaintiff's Subjectively Reasonable Belief

Defendants' challenge to Plaintiff's subjective belief that Client A was engaged illegal conduct completely disregards this Court's prior citation to the legislative history of SOX, which

states: "The threshold is intended to include all good faith and reasonable reporting of fraud, and there should be no presumption that reporting is otherwise, absent specific evidence." Sharkey, 805 F.Supp.2d at 555 (citing Legislative History of Title VII of HR 2673: The Sarbanes-Oxley Act of 2002, 148 CONG. REC. S7418, S7420 (July 26, 2002)).  Defendants' claim that Plaintiff has not identified the fraud she believed was being perpetrated by Client A also willfully ignores her specific references to money laundering, wire fraud, bank fraud, mail fraud and/or securities fraud, and JPMC's non-compliance with the Patriot Act. See supra pp. 7-8.

This Court has recognized that "a whistleblower 'need not 'cite a code section he believes was violated' in his communication to his employer, but the employee's communications must identify the specific conduct that the employee believes to be illegal.'" Sharkey, 805 F. Supp. 2d at 56 (citing Welch, 536 F.3d at 276); see also, Leshinsky, 2013 WL 1811877 at *11 (summary judgment denied where the plaintiff reported only that the conduct at issue "may even be illegal" because "this is sufficient evidence for a jury to find that he was in act concerned about the legality of Defendants' conduct."); Mahony, 2007 WL 805813 at *5-6.

In order to avoid the vast evidence of her concerns, Defendants make a feeble and disputed effort to cast doubt on the sincerity of Plaintiff's concerns by insinuating that her recommendation that PWM, and not all of JPMC, exit the Client A relationship suggests that she did not believe any illegality or risk was present. This is nonsense. Sharkey had the authority to make recommendations for PWM, and it was not her role nor within her authority to make recommendations concerning other areas of JPMC. Supra p. 8, n. 5. Drawing a negative inference regarding the subjective sincerity of Plaintiff's belief based on this highly questionable assertion would run contrary to the well-established rule that all inferences must be drawn in favor of a non-movant on a summary judgment motion. See Tomassi v. Insignia Financial

Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007). The defendants in Leshinsky attempted a similar

argument, claiming that the plaintiff's decision to report unlawful conduct only to one individual

demonstrated that he did not possess a *bona fide* belief of wrongdoing. Leshinsky, 2013 WL

1811877 at *11. Although the court noted that such evidence (which differs from Sharkey's

broad announcement of her concerns) might weigh against the plaintiff, it recognized that "this is

a question for the finder of fact, not the Court." Id.; see also Barker, 888 F. Supp. 2d at 298

(reasonable jury could find that plaintiff "had a subjectively reasonable belief" where she

"advised multiple people . . . of her concerns.").

Defendants' analogy to Fraser v. Fiduciary Trust Co., 04 Civ. 6958 (PAC), 2009 WL

2601389 (S.D.N.Y. Aug. 25, 2009) is unavailing. In that case, the plaintiff waited three months

from the date he thought to complain until he actually complained. Id. at *5. The court noted

that this fact "cast doubt on [the plaintiff's] subjective belief that the [reported action] constituted

a violation." Id. There is no similar delay in the instant action, as Sharkey repeatedly raised her

concerns and formally recommended that PWM exit its relationship with Client A: the maximum

extent of her power to act. Of additional import in Fraser is that the plaintiff's "own explanation

of his reason for sending the [alleged complaint] negate[d] his argument that he was attempting

to report fraud or misconduct." Id. Defendants cannot cite similar testimony of Sharkey.

### III.   PLAINTIFF'S PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR

Defendants suggest that it is Plaintiff's burden to "prove" that her protected activity

contributed to her termination. However, "[a]t the summary judgment stage, a plaintiff need

only demonstrate that a rational factfinder **could** determine that Plaintiff has made [her] *prima*

*facie* case." Leshinsky, 2013 WL 1811877 at * 6 (emphasis added). A "contributing factor" is

"any factor which, alone or in connection with other factors, tends to affect in any way the

outcome of the decision." <u>Perez</u>, 2013 WL 3835199 at *13 (plaintiff need not prove protected

activity was the primary factor in termination or that proffered reason is pretext).  This is a

"relatively low burden for a plaintiff to meet." <u>Barker</u>, 2011 WL 283993 at *4.

The record absolutely supports a finding that Plaintiff's protected activity played a role in

the decision to terminate her employment.  Plaintiff was terminated less than one week after

formally recommending that the PWM unit exit its relationship with Client A due to her

suspicions of money laundering, wire fraud, bank fraud, mail fraud and JPMC's violation the

Patriot Act. <u>Supra</u> p. 9.  Summary judgment is inappropriate if retaliation occurs shortly after the

protected activity. <u>See</u>, <u>e.g.</u>, <u>Barker</u>, 2011 WL 283993 at *4 ("amount of time between the

protected activity and the adverse employment action" considered in contributing factor

analysis); <u>Mahony</u>, 2007 WL 805813 at *6 (denying summary judgment where firing was 13

months after protected activity because the "Plaintiff state[d] that he began to experience

retaliation almost immediately.").  Indeed, if protected activity and retaliation are "very close," a

plaintiff can rely solely on temporal proximity. <u>Leshinsky</u>, 2013 WL 1811877 at *13.

