**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

JENNIFER SHARKEY,                :

               Plaintiff,      :

                     :

         v.            :  Civil Action No.: 10-CIV-3824 (RWS)

J.P. MORGAN CHASE & CO., JOE KENNEY,  :
ADAM GREEN, and LESLIE LASSITER, in their  :
official and individual capacities,    :

                     :

            Defendants.    :

                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S COUNTERSTATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1

Pursuant to Local Civil Rule 56.1, Plaintiff Jennifer Sharkey ("Plaintiff" or "Ms. Sharkey") respectfully submits this counterstatement, in response to the Statement of Undisputed Material Facts of J.P. Morgan Chase & Co. ("JPMC"), Joe Kenney, Adam Green and Leslie Lassiter's (collectively, "Defendants"), and in opposition to Defendants' motion for summary judgment and to dismiss the First Amended Complaint ("AC").

1.      Plaintiff was employed as a Private Wealth Manager in JPMC's Private Wealth Management ("PWM") division from the spring of 2008 until she was terminated on August 5, 2009. AC ¶ 9 (Ex. A to the Declaration of Michael Schissel, dated August 12, 2013 ("Schissel Decl.")); Lassiter Dep. Tr. 85 (Schissel Decl. Ex. D). Prior to her employment at JPMC, Plaintiff had been in the banking industry for 11 years and had been employed at Citibank and First Republic Bank, where she had received training on due diligence procedures, the Know Your Client ("KYC") process, identifying suspicious account activity and reviewing information

provided by clients. Sharkey Dep. Tr. 17-20 (Schissel Decl. Ex. B); Defendant's Ex. 1 (Schissel Decl. Ex. C).

## RESPONSE TO PARAGRAPH 1

Admit.[1]  Further state that Ms. Sharkey was hired by JPMC in November 2006.  Ex. 1[2] JS at 22-23; Ex. 10.

2.      In the spring of 2008, Defendant Leslie Lassiter became the head of the PWM unit in which Plaintiff was employed. AC ¶ 14 (Schissel Decl. Ex. A); Sharkey Dep. Tr. 22 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 8 (Schissel Decl. Ex. D).  At all relevant times, Plaintiff reported directly to Ms. Lassiter.

## RESPONSE TO PARAGRAPH 2

Admit.

---

[1] All statements admitted herein are admitted without prejudice and solely for the purpose of responding to Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 of the U.S. District Court for the Southern District of New York, and responding to Defendant's motion for summary judgment.

[2] All exhibit (Ex. __) citations in the "RESPONSE"s herein are to the declaration of Lawrence M. Pearson, dated September 27, 2013 ("Pear. Dec."), unless otherwise specified. "Ex. 1, JS at __" refers to the October 16, 2012 deposition transcript of Jennifer Sharkey. "Ex. 2, LL at __" refers to the January 11, 2013 deposition transcript of Leslie Lassiter. "Ex. 3, AG at __" refers to the January 31, 2013 deposition transcript of Adam Green. "Ex. 4, JK at __" refers to the February 5, 2013 deposition transcript of Joe Kenney. "Ex. 5, KG at __" refers to the February 8, 2013 deposition transcript of Kathleen Gruszczyk. "Ex. 6, J. Spira at __" refers to the January 18, 2013 deposition transcript of Jonathan Spira. "Ex. 7, SG at __" refers to the January 24, 2013 deposition transcript of Steven Grande. "Ex. 8, Client A at __" refers to the February 25, 2013 deposition transcript of Client A. "Ex. 9, AM at __" refers to the June 6, 2013 deposition transcript of Anne Marchetti.

3.      Ms. Lassiter reported to Defendant Adam Green, then the head of the Northeast

Region of PWM.  AC ¶ 13 (Schissel Decl. Ex. A); Green Dep. Tr. 13 (Schissel Decl. Ex. E).

**RESPONSE TO PARAGRAPH 3**

Admit to the extent that Ms. Lassiter reported to Defendant Green during the relevant

time period, without admitting any additional facts regarding any other reporting relationships

that existed during that time.

4.      Mr. Green reported to Defendant Joseph (Joe) Kenney, then the Chief Executive

Officer of PWM. AC ¶ 12 (Schissel Decl. Ex. A); Green Dep. Tr. 13 (Schissel Decl. Ex. E);

Kenney Dep.  Tr. 15 (Schissel Decl. Ex. F).

**RESPONSE TO PARAGRAPH 4**

Admit to the extent that Defendant Green reported to Defendant Kenney during the

relevant time period, without admitting any additional facts regarding any other reporting

relationships that existed during that time.

5.      As a Private Wealth Manager, Plaintiff's responsibilities included understanding

JPMC's various financial products, generating new business and managing existing clients.

Sharkey Dep. Tr. 26 (Schissel Decl. Ex. B); Green Dep. Tr. 25-26 (Schissel Decl. Ex. E).

Private Wealth Managers also oversee and complete KYC due diligence and associated forms for

each of their clients. Sharkey Dep. Tr. 26-28 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 84

(Schissel Decl. Ex. D); Green Dep. Tr. 29 (Schissel Decl. Ex. E).

**RESPONSE TO PARAGRAPH 5**

Admit, but dispute any implication that this is an exhaustive explanation of Ms.

Sharkey's duties, or that each of her duties accounted for equal amounts of her time or were

considered to be of equal importance by her managers.  In fact, Ms. Sharkey testified that her

responsibilities included: "Acquiring new clients, managing the existing clients in my book of business, working with my team of product specialists, attending meetings, KYC ["Know Your Client" compliance activities]. But primarily, [my] focus was on bringing in new business and managing the existing clients." Ex. 1, JS at 26. Ms. Sharkey also testified that her "primary responsibility at the bank was to go out and get new business," and that the KYC process was a "small" part of her job. Id. at 135. While employed by JPMC, Ms. Sharkey "[m]anaged a portfolio of high net worth clients consisting of approximately 50 relationships with assets under management ranging from $250MM - $500MM generating revenue in excess of $2.5MM." Ex. 10. She also was "responsible for acquiring, developing and managing 20 new client relationships and $90MM in new assets from January 1, 2009 through August 2, 2009 across J.P. Morgan's Private Wealth Management Platform." Id. Moreover, Ms. Sharkey "[a]ssisted clients and prospects advance towards their financial goals with consistent communication and focus on growing, managing and sustaining their wealth." Id. Finally, Ms. Sharkey "[l]everaged internal partnerships with other divisions of J.P. Morgan including, Asset Management, Commercial Bank, Investment Bank, Treasury Services, and Retail Bank to offer high net worth clients and prospects a holistic banking relationship." Id.

