Finally, months after Defendants' decision to terminate Ms. Sharkey and retain Client A, Ms. Gruszczyk wrote the following about this meeting referenced in this Paragraph 21: "Sharkey said she wanted to exit the client, Lassiter agreed – **which appeared to be** in support of her banker." Ex. 19 (emphasis added).  Obviously, upon reflection, even Ms. Gruszczyk had come to the conclusion that Defendant Lassiter had not supported Ms. Sharkey given that she had fired her almost immediately and retained the relationship with Client A.

22.     Following the meeting, Ms. Gruszczyk sent Plaintiff sample letters used to exit client relationships. Sharkey Dep. Tr. 198-200 (Schissel Decl. Ex. B); Gruszczyk Dep. Tr. 65 (Schissel Decl. Ex. G); July 28, 2009 Email from Kathleen Gruszczyk (Schissel Decl. Ex. O).

**RESPONSE TO PARAGRAPH 22**

Admit, but dispute any implication that steps were actually taken to exit the relationship with Client A by anyone at JPMC other than Ms. Sharkey.  The templates sent were not filled out or finalized in any way following Ms. Sharkey's termination (Schissel Decl. Ex. O), and no finalized or prepared letters were ever produced during discovery in this action.  Moreover, it is undisputed that no exit letters were ever sent to Client A.  Ex. 8, Client A at 35.  Further state that Ms. Sharkey obtained the sample exit letters from Ms. Gruszczyk barely a week before her termination, and had sent an email to colleagues on Tuesday, August 4, 2009 (the day before her termination), announcing her intention to send an exit letter to Client A that same week.  Ex. 33 ("We have decided to exit the relationship and will be sending the letter this week.").

23.     After Ms. Sharkey's termination, members of Ms. Lassiter's PWM group worked to complete the exit from the Client A relationship. Plaintiff's Ex. 32 (Schissel Decl. Ex. P); Plaintiff's Ex. 35 (Schissel Decl. Ex. Q); Plaintiff's Ex. 78 (Schissel Decl. Ex. R).

**RESPONSE TO PARAGRAPH 23**

Dispute. Plaintiff's Ex. 32 (an August 27, 2009 email of Defendant Lassiter attached to the Schissel Decl. as Ex. P, and reproduced herein as Ex. 32 to the Pear. Dec.) concerns exit letters. Ex. 32. However, there is no evidence that exit letters were actually prepared, as none were produced during discovery and it is undisputed that any purportedly prepared exit letters were never sent. Ex. 8, Client A at 35. Plaintiff's Ex. 35 (September 17, 2009 emails of Mr. Spira stating that JPMC was attempting to exit its relationship with Client A, attached to Schissel Decl. at Ex. Q, reproduced herein as Ex. 35 to the Pear. Dec.) and 78 (Schissel Decl. Ex. R, reproduced herein as Ex. 34) actually demonstrate that no *bona fide* efforts to exit the Client A relationship were being made, as each demonstrates that the Client A relationship was still completely active as of September 17, 2009. Exs. 34, 35. Plaintiff's Ex. 78 demonstrates that as of September 17, 2009 – more than a month after purportedly deciding to exit JPMC's relationship with Client A – an exit date had not even been provided to Client A. Ex. 34. This is particularly telling because Plaintiff's 32 states that exit letters could properly be issued by as early as August 27, 2009, yet never were. Ex. 32; Ex. 8, Client A at 35. This is after the exit letters were supposed to be sent out by Sharkey in the first week of August 2009 (she was terminated before she had the chance). Ex. 33.

Moreover, as explained in Response to Paragraph 21, Defendant Lassiter fabricated and/or misstated events that never occurred in order to support her false claim that she intended to exit the relationship with Client A, including her false claim that informed Client A that JPMC was prepared to exit its relationship with him. Moreover, Mr. Spira, the Associate on the Client A account before and after Ms. Sharkey was terminated, testified that he did not remember preparing any paperwork in connection with the exit or potential exit of a client, including Client

A.  Ex. 6, J. Spira at 26, 48.  He also testified that he was unaware of anyone ever recommending that JPMC exit its relationship with Client A, and that he never spoke about exiting the relationship with Defendant Lassiter.  Ex. 6, J. Spira at 28, 94, 102-103.

**24.**     Ms. Lassiter informed Client A that they were missing information relating to the KYC process, and he responded that he was unaware documents were outstanding. Lassiter Dep. Tr. 157, 263-64 (Schissel Decl. Ex. D); Plaintiff's Ex. 53 (Schissel Decl. Ex. S).

## RESPONSE TO PARAGRAPH 24

Admit for the purposes of this motion, but dispute any implication that Client A was in fact unaware that documents and information requested by JPMC were still outstanding.  To begin, Client A had earlier actually promised to provide the documents and information necessary to complete the KYC, but failed to do so.  Ex. 1, JS at 76-79.  Although he seemed to want to be cooperative, after the first or second time they spoke, Client A "was unable to get to the phone, he wouldn't return [Ms. Sharkey's] phone calls [and JPMC] couldn't get the information.  Ex. 1, JS at 47-48.  Client A continued to be evasive up to the day Ms. Sharkey was terminated, and Ms. Sharkey "couldn't get any of the information that [she] and [her] colleagues were trying to get from [Client A]." Ex. 1, JS at 92; see also Ex. 5, KG at 42-43.  As explained in Response to Paragraph 18, JPMC was aware that Client A was "guarded and not forthcoming when asked about his businesses," giving Ms. Sharkey the "run around" and telling "lies."  It is undisputed that the documents and information provided by Client A were not sufficient and did not comply with Ms. Sharkey's requests. See, e.g., Ex. 1, JS at 167, 305-306; Ex. 36; Ex. 2, LL at 22-23; Ex. 23 (Ms. Gruszczyk noting that on "4/30 – Client acknowledges receipt of request for info/business docs but has not yet responded").

