UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

JENNIFER SHARKEY,

                Plaintiff,               10 Civ. 3824

    -against-                       OPINION

J.P. MORGAN CHASE & CO., JOE KENNEY,
ADAM GREEN, and LESLIE LASSITER, in
their official and individual
capacities,

                Defendants.

-----------------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10|9|15

        Attorneys for Plaintiff

        WIGDOR LLP
        85 Fifth Avenue
        New York, NY 10003
        By:  Douglas H. Wigdor, Esq.
             Lawrence M. Pearson, Esq.
             Michael J. Willemin, Esq.

        Attorneys for Defendants

        ARNOLD & PORTER LLP
        399 Park Avenue
        New York, NY 10022-4690
        By:  Michael D. Schissel, Esq.

**Sweet, D.J.**

Upon remand, defendants J.P. Morgan Case & Co. ("JPMC"),
Joe Kenney ("Kenney"), Adam Green ("Green") and Leslie Lassiter
("Lassiter") (collectively, the "Defendants") have again moved
for summary judgment pursuant to Fed. R. Civ. P. 56, seeking to
dismiss plaintiff Jennifer Sharkey's ("Plaintiff" or "Sharkey")
Amended Complaint (the "FAC") alleging that she was terminated
for whistleblowing, in violation of the Sarbanes-Oxley Act's
anti-retaliation provision, 18 U.S.C. § 1514A ("SOX"). Upon the
findings and conclusions set forth below, the Defendants' motion
is granted.

## Prior Proceedings

On October 22, 2009, Plaintiff filed a complaint with the
Occupational Safety and Health Administration ("OSHA") of the
U.S. Department of Labor. On April 12, 2010, OSHA dismissed the
complaint because "Complainant did not engage in protected
activity under SOX."

On May 10, 2010, Plaintiff filed her Complaint in this
Court alleging breach of contract and violations of the SOX

1

anti-retaliation statute. (Dkt. No. 1.) By an Opinion dated
January 14, 2011, the Court dismissed the whistleblower claim
with leave to refile, concluding that "Sharkey has not
identified the allegedly illegal conduct that forms the basis of
her whistleblower complaint." Sharkey v. J.P. Morgan Chase &
Co., No. 10 Civ. 3824, 2011 WL 135026, at *8 (S.D.N.Y. Jan. 14,
2011) ("Sharkey I"). The breach of contract claim was also
dismissed, but with prejudice. Id. at *10. On February 14,
2011, Plaintiff filed the FAC, which states a single claim under
SOX. (Dkt. No. 20)


On December 12, 2013, The Court granted summary judgment
for the Defendants, dismissing the FAC. Sharkey v. J.P. Morgan
Chase & Co., No. 10 Civ. 3824, 2013 WL 10796833 (S.D.N.Y. Dec.
12, 2013) ("Sharkey II"). The Court found that Sharkey was not
protected by SOX's anti-retaliation provision because "the
undisputed statements of fact indicate that the legitimate
intervening basis for [Plaintiff's] termination was her
dishonesty to her supervisor, and her past performance
deficiencies," Id. at 11, and that, "even if Plaintiff were able
to establish a prima facie case for whistleblowing, on the
undisputed record, JPMC terminated Plaintiff for reasons

2

unrelated to her alleged protected activity and which, in and of themselves, were valid grounds for termination." Id. The December 12 Opinion concluded that "Plaintiff has failed to show a causal connection between her purported protected activity and Defendants' decision to terminate her employment." Id. On December 19, 2013, Plaintiff filed a Notice of Appeal. (Dkt. No. 83.)

After the parties briefed the appeal, the Second Circuit issued its decision in another SOX whistleblower case, Nielsen v. AECOM Tech. Corp., 762 F.3d 214 (2d Cir. 2014), which clarified the state of mind that a plaintiff must have in order for her conduct to merit protection from retaliation. On October 9, 2014, the Second Circuit vacated this Court's Sharkey II opinion "[i]n light of this intervening shift in standard," and remanded the case, directing the Court "to assess in the first instance whether Sharkey engaged in Section 806 protected activity under the standard set out in Nielsen." Sharkey v. J.P. Morgan Chase & Co., 580 F. App'x 28, 29 (2d Cir. 2014) ("Sharkey III"). The Second Circuit directed:

> Should the district court conclude that Sharkey engaged in any identifiable protected activity under the more lenient Nielsen standard, it should reassess, in the context of this finding,

3

> whether the identified protected activity "was a
> contributing factor in the unfavorable action,"
> Bechtel v. Admin. Review Bd., 710 F.3d 443, 451
> (2d Cir. 2013), and if so, whether defendants
> have proven "with clear and convincing evidence
> that [they] would have taken the same unfavorable
> personnel action in the absence of [that]
> protected behavior," id.

Sharkey III, 580 F. App'x at 29.

The Defendants filed the instant motion for summary
judgment on December 22, 2014. (Dkt. No. 89.) The motion was
heard and marked fully submitted on February 11, 2015.

## The Facts

The facts have been set forth in the Defendants' Statement
of Undisputed Material Facts (Dkt. No. 92), the Plaintiff's
Counterstatement (Dkt. No. 99), and the Defendants'
Counterstatement to Plaintiff's Additional Material and Disputed
Issues of Fact (Dkt. No. 106), and are not in dispute except as
noted below.

1. Sharkey

Sharkey was hired by JPMC in November 2006 and worked in its Private Wealth Management ("PWM") division from the spring of 2008 until she was terminated on August 5, 2009. Prior to her employment at JPMC, she had been in the financial industry for 11 years at Citibank and First Republic Bank, where she had received training on due diligence procedures, the Know Your Client ("KYC") process, identification of suspicious account activity and reviewing information provided by clients.

