# Exhibit C

                                                                1
          H1H7SHAC


1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JENNIFER SHARKEY,

4                  Plaintiff,

5           v.                          10 Civ. 3824 (RWS)

6    J.P. MORGAN CHASE & CO., et al.,

7                  Defendants.

8    ------------------------------x
                                        New York, N.Y.
9                                       January 17, 2017
                                        11:00 a.m.
10
     Before:
11
                          HON. ROBERT W. SWEET
12
                                           District Judge
13
                          APPEARANCES
14
     WIGDOR LLP
15        Attorneys for Plaintiff
     BY:  DOUGLAS WIGDOR
16        ALEX HARTZBAND
          MICHAEL WILLEMIN
17
     ARNOLD & PORTER LLP
18        Attorneys for Defendants
     BY:  MICHAEL SCHISSEL
19        KATHLEEN REILLY

20   JACQUES SEMMELMAN
          Attorney for Client A and pro se counsel for Curtis Mallet
21

22

23

24

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

2

H1H7SHAC

1          (In open court)

2          THE COURT:  OK.  Thank you for all the trees that were

3     killed over the weekend.  I have the January 16 letter from Mr.

4     Wigdor as a road map.  Any problems with that?

5          MR. SCHISSEL:  No, no problems.  There are a couple of

6     items that I don't think are accurate, but we'll get to that.

7     There is one additional item; there is a subpoena --

8          THE COURT:  Yes, OK.

9          MR. SCHISSEL:  -- that we got yesterday.

10          THE COURT:  All right.  Let's start down that road.

11     Let me also say this:  I have some impacts on my own calendar

12     which were somewhat unanticipated, and so I am not going to be

13     able to try this case on January 23 as we had hoped.  However,

14     those matters will be taken care of, one hopes and expects, and

15     so I would suggest we put it over two weeks, in other words,

16     start on either the 6th or the 13th of February.

17          Now, I used to be a lawyer, and I recognize that that

18     may very well create all kinds of problems both for counsel's

19     availability and witnesses, etc., etc., and I'm not wedded to

20     those particular dates.  What I would suggest with respect to

21     that aspect of it is that you, counsel, maybe when we're

22     through today, get together, meet and confer, and find whatever

23     date you think makes the most sense.

24          MR. SCHISSEL:  Just one caveat about today is most of

25     the witnesses are J.P. Morgan witnesses, so we are going to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1    have to check on their availability as well.

2            THE COURT:  Understood.  Understood.  That's what I'm

3    saying.  I mean it doesn't have to be done immediately.  And I

4    apologize for it, but these are things that regrettably I am

5    unable to control about my own calendar.  So, that's where that

6    is.

7            MR.  WIGDOR:  If I could just add --

8            THE COURT:  Yes.

9            MR.  WIGDOR:  Just one piece of the puzzle as well is

10   that our client is pregnant and due in early February as well,

11   so I don't think those sorts of dates are going to be

12   realistic.

13           THE COURT:  What would be your preference?

14           MR.  WIGDOR:  My preference would be to start the

15   trial on Monday, your Honor, but I understand you have a

16   conflict.

17           THE COURT:  Well, let me ask you this:  How would you

18   all feel -- I wonder if I could do it on the 30th.

19           MR.  WIGDOR:  Your Honor, I have a conflict later in

20   that week.  I could go into detail off the record if your Honor

21   wants to hear it.

22           THE COURT:  OK, so the 30th would not work for you.

23           MR.  WIGDOR:  No.

24           THE COURT:  So, are you telling me that the 6th will

25   not work, you think?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

H1H7SHAC

1          MR.  WIGDOR:  I think it would be precariously close

2     to her due date at that point.

3          THE COURT:  Well, I never saw a defendant who was

4     eager to go to trial, so it's really up to you.  Let me see

5     what March looks like.

6          MR.  WIGDOR:  Well, she will just have different

7     burdens.

8          THE COURT:  When do you want to?

9          MR.  WIGDOR:  I think the best thing to do, your

10    Honor, given that we're not going to start on Monday, would

11    probably be for Mr. Schissel and I to have a conversation and

12    find some alternative dates that work and present those to the

13    court and see if the court is available then.

14         THE COURT:  Yes.  But let me tell you March presents a

15    problem.

16         MR. SCHISSEL:  Judge can I make one point?  We were

17    supposed to have a two week trial starting on the 23rd.  That's

18    why I'm a little surprised that counsel is not available the

19    week of the 30th.

20         MR.  WIGDOR:  My conflict arises actually on the 3rd,

21    which is that Friday, which would have been the 10th day of

22    trial, which is not going to happen, I think both sides can

23    agree.

24         THE COURT:  Well, I'm not sure.  At this point I

25    cannot really be clear on March.

H1H7SHAC

1           MR.  WIGDOR:  Your Honor, may I suggest an alternative

2    suggestion?  Even though I know your Honor is very anxious to

3    try this case himself, but perhaps there is another district

4    judge or magistrate judge who would be available.

5           THE COURT:  I wouldn't wish this case on my worst

6    enemy.  No, I mean I've lived with it, and I suppose I could

7    say I probably will die with it, but be that as it may.

8           OK.  Well, you all can get together.  If you pick a

9    date in March, I will do the best I can to accommodate you.  I

10   have a significant case with the City that is scheduled for

11   March 1, but I don't know.  I have a criminal case that is

12   scheduled for March 6, which probably will have to be tried,

13   and so March is a little fuzzy.  April is fine, as far as I

14   know.  And I'm sorry about that, I really am, but sometimes

15   those things can't be helped.

16          OK.  So my purpose then today is to dispose of as much

17   of this as we can today, and then you all will get together and

18   let me know what you think is the best solution.  OK?  No

19   interlocutory appeal.

20          MR.  WIGDOR:  We were actually going to withdraw that

21   anyway.

22          THE COURT:  Well, you don't have to.  Denied.

23          Client A's identity.  Client A will be identified like

24   anybody else.  OK?

25          MR. SEMMELMAN:  Your Honor, may I be heard on that,

6

H1H7SHAC

1   please?

2           THE COURT:  Sure, but you're not going to change my

3   opinion.

4           MR. SEMMELMAN:  Curtis Mallet-Prevost Colt & Mosle.

5   May I address that?

6           THE COURT:  Sure.

7           MR. SEMMELMAN:  May I approach the podium?

8           THE COURT:  Of course.

9           MR. SEMMELMAN:  Thank you, your Honor.  Good morning,

10  your Honor.  As the court is aware, I represent Client A and

11  affiliated persons and entities and, as the court is also

12  aware, Client A is an innocent nonparty who unfortunately has

13  been dragged into and through this case over and over again by

14  the plaintiff over the past five years.

15          The last time I stood before this court was in 2011,

16  and at that time I asked the court to protect my client by

17  shielding his name from disclosure in order to protect his

18  reputation and avoid serious harm to his business.  At that

19  time the court entered a protective order, which is docket

20  number 38.  That has been very effective in protecting my

21  client.  And in its written opinions, the court has always

22  carefully referred to Client A, and we are deeply grateful for

23  that.

24          But now we're back more than five years later, and

25  once again we are fighting a battle to protect my client from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1    what is really an unwarranted smear campaign by the plaintiff.

