

# WIGDOR LLP
ATTORNEYS AND COUNSELORS AT LAW

85 FIFTH AVENUE
NEW YORK, NY 10003
TEL 212.257.6800
FAX 212.257.6845
WWW.WIGDORLAW.COM

**Douglas H. Wigdor**
dwigdor@wigdorlaw.com

October 29, 2017

<u>**VIA ECF**</u>

The Honorable Denise L. Cote
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 15B
New York, NY 10007

    Re:    <u>Sharkey v. J.P. Morgan Chase & Co., et al.; Civil Action No. 10 Civ. 3824 (DLC)</u>

Dear Judge Cote,

We represent Plaintiff in this action and write to respectfully raise six disputes between the parties in connection with the trial in this matter, as well as with regard to two areas of agreement.

*First*, there is a dispute as to what testimony Ms. Sharkey will be permitted to give during the trial. In order to establish her claim, Ms. Sharkey will have to prove that she actually held a belief that Client A might be engaged in certain illegal activity, including fraud, and that her belief was objectively reasonable. Defendants are going to argue that Ms. Sharkey could not possibly have believed that Client A might be engaged in fraud (or that such belief was unreasonable) because the conduct that Ms. Sharkey says she encountered – including Client A's refusal to cooperate with the Know Your Customer ("KYC") process – did not at all indicate that fraud might be occurring.

Ms. Sharkey was attempting to complete the Client A KYC in the wake of the Bernie Madoff scandal – she received the Client A account mere weeks after Mr. Madoff pled guilty in connection with his Ponzi scheme. Mr. Madoff's December 2008 arrest and March 2009 guilty plea, as well as what Ms. Sharkey was told by her colleagues regarding efforts to "get to know" Mr. Madoff, played a role in the formation of her reasonable belief that Client A might also be engaged in fraud. Like Mr. Madoff (who used J.P. Morgan Chase & Co., Inc. ("JPMC") as his primary bank), Client A was a long-time customer of the bank and no KYC had been completed with regard to Client A and his companies. Ms. Sharkey was aware that Mr. Madoff was able to perpetuate a tremendous fraud because JPMC never "got to know" Mr. Madoff. These issues were fresh in Ms. Sharkey's mind while she was attempting to complete the Client A KYC, and Ms. Sharkey's understanding as to the impact and consequences of a failure to produce KYC information (*e.g.*, one who refuses to


produce KYC information may very well be engaged in fraud) were informed by the Madoff scandal.

Defendants are objecting to any mention of Mr. Madoff.  However, precluding the aforementioned testimony would by highly prejudicial.  Defendants are contesting whether Ms. Sharkey had a reasonable belief that Client A was engaged in unlawful activity.  Preclusion of this testimony would deny Ms. Sharkey the ability to present all of the facts that supported her conclusion that Client A was engaged in unlawful activity.  While Defendants can certainly can cross-examine Ms. Sharkey on this issue, there is no legitimate basis for preclusion.

Moreover, while she will not testify about this, Ms. Sharkey's concerns were well founded.  In connection with the $1,700,000,000 settlement that JPMC ultimately paid in 2014, JPMC admitted substantial failures relating to its efforts to "get to know" Mr. Madoff, and admitted that "efforts to electronically store KYC materials were behind schedule and, accordingly, as set forth herein, on some occasions AML investigations teams responding to alerts were unable to access the computerized KYC material on the client as part of their investigation."  Ex. A.

*Second*, there is a dispute as to what testimony Defendants will be permitted to elicit about JPMC being a "good corporate citizen" and/or its commitment to KYC obligations.  We have asked defense counsel to confirm that it does not intend to elicit any testimony or make any statements that JPMC and its employees generally are good and honest and/or that they take their KYC obligations seriously.  We believe that any such testimony would necessarily open the door to the admission of the deferred prosecution agreement and/or other evidence that JPMC is not a "good corporate citizen" and does not take its KYC obligations seriously.  Defense counsel has not yet responded on this issue.

*Third*, we respectfully request that the Court provide the following instruction to the jury during the Court's preliminary statements prior to opening statements:  "Ms. Sharkey was terminated in 2009.  It is now 2017.  The fact that Ms. Sharkey was terminated in 2009 and that this case is not being tried until now should not be considered or held against any party."  We believe that this is an innocuous instruction that should be issued because, if it is not, the jury may be confused or distracted by the fact that this matter is being tried eight years after Ms. Sharkey's termination.  The jury may believe this delay is due to a lack of interest on the part of Ms. Sharkey or because she sat on her rights for eight years, which would be unduly prejudicial to Plaintiff.  Defense counsel objects to this instruction.

