**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
JENNIFER SHARKEY,                                     :
                                                      :
                              Plaintiff,              :     Civil Action No.: 10-cv-3824 (DLC)
                                                      :
              v.                                      :
                                                      :
J.P. MORGAN CHASE & CO., JOE KENNEY,   :
ADAM GREEN, and LESLIE LASSITER, in    :
their official and individual capacities,            :
                                                      :
                              Defendants.             :
------------------------------------------------------------------X


# PLAINTIFF'S MEMORANDUM OF LAW
# <u>REGARDING POST VERDICT RELIEF</u>


**WIGDOR LLP**

Douglas H. Wigdor, Esq.
Michael J. Willemin, Esq.

85 Fifth Avenue
New York, NY  10003
Tel:  (212) 257-6800
Fax: (212) 257-6845

*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

I.  CURRENT PROCEDURAL STATUS ...................................................................1

II.  LEGAL STANDARD.............................................................................................2

    A.  FRCP 50(b) Motions ..................................................................................2

    B.  FRCP 59 Motions ......................................................................................4

III.  THE JURY'S VERDICT WAS FULLY SUPPORTED BY THE EVIDENCE
    INTRODUCED DURING TRIAL ........................................................................4

    A.  Ms. Sharkey's Reasonable Belief ..............................................................5

        i.  Legal Standard ...............................................................................5

        ii.  The Court's November 7, 2017 Statements Regarding Ms. Sharkey's
          Reasonable Belief .........................................................................6

            a.  The Evidence Was Sufficient............................................7

            b.  A Plaintiff Can Rely On Behavior That Constitutes a Red Flag
               For Fraud..........................................................................9

    B.  Causation..................................................................................................14

    C.  The Jury Was Not Required to Find By Clear and Convincing Evidence that
       Defendants Would Have Terminated Ms. Sharkey in the Absence of Her
       Protected Activity .....................................................................................17

IV.  THERE IS NO BASIS TO REMIT THE DAMAGES AWARDED BY THE JURY ......17

    A.  Back Pay ...................................................................................................17

    B.  Emotional Distress ...................................................................................18

V.  REINSTATEMENT ..............................................................................................21

VI.  CONCLUSION......................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

Bechtel v. Administrative Review Bd.,
   710 F.3d 443 (2d Cir. 2013).................................................................. 6

Buckley v. Reynolds Metals Co.,
   690 F. Supp. 211 (S.D.N.Y. 1988)........................................................ 25

Cash v. Cnty. of Erie,
   654 F.3d 324 (2d Cir. 2011).................................................................. 4

Castle v. Sangamo Weston, Inc.,
   837 F.2d 1550 (11th Cir.1988).............................................................. 26

Chaney v. New Orleans Pub. Facility, Inc.,
   No. 96 Civ.A. 4023, 1997 WL 786971 (E.D.La. Dec. 19, 1997) ......................... 25

Dilley v. SuperValu, Inc.,
   296 F.3d 958 (10th Cir. 2002) .............................................................. 24

DLC Mgmt. Corp. v. Town of Hyde Park,
   163 F.3d 124 (2d Cir. 1998).............................................................. 5, 6

Ellis v. Ethicon, Inc.,
   No. 05 Civ. 726, 2009 WL 10641983 (D.N.J. Nov. 13, 2009)............................. 27

Fabri v. United Tech. Int'l, Inc.,
   387 F.3d 109 (2d Cir. 2004)................................................................. 5

Gotthardt v. Nat'l R.R. Passenger Corp.,
   191 F.3d 1148 (9th Cir.1999)................................................................ 26

Hewitt v. B.F. Goodrich Co.,
   732 F.2d 1554 (11th Cir. 1984) ............................................................ 6

Izzarelli v. R.J. Reynolds Tobacco Co.,
   731 F.3d 164 (2d Cir. 2013)................................................................. 4

Kosmynka v. Polaris Indus., Inc.,
   462 F.3d 74 (2d Cir. 2006).................................................................. 4

Lavin–McEleney v. Marist Coll.,
   239 F.3d 476 (2d Cir. 2001)................................................................. 4

Leshinsky v. Telvent GIT,
     No. 10 Civ. 4511 (JPO), 2013 WL 1811877 (S.D.N.Y. May 1, 2013) ....................... 6, 11, 12

Mahony v. KeySpan Corp.,
     No. 04 Civ. 554 (SJ), 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007)..................................... 11

Major v. W. Home Ins. Co.,
     169 Cal. App. 4th 1197, 87 Cal. Rptr. 3d 556 (2009)............................................................. 24

Nielsen v. AECOM Technology Corp.,
     762 F.3d 214 (2d Cir. 2014)....................................................................................................... 7

Noyes v. Kelly Servs., Inc.,
     No. 02 Civ. 2685 (GEB)(CMK), 2008 WL 2915113 (E.D. Cal. July 25, 2008) ................... 23

Noyes v. Kelly Servs., Inc.,
     349 F. App'x 185 (9th Cir. 2009)............................................................................................. 23

Raedle v. Credit Agricole Indosuez,
     670 F.3d 411 (2d Cir. 2012)....................................................................................................... 5

Ramos v. Davis & Geck, Inc.,
     968 F. Supp. 765 (D.P.R.)......................................................................................................... 25

Reeves v. Sanderson Plumbing Prod., Inc.,
     530 U.S. 133 (2000)............................................................................................................... 4, 5

Sharkey v. J.P. Morgan Chase & Co.,
     660 F. App'x 65 (2d Cir. 2016) ........................................................................... 8, 12, 14, 18

Sharkey v. J.P. Morgan Chase & Co.,
     No. 10 Civ. 3824, 2015 WL 5920019 (S.D.N.Y. Oct. 9, 2015) ........................................ 9, 12

Shea v. Icelandair,
     925 F. Supp. 1014 (S.D.N.Y. 1996).................................................................................. 25, 26

Taylor v. Fannie Mae,
     No. 11 Civ. 01189 (RCL), 2014 WL 4219553 (D.D.C. Aug. 25, 2014) ................................. 7

Tolbert v. Queens College,
     242 F.3d 58 (2d Cir. 2001)......................................................................................................... 5

Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co.,
     371 F.3d 105 (2d Cir. 2004)....................................................................................................... 5

Truskoski v. ESPN, Inc.,
    823 F. Supp. 1007 (D. Conn. 1993) ........................................................................ 27

Van Asdale v. Int'l Game, Tech.,
    577 F.3d 989 (9th Cir. 2009) ................................................................................... 7

Wiest v. Lynch,
    710 F.3d 121 (3d Cir. 2013) ............................................................................... 7, 12

## **Other Authorities**

18 U.S.C. § 1514A ....................................................................................... 9, 12, 24, 26

Fed. R. Civ. P. 50 ................................................................................................. *passim*

Fed. R. Civ. P. 59 ................................................................................................. *passim*

Sylvester v. Parexel Int'l LLC,
    ARB Case No. 07–123, 32 IER Cases 497, 2011 WL 2517148 (ARB May 25, 2011) .......... 7

Plaintiff Jennifer Sharkey respectfully submits this memorandum of law: (i) in opposition to Defendants' Fed. R. Civ. P. 59 motion; (ii) in connection with the November 7, 2017 post-trial proceedings in this matter related to Defendants' Fed. R. Civ. P. 50(b) motion; and (iii) in support of her request that the Court enter Judgment in this matter in accordance with the jury's verdict in this case, along with an award of reinstatement and an award of pre-judgment interest.