However, Plaintiff does not rely solely upon temporal proximity to establish that her

protected activity was a contributing factor in her termination.  A July 21, 2009 email between

Defendants Green and Kenney shows that they were waiting for an excuse to fire Sharkey, who

had repeatedly raised issues concerning the potential illegality of Client A's actions. <u>Supra</u> p.

10.  After being informed by Green about a purported and unspecified incident that would likely

result in Sharkey being terminated, Kenney responded:  **"Okay.  Sometimes it doesn't take**

**long for people to step on their own feet."** <u>Supra</u> p. 10 (emphasis added).  Green's email had

not provided Kenney with a single detail concerning the supposed incident, but nevertheless

Kenney exhibited satisfaction that Sharkey would be terminated. <u>Id.</u>

21

When Ms. Sharkey raised issues regarding Client A with Lassiter around the same time, Lassiter was "very dismissive of the facts." Supra at p. 8. Defendants say JPMC was planning to exit the relationship per Sharkey's recommendation, but this is false. Various documents outline plans by PWM management to expand the already large relationship with Client A, and the testimony of Spira and Client A contradicts Lassiter's claim that she was trying to exit. Supra at p. 13. Lassiter also claimed to have prepared exit letters, but none were produced and it is undisputed that no exit letters were ever sent. Id. In fact, on August 4, 2009 Sharkey sent an email announcing her intention to send an exit letter to Client A that same week. Id. She was terminated the very next day. Significantly, some months after a decision was made to retain Client A, Ms. Gruszczyk wrote that Lassiter had "appeared" to support Ms. Sharkey's recommendation to exit in late July 2009, in apparent recognition of the seemingly retaliatory nature of Plaintiff's termination. Supra at p. 11.

Defendants cannot rely on the self-serving testimony of themselves and their employees. Sharkey firmly disputes that she ever lied or admitted to lying concerning Manager T. Supra at p. 9-10. Sharkey also disputes the alleged performance deficiencies. Supra at pp. 11-12.[11] This case presents a situation analogous to that in Perez, in which the court explained:

> Defendant relies on its theory that Plaintiff was terminated because of "insubordination" . . . and argues that this intervening act severs any causation from the protected activity . . . However, according to Plaintiff's testimony, there was no insubordination, because Baker never gave Plaintiff an opportunity to answer the question. In order to weigh these competing narratives, the Court would have to evaluate the credibility of Plaintiff and Baker, a task outside the Court's domain at the summary judgment stage.

---

[11] It is unclear if Defendants rely on Sharkey's disputed performance to justify her termination. However, reliance cannot be credited, as Sharkey was told by Lassiter and Grande that performance was not a factor. Supra at p. 10.

2013 WL 3835199 at *11.  Unlike <u>Perez</u>, however, Defendants in this case have not set forth a consistent reason for Sharkey's termination.  <u>Supra</u> pp. 10-11.  Defendants have already been informed by the Second Circuit that such inconsistency warrants denial of summary judgment. <u>See</u> <u>Weiss v. JPMorgan Chase & Co.</u>, 332 F. App'x 659, 663 (2d Cir. 2009) (noting in a discrimination case that "[i]nconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive," and denying summary judgment where the plaintiff was not informed of currently proffered reason for his termination, even where the reason was supported by the record).  The record provides a more-than-sufficient basis for a jury to find that Sharkey's protected activity was a contributing factor in the decision to terminate her employment.

## IV.   THERE IS NO EVIDENCE THAT PLAINTIFF WOULD HAVE BEEN FIRED IN THE ABSENCE OF HER PROTECTED ACTIVITY

As Plaintiff has set forth a *prima facie* case, Defendants can only prevails only if they can "prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior."  <u>Leshinsky</u>, 2013 WL 1811877 at *6 (quoting <u>Bechtel</u> 710 F.3d at 447)).  **"The defendant's burden under Section 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition."**  <u>Id.</u> (emphasis added); <u>see also</u> <u>Mahony</u>, 2007 WL 805813 at *7 ("clear and convincing" standard "more stringent that the already 'tough standard' that employers face in other employment discrimination cases.").