      **6.**      The KYC process includes collecting information such as incorporation documents and clients' source(s) of wealth. Sharkey Dep. Tr. 76, 108 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 18-20 (Schissel Decl. Ex. D). The KYC process also identifies potential "high risk factors" associated with clients. Gruszczyk Dep. Tr. 21 (Schissel Decl. Ex. G)

**RESPONSE TO PARAGRAPH 6**

      Admit, but dispute any inference that this Paragraph contains an exhaustive description of the KYC process. The KYC process also involves collecting other documents concerning a

client's corporate formation, as well as photocopies of driver's licenses and passports. Ex. 1, JS at 108. The KYC process also requires gathering information concerning the location(s) that a client conducts business and whether the client's entities are based in the United States or abroad, as well as documents such as tax returns, financial statements and Form W-9s. Ex. 1, JS at 76-77; Ex. 11 at JPMC-00001107. JPMC is required to conduct KYC due diligence by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "Patriot Act"), the Bank Secrecy Act and "various rules and statutes that govern banking in the United States." Ex. 2, LL at 20-22; Ex. 4, JK at 80-81; Ex. 5, KG at 12-13; Ex. 1, JS at 62-63, 85-86; Ex.12 (KYC information gathering necessary to comply with Patriot Act); Ex. 13 at JPMC HC 1088 (Bank Secrecy Act and Patriot Act are "anti-money laundering laws" and, in order to comply, JPMC is required to "know the true identity of their customers."); Ex. 14 at p. 11 ("know[ing] your customers" is a policy designed and implemented to prevent money laundering and comply with the Bank Secrecy Act and Patriot Act.). The purpose of the KYC program is to, *inter alia*, "detect suspicious activities, such as money laundering or other violations of the USA Patriot Act." Ex. 2, LL at 129-130; Ex. 15 at ¶ 7; Ex. 3, AG at 16-17 (testifying that the KYC process can detect money laundering); Ex. 4, JK at 117-118.

    **7.**    Client A has been a client of JPMC for 20 years and remains a client today. He is engaged in the gem, real estate, telecommunications, medical technology and pre-paid calling cards businesses. Defendant's Ex. 2 (Schissel Decl. Ex. H).

**RESPONSE TO PARAGRAPH 7**

    Admit. Further state that Client A was a "huge" client. Ex. 16 at JPMC2-00089885. At a minimum, Client A was "larger than average" from an "assets under management" perspective.

Ex. 2, LL at 251.  Further state that JPMC recognized a potential for growth in its relationship with Client A, as Client A "mentioned that he would like JPMorgan to enter into a more active brokerage dialogue which if positive could increase the trading volume." Ex. 17 at JPMC2-00089837.  In fact, in December 2008, Defendant Lassiter approved the opening of a brokerage account for Client A despite the fact that certain negative issues had been discovered and remained unresolved.  Ex. 18, Ex. 19.  Defendant Lassiter's compensation was influenced by the total revenue from trades, including trades by Client A.  Ex. 2, LL at 268-273.  In April 2006, JPMC employee Deborah Nye conveyed to Defendant Lassiter that Client A had asked for certain discount pricing, and added "I didn't want to jeopardize anything [Defendant Lassiter might have with [Client A]." Ex. 53.

8.      In early 2009, Plaintiff was assigned to be the Private Wealth Manager for Client A's accounts. Sharkey Dep. Tr. 32 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 11 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 8**

Admit.  Further state that Defendant Lassiter assigned Ms. Sharkey to these accounts. Ex. 1, JS at 32-33.

9.      Other JPMC employees began the KYC process for Client A and identified risk factors pertaining to that client as of the time Plaintiff was assigned to his accounts.  Sharkey Dep. Tr. 205-206 (Schissel Decl. Ex. B); Gruszczyk Dep. Tr. 51-52, 222 (Schissel Decl. Ex. G).

**RESPONSE TO PARAGRAPH 9**

Admit.  Further state that JPMC employees other than Ms. Sharkey also encountered avoidance and other difficulty in connection with the collection of documents and information from Client A, including with respect to the KYC process.  Ex. 20; Ex. 57 at ¶ 3.

**10.**     In April 2009, Kathleen Gruszczyk of the JPMC Risk Department sent Plaintiff

an email summarizing information the Risk Department had collected about Client A and setting

forth "risk concerns" with regard to Client A.  Sharkey Dep. Tr. 69-70 (Schissel Decl. Ex. B);

Defendant's Ex. 2 (Schissel Decl. Ex. H); Gruszczyk Dep. Tr. 221-222 (Schissel Decl. Ex. G).

Ms. Gruszczyk used the term "risk concerns" to "either point out something unusual about the

client or some more information we need to get from the client."  Gruszczyk Dep. Tr. 199

(Schissel Decl. Ex. G).

**RESPONSE TO PARAGRAPH 10**

        Admit that, in April 2009, Kathleen Gruszczyk of the JPMC Risk Department sent

Plaintiff an email summarizing information the Risk Department had collected about Client A

and setting forth "risk concerns" with regard to Client A.  Ex. 20.  Dispute that Ms. Gruszczyk

used the term "risk concerns" to "either point out something unusual about the client or some

more information we need to get from the client."  This implausible and deceptively neutral

explanation is demonstrative of Ms. Gruszczyk's consistent efforts at deposition to downplay the

real concern she and other JPMC employees had regarding Client A.  For example, Ms.

Gruszczyk went so far as to testify that there somehow was "no risk contemplated" at the time

she drafted the document containing "various risk concerns."  Compare Ex. 5, KG at 199 with

Ex. 20.  Moreover, among the issues raised in this document are:

- "It appears that the client primarily continues to be in the diamond/gem business – considered potentially **high risk** from an AML [anti-money laundering] perspective."