Indeed, documents show that Client A's statement that he was not contacted by JPMC about missing documents from April 30, 2009 through October 2009 (Ex. 31) is patently false. Ex. 23 (Ms. Gruszczyk noting that there was a "5/8 client meeting didn't produce info needed"); Ex. 37 (May 22, 2009 email showing that JPMC had talked to Client A and that JPMC did not have all documents yet); Ex. 38 (June 26, 2009 email demonstrating that Ms. Sharkey was attempting to set up a meeting with Client A); Ex. 39 (July 24, 2009 email demonstrating that Client A had a conversation regarding documents with JPMC).

   25.   Client A provided JPMC with the necessary information to complete the KYC process. Plaintiff's Ex. 53 (Schissel Decl. Ex. S); Plaintiff's Ex. 47 (Schissel Decl. Ex. T); Lassiter Dep. Tr. 33, 63 (Schissel Decl. Ex. D).

## RESPONSE TO PARAGRAPH 25

   Admit for the purposes of this motion.  Further state that such documents were not provided prior to October 2009, months after Ms. Sharkey's termination and that the relationship with Client A was not approved by PWM's head, Defendant Kenney, until well into 2010.  Ex. 55; Ex. 31; Ex. 43 (emails demonstrating that Client A was not approved as of January 2010, but was in February 2010).

   26.   Individuals from JPMC contacted the Ostrager Firm and received confirmation that Client A was authorized to trade in the escrow account.  Plaintiff's Ex. 38 (Schissel Decl. Ex. U); Lassiter Dep. Tr. 80-81 (Schissel Decl. Ex. D).  They also located the written authorization in JPMC's files that Plaintiff contended she could not find.  Lassiter Dep. Tr. 80-81 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 26**

Admit that individuals from JPMC contacted the Ostrager Firm and received confirmation that Client A was authorized to trade in the escrow account in October 2009. Dispute that these individuals located the written authorization in JPMC's files that Plaintiff could not find. The testimony cited states no such thing. Moreover, to the extent that the necessary documentation was in the possession of JPMC, it was under the control of Defendant Lassiter's subordinate on the investor's desk, and not Ms. Sharkey. Ex. 2, LL at 25-26. In fact, Defendant Lassiter specifically testified that, "It would have been nice to have [the documentation] sooner, but the people on the desk felt that they had an understanding of the situation." Id. at 26-27. Any insinuation that the failure to find the documentation is attributable to Ms. Sharkey is, therefore, false.

27. Ms. Lassiter then reversed the decision to exit the client. Lassiter Dep. Tr. 62-63 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 27**

Admit that the relationship with Client A was not exited, but dispute that this constituted a "reversal." As explained in Paragraph 21, there is a dispute as to whether Ms. Lassiter and JPMC ever genuinely intended or agreed to exit the relationship with Client A. Paragraph 21.

28. After Plaintiff became a Private Wealth Manager, Ms. Lassiter, Mr. Green and Mr. Kenney noted issues with her performance. For Ms. Lassiter, these issues included: Plaintiff's failure to pass the Series 7 examination on her first two tries; her inability to perform adequate KYC due diligence; her casual attitude towards her job and KYC responsibilities; her casual approach to the Client A KYC specifically; Plaintiff's revenue generation over-estimated her efforts in developing business; and the lack of confidence in her abilities expressed by

Plaintiff's colleagues, especially regarding Plaintiff's follow-up with clients. Lassiter Dep. Tr. 150-52, 154-55, 197-200 (Schissel Decl. Ex. D); Grande Dep. Tr. 187 (Schissel Decl. Ex. Z). Mr. Green also was concerned about the informal nature of Plaintiff's interactions with clients, as well as her inadequate knowledge and understanding of various JPMC products and her chosen invitee to a client event. Green Dep. Tr. 24-25, 58-59 (Schissel Decl. Ex. E). Mr. Kenney was also troubled by Plaintiff's invitation of a non-JPMC mortgage broker to a major JPMC hosted client event, believing that it demonstrated poor judgment, given JPMC's involvement in the mortgage business. Kenney Dep. Tr. 39-40, 147 (Schissel Decl. Ex. F); *see also* Grande Dep. Tr. 168 (Schissel Decl. Ex. Z).

**RESPONSE TO PARAGRAPH 28**

Dispute the contention that Plaintiff's performance in any way contributed to her termination. Most importantly, when Defendant Lassiter terminated Ms. Sharkey, she specifically told her that the decision "didn't have anything to do with [her] performance." Ex. 1, JS at 215-216; see also Ex. 2, LL at 188; Ex. 40 at JPMC HC2 0000217 (Defendant Lassiter termination meeting notes demonstrating that performance was not mentioned as a reason for termination during the termination meeting). Steven Grande, the Human Resources employee who met with Ms. Sharkey separately regarding her termination, also specifically told her that the termination was not based on her performance. Ex. 7, SG at 186. He confirmed this at his deposition: "[T]his was not a termination based on her performance, her flow, her asset flows, her new client production." Ex. 7, SG at 186. At her deposition, Defendant Lassiter at first confirmed that the purported reason for Ms. Sharkey's termination was solely a purported incident in which Defendant Lassiter alleges Ms. Sharkey was untruthful: "[Q:] And with respect to Ms. Sharkey, why was she terminated, why did you make the decision to terminate her

employment?" [A:] Because she was untruthful." Ex. 2, LL at 165.  It was not until after a

break in her deposition that Defendant Lassiter states that the purported dishonesty was only the

"straw that broke the camel's back," and invoked performance as another factor.  Ex. 2, LL at

171, 175.  However, Mr. Grande confirmed that purported dishonesty was the sole reason

Defendant Lassiter provided him for the basis to terminate Ms. Sharkey.  Ex. 7, SG at 186.