In the spring of 2008, Lassiter became the head of the PWM unit in which Plaintiff was employed. At all relevant times, Plaintiff reported directly to Lassiter. Lassiter reported to Green, then the head of the Northeast Region of PWM. Green in turn reported to Kenney, then the Chief Executive Officer of PWM.

As a Private Wealth Manager, Sharkey's responsibilities included understanding JPMC's various financial products, generating new business and managing existing clients, as well as completing KYC due diligence and associated forms for each of her clients. Sharkey further states that her responsibilities included soliciting new clients, communicating with clients to

5

achieve their financial goals, and liaising with other arms of
JPMC to generate investment opportunities for them. She managed
approximately 50 client relationships, with assets under
management ranging from $250-500 million, generating over $2.5
million in revenue for JPMC. Between January and August 2009
she developed 20 new client relationships that brought in $90
million in new assets.

The Know Your Client process involves collecting
information such as incorporation records and documentation
establishing clients' source(s) of wealth, as well as
identifying potential "high risk factors" associated with
clients. The KYC process also involves collecting documents
concerning a client's corporate formation, documents showing the
location(s) that a client conducts business and whether the
client's entities are based in the United States or abroad, tax
returns, financial statements, Form W-9s, and even photocopies
of driver's licenses and passports. JPMC is required to conduct
KYC due diligence by the Uniting and Strengthening America by
Providing Appropriate Tools Required to Intercept and Obstruct
Terrorism Act of 2001, commonly known as the "Patriot Act", the
Bank Secrecy Act and "various rules and statutes that govern

6

banking in the United States." The goals of the KYC program
include detecting suspicious activities such as money laundering
or other violations of the Patriot Act.

2. Client A

During her employment with JPMC, Sharkey raised concerns
about allegedly suspicious practices by one of her clients, who
the Court and the parties have referred to as "Client A."
Client A has been a client of JPMC for 20 years and remains a
client today. He is engaged in the gem, real estate,
telecommunications, medical technology, and pre-paid calling
cards businesses. In early 2009, Sharkey was assigned by
Lassiter to be the Private Wealth Manager for Client A's
accounts. According to Sharkey, Client A was a "huge" client,
or at least "larger than average" from an "assets under
management" perspective. Sharkey states that JPMC recognized a
potential for growth in its relationship with Client A, since
Client A "mentioned that he would like JPMorgan to enter into a
more active brokerage dialogue which if positive could increase
the trading volume." In December 2008, according to Sharkey,
Lassiter approved the opening of a brokerage account for Client

7

A despite the fact that certain negative issues had been discovered and remained unresolved. Sharkey has alleged that Lassiter's compensation was influenced by the total revenue from trades, including trades by Client A, and states that in April 2006 JPMC employee Deborah Nye conveyed to Lassiter that Client A had asked for certain discount pricing, and added "I didn't want to jeopardize anything [Lassiter might have with [Client A]."

Other JPMC employees had begun the KYC process for Client A and identified risk factors before Sharkey was assigned to his accounts. These other JPMC employees had encountered avoidance and other difficulty in connection with the collection of documents and information from Client A, including with respect to the KYC process. In April 2009, Kathleen Gruszczyk ("Gruszczyk") of the JPMC Risk Department sent Plaintiff an email summarizing information that had been collected about Client A and setting forth "risk concerns" with regard to Client A's practices. This document included the following points:

• Client A "primarily continues to be in the diamond/gem business - considered potentially high risk from an [anti-money laundering] prospective."

8

•        "[o]ther [of Client A's] interests appear to
include real estate, telecommunications, medical technology, and
pre-paid calling cards system (Note: pre-paid calling card is
also a high risk business type)."

•        Client A had seven judgments/liens filed against
him for over $33,000,000, and prior banks working with Client A
claimed over $50,000,000 in losses when a business run by Client
A was forced into bankruptcy.

•        Prior to being forced into bankruptcy, this
business of Client A's was sued for $30,000,000 allegedly owed
to Merrill Lynch Capital Corporation.

•        One owner/signer on certain Client A accounts is
a "politically exposed person."

•        "Many business accounts [had] been opened [by
Client A], but apparently there [were] no legal documents for
the entities in the client's file."

•        It was unclear whether Client A's businesses were
foreign or domestic.

•        It was unclear how Client A's businesses
interacted with each other.

•        It was unclear who owned Client A's businesses.

•        The occupations and sources of wealth of the
principals of Client A's businesses was unknown.

•        Various bankers had noted that Client A was
guarded and not forthcoming when asked about the businesses.

Gruszczyk also sent several emails discussing difficulties

obtaining documents and concerns about client A's legitimacy,

several of which advocated terminating the relationship between

JPMC and Client A.  When JPMC decided to continue the

relationship, Gruszczyk sent an email describing the situation

as a "bummer!" Gruszczyk ultimately referred Client A to JPMC's Anti-Money Laundering ("AML") division, which she admitted was "beyond [] the norm."