2            Client A is a very successful businessman with an

3    excellent reputation.  Now, the only incident the plaintiff has

4    been able to dredge up was back in 1995 where there was a

5    bankruptcy litigation and accusations were made and were never

6    proven.  Those wrongful accusations caused serious harm to my

7    client and his business at the time.  That was more than 20

8    years ago.  And he has spent two decades rebuilding his

9    business, cultivating an excellent reputation, and there is no

10   evidence to the contrary, because all they have been able to

11   find is articles from more than 20 years ago.

12           Exposing my client's identity is going to cause him

13   serious injury; it's going to seriously damage his reputation;

14   and it's going to cause untold harm to his business.

15   Competitors will be able to capitalize on negative publicity,

16   sow doubt in the minds of customers, and Client A could lose

17   everything he has built.

18           The law recognizes this, your Honor, as defamation per

19   se.  Falsely accusing someone of a crime is defamation per se.

20   Making a false statement that injuries someone in their trade

21   or business is defamation per se, and where there is defamation

22   per se damage is presumed.  And that is our situation.

23           The plaintiff is asking the court for a license to

24   take this witness stand, to engage in defamation per se of a

25   innocent nonparty, cause presumed and actual harm to his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1   reputation and business, and then walk away.  And I
2   respectfully urge the court to please reconsider and not allow
3   this to happen.
4          The court is familiar with the protective order
5   paragraph 17.  There is no waiver of any restriction even at
6   trial.  The parties shall take reasonable steps to maintain
7   confidentiality at trial.
8          The plaintiff has not proposed any reasonable steps.
9   Where are the reasonable steps in plaintiff's proposal?  There
10  are none.  The plaintiff wants to eliminate and destroy
11  confidentiality, and this is contrary to the protective order.
12         The court has discretion under the protective order
13  and under Rule 45 to formulate reasonable steps, and the court
14  should be mindful, I respectfully submit, of Amadeo 2, where
15  the Second Circuit directed courts in general to balance the
16  interests in disclosure against the right to privacy of a
17  nonparty.  The Second Circuit said the privacy interests of
18  innocent third parties should weigh heavily in the court's
19  balancing equation.
20         Client A is not a public official; his name has no
21  significance; there is no public interest in knowing the name
22  of a private citizen who is falsely accused of criminal
23  conduct.  And under Amadeo 2, the presumed damage caused by
24  defamation per se "weighs heavily against disclosure."
25         Now moving past the public interest, which is

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

H1H7SHAC

1    nonexistent, and looking at the private interest asserted by

2    the plaintiff, she claims, first of all, the jury is going to

3    become hopelessly confused unless they know the real name.  But

4    there is no basis for that.  In all kinds of cases juries

5    listen to very sophisticated expert testimony, and here all

6    they are being called upon is to think of a husband, a wife, a

7    son and a few affiliated companies.  There is no need for them

8    to know the name.

9         Second, the plaintiff claims that as a logistical

10   matter there is a big burden in redacting documents.  Well, she

11   has known about this obligation for five years since the

12   protective order talked about maintaining confidentiality at

13   trial, and so it's not a surprise.  In any event, I would

14   submit, your Honor, that the logistical task of redacting some

15   documents should not outweigh protecting an innocent nonparty's

16   right to privacy.

17        In terms of having to testify live and in person, the

18   plaintiff has written in her own submission -- this is docket

19   number 158 on page 4 -- the only evidence regarding Client A's

20   conduct that the jury should be permitted to consider is that

21   which was available and known to Ms. Sharkey and/or her

22   colleagues involved either in the investigation or the decision

23   to terminate at the time Ms. Sharkey attempted to complete the

24   KYC process and ultimately recommended exit.

25        Well, that pretty much sums it up.  That's the only

H1H7SHAC

1    evidence.  There is no reason why Client A or his family

2    members should come and testify in person.  But assuming there

3    is relevance to what he might have to say -- he has been

4    deposed, his wife has been deposed, his son has been deposed --

5    the deposition testimony is right there.  If plaintiff needs a

6    follow-up deposition between now and the trial, we can schedule

7    that.  If they forgot to ask some questions, if they want to

8    ask some more questions, your Honor, we will schedule that.

9    But there is no reason why the witnesses have to appear live

10   and in person.

11          Your Honor, I most respectfully submit here that this

12   would cause a grave injustice to innocent people, innocent

13   people who really should not be here.  This case should not be

14   here, but these innocent people should not have to come in

15   here, be paraded in public before the press, have all these

16   accusations exposed and their reputation and business severely

17   hurt.

18          If the court has questions, I will be happy to take

19   them.

20          MR. SCHISSEL:  Can I be heard for J.P. Morgan?  I will

21   be brief.

22          As your Honor knows, we join in the application of

23   Client A in this regard, but let me also make a couple of

24   points, since I lived through this discovery process.

25          The plaintiff is going to get up on that stand and say

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1    I believe Client A committed mail fraud, wire fraud, money

2    laundering, securities fraud, and whatever else she can dream

3    up between now and the time she testifies.  There's absolutely

4    no basis for that.

5         The problem here is that this is an innocent third

6    party, but just making the allegation in this court, in open

7    court, is going to smear really the reputation of an innocent

8    person.

9         J.P. Morgan -- this has been a client of J.P. Morgan's

10   for 20 years at the time the plaintiff got involved and is a

11   client today in good standing.  He has done nothing wrong;

12   there has been no evidence of anything; plaintiffs can't

13   marshal that evidence; and they had more than adequate

14   opportunity.

15        And I would submit to your Honor, I'm not even sure

16   what the relevance is of Client A's testimony, because there

17   are two issues in this case:  Did plaintiff reasonably believe

18   the client was engaged in some illegal conduct?  And she is

19   going to testify.  Presumably the only thing she can testify to

20   are the factors that she had.  She said in her own motion she

21   doesn't have to prove that he actually engaged in fraud.  And

22   the client doesn't have to get up here and defend that he

23   didn't engage in fraud.  It's what she reasonably believed

24   based on the factors in front of him.  So, there is really no

25   need for his testimony.

H1H7SHAC

1          And, frankly, your Honor, you know, this is a kind of

2     in terrorem tactic on the part of the plaintiff, because it is

3     irrelevant.  It's absolutely irrelevant that that client has to

4     get up here and testify in open court with these allegations

5     that are utterly, utterly false.  Thank you.

6          MR.  WIGDOR:  Your Honor, counsel for J.P. Morgan and

7     counsel for Client A have both here in open court made

8     assumptions that are not necessarily true.  They have said, for

9     instance, that Client A is an innocent nonparty and that Client

10    A has an excellent reputation.  They can make those statements,

11    and you might just believe them because the record in this case

12    has been so sanitized to permit them to do that.

13         So, I think it's important to just for a moment step

14    back and look at Client A, who was a client of J.P. Morgan

15    since 1993.  J.P. Morgan had not done any "know your customer"

16    reviews of this client until late 2007, 2008.  And we all know

17    what happened in late 2008; that's when the country's biggest

18    bank showed its alliance with the world's biggest criminal

19    Bernie Madoff.  So why should we even believe anything about

20    what J.P. Morgan has to say about their client, coming in and

21    saying that this client is an innocent nonparty with an

22    excellent reputation?  And in fact it's actually not true,

23    because these aren't the things that Ms. Sharkey or her counsel

24    are doing as an ad terrorem effect.  These are things that J.P.