*Fourth*, we understand that Defendants intend to submit a letter regarding a damages calculation we provided this afternoon.  Defendants claim that we should have provided a more detailed damages calculation before now.  This is yet another attempt by Defendants to re-litigate an issue that they have already lost.  Defendants' January 9, 2017 motion *in limine* 1 (Dkt. No. 145) sought to limit Plaintiff's request for back-pay to damages accruing before August 2012.  Defendants argued at the time that this limitation was required because Plaintiff had failed to comply with her



discovery obligations. Specifically, Defendants stated that Plaintiff failed calculate damages in her Fed. R. Civ. P. Rule 26(a) disclosures and also failed to do so in response to discovery requests. Id.

In our opposition (Dkt. No. 179), we noted that we had provided a damages calculation to Defendants in connection with a November 2016 mediation. In addition, Plaintiff's initial disclosures contained an estimated back pay award based on what we thought at the time her damages would be though August 2012. That was, at the time the initial disclosures were served, when we expected the trial to be. We also argued that Defendants were at all times aware of Ms. Sharkey's salary (as well as the benefits, bonuses and salary increases she received) at the time she was fired from JPMC, and that despite her efforts to do so, Ms. Sharkey has been unable to secure comparable employment since her termination. We also offered to revise our initial disclosures, which Defendants did not follow-up on until the October 27, 2017 conference before Your Honor. Judge Sweet necessarily rejected Defendants' argument by holding that Ms. Sharkey's "claims for back pay will end at the date at which the jury determines she stopped actively applying for jobs and seeking employment," and not limiting that date to a time period before August 2012. Moreover, *one week ago*, Defendants produced a brand new document that relates to Ms. Sharkey's claim for damages. Based on this document, we provided an updated damages calculation today.

Defendants' claim that they somehow did not know what Ms. Sharkey would be seeking in damages is preposterous and, given that they withheld critical information until last week, disingenuous. Making their conduct worse – Defendants waited until four years after the deadline to amend their Answer to include their "failure to mitigate" affirmative defense. Defendants saw no problem with their eleventh hour request, which actually did prejudice Plaintiff, yet they now complain that they were unable to take discovery on back pay.

Finally, when asked how Defendants have been prejudiced, defense counsel reiterated exactly the same argument Defendants made in their motion *in limine*. That motion was denied and we should not be continually forced to re-litigate decided issues on the eve of trial.

*Fifth*, in qualifying Anne Marchetti as an expert in this matter, we intend to use the following language: "Plaintiff hereby submits Ms. Marchetti as an expert in accounting and with respect to Sarbanes-Oxley compliance programs who may testify regarding 'red flags' of possible fraud in the financial industry." This language is taken directly from pages 8 and 9 of Judge Sweet's October 9, 2013 Order (see Dkt. No. 80), yet Defendants object.

*Sixth*, earlier today, Your Honor held that expert witness Anne Marchetti would not be permitted to testify about any red flags that were not discussed during her deposition. The following items were discussed during her deposition:



1. Refusal to provide documents or information sufficient to determine individual's sources of wealth. See Ex. B at 62:19-64:13 (In discussing the facts that supported recommending the termination of the Client A relationship, Ms. Marchetti refers to the internal email exchanges she reviewed in connection with this case. Defense counsel did not ask any follow-up questions on this during the deposition, but defense counsel had been provided with a list of those emails, which includes Plaintiff's Ex. 94. See Ex. C. Plaintiff's Ex. 94 states that one risk concern regarding Client A is that it was unclear what his source of wealth was.).

2. Refusal to provide documents or information sufficient to determine who the owners of a company are. See Ex. B at 62:19-64:13 (In discussing the facts that supported recommending the termination of the Client A relationship, Ms. Marchetti refers to the internal email exchanges she reviewed in connection with this case. Defense counsel did not ask any follow-up questions on this during the deposition, but defense counsel had been provided with a list of those emails, which includes Plaintiff's Ex. 94. See Ex. C. Plaintiff's Ex. 94 states that one risk concern regarding Client A is that it was unclear who owned the Client A network of companies.).

We have asked for Defendants' consent to have Ms. Marchetti testify as to red flags related to the issues raised in Exhibit 94. Defendants have not yet responded on this issue.

The parties have agreed to submit a jointly-proposed preliminary jury instruction (we are still finalizing the language) regarding the jury's obligation not to search the internet for or read anything about this case that may have already been published, or that is published during the pendency of the case. The parties have also agreed (to the extent permitted by the Court) to proceed with seven jurors in the event that becomes necessary.

Finally, we respectfully ask Your Honor whether the Court intends to hold a charging conference and/or whether the Court would like Plaintiff to submit formal objections to Defendants' proposed jury charge.



We thank Your Honor for the Court's consideration of these matters, and will be prepared to discuss them in more detail tomorrow.

Respectfully submitted,

Douglas H. Wigdor

Enc.

cc: Michael D. Schissel, Esq. (*via* ECF)
Kathleen A. Reilly, Esq. (*via* ECF)