## I.    CURRENT PROCEDURAL STATUS

The trial in this action commenced on October 30, 2017.  See October 31, 2017 Dkt. Text.  After the close of evidence, and before the jury began to deliberate, Defendants J.P. Morgan Chase & Co. ("JPMC" or "the Bank"), Joseph Kenney, Adam Green and Leslie Lassiter filed a Fed. R. Civ. P. ("FRCP") 50(a) motion, which was fully briefed on November 5, 2017. See Dkt. Nos. 304, 305, 307, 309.  The Court reserved decision.  The jury deliberated for approximately five hours, and found JPMC and Ms. Lassiter liable for retaliation under the Sarbanes-Oxley Act ("SOX").  See Dkt. No. 312.  The jury awarded Plaintiff $563,000 in back pay and $563,000 in emotional distress, for a total award of $1,126,000.  Id.  Following the trial, Defendants renewed their FRCP 50(a) motion pursuant to FRCP 50(b).  Trial Transcript Page ("TP") at 1097-104.  Defendants also argued for a reduction in the damages awarded to Plaintiff in the event the FRCP 50(b) motion was denied.  TP at 1104-07.  The Court made a number of statements regarding the motion, the evidence submitted at trial and the possibility of a new trial, but reserved decision pending this briefing.  TP at 1114-18.

As described herein, based on two prior decisions of the Second Circuit in this case and myriad additional case law, there is simply no basis to grant Defendants' FRCP 50(b) motion or order a new trial on liability or damages pursuant to FRCP 59.  Therefore, Plaintiff respectfully requests that the Court enter judgment against Defendants in accordance with the jury's

November 7, 2017 verdict so that this case, which has been pending for nearly eight years, can finally come to a close.

## II.   LEGAL STANDARDS

### A.   FRCP 50(b) Motions

A movant seeking to set aside a jury verdict faces a "high bar."  Lavin–McEleney v. Marist Coll., 239 F.3d 476, 479 (2d Cir. 2001).  "Under Rule 50, a court should render judgment as a matter of law when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 149 (2000) (quoting FRCP 50(a)); see also Izzarelli v. R.J. Reynolds Tobacco Co., 731 F.3d 164, 167 (2d Cir. 2013) ("Judgment as a matter of law is appropriate if, after reviewing the evidence in the light most favorable to . . . the nonmovant, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.") (alteration in original).  A jury verdict should be set aside under FRCP 50 only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against him."  Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 79 (2d Cir. 2006) (citation and internal quotation marks omitted).  This standard "imposes a heavy burden on a movant," especially where "the jury has deliberated in the case and actually returned its verdict in favor of the non-movant."  Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011).

In deciding a FRCP 50(b) motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it *may not make credibility determinations or weigh the evidence.*"  Reeves, 530 U.S. at 151 (emphasis added).  "*The district court cannot set aside the jury's*

*credibility findings* and cannot find for the movant based on evidence the jury was entitled to discredit." Fabri v. United Tech. Int'l, Inc., 387 F.3d 109, 119 (2d Cir. 2004) (emphasis added) (citing Tolbert v. Queens College, 242 F.3d 58, 70 (2d Cir. 2001)); see also Toporoff Engineers, P.C. v. Fireman's Fund Ins. Co., 371 F.3d 105, 108 (2d Cir. 2004) (*reversing grant of FRCP 50 motion where "[t]he district court simply made credibility determinations and weighed the evidence itself, something it is forbidden to do."*) (emphasis added).

    **B.**    <u>**FRCP 59 Motions**</u>

A court may grant a new trial only "if the verdict is against the weight of the evidence." Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012). However, "[a] decision is against the weight of the evidence . . . *if and only if* the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice." Id. at 418-19 (emphasis added) (citing DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998) for the proposition that "[a] court considering a Rule 59 motion for a new trial . . . should only grant such a motion when the jury's verdict is egregious.") (quotation marks omitted)). While, on new trial motions, the trial judge may weigh the evidence and the credibility of witnesses, Second Circuit "precedent counsels that *trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge "should rarely disturb a jury's evaluation of a witness's credibility," . . . and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.*" Id. at 419 (emphasis added). Indeed, "*[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.*" Id. (emphasis added). A "high degree of deference" must be "accorded to the jury's evaluation of witness credibility, and [ ] jury verdicts should be disturbed with great

infrequency." Id. (grant of FRCP 59 motion reversed because the District Court abused its discretion in making credibility determinations); see also Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984) (same, and noting that "[w]hen a new trial is granted on the basis that the verdict is against the weight of the evidence our review is particularly stringent to protect the litigant's right to a jury trial").

### III.   THE JURY'S VERDICT WAS FULLY SUPPORTED BY THE EVIDENCE INTRODUCED DURING TRIAL[1]

On a SOX relation claim, the plaintiff "bears the initial burden of making a prima facie showing of retaliatory discrimination." Leshinsky v. Telvent GIT, No. 10 Civ. 4511 (JPO), 2013 WL 1811877 at *6 (S.D.N.Y. May 1, 2013) (citations omitted).  In order to do so, an employee must demonstrate that: "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." Id. at *6 (quoting Bechtel v. Administrative Review Bd., 710 F.3d 443, 447 (2d Cir. 2013)).  The evidence adduced at trial is plainly sufficient to satisfy each of these elements.