Defendants' argument that they would have fired Sharkey even if she had not engaged in protected activity is based on disputed self-serving contentions.  <u>Cf.</u>, <u>Sonnentheil v. Christian Moerlein Brewing</u>, 172 U.S. 401, 408 (1899) (witnesses interest in action is sufficient to require credibility of his testimony to be submitted to the jury").  Plaintiff did not lie to Lassiter, nor did

she admit any lie. Supra pp. 9-10. It is disputed that she admitted to any untruthful statement, and therefore Defendants have not established "clearly and convincingly" they would have fired her for an alleged lie absent any protected activity. See Perez, 2013 WL 3835199 at *11.

Even if the Court were to credit Defendants' purported termination justifications (which, under FRCP 56, it cannot) this still would be insufficient to grant summary judgment, given the evidence of retaliation. Leshinsky, 2013 WL 1811877 at *14 (though "legitimate frustrations with Plaintiff played a large role in his firing ... it is not *beyond genuine dispute* that legitimate reasons *alone* motivated Plaintiff's firing") (emphasis in original). Defendants' burden is not, as they contend, to establish that an event occurred that could serve as a basis for termination. See DB at p. 18 ("[I]t was JPMC's prerogative to terminate Planitiff for [dishonesty], and therefore summary judgment should be granted."). Rather, Defendants must establish by "clear and convincing evidence" that they *would* have terminated Plaintiff for (disputed) dishonesty and performance even absent protected conduct. Bechtel, 710 F.3d at 446. The evidence discussed supra pp. 20-23 shows that Sharkey's protected activity was a contributing factor and undercuts any claim that she would have been terminated without her protected activity. See, e.g., id. (denying summary judgment and relying on similar evidence for contributing factor and clear and convincing inquiries); Leshinsky, 2013 WL 1811877 at *14 (denying summary judgment and relying on same evidence for contributing factor and clear and convincing inquiries).

In addition, Sharkey has identified employees who were, in fact, dishonest to Lassiter or other team members but were not terminated. ¶ 41. See, e.g., Nichik v. New York City Transit Auth., 10 Civ. 5260 (JG), 2013 WL 142372 at *6-7 (E.D.N.Y. Jan. 11, 2013) (summary judgment denied on National Transit Systems Security Act retaliation claim using SOX analysis; evidence showed other employees "would not have been disciplined for similar conduct.").

Defendants' reliance on Halloum v. Intel Corp., ARB Case No. 04-068, 2006 WL 618383, at \*6 (ARB Jan. 31, 2006) is bizarre, as that decision concerned an Administrative Law Judge finding issued **on the merits after an arbitration.** Defendants, in contrast, request that Plaintiff be denied a trial.  Moreover, the Halloum complainant did not dispute the purported justifications for termination, and seemingly admitted some of them.  Id.  Pardy v. Gray, 07 Civ. 6324 (LAP), 2008 WL 2756331 at \*6 (S.D.N.Y. July 15, 2008) is likewise distinguishable.  In Pardy, the plaintiff adduced no evidence that her protected activity contributed to her firing, other than that it occurred six months after her protected activity.  Id.; see also Riddle v. First Tenn. Nat'l Bank, N.A., 497 F. App'x 588, 596 (6th Cir. 2012) (relied upon by Defendants despite holding that plaintiff failed to engage in protected activity or establish that protected activity contributed to termination because he relied solely on four-month temporal proximity).[12]

Sharkey was terminated within **one week** of recommending PWM exit due to her belief that he may be involved in money laundering, attendant fraud and put JPMC at risk of violating federal law. Supra p. 9.  She has produced significant evidence of retaliatory intent.  See supra pp. 20-25.  In contrast, in Kim v. Boeing Co., 487 F. App'x 356, 357 (9th Cir. 2012), the court found defendant presented clear and convincing evidence that plaintiff was insubordinate, and that the plaintiff "presented no evidence giving a materially different account of his conduct." Sharkey presents a completely different account of the Manager T incident.

Defendants cannot establish an undisputed reason for the termination, and fail to show such a reason clearly and convincingly would have resulted in Plaintiff's termination at all, much less in the absence of her protected activity, as she was not terminated until two weeks after the purported incident.  Summary judgment must be denied.

---

[12] The Riddle court also applied a pretext analysis rejected by the Second Circuit.  See Bechtel, 710 F.3d at 448-449.

## **CONCLUSION**

For the reasons set forth herein, Defendants' motion for summary judgment should be denied in its entirety as numerous issues of material fact preclude summary judgment as to all causes of action alleged in the Complaint.

Dated:  September 27, 2013
        New York, New York

                                        Respectfully submitted,

                                        THOMPSON WIGDOR LLP

                                        By: _____
                                            Douglas H. Wigdor
                                            Lawrence M. Pearson
                                            Michael J. Willemin

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone:  (212) 257-6800
                                        Facsimile:  (212) 257-6845
                                        dwigdor@thompsonwigdor.com
                                        lpearson@thompsonwigdor.com
                                        mwillemin@thompsonwigdor.com

                                        *Counsel for Plaintiff*