- "Other interests appear to include real estate, telecommunications, medical technology, and pre-paid calling cards system (Note: pre-paid calling card is also a **high risk** business type)."

- An entire section of the document is dedicated to describing "Risk Concerns," which describes approximately 20 separate risks, including seven judgments/liens

against Client A for over $33,000,000, and the fact that prior banks working with Client A claimed over $50,000,000 in losses when a business run by Client A was forced into bankruptcy.

- Prior to being forced into bankruptcy, this business run by Client A was sued for $30,000,000 allegedly owed to Merrill Lynch Capital Corporation.

- One owner/signer on certain Client A accounts is a "Politically exposed person," which was a "risk concern."

- "Many business accounts [had] been opened [by Client A], but apparently there [were] no legal documents for the entities in the client's file," which was a "risk concern."

- It was unclear whether Client A's businesses were foreign or domestic, which was a "risk concern."

- It was unclear how Client A's businesses interacted with each other, which was a "risk concern."

- It was unclear who even owned Client A's businesses, which was a "risk concern."

- The occupation of the principals of Client A's businesses was unknown, which was a "risk concern."

- The source of wealth of the principals of Client A's businesses was unknown, which was a "risk concern."

- Various bankers had noted that Client A was guarded and not forthcoming when asked about the businesses, which was a "risk concern."

Ex. 20. (April 8, 2009 email from Ms. Gruszczyk to Ms. Lassiter and Ms. Sharkey attaching document explaining various "risk concerns" associated with Client A).

Many other documents demonstrate that Ms. Gruszczyk always believed that Client A's behavior and businesses posed a risk to JPMC, including: (i) an April 29, 2009 email sent by Ms. Gruszczyk stating: (a) "[T]he supporting bankers are trying to build a strong case to exit" the relationship with Client A, and (b) "They doubt they will get the docs **which is another reason to close**" the relationship with Client A (Ms. Gruszczyk attempted to distance herself from this

document at her deposition by testifying that it was untrue) (Ex. 21; Ex. 5, KG at 108) (emphasis added); (ii) a document Ms. Gruszczyk sent to her supervisor on May 15, 2009 that (a) described failed efforts to obtain necessary documentation from Client A despite the fact that he acknowledged that that documents were requested, (b) described a **"suspicious transfer of funds between account[s],"** (c) noted that "the company was investigated three times before, and stated that there were **"many red flags"** with regard to Client A (Ex. 22) (emphasis added); (iii) a June 4, 2013 email in which Ms. Gruszczyk stated: "They've met with [Client A] twice and **are getting a run around and sometimes bad info.** And we have **still not gotten all the business docs.** The Market Manager is still not ready to exit the relationship – although a Middle Market banker said **they wouldn't touch this guy"** (Ex. 16 at JPMC2-00089882) (emphasis added); (iv) a timeline put together by Ms. Gruszczyk wherein she states that **she advised Ms. Sharkey that the relationship with Client A "needed closure"** (Ex. 19) (emphasis added); (v) a July 1, 2009 email stating: **"We've caught [Client A] telling us lies so I hope we exit."** (Ex. 16 at JPMC2-00089884) (emphasis added); and (f) an email in which Ms. Gruszczyk described JPMC's decision to maintain a relationship with Client A as a **"bummer!"** Ex. 23 (emphasis added).

Indeed, **Ms. Gruszczyk was so suspicious of Client A that she referred his matter to JPMC's Anti-Money Laundering ("AML") division, which she admitted was "beyond [ ] the norm" in terms of a due diligence perspective.** Ex. 5, KG at 173-174 (emphasis added). In fact, the AML "will screen the [clients] or they will look at the ones that I request, if, in fact, the client alerted for some reason." Ex. 5, KG at 174. Any claim that Ms. Gruszczyk did not believe that Client A posed a risk, particularly with regard to money laundering, is simply false.

11.    Plaintiff contends she had concerns about Client A based on the following factors.

Sharkey Dep. Tr. 285-92 (Schissel Decl. Ex. B). They were contained in the April 2009

memorandum that Ms. Gruszczyk sent to Plaintiff:

      a.  Client A and his businesses had 50 bank accounts, some of which had zero balances;

      b.  Client A was in the diamond and prepaid calling card businesses;

      c.  Corporate documents for some of Client A's businesses were not in JPMC's files;

      d.  No records for one Client A entity were found during a background check performed in 2007;

      e.  One of Client A's businesses was incorporated in Israel;

      f.  Client A had made requests to wire money from Colombia;

      g.  Client A had not provided all documentation requested by prior bankers; and

      h.  Client A had been involved in businesses that went bankrupt in the mid-1990s.

*Id.*; Defendant's Ex. 2 (Schissel Decl. Ex. H). Ms. Sharkey also testified that she deemed the

following additional factors important:

      i.  Client A's execution of trades in an escrow account at JPMC owned by a law firm (the "Ostrager Firm") and Plaintiff's inability to corroborate Client A's statement that he was authorized to trade in that account;

      j.  Client A's failure to provide all documents Plaintiff requested; and

      k.  Plaintiff's inability to confirm addresses for some of Client A's businesses.

Sharkey Dep. Tr. 81-82, 84, 100, 130, 177, 292 (Schissel Decl. Ex. B).

## RESPONSE TO PARAGRAPH 11

Admit that Ms. Sharkey considered the factors listed in Paragraph 11 when coming to the

belief that Client A may have been engaging in "mail fraud, wire fraud, violations of securities

laws, money laundering, tax fraud and violations of the Patriot Act," as well as "bank fraud" Ex.