Finally, Ms. Sharkey was never disciplined or given any written or verbal warning whatsoever

concerning any purported performance issues other than being pressured to complete the KYC

for Client A.  Ex. 57 at ¶ 4.

      Furthermore, dispute that anything referenced in this Paragraph was a "performance

issue," as well as the substance of the contentions regarding Ms. Sharkey's performance.  Admit

that Plaintiff did take the Series 7 examination three times, and passed it the third time.

However, Ms. Sharkey was forced to walk out of one of these examinations – indeed she was

called out of the examination by Defendant Lassiter – to tend to a client emergency.  Ex. 57 at ¶

5.  Ms. Sharkey was able to pass the Series 7 examination within six months after she began

studying for the examination.  Ex. 57 at ¶ 6.  Defendants are well aware of these facts, and any

claim that Ms. Sharkey's performance on the Series 7 was a "performance issue" or contributed

in any way to the decision to terminate her employment is completely fabricated.  The fact that

Defendant Lassiter denies knowledge that Ms. Sharkey had to walk out of one of the

examinations (Ex. 2, LL at 151-152), despite the fact that Defendant Lassiter was the one who

called her out of the examination (Ex. 57 at ¶ 5), also demonstrates that this purported

performance issue, as well as its significance, is completely fabricated.

      Dispute that Plaintiff demonstrated an "inability to perform adequate KYC diligence" for

the reasons described in response to Paragraph 18.  As explained in response to Paragraph 18,

Defendants know very well – indeed, they admit in contemporaneous documentation – that any delay in the completion of the Client A KYCs was attributable to Client A, and not any deficiency on the part of Plaintiff.

Dispute that Plaintiff had a casual approach to her job or, specifically to Client A. Indeed, as explained in response to Paragraphs 18 and 19, Ms. Sharkey vigorously and repeatedly did everything within her power to get Client A to comply with JPMC's KYC process.

Dispute that "Plaintiff's revenue generation over-estimated her efforts in developing business." In fact, when asked whether "Ms. Sharkey's sales record [and/or] client development record at all part of the decision to terminate her employment," Defendant Lassiter answered: "No, her metrics were fine." Ex. 2, LL at 179. Defendant Lassiter also admitted that Ms. Sharkey had developed a number of "significant client relationships" during her tenure under Defendant Lassiter. Ex. 2, LL at 202-203. Defendant Green admitted that "By the middle of 2009, [Ms. Sharkey's] performance versus metrics exceeded expectations." Ex. 3, AG at 27-28. Ms. Sharkey's revenue generation, particularly relative to her PWM peers, speaks for itself, and the documents produced in this action demonstrate that she was a top performer. See, e.g., Ex. 41.

Dispute that Ms. Sharkey's colleagues lacked confidence in her abilities. Ex. 41; Ex. 42 Defendants rely solely on hearsay for this proposition and do not provide any admissible evidence to support it. Moreover, Ms. Sharkey was well -respected by her colleagues and followed-up with clients in a timely fashion. Ex. 57 at ¶ 7. Ms. Sharkey was never informed by any of her teammates that they lacked confidence in her. Ex. 57 at ¶ 7. Rather, Ms. Sharkey's subordinates and peers consistently sought advice from her and asked her to attend client

meetings with them because of their confidence in her.  Ex. 57 at ¶ 7.  Ms. Sharkey's

performance review from 2007 also indicates that she was "well liked by peers" and a "strong

team player."  Ex. 41; Ex. 42.

Dispute that Defendant Green was concerned about the purportedly informal nature of

Plaintiff's interactions with clients, as he specifically testified that he only had a "vague sense of

that" and could not recall any examples of Ms. Sharkey being overly informal.  Ex. 3, AG at 25.

Dispute that Defendant Green was concerned about Ms. Sharkey's purportedly

inadequate knowledge and understanding of "various" JPMC products.  First, Defendants do not

even identify a single product that Ms. Sharkey has any difficulty understanding.  Moreover, as

explained above, Ms. Sharkey's production was excellent and she was able to develop numerous

significant client relationships.  Ex. 2, LL at 179, 202-203; Ex. 3, AG at 27-28; Ex. 41.  Ms.

Sharkey's performance with regard to "Results" was rated as "Exceed[ed] Expectations" in her

2008 year-end performance review.  Ex. 41 at JPMC2-00005002.  Finally, Ms. Sharkey was

never counseled, warned or disciplined in any way concerning her purported lack of

understanding of JPMC products, nor did any client or colleague ever suggest to her that she

lacked an understanding of JPMC products.  Ex. 57 at ¶ 8.

Dispute that there was any issue with regard to Ms. Sharkey's choice of invitee to a client

event.  Defendants' version of events concerning this purported issue has shifted as prior

versions have been proven false.  In fact, Defendant Lassiter admitted that her first account of

this incident was inaccurate.  Ex. 2, LL at 194-195.  This first version of the story, appearing in a

sworn affidavit, included the claim that Defendant Kenney witnessed Ms. Sharkey attending the

event at issue (the 2008 U.S. Open of tennis), and that Ms. Sharkey had actually introduced her

client invitee, who worked as a mortgage broker, to Mr. Kenney.  Ex. 2, LL at 194-195; Ex. 15 at