Sharkey contends that she became concerned about Client A as well, both for the reasons identified by Gruszczyk and due to Client A's failure to provide documents, her inability to confirm addresses for some of his businesses, and Client A's execution of trades in an escrow account at JPMC owned by a law firm, where Client A appeared to lack authorization. Sharkey also identified several additional points she found important, including 1) the fact that Client A's businesses were in areas that were high-risk from a money laundering perspective; 2) Client A having several judgments and liens against him and other banks having lost tens of millions of dollars when one of his businesses went under; 3) the business that went bankrupt having been sued for accounting-related fraud; 4) business accounts having been opened by Client A without legal documents for the entities in question; 5) the large number of different accounts Client A controlled, in contrast to a smaller number of sources of income; 6) the fact that many of the accounts had low or zero balances, yet Client A refused to close them; 7) a

10

background screen on one of Client A's major businesses that
returned no records of the corporation; 8) some of Client A's
organizations doing business in the name of other Client A-
affiliated entities, with many of his businesses sharing the
exact same address, all while Client A refused to provide
supporting documentation; 9) Client A's being unable or
unwilling to return her phone calls regarding KYC and Patriot
Act requirements; 10) Client A's wife requesting that JPMC
reimburse her for money taken out of an account by another
individual who had trading authority; 11) evasive or
stonewalling responses from Client A to questions seeking
information about how his businesses operated and made their
money; and 12) unusual account activity by Client A, including
transferring money between his accounts, withdrawing money and
returning it soon afterwards, and using bank branches in a way
that made it difficult for JPMC to track his activity.
According to Sharkey, she formed her belief that Client A might
be engaged in illegal activity after investigating Client A and
having numerous conversations with and about him.

The escrow account that concerned Sharkey belonged to
Ostrager Chong Flaherty & Broitman PC, which represented and

11

still represents Client A in multiple lawsuits concerning his intellectual property. The firm deposited proceeds from the lawsuits into the escrow account with JPMC, from which Client A made trades. Client A was in fact authorized to execute trades using the funds held in that escrow account, but Sharkey states that she made "numerous efforts" to determine whether he was authorized to trade from the account and was unable to find supporting documentation. According to Sharkey, the supporting papers were not found (or perhaps not obtained) until October 2009, two months after she recommended terminating JPMC's relationship with Client A. Sharkey brought her concerns regarding the escrow account to Lassiter's attention, but the parties dispute how Lassiter responded. The Defendants contend that Lassiter asked Sharkey to investigate, while Sharkey states that Lassiter "largely dismissed Ms. Sharkey's concerns and simply assumed that Client A was acting beyond reproach." Sharkey contacted Client A about the account, who replied that the funds he used were proceeds from his patent lawsuits and that he was authorized to trade from the Ostrager Firm's escrow account. Sharkey contacted the Ostrager Firm regarding the account activity, but was told to speak with an individual who was unavailable. Sharkey left messages for him, but was

12

uncertain whether she sent him an email. According to the Defendants, the appropriate authorizations for Client A's transactions in the account were located in the files after Sharkey's termination.

Sharkey suggested to Lassiter and Gruszczyk, sometime after she was assigned to Client A, that she was concerned about his legitimacy and that PWM should exit the relationship. When Lassiter asked Plaintiff for the reasons, she responded primarily by saying that Client A was in the gem business, he was Israeli, he had not provided all KYC information, he had multiple bank accounts and he was trading in the Ostrager Firm escrow account. According to the Plaintiff, she also identified additional reasons, including her belief that Client A was engaged in money laundering and other illegal activity and her belief that Client A was not in compliance with the Patriot Act. Sharkey recommended that JPMC exit its relationship with Client A in a final KYC report submitted at the end of July 2009.

The parties dispute how Lassiter responded to Sharkey's concerns. According to the Defendants, when Plaintiff conveyed her concerns about Client A to Lassiter, Lassiter replied that

Plaintiff should investigate Client A further, telling her "Jennifer, you need to give me something more specific than lack of comfort, please tell me exactly [w]hat's there that is cause for terminating the client." The Defendants also state that Gruszczyk made similar suggestions. Sharkey states that Lassiter "was very dismissive of the facts" relayed by Sharkey and stated "Oh, c'mon, Jennifer, you're - you know - you don't have proof of that." Sharkey also testified that Lassiter did not press her for evidence, but rather pushed Sharkey to wrap up the KYC process. Sharkey disputes the suggestion that Gruszczyk encouraged her to investigate Client A, noting that Gruszczyk stated in a deposition stated that she had no knowledge of Sharkey having recommended to Lassiter that JPMC exit the Client A relationship.

Lassiter and JPMC's Risk Department urged Plaintiff to complete her KYC documentation, including the ones associated with Client A. According to the Defendants, Sharkey was one of the worst performers under Lassiter's supervision with regard to completing KYC forms in a timely manner. Sharkey disputes this statement, maintaining that she was not one of the worst performers and stating that she "did complete every possible

14

aspect of her KYCs based upon the level of cooperation of her clients." She also asserts that two of her coworkers, Tim Walch and Dan Desmond, both of whom reported to Lassiter, were also behind on their KYCs and were "counseled," not terminated. According to Sharkey, significant documentary evidence demonstrates that JPMC knows that it was Client A, and not Sharkey, who caused the delay in completing the KYC, which had been outstanding for months already when it was assigned to her.

According to Sharkey, although Client A gave the appearance of wanting to be cooperative with the KYC process, after the first or second time they spoke, Client A "was unable to get to the phone, he wouldn't return [Sharkey's] phone calls [and JPMC] couldn't get the information" necessary to complete the KYC documentation. Sharkey states that Client A continued to be evasive up to the day she was terminated. Sharkey states that she contacted the Private Wealth Manager previously assigned to Client A's account, as well as other individuals who had worked on the account, and all of them confirmed that Client A had been refusing to provide the requested information for years. Sharkey also points out that Grusczyk had sent multiple emails discussing Client A's unwillingness to provide documentation,

15

including one stating that "We've caught [Client A] telling us lies." She also notes that Lassiter stated on April 29, 2009 that the delay in KYC reporting was due in part to her division's large workload.