25    Morgan knew well before Ms. Sharkey even got assigned the case

13

H1H7SHAC

1     in April of 2009, just months before she was terminated.

2             For many months prior to that, J.P. Morgan was trying

3     to do "know your customer" work on this client, and what they

4     found, your Honor, is some very interesting things.  As

5     attached to Mr. Schissel's motion in limine 5 and 6 as Exhibit

6     G, for instance -- and I can hand up a copy to the court --

7             THE COURT:  No, don't bother.

8             MR.  WIGDOR:  OK.  Well, that exhibit, your Honor,

9     goes through the relationship with Client A, and it talks about

10    a number of risk concerns that that client had, not least of

11    which, your Honor, were the bankruptcies that were just

12    mentioned.  But what wasn't mentioned -- and this isn't a

13    client who, for instance, your Honor, who if we Googled this

14    client, if we Googled this client, this is not someone like

15    your Honor, who we would come back if you were a client of J.P.

16    Morgan, and we would see some articles about you being a judge

17    and your ice-skating that you do.  This is a client who the

18    first bunch of results that come back are negative.  They are

19    about this bankruptcy in which there are all sorts of

20    allegations, including the failure to pay $28 million in bank

21    loans.  He was accused of siphoning --

22            THE COURT:  Let's not talk about the evidence.  OK?

23            MR.  WIGDOR:  My point, your Honor, is this:  That for

24    Client A's lawyer to come up here and say that his reputation

25    is going to be ruined is not true.  But let me explain finally

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

H1H7SHAC

1   why this evidence is critical to the case.  It's critical

2   because --

3          THE COURT:  Well, I'm not quite clear when you say

4   "this evidence" what you are talking about.  But let's get

5   back.  Anything else you want to tell me?

6          MR. WIGDOR:  Just that, your Honor, we're not in

7   arbitration, your Honor; we are here in court.  Sarbanes-Oxley

8   does not permit arbitration; we are in an open court.  And the

9   jury -- it is our burden.  The jury will have to determine

10  whether Ms. Sharkey when she made the decision, whether it was

11  a reasonable decision.

12         We need to be able to cross-examine the client, and

13  his wife and their son, about the conversations that they had

14  with Ms. Sharkey, about the conversations that they had with

15  other bankers that were trying to get information, who he would

16  not and who his son and wife would not give information.  And

17  all of that goes to Ms. Sharkey's reasonable belief.  The

18  reason we can't just rely on the deposition, your Honor, is

19  because the jury needs to assess the credibility of those

20  witnesses in terms of determining whether Ms. Sharkey had such

21  a reasonable belief.

22         THE COURT:  Anything further?

23         MR. SCHISSEL:  Yes, Judge.  He just made our case for

24  us, because he wants to get up and say the guy is a criminal.

25  He just listed the factors of why she had a reasonable belief.

15

H1H7SHAC

1     That's what she is going to testify about:  He said this to me.

2     He didn't give this to me.  That's the evidence.  It's not the

3     credibility of the client.  It's the credibility of the

4     plaintiff about whether or not she had a reasonable belief.

5           MR.  WIGDOR:  Well, that's just not true, because Mr.

6     Schissel has made --

7           THE COURT:  Wait, wait, wait.

8           MR.  WIGDOR:  Can I be heard on just one point?

9           THE COURT:  Wait, gentlemen.  We have a very heavy

10    agenda.  I had set aside an hour for this, and we've got to

11    keep moving, so thanks very much.

12          MR.  WIGDOR:  May I be heard about that last point,

13    your Honor?

14          THE COURT:  No.  Look, my concern is a simple one:  I

15    want the jury to have all the relevant facts.  And this

16    gentleman's affairs are to a degree -- and that's an issue, I

17    understand -- are to a degree those relevant facts.  And I am

18    persuaded that there is no enforceable right to secrecy and

19    that it would be confusing for the jury.  That's the reason I

20    think that his identity will be revealed.  I will think about

21    it, further, however.  We have time now, and I will think about

22    it further and write an opinion on the subject, but at the

23    moment I feel that that's what is going to happen.  So that

24    takes care of one and two.

25          I don't understand to preclude the defendants from

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1    referencing evidence to establish that he did not violate.  I'm

2    not sure what we're talking about there.  Let me tell you what

3    I think.

4         I think any evidence of any communications between

5    Sharkey and Client A are relevant up to the time of her

6    termination, end of story.  I think that may resolve that

7    issue.  Does it?  I'm looking at three.

8         MR.  WIGDOR:  Your Honor, we, your Honor -- the

9    plaintiff, that is -- believe that it's relevant to show that

10   ultimately this client was retained by J.P. Morgan, because the

11   theory of our case, your Honor, is that --

12        THE COURT:  I don't think so.

13        MR.  WIGDOR:  Can I just tell you what our theory is?

14        THE COURT:  I don't think so.

15        MR.  WIGDOR:  May I just tell you what our theory is?

16        THE COURT:  Yes.

17        MR.  WIGDOR:  Our theory is that the reason why

18   Ms. Sharkey was terminated is because J.P. Morgan wanted to

19   keep this very large client, which they ultimately did despite

20   her recommendation.  We believe the fact that they kept her --

21   that they kept this client -- will demonstrate to the jury the

22   intent and the motivation for terminating her:  We get rid of

23   her, and then we keep the client.

24        THE COURT:  No.  OK.

25        MR. SCHISSEL:  Your Honor, I am a little confused

H1H7SHAC

1    about what evidence is in or out based on that ruling.

2            THE COURT:  Well, I'm saying it seems to me

3    communications between Sharkey and Client A are appropriate up

4    to the time of her termination.  After her termination it's not

5    an issue, as far as I'm concerned.

6            MR. SCHISSEL:  Well, there is evidence

7    post-termination that we need to get in.

8            THE COURT:  Yes.

9            MR. SCHISSEL:  And I can explain what that is.

10           So in their motion they talk specifically about -- so

11   the chronology is this:  She says terminate the client because

12   he is not giving me the KYC documents, and I can't confirm that

13   he has authority to trade in an escrow account.  We terminated

14   her for lying to her boss.  Then we have no problem completing

15   the KYC, getting those couple of documents and confirming with

16   the law firm.  So we have to be able to prove that to respond

17   to that argument.

18           THE COURT:  But what's the relevance that you later

19   obtained information and made a decision?

20           MR. SCHISSEL:  Because for this reason --

21           THE COURT:  Well, if you get it in, then what we're

22   going to have is the argument the plaintiff just made.

23           MR. SCHISSEL:  Which is that he wants conversations

24   between the client and Sharkey?

25           THE COURT:  No, no, no.  He wants to establish Morgan

H1H7SHAC

1   all along wanted to retain the client and that the lying was

2   pretextual.

3           MR.  WIGDOR:  Correct, your Honor.

4           MR. SCHISSEL:  Well, we're going to have to think

5   about that.  Because if they're going to make the argument that

6   we retained the client -- that we never intended to really exit

7   the client, then we need to be able to respond to that.

8           THE COURT:  Well, what is the evidence going to be?

9           MR. SCHISSEL:  I don't know; it's his theory.  I don't

10  really know what that evidence -- but if they're going to

11  challenge the reason, the jury needs to hear the whole story

12  about why we ultimately did not.  So I don't -- that's why I'm

13  confused about what he is going to be able to prove and not

14  prove.