### A.   Ms. Sharkey's Reasonable Belief

### i.   Legal Standard

SOX protects employees who provide information regarding conduct that the employee "reasonably believes constitutes a violation of the enumerated federal provisions." Nielsen v. AECOM Technology Corp., 762 F.3d 214, 221 (2d Cir. 2014) (quotation omitted).  A reasonable belief contains both subjective and objective components. Id.  Thus, a plaintiff must subjectively

---

[1]      Plaintiff will not reiterate the arguments made in her opposition to Defendants' FRCP 50(a) motion.  Rather, this brief is intended to supplement her opposition in response to the statements made by Defendants and the Court during the oral argument on the FRCP 50(b) motion.

believe that the conduct may constitute a violation, and that belief must be objectively

reasonable.  Id.  "The legislative history of SOX makes clear that its protections were 'intended

to include all good faith and reasonable reporting of fraud, and there should be no presumption

that reporting is otherwise.'"  Taylor v. Fannie Mae, No. 11 Civ. 01189 (RCL), 2014 WL

4219553, at *3 (D.D.C. Aug. 25, 2014) (quoting Van Asdale v. Int'l Game Tech., 577 F.3d 989,

1002 (9th Cir. 2009)).  Critically:

> "requiring a complainant to prove or approximate the specific
> elements of a securities law violation ***contradicts*** the statute's
> requirement that an employee have a reasonable belief of a
> violation of the enumerated statutes" . . . "***[A] complainant can***
> ***engage in protected activity under Section 806 even if he or she***
> ***fails to allege or prove materiality, scienter, reliance, economic***
> ***loss, or loss causation.***"  . . . We find this interpretation to be
> reasonable because ***there is nothing in the statutory text that***
> ***suggests that a complainant's communications must assert the***
> ***elements of fraud*** in order to express a reasonable belief that his or
> her employer is violating a provision listed in Section 806.

Wiest v. Lynch, 710 F.3d 121, 133 (3d Cir. 2013) (emphasis added) (citing Sylvester v. Parexel

Int'l LLC, ARB Case No. 07–123, 32 IER Cases 497, 508, 2011 WL 2517148 (ARB May 25,

2011)).

### ii.   The Court's November 7, 2017 Statements Regarding Ms. Sharkey's Reasonable Belief

#### a.   The Evidence Was Sufficient

Following oral argument on Defendants' FRCP 50(b) motion, the Court stated, *inter alia*:

> I believe there is no basis for me to find on this record that Ms.
> Sharkey provided information regarding conduct which she
> reasonably believed constituted a violation of one of the
> enumerated statutes.

TP at 1117.  However, the Second Circuit has already held that the evidence regarding Ms.

Sharkey's reports to Defendants regarding Client A is sufficient to support a determination that

Ms. Sharkey engaged in protected activity.  Specifically, on September 12, 2016, the Second

Circuit vacated the Honorable Robert W. Sweet's second summary judgment decision.  See

Sharkey v. J.P. Morgan Chase & Co., 660 F. App'x 65, 68 (2d Cir. 2016) ("Sharkey III").  In

Sharkey III, the Second Circuit identified evidence in the record that supported its conclusion

that this case must be decided by a jury, including the evidence sufficient to require a jury trial

on the issue of Ms. Sharkey's reasonable belief of relevant wrongdoing:

1.   [W]e conclude that when the record evidence is viewed most favorably to Sharkey, it permits a factfinder to conclude that she had the requisite objective and subjective belief.

2.   This included evidence that the client (1) was trading in a third-party account, with no documented authority to do so; (2) was not forthcoming with information on various matters relating to his businesses; and (3) maintained numerous accounts through some of which he engaged in unusual transfers, while others were almost empty.

3.   J.P. Morgan's training materials, which Sharkey received as a new employee, identified a number of these activities as money laundering "red flags."

4.   Sharkey also adduced evidence that the client failed to comply with federally mandated due diligence protocols.

Sharkey III, 660 F. App'x at 68.[2]

During trial, Plaintiff presented the exact same evidence cited by the Second Circuit in

rejecting the contention that a jury could not reasonably find that Ms. Sharkey engaged in

protected activity:

---

[2]      In addition, Judge Sweet's second summary judgment decision ("Sharkey II") correctly held that:  "While the Plaintiff does not point to specific statutes or 'explain ... how these allegations meet the elements of the enumerated categories required under SOX,' . . . it was objectively reasonable for her to believe that Client A was engaged in illegal activity covered by 18 U.S.C. § 1514A(a)(1)."  Sharkey v. J.P. Morgan Chase & Co., No. 10 Civ. 3824, 2015 WL 5920019, at *12 (S.D.N.Y. Oct. 9, 2015).

1.  Client A was trading in a third-party law firm escrow account (including on margin, which means he was borrowing money from the bank and, by extension, its shareholders) without any apparent authorization.  TP at 170-71, 177, 191-92, 211, 254-55.  He was also removing hundreds of thousands of dollars from this account – again, without any known authorization – and transferring that money into checking accounts in the Bank's retail branch, which made it impossible for Ms. Sharkey to track.  See Pl. Ex. 125.[3]  Despite her substantial efforts, Ms. Sharkey was not able to verify that Client A had the authority to trade and wire money in and out of this account.  TP at 170-71, 177, 191-92, 211, 254-55.

2.  Client A was not forthcoming with information on various matters relating to his businesses, including, *inter alia*,

    -   Ms. Sharkey asked for various documents and information to verify Client A's source of wealth, but Client A refused to produce same.  TP at 192-193.

    -   Ms. Sharkey asked Client A to fill out a form that requested information regarding his and his businesses' addresses, occupations, net worth and sources of wealth.  See Pl. Ex. 98; TP at 219-20.  Client A never filled out the form or provided the information.  Id.

    -   Client A failed to produce financial statements and tax returns.  TP at 220.

    -   Client A was concealing information from JPMC, Ms. Sharkey and her colleagues.  TP at 352.

    -   Various bankers stated that Client A was guarded and not forthcoming when asked about his businesses.  See Pl. Ex. 94.

    -   Other bankers found that Client A was "not being very accommodating" with regard to the production of documents and information.  See Pl. Ex. 81.

    -   At least six of Ms. Sharkey's colleagues told Ms. Sharkey about their difficulties getting information and documents from Client A, including the authorization for Client A to be trading in the law firm escrow account.  TP at 171-77.

_____

[3]    All "Ex. __" citations refer to the trial exhibits in this matter.

3.      Client A maintained numerous accounts through some of which he engaged in unusual transfers, while others were almost empty:

-       Client A had 50 or 60 accounts with JPMC.  TP at 178.

-       Many of the accounts had low or no balance, and Client A refused to close them, which indicated that he might be using the accounts to move money inappropriately and/or launder money.  See Pl. Exs. 53, 91, 94; TP 199, 366.

-       Ms. Sharkey learned that Client A was previously accused of "massive fraud" in connection with involuntary bankruptcies with which multiple banks lost more than $50,000,000.  See Pl. Exs. 94, 245-247; TP 190.  Client A's company was accused of attempting to fraudulently transfer assets to another company owned by Client A's brother.  Id. $16,000,000 worth of loose diamonds also disappeared in connection with this matter.  Id.