1, JS at 284-294; Ex. 20. Dispute any implication that these factors are appropriately or fully explained, as well as any implication that the list in Paragraph 11 is exhaustive. The reasons Ms. Sharkey formed a belief that Client A may have been engaging in "mail fraud, wire fraud, violations of securities laws, money laundering, tax fraud and violations of the Patriot Act," as well as "bank fraud" include:

- As admitted by JPMC's Risk Compliance Officer, Ms. Gruszczyk, Client A "primarily continues to be in the diamond/gem business -- considered potentially **high risk from an [anti-money laundering] prospective."** Ex. 20; <u>see also</u> Ex. 24 at JPMC-00090607 (Client A's business "centers around the high risk diamond industry"); Ex. 4, JK at 78-79 (jewelry business considered high risk for money laundering); Ex. 3, AG at 32-34 (same); Ex. 1, JS at 86-87, 286-287.

- As admitted by JPMC's Risk Compliance Officer, Ms. Gruszczyk, "[o]ther [of Client A's] interests appear to include real estate, telecommunications, medical technology, and pre-paid calling cards system (Note: pre-paid calling card is also a **high risk business type)."** Ex. 20; <u>see also</u> Ex. 9 AM at 131-132 (pre-paid telephone card business high risk because it deals in a lot of cash); Ex. 1, JS at 86-87, 286-287.

- As admitted by JPMC's Risk Compliance Officer, Ms. Gruszczyk, Client A had seven judgments/liens filed against him for over $33,000,000, and prior banks working with Client A claimed over $50,000,000 is losses when a business run by Client A was forced into bankruptcy. Ex. 20; Ex. 54, Ex. 1, JS at 290-291.

- As admitted by JPMC's Risk Compliance Officer, Ms. Gruszczyk, prior to being forced into bankruptcy, this business run by Client A was sued for $30,000,000 allegedly owed to Merrill Lynch Capital Corporation. Ex. 20; Ex. 16 at JPMC2-00089882; Ex. 54; Ex. 1, JS at 290-291.

  o According to Janice Barnes, JPMC Risk Compliance Officer, Merrill Lynch alleged that Client A's business was engaged in "systematic manipulation of its books" and "substantial fraud," which resulted in "an account of disappearing assets that reads like a whodunit mystery." Ex. 16 at JPMC2-00089882.

- One owner/signer on certain Client A accounts is a "Politically exposed person," which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20.

- "Many business accounts [had] been opened [by Client A], but apparently there [were] no legal documents for the entities in the client's file," which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20; see also Ex. 1, JS at 288-289.

- It was unclear whether Client A's businesses were foreign or domestic, which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20; see also Ex. 1, JS at 289-290.

- It was unclear how Client A's businesses interacted with each other, which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20; Ex. 57 at ¶ 12.

- It was unclear who even owned Client A's businesses, which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20.

- The occupation of the principals of Client A's businesses was unknown, which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20.

- The source of wealth of the principals of Client A's businesses was unknown, which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20.

- Various bankers had noted that Client A was "guarded and not forthcoming when asked about the businesses," which was a "risk concern," according to JPMC Risk Compliance Officer, Ms. Gruszczyk. Ex. 20; see also Ex. 16 at JPMC2-00089882-84 (Client A was giving Sharkey the "run around," "PWM LOB risk is still attempting to obtain the proper documentation from the customer with very little success" and JPMC "caught" Client A in "lies"); Ex. 3, AG at 18 (missing documentation and a client's refusal to provide documentation pursuant to KYC can be a red flag); Ex. 1, JS at 38-39 (prior bankers had not been able to obtain the information sought); Ex. 1, JS at 86 (Client A was not forthcoming), 290.

- Client A had 25 sources of Effectively Connected Income and 50 accounts, not including credit cards.  Ex. 20; Ex. 1, JS at 87, 116, 118; 284-286; Ex. 23.

- Many of these accounts had balances of zero or very low balances and no activity, and Client A refused to close these accounts, which is suggestive of money laundering or an intent to commit same.  Ex. 3, AG at 17-18; Ex. 57 at ¶ 12; Ex. 1, JS at 87, 118, 131-133.

- A background screen on one of Client A's major businesses in 2007 returned no records of the corporation.  Ex. 20; Ex. 1, JS at 287-288.

- Certain of Client A's businesses were doing business in the name of other of Client A businesses, certain businesses were shell companies, and many businesses had the exact same address. Client A would refuse to provide information and documents concerning these businesses.  Ex. 57 at ¶ 12; see also Ex. 20; Ex. 1, JS at 86-87, 116, 120-121.

- Client A had requested wire transfers from Colombia for the sale of emeralds, which was considered a very high risk country to do business with, and there was no indication that the proper approval for such a transaction had been received.  Ex. 1, JS 53-59, 120, 289, 306-308; see also Ex. 5, KG at 14-15 (Colombia is a "high risk" country because it lacks adequate anti-money laundering laws); Ex. 2, LL at 37-39, 90-92 (same).

- When Ms. Sharkey was put in charge of the relationship, Client A was not in compliance with the KYC process, mandated by, *inter alia*, the Patriot Act.  Ex. 1, JS at 86, 121.

- Although purported to be interested in cooperating with Ms. Sharkey, after the first or second time she spoke with Client A he "was unable to get to the phone, he wouldn't return [her] phone calls [and JPMC] couldn't get the information" required to comply with the Patriot Act and KYC requirements.  Ex. 1, JS at 47-48, 86, 121, 290-291;  see also Ex. 16 at JPMC2-00089882-84 (Client A was giving Sharkey the "run around," "PWM LOB risk is still attempting to obtain the proper documentation from the customer with very little success" and JPMC "caught" Client A in "lies"); Ex. 3, AG at 18 (missing documentation and a client's refusal to provide documentation pursuant to KYC can be a red flag); Ex. 2, LL at 23 (JPMC did not have the appropriate documentation to work with Client A);

- Client A's wife requested that JPMC reimburse her for monies that another individual took out of an account that she and he jointly owned, despite the fact that he had the full authority to withdraw the funds. Client A's wife claiming that the other individual on the account was engaged in unlawful activity. Ex. 1, JS at 39-41; 48-50.

- JPMC's file on Client A was notable for the lack of information contained within it, and because it contained identification cards that were completely indiscernible. Ex. 1, JS at 33-36, 288-289.