¶ 21.  This story has been admitted to be false as Ms. Sharkey did not even attend this event, despite Defendant Lassiter relating that Ms. Sharkey was there in the sworn affidavit of dated December 4, 2009, which was submitted to OSHA as part of Defendants' response to Plaintiff's OSHA Complaint.  Ex. 15 at ¶ 21, Ex. 2, LL at 194-195; Ex. 4, JK at 56-57.  Significantly, the invitee was a JPMC client who had referred business to JPMC.  Ex. 57 at ¶ 9.  Defendant Kenney testified that Ms. Sharkey was asked to invite a client, and that is what she did.  Ex. 4, JK at 40; Ex. 57 at ¶ 9.  In light of Defendants' knowledge of this fact, their insistence on raising this issue demonstrates the pretextual nature of their attacks on Ms. Sharkey's performance.  The lack of any connection between the 2008 U.S. Open event and Ms. Sharkey's August 2009 termination is further demonstrated by Defendant Green's admission that this incident played no role whatsoever in his input concerning Ms. Sharkey's termination.  Ex. 3, AG at 127-128.  For the same reasons, dispute the contention that Defendant Kenney was genuinely troubled by Plaintiff's invitation of this client to the U.S. Open, which occurred nearly a year before her termination, or that this decision demonstrated poor judgment.

29.     Ms. Lassiter expressed some of these concerns in at least two meetings with Plaintiff.  Lassiter Dep. Tr. 159, 196-201 (Schissel Decl. Ex. D); Plaintiff's Ex. 60 (Schissel Decl. Ex. L); Grande Dep. Tr. 101 (Schissel Decl. Ex. Z).  She asked Plaintiff to work on these issues. Plaintiff's Ex. 60 (Schissel Decl. Ex. L); Lassiter Dep. Tr. 160 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 29**

Dispute.  Ms. Sharkey was never given any written or verbal warning concerning her performance, other than being pressured to complete KYCs for Client A.  Ex. 57 at ¶ 4.  Ms. Sharkey specifically disputes that she engaged in the two conversations referenced in Defendant Lassiter's testimony (in April and May 2009).  Ex. 57 at ¶ 4.  Ms. Sharkey was never given any

written or verbal warning indicating that there was any chance she would be terminated.  Ex. 57 at ¶ 4.  Moreover, Mr. Grande's testimony makes clear that Defendant Lassiter only purportedly discussed alleged "stylistic" issues with Ms. Sharkey.  Ex. 7, SG at 101-102.

**30.**     During a mid-year talent review of the hundreds of employees within PWM in 2009, Mr. Green placed Plaintiff on a "watch list" of "people who were struggling." Grande Dep. Tr. 117, 119 (Schissel Decl. Ex. Z); Green Dep. Tr. 71 (Schissel Decl. Ex. E).

**RESPONSE TO PARAGRAPH 30**

Admit that Ms. Sharkey was placed on a so-called "watch list" at some point in 2009, but dispute that Ms. Sharkey was struggling at all, or for any of the reasons asserted by Defendants, as further explained in Plaintiff's Response to Paragraph 28 above.  Moreover, Defendants do not contend that anyone believed that termination was merited at the time Ms. Sharkey was put on this watch list.  Defendant Green expressly testified that neither he nor anyone else advocated for Ms. Sharkey's termination prior to the discussions surrounding her actual termination, and could not recall whether Ms. Sharkey's termination was discussed during the Talent Review leading to Ms. Sharkey being placed on the watch list. Ex. 3, AG at 69-70, 73.  Defendant Kenney also testified that he did not advocate for Ms. Sharkey's termination during the Talent Review and that he did not recall ever discussing the possibility of terminating Ms. Sharkey prior to July 21, 2009.  Ex. 4, JK at 32.  Ms. Sharkey was never given any written or verbal warning indicating that there was any chance she would be terminated.  Ex. 57 at ¶ 4; Ex. 2, LL at 160-161.  In fact, Ms. Sharkey's placement on the watch list is completely unrelated to the termination decision.  As explained in Plaintiff's Response to Paragraph 28, performance had nothing to do with the decision to terminate her employment.  Paragraph 28.  Moreover, on August 6, 2013, even after her termination, the watch list stated that Ms. Sharkey would be

"revisit[ed]" in September 2009, demonstrating that there was no plan to terminate her prior to the recommendation that JPMC exit its relationship with Client A. Ex. 44. Mr. Grande, a JPMC Human Resources employee, testified that he was unaware of whether any employee on the watch list other than Ms. Sharkey was terminated. Ex. 7, SG at 170. Finally, Defendants cite nothing other than their own self-serving testimony for the proposition that Plaintiff was on a watch list prior to her termination, and have no evidence regarding the purported significance of that list.

31.     During that talent review, Mr. Kenney and Mr. Green were prepared to consider Plaintiff's termination, but Ms. Lassiter "was in favor of more time to evaluate. . . . She was generally more supportive and more optimistic about [Plaintiff]'s potential than" Mr. Green or Mr. Kenney. Green Dep. Tr. 124-25, 129 (Schissel Decl. Ex. E).

**RESPONSE TO PARAGRAPH 31**

Dispute.  Any testimony regarding the contention that Defendants Kenney and Green were prepared to consider Plaintiff's termination is contradicted by their testimony that they did not advocate for Ms. Sharkey's termination at that time and could not recall whether Ms. Sharkey's termination was discussed during the Talent Review leading to Ms. Sharkey being placed on the watch list (Mr. Kenney testified that he had not discussed Sharkey's termination prior to July 11, 2009). Ex. 3, AG at 69-70, 73; Ex. 4, JK at 31-32.  Admit that Ms. Lassiter did not recommend terminating Plaintiff at the time of the Talent Review.  The decision to terminate was not made until early August 2009, after Ms. Sharkey recommended exiting the relationship with Client A.  Ex. 4, JK at 31.