3. Sharkey Recommends That PWM Break Ties With Client A

Lassiter asked Plaintiff to make a formal recommendation regarding Client A by the end of July 2009. On July 24, Plaintiff sent an email to Gruszczyk, Lassiter and three others stating that "all of the information that we have accumulated during the KYC remediation process feels uncomfortable regarding the [Client A] family relationship and the nature of its businesses as well as its related entities. After many conversations with the client(s) and attempts to acquire the proper documentation, we still have not received all documentation and identification needed to satisfy our standard Know Your Client requirements. Since this is a complicated and long-term relationship that we inherited, I recommend that we discuss a simple way to detach the relationship from the PWM metro business. I want to be mindful of the fact that other LOB's within the firm have relationships with this client and/or

16

its related entities and may wish to retain some or all of their business."

Shortly thereafter, Plaintiff, Lassiter and Gruszczyk met to discuss Client A. The Parties differ on the outcome of the meeting. According to the Defendants, Sharkey, Lassiter and Gruszczyk agreed to exit any JPMC relationship with Client A, regardless of the line of business associated with an account, based on Sharkey's representations about Client A's unwillingness to provide KYC documentation. According to Sharkey, after being confronted with Sharkey's concerns as outlined above, Lassiter verbally agreed to exit the relationship, but had no intention of actually doing so. Sharkey notes that neither PWM nor JPMC ultimately broke off its relationship with Client A, and that neither JPMC Associate Jonathan Spira nor Client A himself recall Lassiter ever actually taking steps to terminate the relationship. Lassiter testified that she prepared letters to send to Client A that would end the relationship, but no such letters were ever sent and no drafts were produced in discovery.

The Defendants state that after Sharkey's termination, "members of Ms. Lassiter's PWM group worked to complete the exit from the Client A relationship." According to Sharkey, "no bona fide efforts to exit the Client A relationship were actually being made."

After Sharkey was terminated, Lassiter contacted Client A and informed him that JPMC was missing information relating to the KPMC process. Client A informed her that he was unaware that the documents were outstanding – an assertion that Sharkey vigorously disputes – and provided the documentation requested. JPMC also contacted the Ostrager firm and confirmed that Client A was authorized to trade from its escrow account. According to the Defendants, Lassiter then reversed the decision to end the relationship with Client A. Sharkey disputes that this decision constituted a "reversal" and suggests that Lassiter never actually intended to leave the relationship.

4. Performance Issues

According to the Defendants, the decision by Lassiter, Green, and Kenney to terminate Sharkey's employment was due in

18

part to performance issues, including her failure to pass the
Series 7 examination on her first two tries, her inability to
perform adequate KYC due diligence, a casual attitude toward her
job and KYC responsibilities (both generally and with respect to
Client A), a belief that her revenue generation overestimated
her efforts to develop business, lack of confidence in her
follow-up with clients, a concern that she was too informal with
clients, a belief that she did not adequately understand JPMC's
products, and her decision to bring a non-JPMC mortgage broker
to a major JPMC client event.

Sharkey vigorously disputes that performance issues had
anything to do with her termination, particularly because when
she was fired, Lassiter told her that the decision "didn't have
anything to do with [her] performance," a statement that was
echoed by Stephen Grande ("Grande"), the "HR business partner
covering the northeast PWM business" and the JPMC human
resources employee who met with her to discuss her termination.
Sharkey notes that at Lassiter's deposition in this case, she
initially confirmed that Sharkey's firing was based only on the
incident with Manager A (discussed further below), but after

19

taking a break Lassiter changed her response, characterizing the incident as the "straw that broke the camel's back."

Sharkey also disputes the substance of the allegation concerning performance issues. She points out that she did ultimately pass the Series 7 exam on the third try, and failed one of her previous attempts because Lassiter called her and told her she needed to leave the exam due to a client emergency. She claims that any inadequate KYC documentation was due to evasiveness and refusal by clients, particularly Client A, to provide needed documentation. She denies having a casual approach to her job, and as to any concern with her business development, she cites to exhibits and deposition testimony by Lassiter and Green stating that her "metrics were fine" and that her "performance versus metrics exceeded expectations." She states that her colleagues did not lack confidence in her abilities, and that the Defendants cannot point to any incident or evidence for the proposition that she was overly informal or lacked understanding of JPMC's products. As to the issue with the non-JPMC invitee, she states that he was a JPMC client who had referred business to JPMC, and notes that Green had admitted that the incident played no role in her termination.

According to the Defendants, Lassiter met with Sharkey twice and raised some of these performance concerns, asking her to work on them. Sharkey disputes that either meeting happened, and states that she "was never given any written or verbal warning concerning her performance, other than being pressured to complete the KYC for Client A." It is undisputed that Sharkey was placed on a "watch list" of "people who were struggling" at some point in 2009. According to Defendants, at the meeting that resulted in Sharkey being placed on the watch list, Kenney and Green were "prepared to consider Plaintiff's termination," but Lassiter pushed for more time. Sharkey says that this assertion is contradicted by testimony from Kenney and Green stating that they did not advocate for her termination at the meeting and could not recall if it was discussed. Sharkey also notes that even after Sharkey was fired, the watch list said that she would be "revisit[ed]" in September 2009, and that Grande testified that he was unaware of whether any other employees on the list were terminated.