15          MR.  WIGDOR:  I just want to say that the statement by

16  Mr. Schissel that it was easy after Ms. Sharkey's termination

17  to get these couple of documents -- she was terminated, your

18  Honor, on August 4, 2009.  It took from August 4, 2009 to

19  February 2010 to finally get the approval of a CEO of the bank

20  to approve this client.  So it wasn't easy, as he is making it

21  seem.

22          But the reason for the motion in limine was that we

23  wanted to show, your Honor, again that they had every incentive

24  to keep the client.  And the only thing that we wanted to

25  preclude was a debate about whether in fact the client is

H1H7SHAC

1    committing criminal conduct or not.  The fact that they

2    retained the client, I'm fine with that.  If they want to go

3    down that road, I'm happy to travel down it.

4             MR. SCHISSEL:  Well, Judge, we need -- the

5    post-termination evidence shows that she never contacted the

6    client to follow up.  That's what Client A said to J.P. Morgan.

7    So we need that evidence.  It shows that she wasn't doing her

8    job and she was lying to her boss.

9             THE COURT:  OK, sounds likes it's in.

10            The plaintiff's personal or family wealth, I don't

11   think that gets in.  The reasons for her abandonment -- if it

12   turns out that way -- of an effort to get a job, the reasons

13   for that may be explored.  I don't understand the third item,

14   so we will skip it.

15            MR. WIGDOR:  We have already discussed that, your

16   Honor.

17            THE COURT:  OSHA out.

18            MR. SCHISSEL:  Yeah, your Honor, just on that one, we

19   agreed that the decision doesn't go in, but our witnesses are

20   going to testify that the first time they ever heard about

21   whistle blowing was when she filed the OSHA complaint.

22            THE COURT:  That's all right.

23            MR. SCHISSEL:  OK.

24            MR. WIGDOR:  I have no objection to that, your Honor,

25   if they can hear about our first demand letter as well.

H1H7SHAC

```
 1            THE COURT:  My understanding of the law in this area
 2    may very well be faulty.  Well, as events have proven, my
 3    understanding is occasionally faulty, but I don't think front
 4    pay, I don't think emotional damage are available, but I think
 5    I should write on that subject.
 6            MR.  WIGDOR:  I'm sorry, I couldn't hear what your
 7    Honor ruled.  I'm sorry.
 8            THE COURT:  I said I don't believe emotional damages
 9    or front pay are available in this case.
10            MR.  WIGDOR:  Your Honor, can I be heard on that?
11            THE COURT:  No.  Look, I can't believe that you would
12    have anything to add to the papers which I've already gotten.
13            MR.  WIGDOR:  Right.  And so I'd ask your Honor just
14    to reconsider by looking at the statute and the cases.
15            THE COURT:  No, as I say, I'm going to write on it,
16    and I may be persuaded that I was wrong.  Who knows.
17            Similarly, I don't get reputational harm.  I don't
18    know what evidence there would be of reputational harm.
19            MR.  WIGDOR:  Your Honor, the statute itself and all
20    the cases that we've cited would seem to be -- every circuit
21    that has ruled on this issue has held otherwise.  And I think
22    there are four circuits that we cite in the brief, and the
23    statute itself says that the employee prevailing shall be
24    entitled to all relief necessary to make the employee whole.
25    And that certainly would include --
```

H1H7SHAC

1          THE COURT:  What is the evidence of reputational

2    damage?

3          MR.  WIGDOR:  Ms. Sharkey will testify about her

4    efforts to obtain new employment and how people had mentioned

5    to her that because of her whistle blowing complaint that she

6    would not be able to be hired.  There is also evidence of

7    emotional distress damages that she will testify to.

8          THE COURT:  I understand the emotional.

9          MR.  WIGDOR:  And her career progression.  And all of

10   those things are clearly permitted under Sarbanes-Oxley itself

11   and the cases that we've cited.

12         THE COURT:  Well, I will take a look at them.  I may

13   be wrong, but that's my view.

14         MR. SCHISSEL:  Just one point on that one.  They don't

15   have any of those witnesses on their witness list who are going

16   to testify about reputational harm, and that's being offered

17   for the truth.  The plaintiff can't get up and say potential

18   employer X told me I had a bad reputation; that's offered for

19   the truth.

20         THE COURT:  True.  That's why it seems to me that

21   there will not be any reputational damage evidence.

22         MR.  WIGDOR:  It actually wouldn't be offered for its

23   truth; it would actually be offered, your Honor, to show why

24   she didn't get a job and the effect it had on her and her job

25   seeking.

H1H7SHAC

```
 1              THE COURT:  Well, I don't know that that's

 2    reputational damage.  It may be damage but I don't think it's

 3    reputational damage.

 4              All right.  Marchetti we've dealt with, and the same

 5    ruling will apply.

 6              I think we covered the evidence of the KYC process

 7    after July.

 8              MR.  WIGDOR:  I'm sorry, your Honor?

 9              THE COURT:  Or have we?

10              MR. SCHISSEL:  No, your Honor, so --

11              MR.  WIGDOR:  I think we've said we're going down that

12    road, your Honor, and all of these --

13              THE COURT:  I mean I think it sound like we are.

14              MR. SCHISSEL:  It's a different issue, Judge.  That

15    motion says so Ms. Sharkey worked on a KYC, we terminated her,

16    we finished that KYC in July of 2010.  Now, there have been

17    subsequent KYCs, because you have to do it on a regular basis.

18    I don't see how those are relevant to why she was terminated or

19    to any reasonable belief she would have had, so, yeah, to the

20    extent it's post termination and relates to the same KYC, then,

21    yeah, that should be admissible.

22              MR.  WIGDOR:  I mean, your Honor, if I may, I mean the

23    reason why he wants to keep these exhibits out is because

24    they're not good for him, and so he has selected an arbitrary

25    date to say, OK, let's just cut off the relevant exhibits.
```

H1H7SHAC

```
 1              I mean take, for instance, what is in the pretrial

 2     order as Plaintiff's Exhibit 208, Ms. Grusick, who is the

 3     person at risk who is running the investigation, states in an

 4     e-mail that this is the "infamous       relationship" and then

 5     in her deposition she states --

 6              MR. SEMMELMAN:  I'm sorry, your Honor.  I would ask

 7     that that be redacted from the public record.  Sorry to

 8     interrupt, but I would request that.

 9              MR.  WIGDOR:  That was unintentional, your Honor.

10              So, This is the infamous Client A relationship.  Then

11     at her deposition she says, "I don't know why I used the word

12     infamous since I never used the word."  So she says she never

13     uses the word infamous, even though it's in -- so, Mr. Schissel

14     wants to get away from the exhibit, such as the three that he

15     has, by selecting an arbitrary date because the exhibits don't

16     help him.  So if we're going to go down the road, you can't

17     just pick a date and say this is the date, we're going to just

18     stop.

19              MR. SCHISSEL:  Judge, they can use this document to

20     impeach Ms. Grusick; I don't have a problem with that.  She has

21     already testified about what this document means.  The infamous

22     is because they sued and made false statements about

23     Mr. Grusick, so I don't have a problem with that.

24              THE COURT:  So I think -- have we resolved that?

25              MR. SCHISSEL:  Yeah, as long as we can't bring in the
```

H1H7SHAC

1    other KYCs that she had nothing to do with, because at some

2    point it's got to stop.  We're going to have years and years of

3    KYCs that she has had nothing to do with?

4          MR.  WIGDOR:  If it's just the KYCs, we don't have a

5    problem with that, your Honor.