-       Client A's trading in the law firm escrow account was unusual, not only because he did not appear to have authorization to do so, but also because he was moving money out of the account and into his checking accounts in the Bank's retail branch, which made it impossible for Ms. Sharkey to track.  TP at 170-71, 177, 191-92, 211, 254-55.

4.      JPMC's training materials identified a number of these activities as money laundering "red flags."  See Pl. Ex. 22.  Unrefuted expert testimony also established that these activities (as well as others observed by Ms. Sharkey) raised a red flag for fraud.  TP at 101-05, 114-15, 117.

5.      Client A failed to comply with federally mandated due diligence protocols:

-       The "Know Your Customer" ("KYC") process was put in place in connection with the USA PATRIOT Act, and is required by the USA PATRIOT Act.  TP at 823-24.

-       Client A repeatedly refused to produce information and documents, or produced incomplete information and documents, in connection with Ms. Sharkey's and JPMC's efforts to complete the Client A KYC process.  See, e.g., TP at 171-78, 192-93, 219-20, 352, 178; Pl. Exs. 81, 88, 94, 98, 112, 113.

Moreover, although unnecessary, Ms. Sharkey adduced substantially more evidence supporting her belief of fraud and/or money laundering than the Second Circuit even held was necessary.  See Dkt. No. 307, Plaintiff's Brief in Opposition to FRCP 50(a) Motion at pp. 3-5.

Even putting aside the decisions in Wiest, Sharkey II and Sharkey III, a comparison of the facts in this case versus others in which summary judgment was denied makes clear that Ms. Sharkey's reasonable belief was an issue for the jury to decide.  See, e.g., Leshinsky, 2013 WL 1811877 at *6 (the plaintiff was found to have engaged in protected activity where he conveyed that he "thought ... the two overhead strategy ... was unethical, certainly immoral and **may even be illegal**") (emphasis added); Mahony v. KeySpan Corp., No. 04 Civ. 554 (SJ), 2007 WL 805813 at *5-6 (E.D.N.Y. Mar. 12, 2007) (summary judgment was denied where the plaintiff "**admit[ted] he had neither personal knowledge of the fraud nor the educational background to discover the fraud on his own.**" ) (emphasis added).

> b.  A Plaintiff Can Rely On Behavior That Constitutes a Red Flag For Fraud

The Court also suggested that a plaintiff's belief regarding fraud cannot, as a matter of law, be reasonable where it is based on the observation and knowledge of conduct that constitutes a "risk concern"[4] for fraud, rather than a direct observation of fraud.  TP at 1115-16. However, Defendants have been making this same argument over and over again for seven years and it has been repeatedly rejected, including by the Second Circuit, which explicitly held that Ms. Sharkey's reasonable belief could be based on evidence that "J.P. Morgan's training materials, which Sharkey received as a new employee, identified a number of these activities as

---

[4]     The Court repeatedly used the term "risk factor."  However, while Defendants have gone to great lengths to sanitize the conduct at issue, Defendants' own documents expressly state that the various behaviors at issue are "risk **concerns**," not merely risk factors.  See Pl. Ex. 94.  Even when confronted with this document, Ms. Lassiter insisted on referring to the behaviors as "risk factors," which likely diminished her credibility with the jury.  TP at 504-05.

money laundering 'red flags.'" <u>Sharkey III</u>, 660 F. App'x at 68.  That same evidence was adduced during trial (along with unrefuted expert testimony).  <u>See</u> Pl. Ex. 22; TP at 101-05, 114-15, 117.

Simply put, a plaintiff need not establish that she observed fire – she is entitled to rely on the fact that the building is filling up with smoke.  <u>See</u>, <u>e.g.</u>, <u>Wiest</u>, 710 F.3d at 133 ("requiring a complainant to prove or approximate the specific elements of a securities law violation contradicts the statute's requirement that an employee have a reasonable belief of a violation of the enumerated statutes" . . . "[A] complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation."  . . . [T]here is nothing in the statutory text that suggests that a complainant's communications must assert the elements of fraud"); <u>Sharkey II</u>, 2015 WL 5920019 at *12 ("While the Plaintiff does not point to specific statutes or 'explain ... how these allegations meet the elements of the enumerated categories required under SOX,' . . . it was objectively reasonable for her to believe that Client A was engaged in illegal activity covered by 18 U.S.C. § 1514A(a)(1)."); <u>Leshinsky</u>, 2013 WL 1811877 at *6 (the plaintiff was found to have engaged in protected activity where he conveyed that he "thought ... the two overhead strategy ... was unethical, certainly immoral and ***may*** even be illegal") (emphasis added).

In any event, in this case, there was fire.  Client A withdrew hundreds of thousands of dollars out of an account without any apparent authority.  <u>See</u> Pl. Ex. 125.  This act alone gave Ms. Sharkey a reasonable basis to believe that Client A was committing a fraud.

      c.      Defendants' arguments regarding the effort Ms. Sharkey made to <u>obtain missing documentation are both irrelevant and disputed</u>

Following oral argument on Defendants' FRCP 50(b) motion, Your Honor stated:

> The documentary evidence was, in essence, unrefuted.[5]   Ms. Sharkey had problems performing her job, in particular with respect to her KYC obligations with respect to a long list of clients.
> . . .
> There were very few items, really three items, left open with respect to gathering information from Client A, and no documentary evidence that the plaintiff ever attempted to get that information.  When others at the bank attempted to get it after the plaintiff was fired, it was promptly provided.  So it was easily accessible if it had been requested.

TP at 1117-18.

Your Honor's comments track an argument that Defendants have been making for almost

eight years – an argument that was explicitly rejected in the Second Circuit's September 12,

2016 decision:

> To be sure, defendants point to evidence indicating that Sharkey's concerns subsequently proved unfounded and that she may have failed to take reasonable steps to investigate her concerns.  ***But this gives rise to disputes of fact.  It does not compel a conclusion that, as a matter of law, Sharkey could not have held a reasonable belief of illegal client activity.***

<u>Sharkey III</u>, 660 F. App'x at 68 (emphasis added).  Moreover, during the trial, Your Honor stated

essentially the same thing:

> This trial is not about some prior bankruptcy or trading activities.  As we have learned, he was authorized to trade in the escrow account, and that was quickly decided and learned as soon as someone contacted the right people in the law firm.  The authorization form existed.  So it is really an issue about was the plaintiff diligent or not about locating a document that everyone

---

[5]     Your Honor also stated that Plaintiff's closing argument "skillfully didn't engage with the documentary record."  TP at 1118.  However, Plaintiff's closing referenced approximately 35 exhibits, approximately 10 more than defense counsel referenced.  TP at 1003-57.