- Ms. Sharkey asked for numerous pieces of information from Client A, including information concerning how Client A made his money, its source and where the businesses he ran were domiciled to fulfill KYC and other requirements. The answers to these questions were never provided, and Ms. Sharkey's attempts to collect related documentation such as financial statements and tax returns were ignored by Client A (despite the fact that Client A's Controller promised to produce the documents). Ex. 1, JS at 76-79; see also Ex. 16 at JPMC2-00089882-84 (Client A was giving Sharkey the "run around," "PWM LOB risk is still attempting to obtain the proper documentation from the customer with very little success" and JPMC "caught" Client A in "lies");

- Indeed, as admitted by JPMC Risk Compliance Officer, Ms. Gruszczyk, JPMC had caught Client A in lies, and he was giving Ms. Sharkey the run-around. Ex. 16 at JPMC2-00089882, 89884; see also JS at 76-79, 92, 116, 120.

- Client A continued to be evasive up to the day Ms. Sharkey was terminated, and Ms. Sharkey "couldn't get any of the information that [she] and [her] colleagues were trying to get from [Client A]." Ex. 1, JS at 92; see also id. at 116, 120; Ex. 16 at JPMC2-00089882-84 (Client A was giving Sharkey the "run around," "PWM LOB risk is still attempting to obtain the proper documentation from the customer with very little success" and JPMC "caught" Client A in "lies"); Ex. 3, AG at 18 (missing documentation and a client's refusal to provide documentation pursuant to KYC can be a red flag)

- Client A was engaged in very unusual account activity indicating potential money laundering, including transferring money between his own accounts, withdrawing sums of money and soon thereafter depositing the money into the same or different accounts and using Chase branches to conduct certain activity in a way that made it

very difficult for JPMC to track his activity.  Ex. 57 at ¶ 12; Ex. 1, JS at 36, 87, 116, 121-122; Ex. 23 (Ms. Gruszczyk notes a "suspicious transfer' of funds between account[s].").

- Client A was making trades in an escrow account that was in the name of a law firm (the "Ostrager Account") and Ms. Sharkey could not locate any authorization that would permit Client A to trade in this account.  Ms. Sharkey left numerous messages for the partner at the law firm purportedly responsible for the account, but never received a call back.  When Ms. Sharkey asked Client A about the account, he simply said "It's my money."  see also Ex. 2, LL at 23-25, 74-75 (JPMC did not appear to have proper authorization, which was a "concern" to Defendant Lassiter); Ex. 1, JS at 91-93, 97-100, 120, 292.

See also Ex. 1, JS at 293 ("All of these factors led me to believe that the client was engaged in illegal activities, violating Patriot Act, Bank Secrecy Act, money laundering . . . bank fraud, mail fraud.").  Ms. Sharkey also formed her reasonable belief that Client A might be engaged in illegal activity only after investigating Client A and having numerous conversations with and about Client A.  Ex. 1, JS at 117-118.

    **12.**    The Ostrager Firm represented and still represents Client A in multiple litigations relating to the infringement of patents owned by Client A. Declaration of Glenn F. Ostrager ¶¶ 2, 4 (Jan. 8, 2013) ("Ostrager Decl.") (Schissel Decl. Ex. I). The Ostrager Firm deposited proceeds from the litigations into an escrow account. Ostrager Decl. at ¶ 4 (Schissel Decl. Ex. I).  Client A was authorized to execute trades using the funds held in that escrow account. *Id.*; Sharkey Dep. Tr. 98-99 (Schissel Decl. Ex. B).

**RESPONSE TO PARAGRAPH 12**

    Admit, but dispute any relevance to the instant motion, particularly with regard to the fact that Client A eventually was discovered to be authorized to trade in the account months after Ms. Sharkey's termination. Ex. 2, LL at 25-26; Ex. 25.  It is undisputed that Ms. Sharkey did not know, prior to her termination, that Client A was authorized to trade in the Ostrager Account.

Ex. 1, JS at 98-100. Indeed, Ms. Lassiter herself testified: "there was an escrow account [the Ostrager Account] and **we did not appear to have at the time appropriate authorities from [Client A] to be trading in that account. That was a concern to me."** Ex. 2, LL at 23-24 (emphasis added). She also testified that Client A's activity in the Ostrager Account "raised concerns because I didn't understand why Ostrager in this case would allow [Client A] to trade in what was an escrow for their benefit." Ex. 2, LL at 75. It was not until October 2009 – two months after Ms. Sharkey recommended the termination of JPMC's relationship with Client A and was terminated for making that recommendation – that the appropriate authorizations were found and/or received and passed on to JPMC Ex. 2, LL at 25-26; Ex. 25; Ex. 55. Prior to her termination, Ms. Sharkey made numerous efforts to determine whether Client A was authorized to trade in the Ostrager account, including by looking through JPMC's files for an authorization (which she did not find), as well as by calling the Ostrager Firm numerous times and leaving numerous messages in an effort to determine whether Client A was authorized to trade in the account (with no response). Ex. 1, JS at 97-100. It is undisputed that neither Ms. Sharkey nor anyone else at JPMC was able to determine that Client A actually had authority to trade in the Ostrager Account prior to her termination. Ex. 1, JS at 100; Ex. 2, LL at 25-26; Ex. 25. In fact, Ms. Gruszczyk even wrote that "[T]here have been trades in the account which the bank shouldn't have allowed." Ex. 16 at JPMC2-00089882.

    **13.**    When Plaintiff informed Ms. Lassiter about the escrow account, Ms. Lassiter asked her "to find out what -- why this existed, why was it, and what were the reasons for it, and to make sure we had appropriate documentation." Lassiter Dep. Tr. 75 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 13**

Dispute. Ms. Lassiter largely dismissed Ms. Sharkey's concerns and simply assumed that Client A was acting beyond reproach, stating: "Oh, Jennifer, I'm sure there's an explanation, try to figure out what it is." Ex. 1, JS at 96-97. In any event, as explained in response to Paragraph 12 above, Ms. Sharkey did make numerous attempts to determine whether Client A was authorized to trade in the Ostrager Account and it is undisputed that, prior to her termination, neither Ms. Sharkey nor anyone else at JPMC was able to determine that Client A actually had authority to trade in the Ostrager Account. Ex. 1, JS at 100; Ex. 2, LL at 25-26; Ex. 25.