32.     In late July 2009, a client's office manager ("Manager T") phoned Ms. Lassiter and told Ms. Lassiter that she could not contact Plaintiff, Plaintiff had not returned her calls and

Plaintiff was a "phantom."  Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

**RESPONSE TO PARAGRAPH 32**

Dispute on the basis that the only support provided is hearsay and that no affidavit of Manager T is submitted to corroborate this claim, but admit for the purposes of this motion.

33.    Ms. Lassiter then asked Plaintiff whether she had ever spoken to Manager T, and Plaintiff replied yes.  Sharkey Dep. Tr. 219 (Schissel Decl. Ex. B); Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

**RESPONSE TO PARAGRAPH 33**

Admit.

34.    Ms. Lassiter then called Manager T back, and Manager T maintained that she had never spoken to Plaintiff. Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D): Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

**RESPONSE TO PARAGRAPH 34**

Dispute on the basis that the only support provided is hearsay and that no affidavit of Manager T is submitted to corroborate this claim, but admit for the purposes of this motion.

35.    Ms. Lassiter asked Plaintiff again whether she had called Manager T, and Plaintiff replied yes.  Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

**RESPONSE TO PARAGRAPH 35**

Admit.

36.     Ms. Lassiter asked again, and Plaintiff stated that she had not called Manager T.

Lassiter Dep. Tr. 165-169 (Schissel Decl. Ex. D); Plaintiff's Ex. 63 (Schissel Decl. Ex. V);

Grande Dep. Tr. 129-130 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108 (Schissel Decl. Ex. W).

**RESPONSE TO PARAGRAPH 36**

Dispute.  Defendants conspicuously fail to cite to Plaintiff's deposition for this factual

contention, because Ms. Sharkey flatly disputes Defendants' account of this conversation, which

demonstrates the disingenuous nature of the representation that this factual contention is

undisputed.  Plaintiff expressly testified:

> A:     I remember Leslie asking me if I  had called or contacted
> this client.

> Q:     And what did you say?

> A:     I said yes, I had introduced myself to this client.  It was a
> client that I had -- somebody -- I don't know, had left the
> firm and it belonged to somebody else, and I inherited this
> client, and I remember her asking me if I had spoken to this
> client.

> Q:     And you said yes?

> A:     And I said yes, I introduced myself.  You know, I talked to
> the client before -- not the client, the client's assistant or
> associate, this woman [Manager T].

> Q:     And do you recall Ms. Lassiter telling you that [Manager
> T] told her that she had never heard from you?

> A:     I recall Leslie asking me had I ever spoken to this client
> and I said yes, and I don't recall Leslie saying that I didn't --
> that the client had never heard from me.

> Q:  At any point during that back and forth with Ms.
>     Lassiter about this client, did you tell her that you had
>     not, in fact, contacted this client?
>
> A:  I don't know what you're referring to. I had spoken to
>     [Manager T] a few times. I don't know what – what
>     you're referring to or when.

Ex. 1, JS at 218-220 (emphasis added). Thus, to be clear, Ms. Sharkey was asked whether she

had spoken with Manager T, responded truthfully that she had, and never recanted that statement

or otherwise indicated in any way that her response was not truthful. Ex. 1, JS at 218-220.

Plaintiff never stated that she had not called Manager T. Ex. 1, JS at 218-220.

37.    Upset that Plaintiff had lied to her, Ms. Lassiter then called Steven Grande, the

"HR business partner covering the northeast PWM business" to inform him that she had multiple

conversations with both Manager T and Plaintiff, and that it took those multiple conversations

for Plaintiff to admit that she had not spoken to Manager T. Lassiter Dep. Tr. 183-184 (Schissel

Decl. Ex. D); Grande Dep. Tr. 20, 129-30, 140 (Schissel Decl. Ex. Z); Plaintiff's Ex. 108

(Schissel Decl. Ex. W).

## RESPONSE TO PARAGRAPH 37

Dispute on the basis that Plaintiff never admitted that she had not spoken with Manager

T. Response to Paragraph 36 (citing and quoting Ex. 1, JS at 218-220). Plaintiff had, in fact,

spoken with Manager T. Id.

38.    Mr. Grande informed Ms. Lassiter that, under JPMC's policies, "dishonesty could

result in termination." Grande Dep. Tr. 145 (Schissel Decl. Ex. Z); see also JPMC Corrective

Action Policy (Schissel Decl. Ex. X).

## RESPONSE TO PARAGRAPH 38

Admit for the purposes of this motion.

39.   Following his conversation with Ms. Lassiter, Mr. Grande primarily consulted with four individuals regarding possible courses of action in response to Plaintiff's lie: Linda Padilla in JPMC's Employee Relations Group, his supervisor Lee Gatten in JPMC's Human Resources Group, Mr. Green and Ms. Lassiter.  Grande Dep. Tr. 141-42, 201-202 (Schissel Decl. Ex. Z).

**RESPONSE TO PARAGRAPH 39**

Admit, but further state that Defendant Kenney was also involved in the decision to terminate Ms. Sharkey.  Ex. 2, LL at 184-185, 191-192; Ex. 3, AG at 83-84.  The self-serving claim that he was not involved (Ex. 4, JK at 31-32) is, thus, disputed by Defendants' own witnesses.

40.   During these conversations, none of the individuals mentioned Client A or any of Plaintiff's purported concerns regarding Client A. Grande Dep. Tr. 202-03 (Schissel Decl. Ex. Z); Green Dep. Tr. 137-38 (Schissel Decl. Ex. E). The conversations were focused on whether Plaintiff should be terminated. Lassiter Dep. Tr. 174-75, 179-81 (Schissel Decl. Ex. D).

**RESPONSE TO PARAGRAPH 40**

Admit for the purpose of this motion.