5. The Manager T Incident

In late July 2009, a client's office manager ("Manager T") phoned Lassiter and told her that she could not contact Plaintiff, Plaintiff had not returned her calls, and that Plaintiff was a "phantom." Plaintiff disputes this statement on the basis of hearsay, in the absence of an affidavit from Manager T. Lassiter then asked Plaintiff whether she had ever spoken to Manager T, and Plaintiff replied yes. Lassiter then called Manager T back, and Manager T maintained that she had never spoken to Plaintiff. Lassiter asked Plaintiff again whether she had called Manager T, and Plaintiff replied yes.

According to the Defendants, Lassiter asked again, and the Plaintiff admitted that she had not in fact called Manager T. Sharkey disputes this account of this conversation and gave the following testimony at her deposition:

> A: I remember Leslie [Lassiter] asking me if I had called or contacted this client.
>
> Q: And what did you say?
>
> A: I said yes, I had introduced myself to this client. It was a client that I had -- somebody -- I don't know, had left the firm and it belonged to somebody else, and I inherited this client, and I remember her asking me if I had spoken to this client.
>
> Q: And you said yes?

A: And I said yes, I introduced myself. You know, I talked to the client before -- not the client, the client's assistant or associate, this woman [Manager T].

Q: And do you recall Lassiter telling you that [Manager T] told her that she had never heard from you?

A: I recall Leslie asking me had I ever spoken to this client and I said yes, and I don't recall Leslie saying that I didn't -that the client had never heard from me.

Q: At any point during that back and forth with Lassiter about this client, did you tell her that you had not, in fact, contacted this client?

A: I don't know what you're referring to. I had spoken to [Manager T] a few times. I don't know what - what you're referring to or when.

Sharkey contends that she had spoken with Manager T and denies that she ever stated otherwise.

According to the Defendants, Lassiter then called Grande to inform him that she had multiple conversations with both Manager T and Sharkey, and that it took those multiple conversations for Sharkey to admit that she had lied about speaking to Manager T. Grande informed Lassiter that, under JPMC's policies, "dishonesty could result in termination."

Following his conversation with Lassiter, Grande primarily consulted with four individuals regarding possible courses of action in response to Plaintiff's alleged lie: Linda Padilla ("Padilla") of JPMC's Employee Relations Group, his supervisor Lee Gatten ("Gatten") in JPMC's Human Resources Group, Green and Lassiter. The Plaintiff contends that Kenney was also involved in the decision to terminate her. The conversations concerned whether Sharkey should be terminated, and none of the individuals involved mentioned Client A or the concerns Sharkey had raised. According to the Defendants, the group decided collectively that Sharkey should be terminated "for a loss of trust and confidence and for being untruthful to Ms. Lassiter."

According to Sharkey, she was not untruthful in the first place, and the Defendants' version of the decision cannot be credited. She notes that the decision to terminate her was made in early August 2009, approximately two weeks after the Manager T incident and within one week of Sharkey recommending to exit the relationship with Client A. She also notes that while Green testified that the decision to terminate Sharkey was made approximately a month before the actual termination, less than a month passed in between the Manager T incident and Sharkey's

24

firing. Sharkey characterizes any connection between the Manager T incident and her firing as "pure pretext" and points to an email exchange between Green and Kenney from July 21, 2009, the purported day of the incident:

[From Green to Kenney:]

FYI, just as I was running out, Leslie posted me on an incident regarding Jennifer Sharkey. I sent her to Grande, but it is highly likely we terminate her right away. As you recall, she is ranked yellow and watch list.

[Response from Kenney to Green:]

Okay. Sometimes it doesn't take long for people to step on their own feet.

Sharkey argues that the email "reveals that Defendants were simply waiting for an excuse that would provide a pretext for terminating Ms. Sharkey."

6. Sharkey's Termination

On August 5, 2009, Lassiter and Grande informed Sharkey that she was fired. According to the Defendants, Sharkey was told she was fired "due to a lack of judgment and untruthfulness related to the Manager T incident." Sharkey does not recall the

25

Manager T incident being discussed in the meetings, saying that
Lassiter told her that "she just couldn't have someone around
that she didn't trust" and that Grande told her she was being
terminated because Lassiter did not trust her anymore.   It is
undisputed that Sharkey did not mention Client A in her meetings
with Lassiter and Grande.   Sharkey contends that she was shocked
and in a "state of disbelief" in her termination meetings, and
therefore could not be expected to raise every thought she might
have had regarding her termination or the reasons for it.
Sharkey also states that Lassiter and Grande each told her that
the decision was not based on her performance.   Sharkey states
that Kenney could not identify an employee other than Sharkey
who had been terminated on grounds of dishonesty, and that
Grande identified one other employee who was purportedly
terminated on grounds of dishonesty, but that the other
individual terminated in or around 2012 had engaged in
undocumented trading.   According to the Plaintiff, Lassiter was
aware of instances of other employees being dishonest to her or
members of the PWM team, yet did not terminate these employees.

Although the facts as described above are in dispute with
respect to Sharkey's communication with Manager T, there is no

contemporaneous denial of Lassiter's statement concerning Sharkey's admission that she lied.

**The Motion for Summary Judgment is Granted**

"Under the burden-shifting framework of [SOX] Section 806, the employee bears the initial burden of making a prima facie showing of retaliatory discrimination because of a specific act." Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 444 (S.D.N.Y. 2013) (quoting Day v. Staples, Inc., 555 F.3d 42, 53 (1st Cir. 2009). To succeed in making a prima facie case, "an employee must prove by a preponderance of evidence that 1) she engaged in protected activity, 2) her employer knew that she engaged in the protected activity, 3) she suffered an unfavorable personnel action, and 4) the protected activity was a contributing factor in the unfavorable action." Bechtel v. Admin. Review Bd., 710 F.3d 443, 447 (2d Cir. 2013). Once the plaintiff has made her prima facie case, a defendant employer prevails only "if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior."