6          THE COURT:  OK.

7          MR. SCHISSEL:  Judge, can I just go back to one thing?

8    Only because I think you skipped it.  Is your Honor going to

9    decide the issue of back pay?

10          THE COURT:  Yes.

11          MR. SCHISSEL:  OK, thank you.

12          MR.  WIGDOR:  Your Honor, can I be heard on that?

13          THE COURT:  What's to hear?

14          MR.  WIGDOR:  Well, your Honor, again I think it's

15    very important to start with the premise that unlike any

16    discrimination statute that I'm aware of at least,

17    Sarbanes-Oxley has within it a provision that does not allow

18    employers to mandate arbitration.  The reason for that is

19    because Congress decided that jurors should hear these issues.

20    And in Sarbanes-Oxley itself not only does it exclude

21    arbitration, it also lists as a compensatory damage to which

22    the plaintiff is entitled to a jury trial back pay.

23          And so, your Honor, while I have no doubt your Honor

24    would be fair in determining what the back pay should be, it is

25    the province of a jury, and respectfully that is what the jury

H1H7SHAC

1    should decide.  So I would ask that you at least take a look at

2    the things we cited in the statutes.

3              THE COURT:  OK, thank you.

4              MR. SCHISSEL:  Should I respond to that?

5              THE COURT:  I don't think so.

6              MR. SCHISSEL:  OK, thank you.

7              THE COURT:  Sauce for the goose on item 7.  If it

8    turns out that we do reveal Client A, we certainly are not

9    going to preserve the confidentiality of Morgan's employees.

10             8, I don't know what -- I presume that that's correct.

11             MR. SCHISSEL:  Well, I can tell you, actually it's

12   three documents really.  Yeah, three documents:  Plaintiff's

13   proposed Exhibit 210 is a 2013 consent order between J.P.

14   Morgan entities and the board of governors of the Federal

15   Reserve regarding certain compliance risk management programs

16   that are not at issue here.  Plaintiff's Exhibit 211 is a 2013

17   report.

18             MR.  WIGDOR:  We're withdrawing 211, your Honor.

19             THE COURT:  OK.

20             MR. SCHISSEL:  OK.  And then 222 is a deferred

21   prosecution agreement between J.P. Morgan and the Southern

22   District relating to Bernie Madoff.

23             THE COURT:  OK, they're excluded.

24             MR.  WIGDOR:  May I be heard on that?

25             THE COURT:  No, no, no.

H1H7SHAC

1          MR.  WIGDOR:  This is a very important part of the
2     case, your Honor.
3          THE COURT:  Oh, really.
4          MR.  WIGDOR:  Yes, it is, your Honor.  May I just be
5     heard, your Honor, please?  I know your Honor has made a
6     decision, but if I can just be heard on why it is extremely
7     relevant, especially with respect to the deferred prosecution
8     agreement with the Southern District in which they admit --
9     this is the defendant J.P. Morgan Chase during the relevant
10    period of time now.  I'm not talking about something that
11    happened decades ago.
12         You have to recall that Bernie Madoff was arrested in
13    2008, December 2008.  This was at the same time Ms. Sharkey
14    started to have to do the KYC for Client A.  And in the
15    deferred prosecution agreement they make a whole host of
16    admissions, including admitting to the systemic deficiencies,
17    failure to maintain adequate policies, procedures, controls, to
18    ensure compliance with the bank's secrecy act -- which is
19    relevant here -- and regulations regarding anti-money
20    laundering, which is at issue here as well.
21         THE COURT:  But all of this is -- I assume that those
22    admissions are all relevant to the Madoff inquiry.
23         MR.  WIGDOR:  No, they're broader than that, your
24    Honor.  They're systemic.  They admitted to systemic failures,
25    your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

27

H1H7SHAC

1          THE COURT:  No, but I'm saying it all arose out of the

2     Madoff, and that clearly is -- well.

3          MR.  WIGDOR:  It did, your Honor.  And in fact my

4     client actually was interviewed on a number of occasions by the

5     Southern District just right up here and participated in that

6     investigation that ultimately led to the entering of this

7     order.  It is relevant clearly under Rule 404(b) of the Federal

8     Rules of Evidence.  It goes to show motive and intent.  I tried

9     a case a while back before Judge Orenstein in the Eastern

10    District where Walmart had entered into a consent decree and

11    the judge admitted it for the purpose of showing motive intent.

12    Here it goes to those issues.

13         THE COURT:  What is the intent that you think this

14    reveals?

15         MR.  WIGDOR:  It goes to the theory of the case which

16    I described earlier, which is that they had this relationship

17    with Bernie Madoff, and they admit to turning a blind eye, and

18    they admit to having inadequate controls, and now you have

19    Ms. Sharkey who blows the whistle, who raises red flags, who

20    complains about illegal and unlawful conduct, and she is fired

21    as a result of it.  And they are essentially a prior felon

22    offender by entering into this joint prosecution agreement.

23    They can't come in here to court -- and they have already told

24    your Honor, oh, Client A, he is an innocent nonparty.  Why

25    should we believe them?  They've already entered into this

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

H1H7SHAC

1    agreement with the Southern District.  If they try to portray

2    Chase as a good corporate citizen -- as I'm sure they are going

3    to do -- and they're going to try to portray Client A as this

4    great person, that shows that all of their statements are not

5    worthy of any credibility.

6              THE COURT:  I will hear from defendant.

7              MR. SCHISSEL:  Your Honor, this is so far afield.  I

8    mean what they don't want to try is this case.  This case has

9    to do with whether or not the plaintiff reasonably believed

10   that Client A was committing a fraud, and did we terminate her

11   for blowing the whistle, or did we terminate her because she

12   lied to her boss?  And Bernie Madoff had nothing to do with it.

13   This client wasn't blowing the whistle on some systems at J.P.

14   Morgan; she was supposedly blowing the whistle on a particular

15   client.  It's completely far afield because they don't want to

16   deal with the facts of our case.

17             MR.  WIGDOR:  I would ask you to look at the deferred

18   prosecution, your Honor.  You will see that when you read that

19   agreement that there are many, many relevant pieces in that

20   deferred prosecution agreement that demonstrate what I already

21   said.  So, I won't repeat myself.

22             And, you know, God knows how many millions of dollars

23   Chase spends on events to make them look good to these jurors

24   who are going to be sitting here, and the fact is that they

25   were partners with Bernie Madoff for years and years and years,

H1H7SHAC

 1   and people lost billions and billions of dollars, and they

 2   turned a blind eye.  They wanted to turn a blind eye with

 3   regard to Ms. Sharkey's whistle blowing complaints, and they

 4   fired her as a result of it.  It's clearly relevant, and they

 5   just don't want to deal with it.

 6           THE COURT:  I don't think it is clearly relevant.  I

 7   think it is tangential and prejudicial, but I will write on

 8   that, the deferred prosecution issue.

 9           The size of J.P. Morgan?

10           MR. SCHISSEL:  This has to do with how much money the

11   company makes, how many employees, profits, revenues, that sort

12   of thing.  That's irrelevant.