> agrees existed. ***There is a dispute about whether she made an
> effort or not. <u>The jury will have to resolve that.</u>***

TP at 297-98.

The jury heard significant evidence to support a determination that Plaintiff was sufficiently diligent with regard to Client A. The KYC process for Client A commenced in earnest in December 2008, and was not complete until February 2010. TP at 464, 466, 882. Ms. Sharkey was assigned Client A in April 2009 and was terminated in early August 2009; *i.e.*, she worked on the Client A account for only four of the 15 months at issue. TP at 425. Both before and after Ms. Sharkey worked on the account, many other bankers were unable to complete the KYC because Client A was not cooperating. *Supra* at p. 7; TP at 466-68, 471, 484, 502, 681-82; Def. Exs. 317, 350. Ms. Lassiter admitted that *she* was responsible for the failure to have the KYC done prior to the time Client A was assigned to Ms. Sharkey, and after Ms. Sharkey left, other bankers also commented that they had called the Ostrager law firm multiple times to obtain Client A's required trading authorization without success. <u>Id.</u> The authorization was not obtained until more than two months after Ms. Sharkey was terminated, and as of October 27, 2009, Lassiter ***still*** did not know why Client A had the authority to trade in the account. <u>Id.</u> It also is undisputed that Client A never filled out the form Ms. Sharkey requested that sought information regarding his and his businesses' addresses, occupations, net worth and sources of wealth. <u>See</u> Pl. Ex. 98; TP at 219-20. Finally, the "facts" that Defendants rely on to support of their conclusion that Ms. Sharkey was not diligent were all disputed by evidence presented to the jury. <u>See</u> Dkt. No. 307 at pp. 9-10. To incorrectly conclude that Client A promptly provided information to Ms. Sharkey's colleagues, and therefore determine (for the jury) that Ms. Sharkey was not diligent and could not have held a reasonable belief of fraud, would be totally inappropriate on this record.

Finally, whether Ms. Sharkey was diligent is completely irrelevant to any issue in the case.  Ms. Sharkey was presented with, and reported, behaviors that the Second Circuit has already held are sufficient to give rise to a reasonable belief of fraud.  SOX does not require any plaintiff to assume the role of a detective, and there is nothing in the text of the statute or case law that even hints to a requirement that the plaintiff attempt to resolve her concerns before reporting them.  To the contrary, the statute was passed to encourage reports of potential fraud so long as those reports are not made in bad faith, and there is zero evidence that Ms. Sharkey's reports were made in bad faith.

   d. <u>Ms. Lassiter Was on Notice of Ms. Sharkey's Protected Activity</u>

Following oral argument on Defendants' FRCP 50(b) motion, Your Honor stated:

> I believe there is no basis for me[6] to find on this record that Ms. Sharkey provided information regarding conduct which she reasonably believed constituted a violation of one of the enumerated statutes

TP at 1117.  However, the record is clear that Ms. Sharkey did complain and provide information regarding relevant unlawful activity:

1. Ms. Sharkey voiced her concerns that Client A may be involved in unlawful conduct to Ms. Lassiter many times.  TP at 260, 424.  Ms. Sharkey told Ms. Lassiter that she believed that Client A might be engaged in money laundering and illegal activity.  <u>Id.</u>  Ms. Sharkey told Ms. Lassiter that she believed that Client A was involved in mail fraud, wire fraud, money laundering and illegal activity.  TP at 320, 322, 323, 324-25, 452-55.  Ms. Sharkey voiced all of the concerns cited *supra* at pp. 6-8 to Ms. Lassiter.  TP at 261

2. Ms. Sharkey reported that Client A would not produce the documentation and information requested from him.  <u>See</u> Pl. Ex. 148.

---

6 The use of the term "me" here is problematic.  The jury is the finder of fact, and, respectfully, whether the record was sufficient to convince Your Honor that Ms. Sharkey provided information regarding conduct which she reasonably believed constituted a violation of one of SOX's enumerated statutes is not the pertinent question.

3.      Ms. Sharkey recommended that Private Wealth Management exit its relationship with Client A.  Id.

4.      Ms. Sharkey expressed that she would not sign the KYC attestation for Client A, which requires a banker to attest that the client is not engaged in fraud.  See Pl. Ex. 33; TP at 243, 263-64.

5.      Following her email recommendation to exit the Client A relationship, Ms. Sharkey conveyed to both Ms. Lassiter and Kathleen Gruszczyk (a JPMC Risk Department employee) the basis for her concerns described supra at pp. 6-8, and that she did not want to attest to the KYC (which requires a banker to attest that the client is not engaged in fraud) for Client A due to these concerns.  TP at 263-64.

Even Ms. Lassiter admitted that Ms. Sharkey:

1.      "[W]ould just keep reciting those risk factors that our risk department, the JPMorgan Chase risk department, had found.  She recited them."  TP at 685; Pl. Ex. 94.

2.      Reported that Client A refused to produce KYC documents and was trading in the law firm escrow account without apparent authorization.  TP at 628.

3.      Reported the issues identified in Pl. Ex. 94.

On this record, and given that the Second Circuit has already held that the concerns at issue were sufficient to support a reasonable belief of relevant violations of law, it was plainly for the jury to decide whether Ms. Sharkey reported information concerning violations of SOX's enumerated statutes.  The jury, reviewing the record as a whole, believed Ms. Sharkey when she testified that she made such reports.  There is no basis to disturb that finding.

**B.      Causation**

At trial, Ms. Sharkey was required to prove by a preponderance of the evidence that her protected activity was a "contributing factor" in her termination.  As the jury was instructed, "[a] contributing factor is any factor that tends to affect in any way the outcome of the decision.  It

14

need not be a significant or substantial factor in the termination decision to constitute a

contributing factor." TP at 1067. This is an ***extremely*** lenient standard.

      Following the verdict, Your Honor stated:

> [there was] insufficient evidence that any issues related to Client A
> were a contributing factor to her firing.
> . . .
> [Ms. Sharkey] lied to her supervisor about calling Manager T and
> returning Manager T's phone calls and admitted lying, and she was
> fired because of that lie.

TP at 1117. However, once again, these comments are at odds with the Second Circuit's

decision in <u>Sharkey III</u>, which rejected the contention that the evidence in this case is insufficient

for a jury to find such causation:

> 1.    [T]he record shows that she was terminated approximately one
> week after making her formal recommendation that J.P. Morgan
> Chase end its relationship with a client about whom she had
> communicated concerns of possible illegal activity for some
> months. Such temporal proximity between protected activity and
> unfavorable personnel action can support a <u>prima facie</u> inference
> that the protected activity was a contributing factor to the
> termination.