14.     Plaintiff asked Client A whether he had authorization to trade in the account. Sharkey Dep. Tr. 98 (Schissel Decl. Ex. B). He replied that the funds were proceeds from the patent litigations and he was authorized to trade in the account, as it was his money. Sharkey Dep. Tr. 98, 126, 128 (Schissel Decl. Ex. B). Plaintiff could not locate a written authorization for these trades. Sharkey Dep. Tr. 97 (Schissel Decl. Ex. B).

**RESPONSE TO PARAGRAPH 14**

Admit that Client A told Ms. Sharkey that the funds were proceeds from the patent litigations and he was authorized to trade in the account, as it was "his money," but dispute any relevance to the instant motion. It is undisputed that corroboration of authorization was necessary. As explained in response to Paragraph 12, above, Ms. Lassiter herself testified that JPMC did not appear to have the appropriate authorizations, which was a concern to her. Ex. 2, LL at 23-24, 75 (emphasis added). The appropriate authorizations were found and/or received by JPMC until October 2009, months after Ms. Sharkey's termination. Ex. 2, LL at 25-26; Ex. 25; Ex. 55. As explained in response to Paragraph 12, Ms. Sharkey made numerous attempts to corroborate Client A's claims that he was authorized to trade in the Ostrager Account, and it is

undisputed that, prior to her termination, neither Ms. Sharkey nor anyone else at JPMC was able to corroborate Client A's claims that he had authority to trade in the Ostrager Account of confirm his claim that "it's my money." Ex. 1, JS at 97-100; Ex. 2, LL at 25-26; Ex. 25.  Admit that Plaintiff could not locate a written authorization for these trades, but further state that others also apparently could not until months after Ms. Sharkey's termination.  See Response to Paragraph 12.

      **15.**     Plaintiff contacted the Ostrager Firm to confirm the authorization, and spoke with someone at the Ostrager Firm who told her to speak with another individual at the firm.  Sharkey Dep. Tr. 97-98, 128 (Schissel Decl. Ex. B).  Plaintiff did not speak with the other individual, but testified that she left him a couple of messages and could not recall whether she ever sent him an email. *Id.*

**RESPONSE TO PARAGRAPH 15**

      Admit, but dispute any suggestion or inference that this constitutes any performance deficiency on the part of Ms. Sharkey.

      **16.**     Plaintiff testified that she suggested to Ms. Lassiter and Ms. Gruszczyk, sometime after she was assigned to Client A, that she was concerned about the relationship with Client A and that PWM should exit the relationship. Sharkey Dep. Tr. 62-63, 146, 172-74 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 111-12, 137, 141-42 (Schissel Decl. Ex. D). When Ms. Lassiter asked Plaintiff for the reasons, she responded primarily by saying that Client A was in the gem business, he was Israeli, he had not provided all KYC information, he had multiple bank accounts and he was trading in the Ostrager Firm escrow account. Sharkey Dep. Tr. 172-74 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 12, 37-38, 143 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 16**

Admit that Plaintiff testified that she suggested to Ms. Lassiter and Ms. Gruszczyk, sometime after she was assigned to Client A, that she was concerned about the relationship with Client A and that PWM should exit the relationship.  Admit that Plaintiff explained that certain of the reasons for her recommendation were that Client A was in the gem business, he was Israeli, he had not provided all KYC information, he had multiple bank accounts and he was trading in the Ostrager Firm escrow account.  Dispute any implication that these were the only reasons relied upon or provided by Ms. Sharkey.  Ms. Sharkey specifically told Ms. Lassiter numerous times that she believed that Client A was engaged in illegal activity. Ex. 1, JS at 171-173. Ms. Sharkey also explained to Ms. Lassiter "why [she] was uncomfortable and the illegal activities that [she] thought might be going on and [her] reasonable belief that . . . there was . . . fraud going on and maybe bank fraud, mail fraud, wire fraud." Ex. 1, JS at 166. Ms. Sharkey also had raised the issues listed in her response to Paragraph 11 with Ms. Lassiter: "I think we, over the months, had discussed exactly what I thought was going on in the accounts, and why I thought it was suspicious, and why I thought it was illegal, and why I thought we weren't in compliance, and why I thought we were violating certain laws over the many months." Ex. 1, JS at 169-170; see also Ex. 1, JS at 294 ("Being complicit in a crime is just as – I would consider JPMorgan to be at risk for being – for turning a blind eye to a situation and saying oh, I didn't know – saying this is going on but we're not going to do anything about it because the revenue is so great."). Ms. Sharkey also explained "how it's feasible that [Client A] could be laundering money." Ex. 1, JS at 173 see also id. at 284-285 (Ms. Sharkey testifying that she had informed Ms. Lassiter that she believed that "[Client A] may be engaging in mail fraud, wire fraud, violations of securities laws, money laundering and violations of the Patriot Act." ).  On July 28,

2009, Ms. Sharkey, Ms. Lassiter and Ms. Gruszczyk had a discussion during which Ms. Sharkey

articulated these concerns.  Ex. 1, JS at 169-173; Ex. 2, LL at 41-44; Ex. 19 ("timeline"

seemingly prepared by Ms. Gruszczyk in which she documents an "End of July" discussion

where Ms. Sharkey "said she wanted to exit the client"); Ex. 28 (Microsoft Outlook meeting

confirmation).  Ms. Sharkey recommended that JPMC exit its relationship with Client A in a

final KYC report submitted at the end of July 2009.  Ex. 1, JS at 188-191.

     **17.**     When Plaintiff conveyed her concerns about Client A to Ms. Lassiter, Ms.

Lassiter replied that Plaintiff should investigate Client A further, telling her "[Plaintiff], you need

to give me something more specific than lack of comfort, please tell me exactly [w]hat's there

that is cause for terminating the client."  Lassiter Dep. Tr. 154-55 (Schissel Decl. Ex. D); *see*

*also* Sharkey Dep. Tr. 97, 166, 171-74 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 75, 97, 108, 111-

12, 137, 141 (Schissel Decl. Ex. D); Gruszczyk Dep. Tr. 56 (Schissel Decl. Ex. G).  Ms.