41.   Collectively, the group decided that Plaintiff should be terminated for a loss of trust and confidence and for being untruthful to Ms. Lassiter. Grande Dep. Tr. 143-144, 148-149, 152-53 (Schissel Decl. Ex. Z); Lassiter Dep. Tr. 174-75, 185 (Schissel Decl. Ex. S).

**RESPONSE TO PARAGRAPH 41**

Dispute.  Defendant Lassiter's claim that Ms. Sharkey was untruthful is simply false.  Ex. 1, JS at 218-220.  This claim is based entirely on Defendant Lassiter's false claim that Ms. Sharkey admitted to lying to Ms. Lassiter, but Defendant Lassiter's account of the conversation

at issue is not true and is flatly disputed by Ms. Sharkey.  See Paragraph 36, response to

Paragraph 36.

Even if Defendant Lassiter's disputed account were to be credited, which it cannot be for

the purposes of this motion, the decision to terminate Ms. Sharkey was not made when the

purported dishonesty was revealed.  Defendant Kenney admitted that the decision to terminate

Ms. Sharkey was made in early August 2009, approximately two weeks after the alleged

Manager T incident and, importantly, within one week of Ms. Sharkey's complaints concerning

Client A and final formal recommendation to exit the relationship with Client A.  Ex. 4, JK at 31.

Defendant Green, in a transparent attempt to separate the termination decision from Ms.

Sharkey's complaints and recommendation concerning Client A, testified that the decision was

made approximately within a month prior to the termination taking place.  Ex. 3, AG at 21-22.

However, the incident involving the purported dishonesty had not yet occurred a month prior to

the termination.  Furthermore, Defendant Green's testimony clashes with Defendant Kenney's

testimony that the termination decision was not made until early August 2009 – days after Ms.

Sharkey's recommendation to exit and much closer to her actual termination date.  Ex. 4, JK at

31.

The purported incident of dishonesty is revealed as pure pretext by email correspondence

between Defendant Kenney and Defendant Green on July 21, 2009 (the purported date of the

incident):

> [From Defendant Green to Defendant Kenney:]
> FYI, just as I was running out, Leslie posted me on an incident
> regarding Jennifer Sharkey.  I sent her to Grande, but it is highly
> likely we terminate her right away.  As you recall, she is ranked
> yellow and watch list.
>
> [Response from Defendant Kenney to Defendant Green:]
> **Okay.  Sometimes it doesn't take long for people to step on their own feet.**

Ex. 45 (emphasis added).  This email reveals that Defendants were simply waiting for an excuse that would provide a pretext for terminating Ms. Sharkey.

      Moreover, Defendants have not provided a consistent explanation for the decision to terminate Ms. Sharkey.  When Defendant Lassiter terminated Ms. Sharkey, she specifically told her that the decision "didn't have anything to do with [her] performance."  Ex. 1, JS at 215-216; see also Ex. 2, LL at 188; Ex. 40 (notes of Defendant Lassiter regarding the termination meeting with Ms. Sharkey demonstrating that performance was not mentioned as a reason for termination during the meeting).  Steven Grande, the Human Resources employee who met with Ms. Sharkey separately regarding her termination, also specifically told her that her termination was not based on her performance.  Ex. 7, SG at 186.  Mr. Grande confirmed this at his deposition: "[T]his was not a termination based on her performance, her flow, her asset flows, her new client production."  Ex. 7, SG at 186.  At her deposition, Defendant Lassiter at first confirmed that the purported reason for Ms. Sharkey's termination was solely an incident in which Defendant Lassiter alleges Ms. Sharkey was untruthful: "[Q:] And with respect to Ms. Sharkey, why was she terminated, why did you make the decision to terminate her employment?"  [A:] Because she was untruthful."  Ex. 2, LL at 165.  It was not until after a break in her deposition that Defendant Lassiter stated that the purported dishonesty was only the "straw that broke the camel's back," and invoked performance as another factor.  Ex. 2, LL at 171, 175.  At that point, Defendant Lassiter invoked the disputed and false performance issues listed in Paragraph 28 as additional factors in Ms. Sharkey's termination.  Ex. 2, LL at 175-176, 179-180.  However, Mr. Grande testified differently, confirming that purported dishonesty was the sole reason that Defendant Lassiter provided to him for Ms. Sharkey's termination.  Ex. 7, SG at 186.  Defendants remain confused as to the reasons for Plaintiff's termination, as they describe numerous fabricated

performance issues in Paragraph 28, and yet do not consistently cite performance as a reason for termination.  See Paragraph 41 ("[T]he group decided that Plaintiff should be terminated for a loss of trust and confidence and for being untruthful to Ms. Lassiter.").  This directly contradicts their memorandum of law, which claims that Ms. Sharkey was terminated for being "an underperforming employee who lied to her supervisor."  Defendants' Memorandum of Law at p. 18.

Additionally, in the aftermath of Defendants' decision to terminate Ms. Sharkey and retain Client A, Ms. Gruszczyk wrote the following about the end-of-July 2009 conversation during which Ms. Sharkey recommended exiting the relationship with Client A: "Sharkey said she wanted to exit the client, Lassiter agreed – **which appeared to be** in support of her banker." Ex. 19 (emphasis added).  Obviously, upon reflection, even Ms. Gruszczyk had come to the **conclusion that Defendant Lassiter may not have genuinely supported Ms. Sharkey's recommendation to exit, considering that Defendant Lassiter fired Ms. Sharkey almost** immediately afterwards and retained the relationship with Client A despite the apparent support of the decision to exit.