The calculus changes somewhat on a motion for summary
judgment. At this stage,

> a plaintiff need only demonstrate that a rational
> factfinder could determine that [the] Plaintiff has made
> [her] prima facie case. Assuming a plaintiff does so,
> summary judgment is appropriate only when, construing
> all of the facts in the employee's favor, there is no
> genuine dispute that the record *clearly and convincingly*
> demonstrates that the adverse action would have been
> taken in the absence of protected behavior. Thus, the
> defendant's burden under Section 806 is notably more
> than under other federal employee protection statutes,
> thereby making summary judgment against plaintiffs in
> Sarbanes-Oxley retaliation cases a more difficult
> proposition.

Leshinsky, 942 F. Supp. 2d at 441.


The Court's December 11, 2013 decision granted summary
judgment for the Defendants, stating that Sharkey failed to make
a prima facie case that she engaged in protected activity,
Sharkey II, 2013 WL 10796833 at *8-10, and that, even if Sharkey
had engaged in protected activity, Defendants clearly and
convincingly established that the activity was not a
contributing factor in her termination. Id. at *11. The Second
Circuit could have affirmed the Court's decision on the same
basis. However, the Circuit directed that, if this Court
determines that Sharkey engaged in protected activity under the
*Nielsen* standard:

> it should reassess, in the context of this finding,
> whether the identified protected activity was a
> contributing factor in the unfavorable action, . . .
> and if so, whether defendants have proven "with clear
> and convincing evidence that [they] would have taken
> the same unfavorable personnel action in the absence
> of [that] protected behavior."

Sharkey III, 580 F. App'x at 29.

It is undisputed that the Defendants knew that Sharkey had raised concerns that Client A was engaging in fraudulent activity, and it is undisputed that she suffered an unfavorable personnel action. The issues to be resolved therefore are whether Sharkey makes a prima facie case that her actions were entitled to protection under 18 U.S.C. § 1514A, i.e., that she had a reasonable belief under Nielsen that Client A had violated one of the provisions enumerated in SOX; whether she makes a prima facie case that her raising concerns about Client A was a contributing factor to her termination; and whether the Defendants can clearly and convincingly show that they would have terminated her had she not done so.

## Sharkey Makes a Prima Facie Showing That She Believed SOX Statutes Were Violated

The December 12, 2013 Opinion concluded that the Plaintiff did not engage in protected activity because she did not have a reasonable belief that one of the statutes enumerated in SOX was being violated: i.e., "mail fraud, wire fraud, bank fraud, securities fraud, violation of an SEC rule or regulation, or violation of a federal law relating to fraud against shareholders." Sharkey II, 2013 WL 10796833, at *8-10. The conclusion was based in part on a reliance on the holding in Fraser v. Fiduciary Trust Co., Int'l, No. 04 Civ. 6958, 2005 WL 6328596 (S.D.N.Y. June 23, 2005), that protected activity must implicate the statutes enumerated in SOX "definitively and specifically." Sharkey II, 2013 WL 10796833, at *8; see also id. ("General inquiries do not constitute protected activity."). This is the standard that the Second Circuit would later reject in Nielsen, in favor of the reasonable belief test. Nielsen 762 F.3d at 221. The December 12 Opinion concluded that the Plaintiff "does not explain how her facts support a scheme or artifice to defraud, fraudulent intent, who was being defrauded by Client A, the nature of the purported fraud, or most importantly, how these allegations meet the elements of the enumerated categories required under SOX. . . . Instead, Plaintiff relies almost exclusively on her purported belief that

30

Client A was engaged in money laundering, which is not a
criminal statute specified in SOX nor is it an SEC regulation or
a law relating to fraud against shareholders." Sharkey II, 2013
WL 10796833 at 9. Accordingly, this Court held that Plaintiff
failed "to report information with a 'certain degree of
specificity' or 'particular concerns, which, at the very least,
reasonably identify,' conduct implicated by the enumerated
statutes." Id. (citation omitted). The Opinion also noted that
Plaintiff's purported belief was not subjectively reasonable,
since the July 24 Email in which Plaintiff recommended
termination "'did not express any specific concern about any
fraud enumerated in SOX § 806,' but stated that [Plaintiff] felt
'uncomfortable' in certain areas relating to Client A's
businesses." Id.

Applying the more lenient Nielsen test, Sharkey has
established at least a prima facie case. In order to satisfy
Nielsen, a plaintiff first must demonstrate that "it was
objectively reasonable for [her] to believe that the activity[]
reported constituted a violation of the laws and regulations
listed in [18 U.S.C.] § 1514A: the federal mail fraud, wire
fraud, bank fraud, and securities fraud statutes, in addition to

31

any rule or regulation of the Securities and Exchange

Commission, or any provision of Federal law relating to fraud

against shareholders." Nielsen, 762 F.3d at 222 (quotations

omitted). Objective reasonableness is a "mixed question of law

and fact, meaning that it should be decided by the Court only if

there is no genuine issue of material fact as to the belief's

reasonableness." Leshinsky, 942 F. Supp. 2d at 444.