13           THE COURT:  What is the relevance of the size?

14           MR. WIGDOR:  Your Honor, the relevance of the size in

15   particular is with respect to Client A to show that he was a

16   large client in comparison to other clients, and the motivation

17   again as to why they would want to terminate Ms. Sharkey.

18           THE COURT:  Of course the size of the client and all

19   that.  I don't think --

20           MR. WIGDOR:  I wasn't intending to do anything else.

21   I think every juror is going to know the size of J.P. Morgan

22   Chase.

23           THE COURT:  Yeah, sure, all right.  So the size, at

24   least at this point, I don't think it's relevant.  That could

25   change depending on how the evidence comes in.

H1H7SHAC

```
1                Number 10, I don't think I understand.

2            MR. SCHISSEL:  So, I'm not sure what they intend to

3    introduce, but during the depositions J.P. Morgan witnesses

4    were questioned about other employee incidents.  And unlike a

5    Title VII case, disparate treatment is not an issue here.

6    They're saying like this person lied and you didn't fire her,

7    that sort of thing.

8            MR.  WIGDOR:  We're not going -- we're not doing that.

9            MR. SCHISSEL:  Fair enough.

10           THE COURT:  OK.  I don't understand number 5.

11           MR. SCHISSEL:  Oh, no.  This had to do with a specific

12   witness.  I think -- yeah, it had to do with we have a former

13   employee who lives in Chicago, and we have said we will bring

14   her live and she will testify in our case, and they can

15   cross-examine her in our case, and they wanted for us to bring

16   her in their case; that's all that is.

17           THE COURT:  Well, I take it that she is beyond the

18   subpoena power.

19           MR. SCHISSEL:  Correct.  We accepted a subpoena, but

20   she is beyond the subpoena power for enforcement purposes.

21           MR.  WIGDOR:  Your Honor, this is gamesmanship at its

22   best, your Honor.

23           THE COURT:  Tell me about it.  Really?

24           MR.  WIGDOR:  Your Honor, with respect this is the

25   ultimate gamesmanship.  I don't think we've acted in any sort
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

```
 1    of gamesmanship, with respect, your Honor.  And you can snicker
 2    all you want, Mr. Schissel.
 3            MR. SCHISSEL:  I'm not snickering.
 4            MR.  WIGDOR:  I can explain.
 5            THE COURT:  You cannot compel her to attend the trial,
 6    can you?
 7            MR.  WIGDOR:  Your Honor, I have been in this
 8    courthouse before before certain judges that have looked at
 9    people like Mr. Schissel and told him to get their client here,
10    yes.
11            THE COURT:  Well --
12            MR.  WIGDOR:  And the reason why, your Honor, is
13    because they represent her.  We have the burden of proof, and
14    we should be able to call witnesses that we believe will
15    sustain our burden of proof in our case in chief.  They clearly
16    don't want --
17            THE COURT:  Yes, yes.
18            MR.  WIGDOR:  They clearly don't want me to
19    cross-examine her before they have an opportunity to do a
20    direct examination.  And I should be able to present our case
21    in chief in the way that I think is best for the jury to
22    determine whether or not we have met our burden.  And to
23    preclude us from doing that, and then let them call the same
24    witness at their case in chief, really is gamesmanship, it is.
25            THE COURT:  It is gamesmanship, but --
```

1          MR.  WIGDOR:  So the court shouldn't condone it, in my

2     view, your Honor.

3          THE COURT:  What authority do I have to tell them that

4     they have to produce the witness?

5          MR.  WIGDOR:  I think your Honor could make clear your

6     preference, and I believe that they would listen to your

7     preference.

8          THE COURT:  My preference?  Well, I will hear from

9     Morgan.  I will hear from Morgan.  I think my understanding

10    would be that you will have to be -- you will have to use her

11    deposition, and then if they want to call her, it seems to me

12    they can.

13         MR.  WIGDOR:  Well, your Honor, if I may just ask your

14    Honor then.  If they won't produce her in my case in chief --

15    which we all agree is gamesmanship -- then I would ask that

16    when they call her in their case in chief, that I be permitted

17    to cross her before they do any direct, because the burden is

18    on me.

19         MR. SCHISSEL:  Judge, first of all, they took her

20    deposition for eight hours, so if they want to use her

21    deposition, they can use it.  If we move for a directed verdict

22    at the close of their case, and they say, well, we need Cathy

23    Grusick live, I suspect your Honor is going to say, Schissel,

24    you didn't want to call her until your case -- and if that's

25    what they're worried about burden of proof, that's what will

H1H7SHAC

1    happen.

2         MR.  WIGDOR:  That's not the issue.  It's not a

3    directed verdict, your Honor.  We need to establish our prima

4    facie case to the jury.  So, it's not whether there is a

5    directed verdict motion or not; it's how we go about sustaining

6    our prima facie case.

7         And, your Honor, on the thing that he just said, that

8    we took her deposition for seven hours, that might be true, but

9    they've also produced at least one document which is about 15

10   or 10 pages, which contains tons of e-mails and documents from

11   Ms. Grusick that they didn't produce until summary judgment was

12   being briefed.  And we never had the opportunity to

13   cross-examine,

14        MR. SCHISSEL:  Judge, this is really important.

15        MR.  WIGDOR:  Please don't interrupt me.

16        MR. SCHISSEL:  We gave -- you gave him the opportunity

17   to take the deposition after we produced the document, so --

18        MR.  WIGDOR:  Please don't interrupt me.  Please don't

19   interrupt me.  Please don't interrupt me.  That document -- we

20   did not have that document at the time we took Ms. Grusick's

21   deposition.  So, your Honor, it seems to me that defendants --

22   all of these motions --

23        THE COURT:  Let's get the facts straight.  It would

24   seem to me -- well, wait a minute.  Let's back up.

25        Presumably there was a request for all relevant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