> 2.    Sharkey disputes lying to her supervisor about the client
> communication [the purported Manager T incident], pointing to
> her own contrary deposition testimony. Indeed, the district court
> acknowledged that whether Sharkey actually lied to Lassiter was
> an issue that remained "factually disputed between the parties" . . .
> Resolution of that question could, in turn, inform a determination
> of whether defendants reasonably believed that Sharkey had lied . .
> . On such a record of conflicting accounts by interested parties, we
> must assume that the factfinder will assess credibility and draw
> inferences in favor of Sharkey.

> 3.    Sharkey argues that defendants' "shifting rationales" for her
> termination also weigh in her favor on the contributing factor
> element. [ ] We need not here decide whether the discrepancies
> would be enough, by themselves, to defeat summary judgment.
> We conclude only that such evidence together with the close
> temporal proximity already discussed gives rise to a triable issue of
> fact on the contributing factor element.

Sharkey III, 660 F. App'x at 67-68.  The evidence presented at trial was exactly the same

evidence that the Second Circuit held was sufficient to send this case to a jury:

1.  Ms. Sharkey recommended the termination of the Client A relationship 12 days before she was fired.  See Pl. Ex. 148; TP at 265.

2.  Ms. Sharkey twice denied ever lying to Ms. Lassiter, and did not admit to lying about Manager T.  TP at 169, 258-59, 397.

3.  Ms. Sharkey's notes even establish that she did call Manager T prior to the Manager T incident, which obviously undercuts Defendants' claim that Ms. Sharkey at any point admitted to never calling Manager T.  See Pl. Ex. 225A.

4.  Defendants provided shifting reasons for Ms. Sharkey's termination.  Ms. Lassiter cited, among other things, Ms. Sharkey's "casualness" and "[in]ability to get KYC's done."  TP at 605.  Ms. Lassiter also testified about a purportedly poor judgment call Ms. Sharkey made in connection with the 2008 U.S. Open and the fact that Ms. Sharkey had failed the Series 7 exam twice.  TP at 598, 618-19.[7]  Mr. Grande testified that the termination was based solely on the Manager T incident, and that "being too casual," the 2008 U.S. Open and the Series 7 exam were not factors in Ms. Sharkey's termination.  TP at 745.  Moreover, Ms. Lassiter and Mr. Green both testified that Mr. Kenney was involved in the termination decision.  TP at 612, 695, 801, 816.  Mr. Kenney, however, denied any involvement in Ms. Sharkey's termination.  TP at 883, 893-94.

In addition to the above, which the Second Circuit found created a triable issue of fact,

Ms. Lassiter was caught in *17* separate lies made under oath about critical issues in this case,

including *six* separate lies about the Manager T incident (including an admission that she

"exaggerated" one aspect of her sworn account of the Manager T incident).  See December 8,

2017 Declaration of Douglas H. Wigdor, Exs. A, B (demonstrative with citations to the record).

---

[7]  Ms. Lassiter also made various other claims regarding Ms. Sharkey's purportedly poor performance, but ultimately admitted (after attempting to lie about the date of the assignment) that she assigned a critical client account to Ms. Sharkey during a time period that Ms. Lassiter claims Ms. Sharkey was performing poorly.  TP at 687-88.

On this record, it was certainly reasonable for the jury to come to the conclusion that Ms.

Lassiter fabricated the Manager T incident and/or that the Manager T incident (which occurred

before Ms. Sharkey's recommendation to exit the Client A relationship) was not the real reason

for her termination.  In fact, Your Honor instructed the jury:

> You may consider, however, whether a defendant's stated reasons
> for a decision are a cover-up or pretext for retaliation against
> protected activity.  If you find that the stated reasons for the
> decision to terminate Sharkey's employment were not the real
> reasons for the decision, then you may infer or not, as you choose,
> that the stated reasons were designed to conceal retaliation for
> protected activity.

TP at 1068.  In explaining why the Court issued this charge, Your Honor stated (after all of the

evidence had been heard):

> [S]ubstantively, the law of pretext is relevant to a jury's decision.
> Wholly apart from what role it might play in a motion context, it is
> independently relevant with respect to a jury's fact-finding.  This is
> really a credibility issue.  If they find someone is lying with respect
> to the reason for an adverse employment action, here the
> termination of an employee, they may use that evidence to find that
> there was a cover-up because of a guilty conscience.

TP at 925-26.  Obviously, the jury determined that Ms. Lassiter was lying or "exaggerating"

about the Manager T incident and/or that it was not the real reason that Ms. Sharkey was

terminated.  There is no basis whatsoever to disturb this determination.  Any attempt to overturn

the jury's findings would depend entirely on a determination that cannot be made in the context

of an FRCP 50 or 59 motion: namely, that Ms. Lassiter (who was impeached nearly 20 times on

material issues) is more credible than Ms. Sharkey (who was hardly impeached at all, and never

with regard to the Manager T incident).

**C.** **The Jury Was Not Required to Find By Clear and Convincing Evidence that Defendants Would Have Terminated Ms. Sharkey in the Absence of Her Protected Activity**

Given that Second Circuit has already held that the Manager T incident is in dispute, and the evidence at trial reaffirmed that dispute, the jury plainly was not required to accept Defendants' contention that they would have fired Ms. Sharkey in the absence of her protected activity because of the Manager T incident.

**IV.** **THERE IS NO BASIS TO REMIT THE DAMAGES AWARDED BY THE JURY**

**A.** **Back Pay**

The jury awarded Plaintiff $563,000 in back pay.  This figure represents a back pay award for the period between Plaintiff's termination and the end of 2011.  Following the verdict, the Court stated that "[i]t is [ ] against the weight of the evidence that she was entitled to any back pay after April of 2010 because of her failure to mitigate her damages."  TP at 1117.

However, Plaintiff's counsel specifically raised the issue of back pay with the Court. Specifically, Plaintiff's counsel argued that Ms. Sharkey should be permitted to seek back pay, based on Ms. Sharkey's prior compensation, for the period between 2009 and 2011.  TP at 17, 29-30.  The Court agreed that the issue of back pay for these years was in dispute and must be decided by the jury:

> THE COURT: I thought the critical issue for the jury ultimately, just projecting here, is whether, should the plaintiff prevail, she could get back pay for any period between 2010 and 2011.  Not that I'm instructing the jury that, but practically speaking I think the back pay calculation is likely to focus on that period of time.
> . . .
> THE COURT: If I understand, Mr. Willemin, you are basing this number on what will be Ms. Sharkey's testimony with respect to her compensation in 2008 and '9 and your examination of Ms. Lassiter about these notes?
>
> MR. WILLIMEN: Correct.