Gruszczyk of JPMC's Risk Department also made similar suggestions to Plaintiff.  Gruszczyk

Dep. Tr. 122 (Schissel Decl. Ex. G).

**RESPONSE TO PARAGRAPH 17**

     Dispute to the extent that the statement is intended to limit the "concerns" "conveyed" to

Defendant Lassiter to those described in Paragraph 16 for the reasons described in the response

to Paragraph 16.  Further dispute that Defendant Lassiter replied that Plaintiff should investigate

Client A further, telling her "[Plaintiff], you need to give me something more specific than lack

of comfort, please tell me exactly [w]hat's there that is cause for terminating the client."  In fact,

Defendant Lassiter "was very dismissive of the facts" relayed by Ms. Sharkey and stated "Oh,

c'mon, Jennifer, you're – you know – you don't have proof of that."  Ex. 1, JS at 166, 171.  Ms.

Sharkey also testified that Defendant Lassiter did not press her for evidence, but rather pushed

Ms. Sharkey to wrap up the KYC process.  Ex. 1, JS at 169.  Moreover, Ms. Grusczyk's

testimony concerning the conversation referenced in this Paragraph 17 was either intentionally

untruthful or she does not accurately recall the conversation.  During her deposition, she stated

that to her knowledge, Ms. Sharkey had never recommended exiting the Client A relationship to

Defendant Lassiter.  Ex. 5, KG at 54.  This directly contradicts a timeline she apparently wrote

several months after Ms. Sharkey's termination and prior to her own deposition which states that,

during the late July 2009 conversation referenced in this Paragraph 17, "Sharkey said she wanted

to exit the client."  Ex. 19.  Dispute that Ms. Gruszczyk of JPMC's Risk Department also made

similar suggestions to Plaintiff because the cited testimony pertains to a completely different

conversation that focused only on the Ostrager Account.

> **18.**     Ms. Lassiter and JPMC's Risk Department urged Plaintiff to complete her KYCs,
> including the ones associated with Client A. Lassiter Dep. Tr. 97, 111-12 (Schissel Decl. Ex. D);
> Gruszczyk Dep. Tr. 41-42 (Schissel Decl. Ex. G). In fact, Plaintiff was one of the worst
> performers under Ms. Lassiter's supervision with regard to completing KYC forms in a timely
> manner. Lassiter Dep. Tr. 152 (Schissel Decl. Ex. D); Plaintiff's Ex. 51 (Schissel Decl. Ex. J);
> Plaintiff's Ex. 7, ¶ 17 (Schissel Decl. Ex. K); Plaintiff's Ex. 60 (Schissel Decl. Ex.

**RESPONSE TO PARAGRAPH 18**

Dispute, as the testimony cited only supports the claim that Defendant Lassiter asked Ms.

Sharkey to complete the KYCs associated with Client A.  In addition, the testimony of

Defendant Lassiter confirms that she threatened to kidnap Ms. Sharkey's dog if she did not

complete the KYCs for Client A.  Ex. 2, LL at 109-111.  Dispute that Plaintiff was one of the

worst performers under Defendant Lassiter's supervision with regard to completing KYC forms

in a timely manner.  The testimony cited does not state that Ms. Sharkey was the worst performer

with regard to completing KYCs. Ex. 2, LL at 152. In fact, it explains that Tim Walch and Dan Desmond, who also were direct reports of Defendant Lassiter, were behind on their KYCs, for which they were counseled. Ex. 2, LL at 152. Defendants' citation to Plaintiff's Ex. 51 (Schissel Decl. Ex. J, reproduced as Ex. 26 to the Pear. Dec.) is unavailing, as this email identified Messrs. Walch and Desmond as among those with the most "tickets" outstanding. Ex. 26. Defendants' citation to Plaintiff's Ex. 60 (Schissel Decl. Ex. L, reproduced as Ex. 27 to the Pear. Dec.), which are notes of Defendant Lassiter, does not state anywhere that Ms. Sharkey was one of the poorest performers with regard to KYCs. Ex. 27. Finally, Ms. Sharkey did complete every possible aspect of her KYCs based upon the level of cooperation of her clients, which was necessary to complete the KC process. Ex. 57 at ¶ 2.

Defendants' false contention that any delay in completing KYCs is attributable to Ms. Sharkey is extremely disingenuous. Significant documentation demonstrates that JPMC knows that it was Client A, and not Ms. Sharkey, who caused the delay in completing the KYC for that client, which had been outstanding for months already when they were assigned to her. Exs. 16, 20, 57 at ¶ 3.

Despite promising to provide the documents and information necessary to complete the KYC, Client A failed to do so. Ex. 1, JS at 76-79. Although Client A gave the appearance of to wanting to be cooperative, after the first or second time they spoke, Client A "was unable to get to the phone, he wouldn't return [Ms. Sharkey's] phone calls [and JPMC] couldn't get the information. Ex. 1, JS at 47-48. Client A continued to be evasive up to the day Ms. Sharkey was terminated, and Ms. Sharkey "couldn't get any of the information that [she] and [her] colleagues were trying to get from [Client A]." Ex. 1, JS at 92; see also Ex. 5, KG at 42-43. Ms. Sharkey even contacted the Private Wealth Manager previously assigned to Client A's account, as well as

other individuals who had worked on the account, and all of them confirmed that Client A had been refusing to provide the requested information for years. Ex. 57 at ¶ 3.  In June 2009, Ms. Gruszczyk admitted: "They've met with [Client A] twice and **are getting a run around and sometimes bad info.  And we have still not gotten all the business docs."** (Ex. 16 at JPMC2-00089882) (emphasis added).  In July 2009, she stated: **"We've caught [Client A] telling us lies."** (Ex. 16 at JPMC2-00089884); <u>see</u> <u>also</u> Ex. 29 (demonstrating Ms. Sharkey's concern that Client A was lying about receiving her emails); <u>see</u> <u>also</u> Response to Paragraph 24 (describing that Client A lied when claiming that he was not informed from April 30, 2009 through October 2009 that documents were outstanding).  Moreover, Ms. Gruszczyk previously noted, in April, 2000, that numerous other bankers had stated that Client A was "guarded and not forthcoming when asked about his businesses."  Ex. 20 at JPMC - 00000701.  In March and April 2009, Ms. Gruszczyk received emails from a JPMC employee who had formally been working on Client A's accounts stating that "the fact is that neither I nor any of the advisors currently on the [Client A] relationship know the answers to many . . . questions" posed by Ms. Gruszczyk and "[s]ome negative information surfaced on the client and the offices are having issues with the client not being forthcoming with information."  Ex. 51; Ex. 52.  Ms. Gruszczyk even took notes concerning the issues on April 23, 2009: "Jennifer trying to get docs from client – wants to exit [and] building case."  Ex. 56.