Mr. Kenney could not identify a single employee other than Ms. Sharkey who had been terminated on grounds of dishonesty.  Ex. 4, JK at 66-67.  Mr. Grande identified one other employee who was purportedly terminated on grounds of dishonesty, but this individual's actions in late 2011 or early 2012 were of a far more serious quality than Defendants' disputed version of the alleged Manager T incident: specifically, this other individual terminated in or around 2012 had engaged in undocumented trading.  Ex. 7, SG at 42, 64-65.

Defendant Lassiter is aware of instances of other employees being dishonest to her or members of the PWM team, yet did not terminate these employees.  Ex. 57 at ¶¶ 10-11.  For

instance, Lu Ann Bowers, a Credit Officer, was working on obtaining a letter of credit for a new client. Id. at ¶ 10.   Ms. Bowers was responsible for the underwriting and extended the letter of credit knowing that the cash collateral had not been received by JPMC. Id.  Ms. Bowers lied to Ms. Sharkey and other team members, stating that the collateral had been received prior to extending the letter of credit. Id. This situation put JPMC at great risk, as, for a period of weeks, JPMC did not have the collateral to satisfy the letter of credit. Id. Ms. Sharkey informed Defendant Lassiter about this situation, including the fact that Ms. Bowers had lied to numerous people on the team (including Ms. Sharkey). Id. Rather than disciplining or terminating Ms. Bowers, Ms. Lassiter simply replied, "Why don't the two of you work it out?" Id.  Defendant Lassiter also was aware that Michael Guild and Stephanie Fennessey, two of her subordinates, were engaged in an intra-office romance. Id. at ¶ 11. Defendant Lassiter confronted the two employees in 2008-2009, who lied to her and said that they were not engaged in a romantic relationship. Id.  If Defendant Lassiter did not know she was being lied to at the time, she certainly found out when Mr. Guild and Ms. Fennessey were later married.  Neither of them was terminated for lying to Defendant Lassiter. Id.

42.     On August 5, 2009, Ms. Lassiter and Mr. Grande separately informed Plaintiff that she was being terminated due to a lack of judgment and untruthfulness related to the Manager T incident. Plaintiff's Ex. 63 (Schissel Decl. Ex. V); Lassiter Dep. Tr. 188 (Schissel Decl. Ex. D); Sharkey Dep. Tr. 215-216, 224-225 (Schissel Decl. Ex. B); Defendant's Ex. 13 (Schissel Decl. Ex. Y); Grande Dep. Tr. 180, 189 (Schissel Decl. Ex. Z).

## RESPONSE TO PARAGRAPH 42

Dispute.  The precise content of what was discussed in Ms. Sharkey's termination meetings is unclear based upon the record.  During Ms. Sharkey's termination meeting with

Defendant Lassiter, Defendant Lassiter stated that "she just couldn't have someone around that she didn't trust." Ex. 1, JS at 216.  Mr. Grande also stated in his separate termination meeting with Ms. Sharkey that she was being terminated because Defendant Lassiter did not trust her anymore. Ex. 1, JS at 224-225.  Ms. Sharkey did not recall that the alleged Manager T incident was discussed in her termination meetings with either Defendant Lassiter or Mr. Grande. Ex. 1, JS at 215-216, 221-222, 223-225.  Furthermore, handwritten notes taken by Defendant Lassiter on the day of Ms. Sharkey's termination, August 5, 2009, seem to note only a "lack of judgment around [Manager T client]," but say nothing about a purported untruthful statement by Ms. Sharkey to her supervisor, Defendant Lassiter. Ex. 40 at JPMC HC2 0000217.  In addition, although notes by Ms. Sharkey from the same day refer to the Manager T client and an unspecified "lapse in judgment," they do not mention anything about a purported lie. Ex. 46.

43.     Plaintiff did not mention Client A or the KYC process during either of these conversations, and did not deny that she lied to Ms. Lassiter. Lassiter Dep. Tr. 188-92 (Schissel Decl. Ex. D); Grande Dep. Tr. 180-81, 199-201 (Schissel Decl. Ex. Z); Sharkey Dep. Tr. 215-216, 224-225 (Schissel Decl. Ex. B).

**RESPONSE TO PARAGRAPH 43**

Admit for the purposes of this motion, but dispute any significance.  As explained, Plaintiff never lied to Defendant Lassiter. Ex. 1, JS at 218-220.  Further state that Ms. Sharkey testified that she was shocked and in a "state of disbelief" in her termination meetings, and therefore could not be expected to raise every thought she might have had regarding her termination or the reasons for it. Ex. 1, JS at 224:18-225:10.

47

## ADDITIONAL MATERIAL AND DISPUTED ISSUES OF FACT

**44.**     Colombia does not have "adequate anti-money laundering laws" and is categorized as a "high risk" nation with regard to money laundering.  Ex. 5, KG at 14-15.

**45.**     The jewelry and prepaid telephone card industries are "high risk" because these industries are more prone to money laundering than other industries because they engage in a lot of cash transactions.  Ex. 5, KG at 18-19; Ex. 3, AG at 32-33; Ex. 4, JK at 78-79; Ex. 9, AM at 131-132.

**46.**     According to Federal Financial Institutions Examination Council documentation, which is incorporated into JPMC's training, the following activity constitute "red flags" with regard to money laundering or terrorist financing: (i) when a client provides insufficient or suspicious information to a bank; (ii)  the customer is a shell company and is reluctant to provide information on controlling parties; (iii) the customer is reluctant to provide information needed to file a mandatory report; (iv) unexplained funds transfer activity; (v) unusual transfers or funds occurring among related accounts that involve the same or related principals; and/or (vi) the client has established multiple accounts in various corporate or individual names that lack sufficient business purpose for the account complexities, or which appear to be an effort to hide the beneficial ownership from the bank.  Ex. 46; Ex. 5, KG at 202-209.