As set forth in the Facts section above, Sharkey contends

that she formed and explicitly communicated her belief that

Client A was potentially involved not only in money laundering,

but also bank fraud, wire fraud, mail fraud, and/or violations

of federal law designed to prevent such conduct. While the

Plaintiff does not point to specific statutes or "explain . . .

how these allegations meet the elements of the enumerated

categories required under SOX," Sharkey II, 2013 WL 10796833 at

9, it was objectively reasonable for her to believe that Client

A was engaged in illegal activity covered by 18 U.S.C. §

1514A(a)(1).[1]

---

[1] During the pendency of this motion, the Second Circuit issued its opinion in Berman v. Neo@Ogilvy LLC, deferring to the Securities and Exchange Commission's interpretation of a section of the Dodd-Frank Act geared toward protecting whistleblowers, 15 U.S.C. § 78u-6(h)(1)(A)(iii), and holding that that statute prohibits retaliation against employees who report securities law violations to their employer, even if they do not report those violations to the Commission. See generally Berman, No. 14-4626, 2015 WL 5254916 (2d

Sharkey had observed that Client A was trading in a third party's escrow account in which, as far as she or JPMC knew at the time, he had no authority to trade. If Client A withdrew a third party's money without authorization this would implicate 18 U.S.C. § 1343, the federal wire fraud statute. See U.S. v. Chambers-Galis, No. 1:10-CR-94, 2013 WL 393664 (M.D. Pa. 2013) (upholding wire fraud conviction based on unauthorized withdrawals from real estate firm's escrow account); see also Nielsen, 762 F.3d at 222 (both mail and wire fraud "require a scheme to steal money or property").

Moreover, the suspicious activities that Sharkey identified in Client A's trading activity – including business accounts having been opened by Client A without legal documents for the entities in question; his use of a large number of different accounts, many of which had low or zero balances, and his refusal to close the empty ones; his reluctance to provide information regarding KYC and Patriot Act requirements; and the unusual account activity between his accounts, such as

Cir. Sept. 10, 2015). Although the holding in Berman indicates that Sharkey might alternatively have sought Dodd-Frank whistleblower protection, it does not directly impact this case.

transferring money between his accounts, withdrawing money and
returning it soon afterwards, and using bank branches in a way
that made it difficult for JPMC to track his activity – were
sufficient to form a reasonable belief that illegal activity was
going on. As Sharkey states (Plaintiff's Local Civil Rule 56.1
Counterstatement, Dkt. No. 99 ¶ 46) and the Defendants confirm
(Defendants' Local Civil Rule 56.1 Counterstatement, Dkt. No.
106, ¶ 46), documentation from the Federal Financial
Institutions Examination Council, which JPMC includes in its
training, identifies a client's providing insufficient
information, use of shell companies, unexplained funds transfer
activity, unusual transfers of funds occurring among related
accounts, and use of multiple accounts that lack sufficient
business purpose for the account complexities as "red flags"
with regard to money laundering or financing of terrorism.   The
Nielsen reasonable belief test focuses on "the basis of
knowledge available to a reasonable person in the circumstances
with the employee's training and experience."   Nielsen, 762 F.3d
at 222 (citing Sharkey I, 805 F. Supp. 2d at 55).  A reasonable
person with Sharkey's training could have concluded that Client
A's conduct was engaged in fraudulent conduct.

Sharkey has made prima facie showing that she reasonably
believed that Client A was violating federal law, see id. at 223
(citing Sharkey I's conclusion that Client A's "behavior
potentially consistent with fraud or money laundering"
adequately stated a claim under § 1514A), and therefore that her
conduct amounted to protected activity under SOX's anti-
retaliation provision.

## Even under SOX's Lenient Standard, Sharkey Does Not Make a Prima Facie Case That Protected Activity Was a Contributing Factor to Her Firing

The December 12 Opinion granted summary judgment for the
Defendants on the ground that Sharkey's allegations about Client
A were not a contributing factor in JPMC's decision to fire her,
noting that several JPMC employees involved in the decision to
terminate Plaintiff were deposed, and all of them "testified
that Client A was never mentioned in the discussions about
whether to terminate Plaintiff, but rather that the decision was
based on Sharkey's dishonesty to her immediate supervisor
following a history of performance-related concerns." Sharkey
II, 2013 WL 10796833, at *12. The Court concluded that "there
is no evidence establishing that Plaintiff's actions regarding
Client A in any way contributed to her termination." Id.

The Plaintiff's strongest argument connecting her whistleblowing with her firing is the temporal proximity between the two - JPMC fired Sharkey less than two weeks after she formally brought her concerns about Client A to her managers and recommended that PWM end its relationship with him. "Temporal proximity is an important, though not necessarily determinative, piece of evidence concerning the motivating factors behind terminating an employee." Leshinsky v. Telvent GIT, S.A., 942 F. Supp. 2d 432, 450 (S.D.N.Y. 2013). Temporal proximity alone can be sufficient to establish a causal connection in a retaliation claim, Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001), but for that to be the case, the proximity between the two incidents "must be very close." Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Two weeks between whistleblowing and firing is certainly "very close" in time, see Gorman-Bakos, 252 F.3d at 545 (noting that periods of twelve days and one month have been held sufficient), but Sharkey's firing was also "very close" in time to the alleged incident with Manager T, weakening any inference that might be drawn.

Sharkey also relies on a July 21, 2009 email between Green
and Kenney in which, after being informed by Green that the
incident with Manager T made Sharkey's termination "likely,"
Kenney responded, "Okay. Sometimes it doesn't take long for
people to step on their own feet." The email may permit an
inference that the Defendants wanted to fire Sharkey for reasons
outside of the incident with Manager T, but there is nothing to
suggest that those reasons are connected to her protected
activity. Any connection is rebutted by the fact that the email
was sent three days before Sharkey made her recommendation to
end JPMC's relationship with Client A.