```
 1   documents prior to the deposition, I assume.  And the
 2   deposition was held, and then there were some documents which
 3   were produced that were subject to the initial demand but
 4   either had not been located or for some reason or another had
 5   not been produced.  And she was not interrogated with respect
 6   to those documents.  Have I got it correct?
 7            MR. SCHISSEL:  Yeah.  There is another step, which is
 8   your Honor gave them the opportunity to redepose her after we
 9   produced those documents, and they didn't take your Honor up on
10   it.
11            MR.  WIGDOR:  Your Honor, we had been litigating this
12   case since 2009 or 2010.  We were briefing summary judgment.
13   The last thing we wanted to do at that point in time was start
14   taking more depositions.
15            THE COURT:  Enough said.  You had an opportunity, and
16   you didn't choose to take it, so that's fine, we're not going
17   to have her deposition now on those documents.
18            MR. SCHISSEL:  Your Honor, 7 and 8 on the list I've
19   read for the first time last night when I got this letter, so I
20   don't think it's an issue.  We're going to cross-examine the
21   plaintiff when she testifies.
22            THE COURT:  Yes.
23            MR.  WIGDOR:  Yes.
24            THE COURT:  OK.  Exhibits, you all can work that out.
25            Do you think we're finished?  Oh, no, there is a late
```

blooming subpoena issue. Tell me about that.

MR. WIGDOR: Your Honor, we have issued a trial subpoena, your Honor, to request the documents back and forth between either Arnold & Porter and Curtis Mallet and/or their clients. They are represented by separate counsel. I'm not aware of any joint defense agreement. And to the extent -- I don't think they've argued that to the extent those documents exist they're irrelevant. I don't think they have. But maybe I'm wrong.

But clearly those documents, to the extent they're talking about Client A, or talking about why he remained at J.P. Morgan, or why Ms. Sharkey recommended they exit the relationship, or anything of that nature, would not be privileged and would be relevant, and so that's what we're requesting.

MR. SCHISSEL: Well, the Client A is represented by counsel, so to the extent there are any documents responsive to that subpoena, it would be correspondence between me and Client A's counsel. And what that has to do with whether Ms. Sharkey had a reasonable belief, and whether she blew the whistle, and whether we terminated her because she was a liar, I have no idea.

MR. WIGDOR: Your Honor, maybe as an alternative you can review those documents in camera and determine that. But why shouldn't we at least examine what they're communicating

H1H7SHAC

1    about.

2            Again they're not privileged communications; they're

3    communications between two separate counsel.  And I don't know

4    as I stand here today whether there are also communications

5    between Client A and Mr. Schissel, or between Curtis Mallet and

6    any of the other J.P. Morgan employees.  I don't know, and so I

7    can't tell you that the documents exist.  They're not in my

8    possession.  I can't tell you that they are relevant, because I

9    haven't seen them.  But I think there is no ground to object to

10   it.

11           MR. SCHISSEL:  I don't know what they are; I don't

12   know if they're relevant.  That's called fishing, Judge.  And

13   they say they asked for these.  Discovery closed three and a

14   half years ago, and they did nothing about it.  This is just --

15           MR.  WIGDOR:  It's a trial subpoena.

16           MR. SCHISSEL:  Talk about gamesmanship.

17           MR.  WIGDOR:  It's a trial subpoena, and notably Mr.

18   Schissel has not said that there aren't such exhibits and that

19   such exhibits are not relevant.

20           MR. SEMMELMAN:  Your Honor, very briefly.  I'm

21   speaking in my capacity as pro se counsel for the Curtis Mallet

22   law firm, and I join in the arguments that Mr. Schissel made,

23   but I just want to add that because by its very nature there is

24   a request for a back-and-forth between what I will call my side

25   and Mr. Schissel's side, whatever documents exist are in the

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                 (212) 805-0300

H1H7SHAC

1    possession and control of Mr. Schissel and whoever he

2    represents, and so that is a battle, I would submit, that

3    should be addressed and handled by the J.P. Morgan team.  My

4    client should not have to undergo the expense, the cost, the

5    burden of having to comply with documents that, if relevant --

6    if deemed relevant -- are in the possession, custody and

7    control of J.P. Morgan.  So I don't see that I or my client or

8    my law firm should really have any involvement in this issue

9    other than to join in the objections raised by Mr. Schissel.

10   Thank you.

11          MR.  WIGDOR:  I tend to probably agree with that,

12   unless there are communications with counsel for Curtis Mallet

13   and people other than Mr. Schissel and his firm.

14          But if there is a representation that there isn't,

15   then I would agree that the potentially relevant exhibits would

16   exist in Arnold & Porter and in their possession.  But I can

17   think of many examples of relevant exhibits or documents.  And

18   again there is no basis to say, well, we're not going to

19   produce them.  They're not privileged, and they may lead to

20   relevant evidence, and at the very least, your Honor, they

21   should be produced in camera for your review to determine

22   whether they're relevant or not.

23          THE COURT:  Anything further from Morgan?

24          MR. SCHISSEL:  No.  I just haven't heard a relevant

25   argument, but nothing further.

H1H7SHAC

1          MR.  WIGDOR:  But I haven't heard that you have

2     declined they're relevant.

3          MR. SCHISSEL:  The burden is on the propounding party.

4          THE COURT:  I'm not going to enforce the subpoena,

5     because there has been no showing of relevance.

6          OK.  Are we done?

7          MR. SCHISSEL:  There is one more subpoena, but they

8     may be withdrawing.  I don't know.  It was to a gentleman named

9     Bill Daley, a former senior executive of J.P. Morgan in

10    Chicago.

11         MR.  WIGDOR:  No, that's a trial subpoena.  We're not

12    withdrawing it.

13         MR. SCHISSEL:  Well then we need to address it then.

14    So, Mr. Daley is the son of the former Chicago mayor, was in

15    President Obama's administration and President Clinton's

16    administration.  We produced a redacted document in this case,

17    which is an e-mail from Joe Kenney, one of the defendants who

18    headed up the private wealth management division of J.P.

19    Morgan.  The e-mail says that he spoke with Mr. Daley and then

20    comments on a client.  We redacted all of the clients except

21    for Client A, but he is actually talking about some prominent

22    politicians who are redacted.

23         We explained that to counsel.  Mr. Kenney is prepared

24    to say that.  I'm prepared to show your Honor the unredacted

25    version.  It's got some very prominent politicians in federal

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1     government who are customers of J.P. Morgan.  And politicians

2     by their very nature are considered high-risk clients for a

3     bank.  And so he was just checking with Mr. Daley.  For

4     example, one of them was in the Illinois state legislature, one

5     of the clients, and it has nothing to do with this case.  Why

6     do we produce it?  I guess it was a mistake.  We hadn't

7     interrogated Mr. Kenney about which client he was referring to.

8     He is irrelevant.  There is no reason why the subpoena should

9     be enforced.  We have explained that to counsel, but they as of

10    yet are not withdrawing the subpoena.

11         MR. WIGDOR:  Your Honor, the exhibit that was

12    produced to us states that is looking for approval from

13    Mr. Kenney -- who, by the way, was the CEO of private wealth

14    management at the time -- and it lists one bullet point with

15    the client name that's at issue here, and then there were two

16    bullet points that were redacted.  And in response -- well,

17    actually Mr. Kenney then says three days later I spoke with

18    Bill Daley, he is supportive and thinks reputation risk is

19    relatively low.  Approved.

20         And so it's clear that -- I mean I heard the

21    representation they've made, but that doesn't mean we have to

22    believe it.  It appears from this document that Mr. Daley and

23    Mr. Kenney had a conversation with regard to approving the

24    client at issue here.  Now, I heard his reputation, but when I

25    cross-examine Mr. Daley and Mr. Kenney, maybe they will think

H1H7SHAC

1    of something else.

2            THE COURT:  What is the relevance of that conversation

3    with respect to Client A?

4            MR.  WIGDOR:  Oh, because this goes back to the

5    beginning of our --

6            THE COURT:  What is the date?

7            MR.  WIGDOR:  The date is in February of 2010.  And it

8    goes to show that this client that's at issue in this trial was

9    getting approval from the CEO of private wealth management and

10   somebody who was on the executive committee.

11           THE COURT:  But we know that.  I mean the evidence --

12   I mean that's known, is it not?

13           MR.  WIGDOR:  No, actually it's not known.

14   Mr. Kenney's recollection at his deposition is that he doesn't

15   remember anything and, so, no, it's not known.  The documents

16   suggest otherwise.

17           But I don't know what he will testify at trial.  And

18   it looks like Mr. Daley was involved in the decision as well,

19   and so we are entitled to cross-examine him and find out what

20   they discussed, why they approved this client, which we believe

21   was the wrong decision, but they made the decision to pad the

22   bottom line.

23           MR. SCHISSEL:  Judge, can I hand up the unredacted

24   copy?  I don't want to say the names in open court because

25   everybody will know them.

H1H7SHAC

1            THE COURT:  Well, the redaction, there is no question

2       about the redaction.

3            MR. SCHISSEL:  No.  The --

4            THE COURT:  The redaction is fine.  It's only a

5       question of the testimony of Daley with respect to the approval

6       of Client A.

7            MR. SCHISSEL:  We're prepared to submit an affidavit

8       to your Honor from Joe Kenney who wrote the e-mail saying I was

9       not talking about Client A; I was talking about one of the

10      politicians listed in the actual e-mail.

11           MR.  WIGDOR:  Well that would be incredible, because

12      at Mr. Kenney's deposition he doesn't remember anything, your

13      Honor; and for him to now recall this e-mail, I would be

14      flabbergasted.

15           THE COURT:  But the document does refer to Client A.

16           MR.  WIGDOR:  It does.

17           MR. SCHISSEL:  It's got a whole list.

18           THE COURT:  OK.

19           MR. SCHISSEL:  But they can get it from Mr. Kenney.

20           THE COURT:  So it seems to me that if we're going down

21      that road -- which I guess we are -- of February 2010 decision

22      to retain the client, then the Daley's conversation about this

23      particular client -- if he has it or remembers it -- would be

24      relevant.

25           MR. SCHISSEL:  But there was no conversation.  That's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1   my point.  So they're going to -- well, the guy is in Chicago

2   anyway, so it's in the same category as Cathy Grusick.

3          MR.  WIGDOR:  It doesn't sound like the defense wants

4   a trial.  The witness is under their control.  They are doing

5   everything not to have a trial, your Honor.  It doesn't sound

6   like they really want to try the case, your Honor.  They really

7   don't.

8          THE COURT:  So I think that's where we are.  It's too

9   late, and you can't compel him.

10         MR. SCHISSEL:  Right.

11         THE COURT:  OK.  Anything else?

12         MR. SCHISSEL:  Nothing from us, your Honor.

13         MR.  WIGDOR:  Your Honor, there is case law, your

14  Honor, that he can appear by video that would support that, out

15  of state.

16         THE COURT:  I think what you're saying is even though

17  you can't spell him, you can compel him to --

18         MR.  WIGDOR:  -- testify there by video.

19  Alternatively, your Honor, I would agree to take his deposition

20  in Chicago.

21         THE COURT:  Well, that's a different kettle of fish.

22         MR.  WIGDOR:  We have time now, your Honor.

23         THE COURT:  If you want to do that, you can.

24         MR.  WIGDOR:  OK, thank you.  I will take you up on

25  that.  Thank you.

43

H1H7SHAC

1           THE COURT:  Anything else?

2           MR. SCHISSEL:  Not from us, your Honor.

3           THE COURT:  Let me know what you think after you have

4    digested all of this.  Thanks.

5           MR.  WIGDOR:  Thank you, your Honor.

6           MR. SCHISSEL:  Can I have one clarification?  If

7    they're going to take a deposition of Mr. Daley, he shows up on

8    that one email, I assume that's what they can talk to him

9    about, that one e-mail.

10          THE COURT:  Yes.

11          MR.  WIGDOR:  The one e-mail is a broader topic of his

12   involvement.

13          THE COURT:  Well, if he had any -- I'm sure the

14   question will be asked:  Did you have any other involvement in

15   the decision to retain the client?

16          MR.  WIGDOR:  Right.  I don't plan on talking about

17   his time in the Obama administration.

18          MR. SCHISSEL:  Well, he can't ask about all those

19   other clients.

20          THE COURT:  No, no, no, no.

21          MR.  WIGDOR:  Just so I'm clear on that, your Honor, I

22   mean to the extent that he is going to say, no, I was talking

23   about this other client, obviously I need to inquire to

24   understand why he believes that.  So if I ask him does this

25   refer to Client A and he says, no, it refers to client Z, then

44

H1H7SHAC

1    I need to probe that.

2           THE COURT:  Wait a minute.  The document on its face

3    indicates that it does apply to Client A.

4           MR. SCHISSEL:  No, no.

5           MR.  WIGDOR:  I mean to Mr. Schissel's --

6           THE COURT:  Let me see it.  Let me see it.

7           MR. SCHISSEL:  This is the redacted, and this is the

8    unredacted.  It's a one sentence e-mail at the top.

9           THE COURT:  Is the first one -- the only one that's

10   there, is that Client A?

11          MR.  WIGDOR:  Yes.

12          MR. SCHISSEL:  And you can see from the unredacted,

13   there is a whole bunch of others.

14          THE COURT:  Well, OK.  So, I think you may inquire as

15   to any conversation between Kenney and Daley on that one

16   client.  The remainder I don't think are relevant.

17          MR. SCHISSEL:  Thank you.

18          THE COURT:  OK?

19          MR.  WIGDOR:  Just so I'm clear, your Honor -- because

20   I don't want to run afoul of the court's ruling -- but if

21   Mr. Daley says, no, my conversation was about one of the other

22   clients, I would need to follow up obviously to figure out why

23   he remembers that and why he knows that.

24          THE COURT:  No, I don't think so.  The identity of the

25   other clients are not relevant to this concern.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