18

> THE COURT: Good.  ***I'll let the jury decide the factual dispute.***
> With respect to the calculation of back pay, it will do what it will
> do with respect to whether there is liability in the first instance,
> whether an award of back pay should be made, and, if it should,
> what they do with the mitigation defense, the affirmative defense.

<u>Id.</u> (emphasis added).

Moreover, the evidence at trial supported the verdict, including: (i) Plaintiff's Exhibit 226, which demonstrates that Plaintiff continued to look for work as late as October 2010; (ii) Plaintiff's testimony that she continued to look for work while she worked without pay for Mint Cars On Demand as its President, through May 2012 (TP at 282-83); (iii) Plaintiff's testimony that, after spending some time as a stay-at-home mother, she made additional efforts to obtain employment even in the recent weeks (TP at 284, 423); and (iv) Plaintiff's testimony that, even while she was a stay-at-home mother, she continued to look for work (TP at 285).  Given this evidence, it is not unreasonable for the jury to have determined that Ms. Sharkey continued to look for work through the end of 2011.[8]

### B.   <u>Emotional Distress</u>

The jury awarded Plaintiff $563,000 in emotional distress damages.  This award was well supported by the evidence of emotional distress, including:

> Q:   Ms. Sharkey, have you suffered emotionally as a result of your
>       termination?
>
> MR. SCHISSEL: Objection.
>
> THE COURT: Overruled.
>
> A:    Definitely.

---

[8]   In addition, we believe that Judge Sweet erred in permitting Defendants to amend their Answer to include the failure to mitigate affirmative defense, and, therefore, that Defendants should not have been permitted to argue that Plaintiff's damages should not extend to the present.

Q:      Can you describe to the jury how that is.

A:      I think anyone could understand. You're losing your job, being
        terminated for something you thought you were doing well.  I had
        been in the field for 15 years. I had never had a situation at work
        with any supervisor. It's just very distressing, upsetting. You feel
        like your whole life is taken away from you.  It was a career. It
        wasn't just a job for me. I had worked my way up from being an
        administrative assistant in the bank to being a VP at City and then
        moving on to two other organizations. Just feeling that it was all
        taken away from me just like that.

Q:      Did you have any physical symptoms that you believe were
        attributed to the termination?

        MR. SCHISSEL: Objection.

        THE COURT: Overruled.

A:      I had extreme anxiety and I was not sleeping whatsoever.

Q:      At any point in time did you take any medication to help cope with
        that?

A:      Yes.

Q:      What was that and when?

A:      What medications?

Q:      Yes.

A:      Xanax and sleeping medications.

Q:      In what period of time?

A:      In '09 probably through 2010. Through 2010.

TP at 286-87.

The fact that Ms. Sharkey required prescription medicine to assist her in coping with her

extreme anxiety and emotional distress takes this case out of the "garden variety" and the

evidence adduced is sufficient to support the jury's verdict.  See, Noyes v. Kelly Servs., Inc., No.

20

02 Civ. 2685 (GEB)(CMK), 2008 WL 2915113, at *13 (E.D. Cal. July 25, 2008), aff'd, 349 F.

App'x 185 (9th Cir. 2009) ($500,000 award for emotional distress not excessive even though the

plaintiff "presented no evidence of emotional distress other than her testimony that 'she got a

prescription for Xanax a few times' and felt depressed and anxious.").

> However, following the verdict, the Court stated:

> > The award of emotional distress damages says to me that the jury
> > was prejudiced against the bank and acted punitively against the
> > bank despite my clear instructions that it could not do so.  That
> > undermines the entire verdict.  I'm very sad to say that because in
> > my experience and judgment, juries usually get it right on the
> > liability.  But it is clear that they have not done so here, and I have
> > the evidence from their award on emotional distress damages.

TP at 1114-15.  To begin, the suggestion that any aspect of the verdict demonstrates that the jury

was prejudiced against Defendants is simply unsupported.  To the contrary, the jury awarded

$100,000 *less* than what Ms. Sharkey requested with regard to back pay.  The jury also dismissed

two of the individual Defendants (high ranking JPMC executives).  If the jury were "prejudiced"

against JPMC, and wanted to punish the Bank, the emotional distress award would have been

*much* higher than $563,000.  No jury would believe that $563,000 would constitute a

"punishment" to an institution like JPMC.

> The jury was tasked with determining what amount of money would constitute a

reasonable award for emotional distress.  We were not permitted to suggest a number to the jury,

and thus the jury was left with essentially no guidance with regard to quantifying emotional

distress.  It is hardly unreasonable that the jury used the back pay award to guide their

quantification of Ms. Sharkey's emotional distress damages.  See, e.g., Major v. W. Home Ins.

Co., 169 Cal. App. 4th 1197, 1216, 87 Cal. Rptr. 3d 556, 572–73 (2009) (Jan. 30, 2009) ("In

determining whether the noneconomic damages award is excessive, we compare the amount of

that award to the economic damages award, to see if there is a reasonable relationship between the two . . . When the total economic damages award of $220,359.55 is compared to the noneconomic damages award of $450,000, we have only a two-to-one ratio. Thus, it bears a reasonable relationship to the economic harm the Majors suffered, and the award is not excessive.").  Here, the jury determined that a 1:1 ratio between economic and non-economic damages was appropriate, and there is no basis to conclude that the jury was trying to punish or was somehow prejudiced against a multi-billion dollar banking institution because they awarded $563,000 in emotional distress damages.  In fact, awarding a random round number such as $400,000, $500,000 or $600,000 would have been completely arbitrary and the jury's award demonstrates that they actually thought through the appropriate figure in a reasonable way.

## V.   REINSTATEMENT

In addition to the jury's award of $1,126,000, Ms. Sharkey is entitled to an award of reinstatement.[9]  The remedy of reinstatement is presumed.  See 18 U.S.C. § 1514A(c)(2)(A) (a prevailing plaintiff is entitled to "all relief necessary to make the employee whole" which "*shall* include . . . reinstatement with the same seniority status that the employee would have had, but for the discrimination.") (emphasis added); Shea v. Icelandair, 925 F. Supp. 1014, 1030 (S.D.N.Y. 1996) ("Courts strongly favor reinstatement over alternative forms of relief"); Chaney v. New Orleans Pub. Facility, Inc., No. 96 Civ.A. 4023, 1997 WL 786971, at *1 (E.D.La. Dec. 19, 1997) ("Some courts have even stated that an award of reinstatement should be "presumed" upon a finding of discriminatory discharge."); Buckley v. Reynolds Metals Co., 690 F. Supp. 211, 214 (S.D.N.Y. 1988) ("After the jury rendered its verdict in favor of plaintiff, this Court

---

[9]     Plaintiff also is entitled to an award of attorneys' fees and costs, which will be the subject of motion practice following the decision on this motion.  See Dkt. No. 334.

ordered that plaintiff be reinstated immediately to his old position or to a substantially equivalent position mutually acceptable to the parties in defendant's 'Northeast region.'").