Even Defendant Lassiter stated on April 29, 2009, with regard to the delayed KYC reports: "It is just a difficult time…too much on our plates."  Ex. 30.

19.     Ms. Lassiter asked Plaintiff to make a formal recommendation regarding Client A by the end of July. Sharkey Dep. Tr. 161 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 106-107 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 19**

Admit.

20.     On July 24, 2009, Plaintiff sent an email to Ms. Gruszczyk, Ms. Lassiter and three others stating that "all of the information that we have accumulated during the KYC remediation process feels uncomfortable regarding the [Client A] family relationship and the nature of its businesses as well as its related entities ([Client A1, Client A2, Client A3], etc). After many conversations with the client(s) and attempts to acquire the proper documentation, we still have not received all documentation and identification needed to satisfy our standard Know Your Client requirements. Since this is a complicated and long-term relationship that we inherited, I recommend that we discuss a simple way to detach the relationship from the PWM metro business. I want to be mindful of the fact that other LOB's within the firm have relationships with this client and/or its related entities and may wish to retain some or all of their business." Plaintiff's Ex. 74 (Schissel Decl. Ex. M).

**RESPONSE TO PARAGRAPH 21**

Admit.

21.     Shortly thereafter, Plaintiff, Ms. Lassiter and Ms. Gruszczyk met to discuss Client A. Sharkey Dep. Tr. 169 (Schissel Decl. Ex. B). During the meeting, Plaintiff, Ms. Lassiter and Ms. Gruszczyk agreed to exit any JPMC relationship with Client A, regardless of the line of business associated with an account, given Plaintiff's representation that Client A had failed to provide all KYC documentation in response to her requests. Lassiter Dep. Tr. 298 (Schissel Decl. Ex. D); Gruszczyk Dep. Tr. 65-66 (Schissel Decl. Ex. G); Plaintiff's Ex. 93 (Schissel Decl. Ex. N).

**RESPONSE TO PARAGRAPH 21**

Admit that a meeting occurred shortly thereafter between Defendant Lassiter and Plaintiff on July 28, 2009.  Ex. 28.

Dispute that Plaintiff's recommendation that JPMC's PWM division exit its relationship with Client A was based solely on Client A's failure to provide all KYC documentation.  Rather, the recommendation was based on all of the factors enumerated in response to Paragraph 11, which were discussed during that meeting and/or numerous times leading up to that meeting. Ex. 1, JS at 169-173.

Further dispute any implication that "Plaintiff's representation that Client A had failed to provide all KYC documentation in response to her requests" was inaccurate in any way.  As explained in Response to Paragraph 18, JPMC is aware that Client A failed to provide the requisite documentation and that Ms. Sharkey (and those before her) made repeated efforts to obtain it.

Further dispute that Defendant Lassiter agreed to exit any JPMC relationship with Client A.  In actuality, Defendant Lassiter "was very dismissive of the facts" relayed by Ms. Sharkey and stated "Oh, c'mon, Jennifer, you're – you know – you don't have proof of that."  Ex. 1, JS at 166, 171.  Moreover, Defendant Lassiter's subsequent actions demonstrate that she did not intend or plan on exiting the relationship with Client A.  To begin, it is undisputed that neither JPMC nor the PWM division exited its relationship with Client A.  See Paragraph 7 ("Client A has been a client of JPMC for 20 years and remains a client today.").  Defendant Lassiter also fabricated events that never occurred and/or misstated facts in order to support her false claim that she intended to exit the relationship with Client A.  For instance, Defendant Lassiter testified that she spoke with Client A and told him that JPMC was prepared to exit its relationship with

him. Ex. 2, LL at 57-58, 157. Defendant Lassiter also stated that she was with Jonathan Spira,

the Associate on the Client A account before and after Ms. Sharkey was terminated, for this

conversation. Id. However, Mr. Spira – when asked about this meeting – did not remember ever

discussing with Defendant Lassiter the possibility of exiting JPMC's relationship with Client A.

Ex. 6, J. Spira at 93-94. Furthermore, Client A flatly denies that he was ever informed that his

relationship with JPMC might or would be exited. Ex. 8, Client A at 35. Indeed, Client A's own

letter to JPMC dated October 2, 2009 completely fails to mention any possible exit by JPMC of

its relationship with him, although it discusses various other business with JPMC, documents he

had/would send and his threats to leave JPMC (rather than vice-versa). Ex. 31. Client A also

denies that Mr. Spira was present at the meeting, and testified that the meeting concerned the fee

that JPMC would charge Client A, which completely undercuts any claim that Defendant

Lassiter intended to exit the relationship. Ex. 8, Client A at 23-26. In fact, no such sentiment

was communicated to Client A. Id.

  Defendant Lassiter also purports to have prepared letters to send to Client A to exit his

relationship with JPMC. Ex. 2, LL at 55. However, these purported letters were never produced

during discovery and, moreover, it is undisputed that any purportedly prepared exit letters were

never sent. Ex. 8, Client A at 35. In fact, Mr. Spira, the Associate on the Client A relationship

before and after Ms. Sharkey was terminated, testified that he did not remember preparing any

paperwork in connection with the exit or potential exit of a client, including Client A. Ex. 6, J.

Spira at 26, 48. He also testified that he was unaware of anyone ever recommending that JPMC

exit its relationship with Client A, and that he never spoke about exiting the relationship with

Defendant Lassiter. Ex. 6, J. Spira at 28, 94, 102-103.