**47.**     The JPMC New Hire Welcome Book states that: "The Bank Secrecy Act (BSA) and other anti-money laundering laws require that banks ascertain the true identities of customers, determine the legitimacy of deposited funds, and report transactions that are suspicious for customers' known business.  The Bank Secrecy Act specifically requires that financial institutions develop programs to fight money laundering."  Ex. 13 at JPMC HC 0001088.

48.     The JPMC New Hire Welcome Book also states that: "The USA Patriot Act imposed strengthened requirements on financial institutions to know the true identity of their customers.  The USA Patriot Act requires [JPMC] to have a Customer Identification Program (a CIP).  Our CIP includes procedures for

- o   obtaining information about each customer's identity,

- o   verifying each customer's identity,

- o   keeping records of the information collected about each customer,

- o   comparing customer names with government lists, and

- o   providing customers with notice about the purpose of the USA Patriot Act."

Ex. 13 at JPMC HC 0001088; see also Ex. 12 (KYC information gathering necessary to comply with Patriot Act); Ex. 14 at p. 11 ("know[ing] your customers" is a policy designed and implemented to prevent money laundering and comply with the Bank Secrecy Act and Patriot Act.).

49.     During her deposition, Ms. Sharkey explained that the information she was unable to obtain from Client A was, inter alia, information required to complete the KYC and determine Client A's source of wealth.  Ex. 1, JS at 81-84.  During her deposition, Ms. Sharkey offered to provide further specific information, but was refused the opportunity by defense counsel:

Q:     You've told me so far [ ] he's not in compliance with the KYC because you could not determine his source of wealth and he hadn't provided you documentation.  If there was some other reason that you believed in April of 2009 he was not in compliance, I want to know.

A:     There were other -- yes.  There was the fact that he was trading in an account, in an escrow account.

Q:     Anything else?

> **A:** There -- we went through specific documentation that was missing. Do you need me to be more specific than that?
>
> **Q:** No.

Ex. 1, JS at 83-84.

50.     Ms. Sharkey's recommendation to exit the relationship with Client A extended only to his relationship with the PWM division. Ex. 1, JS at 168-169.  However, Ms. Sharkey only had the authority to recommend that the PWM division exit its relationship with Client A, and it was not her role nor was it within her authority to make recommendations concerning other areas of JPMC.  Ex. 1, JS at 168-169.

51.     Ms. Sharkey sent an email after July 28, 2009 in which she recommended that the PWM exit its relationship with Client A.  Ex. 1, JS at 179-185.  Defendants Kenny, Green and Lassiter were all copied on this email.  Ex. 1, JS at 179-185.  Defendants did not produce this email during discovery, but have admitted that deleted emails were not searched and that at least two deleted emails were not produced in email form.  Ex. 47.  It is, therefore, no surprise that this email was not produced.

52.     Defendant Lassiter also testified that she discussed with Defendant Kenney the decision to exit JPMC's relationship with Client A.  Ex. 2, LL at 56-57, 155-156; see also,Ex. 48 (Defendant Kenney purportedly believed exiting the relationship was a good decision).

53.     Expert witness Anne M. Marchetti holds a B.A. in Economics from Providence College and an M.S.in Accounting from the University of Hartford.  Ex. 49.  She has over 20 years of experience in both private industry and public accounting.  Id.  Her expertise includes Sarbanes-Oxley implementation, design, analysis and optimization of internal control systems as well as corporate governance and risk management programs.  Id.; see also Ex. 50 (Resume of

Anne M. Marchetti).  Based on her qualifications and experience, as well as her review of

relevant documentation, Ms. Marchetti concluded, *inter alia*, that:

(i)     Sufficient, competent evidential matter to support a reasonable belief
        that the suspect client was engaging in fraud, money laundering, as
        well as violating federal security laws and the subsequent
        recommendation to terminate the suspect client relationship was
        provided to the appropriate level of supervisors and senior
        management including the bank compliance department; and

(ii)    Ms. Sharkey documented and presented significant direct and/or
        circumstantial evidence to support her concerns regarding potential
        illegal activity perpetrated by the suspect client including fraud, money
        laundering and security law violations.  Examples include but are not
        limited to the suspect client's reluctance to provide requested
        information to the bank, unusual fund transfer activity by the suspect
        client as well as suspicious account and transaction activity. These
        documented suspicious activities, in most cases, are historically
        indicative of fraudulent acts.

Ex. 49 at pp. 2-3.  Ms. Marchetti also testified that her conclusions and testimony related only to

the presence of "red flag" indicators of financial fraud, such as money laundering, mail fraud or

tax evasion or other fraud, and did not offer any conclusion regarding whether or not Ms.

Sharkey did, in fact, have a reasonable belief regarding unlawful activity.  Ex. 9, AM at 77:12-

78:12, 85:12-22.  Ms. Marchetti also offered her expert perspective on the practical reasons that

many of the "red flags" and factors present in the instant case are considered indicators of

possible fraud and/or money laundering, such as the hiding of an audit trail through movement of funds through multiple accounts.  Ex. 9, AM at 130:11-17; 134:12-23.

Dated: September 27, 2013
      New York, New York

                                   Respectfully submitted,

                                   THOMPSON WIGDOR LLP

                                   By: _____
                                          Douglas H. Wigdor
                                          Lawrence M. Pearson
                                          Michael J. Willemin

                                 85 Fifth Avenue
                                 New York, NY 10003
                                 Telephone:  (212) 257-6800
                                 Facsimile:  (212) 257-6845
                                 dwigdor@thompsonwigdor.com
                                 lpearson@thompsonwigdor.com
                                 mwillemin@thompsonwigdor.com

                                 *Counsel for Plaintiff*