Sharkey also suggests that the Defendants' shifting
rationales for her termination – initially the Manager T
incident alone, but now both the Manager T incident and alleged
poor performance on Sharkey's part – constitute a separate basis
for finding a causal connection between her whistleblowing and
her termination. While "[i]nconsistent or even post-hoc
explanations for a termination decision may suggest [illegal]
motive," the fact that Sharkey was placed on the watch list at
some point prior to her termination (and prior to Green's July

37

21, 2009 email) rebuts the contention that the alleged performance issues were fabricated.

JPMC ultimately reversed the decision to terminate its relationship with Client A. While the parties dispute how seriously Lassiter and PWM took Sharkey's concerns about Client A and her recommendation to break ties with him, her allegations that Lassiter did not take the issue seriously do not establish a connection between her termination and her recommendation.

As to the standard Sharkey needs to meet, "[a]t the summary judgment stage, a plaintiff need only demonstrate that a rational factfinder could determine that [she] has made [her] prima facie case." Perez v. Progenics Pharms., Inc., 965 F. Supp. 2d 353, 363 (S.D.N.Y. 2013) (quoting Leshinsky, 942 F. Supp. 2d at 441). The contributing factor test is lenient as well - the term means "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." Id. at 366. "A plaintiff need not prove that her protected activity was the primary motivating factor in her termination, or that the employer's articulated reason was pretext in order to prevail." Leshinsky, 942 F. Supp. 2d at

449-50 (citing Barker v. UBS AG, 888 F. Supp. 2d 291, 300 (D. Conn. 2012). Even taken together, the temporal proximity, Green's email, and PWM's lack of action on her recommendations do not establish that her concern about SOX violations was a contributing factor leading to her termination.

Sharkey's prima facie case for a causal connection between her complaints about Client A and her subsequent termination is undermined by the incident with Manager T, a "legitimate intervening basis for the adverse action" that is sufficient to defeat her claim under SOX. See Fraser v. Fiduciary Trust Co. Int'l, No. 04 Civ. 6958, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009). Lying to one's employer about an important client is a separate and sufficient reason to fire an employee. See Kassman v. KPMG LLP, No. 11 Civ. 03743, 2014 WL 3298884, at *12 (S.D.N.Y. July 8, 2014) (finding no genuine issue of material fact that employee who lied would have been fired on lawful grounds).

Defendants have bases their assertions regarding Manager T's complaints about Sharkey and her confirmation that Sharkey had never spoken with her on four sources: Lassiter's recounting

of the conversations at her deposition (Declaration of Michael

D. Schissel, Dkt. No. 91 (the "Schissel Decl."), Ex. D. at 165-

69), Grande's recounting at his deposition of what Lassiter told

him about what Manager T said (Schissel Decl. Ex. Z at 129-30),

Lassiter's notes from the conversation with Manager T (Schissel

Decl. Ex. V), and a set of handwritten notes recounting

Lassiter's conversation with Sharkey about the Manager T

incident.  (Schissel Decl. Ex. Z.)  This evidence is admissible

to show the Defendants' state of mind in choosing to fire her.

See Cameron v. Community Aid For Retarded Children, Inc., 335

F.3d 60, 65-66 (2d Cir. 2003) (affirming district court decision

to admit hearsay evidence used in firing decision because "[t]he

inaccuracy of those reports does not matter if [the supervisor]

believed them.")  Whether or not Sharkey actually lied about

speaking with Manager T, the evidence is clear that Lassiter and

the other decisionmakers in her termination believed that she

had.  Since the motion for summary judgment turns on the

Defendants' state of mind in firing Sharkey, and not on the

truth of Manager T's statements, there is no hearsay issue with

their admission.[2]

---

[2] Sharkey's alleged confession that she had lied about the Manager T incident
is also admissible on this point as an admission of a party-opponent, see
Fed. R. Evid. 801(d)(2), although it remains factually disputed between the
parties.

In sum, Sharkey has failed to make a prima facie showing that her complaints about Client A were a contributing factor to her termination. The strongest evidence in her favor is temporal proximity, but the incident with Manager T represents a legitimate intervening basis for her firing that negates a finding of causation based on temporal proximity alone. The email between Green and Kenney indicates that JPMC had reasons to fire her prior to and outside of the Manager T incident, but her presence on the watch list indicates that they may have been performance-related, and the fact that the email was sent before she recommended cutting ties with Client A negates any inference that JPMC's animus towards her was based on whistleblowing. See Fraser, 2009 WL 2601389, at *6.

"Here, other than the temporal proximity . . . Plaintiff has not proffered any evidence indicating that her [recommendation] was a contributing factor to her termination." Pardy v. Gray, No. 07 Civ. 6324, 2008 WL 2756331 (S.D.N.Y. July 15, 2008) (Preska, J.). None of her other evidence – the Green email, the lack of action on her recommendation, and the *post hoc* addition of performance issues as a stated rationale for her

firing -serves to connect her firing to her recommendation to
terminate the relationship with Client A.  Sharkey thus fails to
make the prima facie showing necessary to survive summary
judgment.[3]

## Conclusion

Since Sharkey fails to make a prima facie showing that her
recommendation regarding Client A was a contributing factor in
her firing, summary judgment is granted for the Defendants.

---

[3] Because Sharkey has not made the required *prima facie* showing that her
whistleblowing contributed to her firing, this Opinion need not reach the
question of whether Defendants could clearly and convincingly show that they
would have fired her even if she had not raised concerns about Client A.  See
Bechtel, 710 F.3d at 447.

It is so ordered.

**New York, NY**
**October 9 , 2015**

ROBERT W. SWEET
U.S.D.J.

43