```
 1          MR.  WIGDOR:  I have seen it.  They have shown it to

 2     us, and I agree, your Honor, that it's of no concern for the

 3     court or for the public, but all I'm suggesting, your Honor, is

 4     that if he says I was talking about somebody else, why should I

 5     just take that at face value?  Why can't I inquire to follow up

 6     and figure out why that is he remembers that?

 7          THE COURT:  As I say, the identity of the other people

 8     on the list will remain confidential.  OK?

 9          MR.  WIGDOR:  But I'm still not following, your Honor.

10     I don't intend to invalidate any confidentiality with respect

11     to those other names; I have already seen those other names.

12     And Mr. Daley knows those names, so it would just be for

13     attorneys eyes only.

14          THE COURT:  The confidentiality will be maintained

15     with respect to the redactions.  OK?  OK.

16          MR.  WIGDOR:  I just don't understand what the ruling

17     is, your Honor.  Are you suggesting that we go to Chicago, I

18     say, Mr. Daley, here is the exhibit, were you referring to

19     Client A?  He says, no.  And then I pack up my bags and leave?

20          THE COURT:  I think --

21          MR.  WIGDOR:  Your Honor, all due respect, why should

22     I not be able to cross-examine him about that?

23          THE COURT:  Well, what would the cross-examination be?

24          MR.  WIGDOR:  The cross-examination would be --

25          THE COURT:  To each one of these people?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

H1H7SHAC

1            MR.  WIGDOR:  No, no.  The cross-examination, your

2     Honor, would be why he recalls an e-mail from February of 2010

3     that he was talking about a certain client.

4            THE COURT:  That's fine.  You can ask that question

5     without -- sure, you can test his recollection.

6            MR.  WIGDOR:  Yes.

7            THE COURT:  But as I've said, the confidentiality of

8     the other people will be maintained.

9            MR.  WIGDOR:  And I don't intend to impede that.  We

10     can make it for attorneys eyes only.  I have no ambition to do

11     that, your Honor.

12            MR. SCHISSEL:  Do you want us to take back those

13     documents?

14            THE COURT:  Oh, yes, they're right here.  Thank you

15     all.

16            MR. SCHISSEL:  Thank you.

17            MR.  WIGDOR:  Thank you, your Honor.

18                              - - -

19

20

21

22

23

24

25