In order to avoid reinstatement, ***Defendants bear the burden*** of demonstrating that reinstatement would not be feasible.  See Ramos v. Davis & Geck, Inc., 968 F. Supp. 765, 772 (D.P.R.) (generally, "the employee seeks reinstatement (and possibly front pay for the period of time before he or she is reinstated) and the employer has the burden of demonstrating that reinstatement is impossible or impractical. The burden is on the employer because reinstatement is the preferred equitable remedy."); Chaney, 1997 WL 786971 at *1 ("If [the defendant] opposed an award of reinstatement, it arguably had the burden of coming forward to prove that reinstatement was not feasible.").

Defendants have not once – in the seven and a half years that this litigation has been pending – adduced any evidence or made any argument that reinstatement would not be feasible. This is despite having had the opportunity to do so in connection with the parties' motions *in limine*, Plaintiff's motion for reconsideration of the decision on those motions and Plaintiff's proposed jury charge, which included reinstatement.  Indeed, Defendants have, on multiple occasions, seemingly or explicitly conceded that Ms. Sharkey is entitled to reinstatement.  See Dkt. No. 239 at p. 19 ("Reinstatement is the remedy that a *prevailin*g plaintiff receives under SOX. *See* 18 U.S.C. § 1514A(c)(2)(A).").  Even if Defendants were permitted to reverse course now, there is no evidence in the record to suggest that reinstatement is not feasible.  To the contrary, if reinstated, Ms. Sharkey would no longer report to Ms. Lassiter, as Ms. Lassiter has moved to California to manage a different team of JPMC employees.  TP at 574-75.  Moreover,

any friction resulting from this litigation is insufficient to bar reinstatement.  See Shea, 925

F.Supp at 1033.[10]

Finally, a plaintiff's right to reinstatement is not affected by a prior failure to mitigate

damages.  As explained in Dilley v. SuperValu, Inc.,

> The failure to mitigate relied on by the district court was Dilley's
> failure to pursue available truck driving jobs with other employers.
> ***Such failure does not bear on Dilley's entitlement to
> reinstatement.***  Mitigation is relevant to determining a plaintiff's
> entitlement to back pay, *see supra* part V, and front pay, *see, e.g.,*
> *Gotthardt v. Nat'l R.R. Passenger Corp.,* 191 F.3d 1148, 1157 (9th
> Cir.1999); *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1562
> (11th Cir.1988), ***but there is no logical link between a plaintiff's
> pursuit of alternative employment and whether he should be
> reinstated to the position from which he was wrongfully
> discharged.***[1]  ***A plaintiff's ability to replace some of the income
> lost by virtue of the wrongful discharge certainly affects how
> much lost income he is due, but it does not bear on whether the
> plaintiff is entitled to the job itself. This is reflected in the reality
> that courts routinely find that a plaintiff's failure to mitigate
> negates or reduces his claim for back pay or front pay, but
> nevertheless analyze his claim for reinstatement without even
> referencing the mitigation finding.***
>           . . .
> ***The district court's reasoning also runs counter to those cases
> where courts have reduced damages based on a failure to
> mitigate even where reinstatement has been ordered.***

296 F.3d 958, 967–68 (10th Cir. 2002) (emphasis added) (internal citations omitted); see also

Ellis v. Ethicon, Inc., No. 05 Civ. 726, 2009 WL 10641983, at *21 (D.N.J. Nov. 13, 2009) ("As a

preliminary matter, Defendant suggests that if the Court were to find that Plaintiff failed to

mitigate her damages, which the Court has found, reinstatement should be foreclosed.  The Court

---

[10]     In Shea, the plaintiff moved for reinstatement or, in the alternative, an award of front pay.
The defendant in Shea opposed reinstatement.  See Shea, 925 F.Supp at 1030.  The defendant
argued that reinstatement was inappropriate because: (i) the plaintiff's position no longer existed;
and (ii) reinstatement would result in another employee being terminated.  Id. at 1030.  The court
also examined whether hostility between the parties rendered reinstatement inappropriate.  Id. at
1033.  The court rejected the defendants' arguments and further determined that the natural
antagonism that arises when an employee sues an employer was insufficient to bar reinstatement.

disagrees.  While an award of front pay may be foreclosed or reduced by a plaintiff's failure to mitigate, ***reinstatement is not.***") (emphasis added).

By way of an example within the Second Circuit, in <u>Truskoski v. ESPN, Inc.</u>, 823 F. Supp. 1007 (D. Conn. 1993), following a bench trial, the court determined that the plaintiff was terminated in 1987 in retaliation for engaging in protected activity.  <u>Id.</u> at 1011, 1013-14.  The plaintiff sought damages in the form of back pay and reinstatement.  <u>Id.</u> at 1014-15.  The plaintiff ***conceded*** that she stopped looking for work in 1989, two years after her termination, and for years before the trial.  <u>Id.</u> at 1015.  In addition, the court found that the plaintiff did not make reasonable attempts to mitigate her damages in 1987 and 1988, and determined that the plaintiff was not entitled to back pay because she failed to mitigate her damages.  <u>Id.</u>  Nevertheless – despite finding that the plaintiff had failed to mitigate her damages during the five years preceding the trial – the court awarded reinstatement.  <u>Id.</u> at 1016.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff Jennifer Sharkey respectfully requests that the Court

issue an order: (i) denying Defendants' Fed. R. Civ. P. 59 motion, (ii) denying Defendants' Fed.

R. Civ. P. 50(b) motion; and (iii) entering Judgment in this matter in accordance with the jury's

verdict in this case, along with an award of reinstatement and an award of pre-judgment interest.

Dated: December 8, 2017
　　　　New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
　　　　Douglas H. Wigdor
　　　　Michael J. Willemin

85 Fifth Avenue
New York, New York 10003
Tel: (212) 257-6800
Fax: (212) 257-6845
dwigdor@wigdorlaw.com
mwillemin@wigdorlaw.com

*Counsel for Plaintiff*

26