UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
                                     :
JENNIFER SHARKEY,                    :        10cv3824 (DLC)
                                     :
                    Plaintiff,       :        OPINION AND ORDER
                                     :
        -v-                          :
                                     :
J.P. MORGAN CHASE & CO., JOE KENNEY, :
ADAM GREEN, and LESLIE LASSITER, in  :
their official and individual        :
capacities,                          :
                    Defendants.      :
                                     :
------------------------------------ X

For the plaintiff:
Douglas H. Wigdor
Michael J. Willemin
Wigdor LLP
85 Fifth Avenue
5th Floor
New York, New York 10003

For the defendants:
Michael D. Schissel
Kathleen Reilly
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019

DENISE COTE, District Judge:

     This Sarbanes-Oxley retaliation case has been pending for

nearly nine years.  After multiple dismissals and appeals, the

case was tried to verdict before a jury in November 2017.  At

the conclusion of the five-day trial, the jury awarded plaintiff

Jennifer Sharkey ("Sharkey") $563,000 in back pay damages, and

an identical amount for her emotional distress.  Neither amount

can be supported by the trial record.  With reluctance, the

Court concludes that awards of damages of this magnitude reflect a verdict infected by passion and prejudice. Defendants have moved for post-verdict relief. For the reasons given below, judgment as a matter of law is entered in the defendants' favor on a portion of the damages claim, a new trial is conditionally ordered on that portion of the damages, and a new trial is ordered on liability and the remainder of the plaintiff's request for damages.

## PROCEDURAL BACKGROUND

Following her discharge in August 2009 by J.P. Morgan Chase & Co. ("J.P. Morgan"), on October 22, 2009, Sharkey filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging violations of Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"). On or about April 12, 2010, OSHA issued an order dismissing her complaint.

Sharkey then brought this action by filing a complaint on May 10, 2010, alleging the same SOX claims. The case was assigned to the Honorable Robert W. Sweet. Defendants moved to dismiss the complaint, and on January 14, 2011, the motion was granted with leave to replead. Sharkey v. J.P. Morgan Chase, 2011 WL 135026 (S.D.N.Y. Jan. 14, 2011). A subsequent motion to dismiss the amended complaint was denied on August 19, 2011. Sharkey v. J.P. Morgan Chase, 805 F. Supp. 2d 45 (S.D.N.Y.

2011).

On December 12, 2013, Judge Sweet granted the defendants'
motion for summary judgment. Sharkey v. J.P. Morgan Chase, 2013
WL 10796833 (S.D.N.Y. Dec. 12, 2013). The Second Circuit
vacated and remanded that decision on October 9, 2014 for
reconsideration in light of Nielsen v. AECOM Tech. Corp., 762
F.3d 214, 221-22 (2d Cir. 2014) and Bechtel v. Admin. Review
Bd., 710 F.3d 443, 451 (2d Cir. 2013). Sharkey v. J.P. Morgan
Chase, 580 F. App'x 28 (2d Cir. 2014).

The defendants again moved for summary judgment, and on
October 9, 2015, the motion was granted on the basis that
Sharkey had failed to make a prima facie showing that any
protected activity under SOX was a contributing factor in her
firing. Sharkey v. J.P. Morgan Chase, 2015 WL 5920019 (S.D.N.Y.
Oct. 9, 2015). The Second Circuit then vacated and remanded
that finding, holding that the temporal proximity between the
protected activity and her discharge was sufficient to establish
a prima facie case. Sharkey v. JP Morgan Chase, 660 F. App'x 65
(2d Cir. 2016). The Second Circuit also declined to affirm on
the basis of the defendants' alternative ground, that Sharkey
lacked a reasonable belief for her reports of fraud, holding
that the issue gave rise to disputes of fact, and did not compel
the conclusion that Sharkey lacked a reasonable belief of fraud.

Id.

After further proceedings before Judge Sweet, including
rulings on motions in limine on January 26, 2017, the case was
reassigned to this Court on April 20, 2017.  This Court then
held conferences on May 5 and July 31, 2017, to determine if any
of Judge Sweet's rulings merited reconsideration.  At the July
31 conference, the Court declined to change any of Judge Sweet's
rulings on the motions in limine.  The case was tried over five
days between October 30 and November 6, 2017.

At the end of the plaintiff's testimony, defendants made an
oral motion for a directed verdict as a matter of law on all
issues of liability.  The Court reserved decision.  After the
conclusion of the evidence, on November 4, 2017, the defendants
again made a motion for judgment as a matter of law.  Both the
defendants and the plaintiff submitted briefs on the motion.  On
November 6, the case was submitted to the jury, and on November
7, the jury returned a verdict.

The jury found that Sharkey had not proven her case as to
two of the defendants, Joe Kenney and Adam Green.[1]  As to
defendants Leslie Lassiter and J.P. Morgan, the jury found that
Sharkey had proven her claim of retaliation, and that Lassiter

---

[1] At trial, Sharkey presented virtually no evidence that Green or
Kenney were aware of any protected activity by Sharkey, much
less that any protected activity was the cause of any decision
they made to terminate her employment.

and J.P. Morgan had failed to prove their affirmative defense. As to damages, the jury found that the defendants had not shown that Sharkey failed to mitigate her damages and that she was entitled to $563,000 in back pay.  The jury also found that Sharkey was entitled to emotional distress damages, and awarded her the identical amount of damages for her emotional distress, $563,000.

The defendants then renewed their motions as to J.P. Morgan and Lassiter, and added a request in the alternative for a new trial.  The Court also made post-verdict comments on the record generally indicating the Court's inclination as to the post-verdict motions.  The motions became fully submitted on December 20, 2017.

## TRIAL EVIDENCE

The undisputed and/or overwhelming weight of the trial evidence established the following.  Sharkey had worked in the banking industry for approximate 12 years before joining J.P. Morgan in November 2006 as a private banker.  In 2008, J.P. Morgan restructured certain of its services for its high-net-worth clients.  The restructuring placed one person in charge of each client relationship, a person which J.P. Morgan called a "Private Wealth Manager."  The wealth manager effectively served as the face of the bank, and was the primary point of contact

for the client for all issues related to the banking relationship. The position therefore required that individual to be familiar with each aspect of the bank's offerings to effectively serve their clients. As part of the restructuring, J.P. Morgan brought in Leslie Lassiter to run its New-York-City-based operations.

When Lassiter arrived in New York City, she had to staff the new wealth manager positions. Lassiter had never worked with Sharkey and did not know her, but she did interview Sharkey and, based on Sharkey's background and previous work, gave her an opportunity to become a private wealth manager. This was a promotion for Sharkey, and required Sharkey to become familiar with banking services Sharkey had never handled before. Sharkey began her work as a private wealth manager in August or September of 2008.

Sharkey had some difficulties learning and performing her new job. She failed the Series 7 securities examination twice.[2] She was consistently tardy in conducting the due diligence associated with the bank's Know Your Client ("KYC") obligations. In conversations with Sharkey regarding her performance in April and May 2009, Lassiter highlighted the deficiencies in Sharkey's

---

[2] Sharkey excused one of her failures, claiming that she had to leave the exam early to respond to a call from Lassiter.

performance, including poor performance with investments and failure to complete KYCs in a timely manner. After a J.P. Morgan biannual regional talent review meeting in June 2009, and a national talent review in mid-July 2009, Sharkey's employment would have been near-termination but for Lassiter's strong support of Sharkey. Then, on July 21, Lassiter learned from Sharkey's largest client -- who was referred to at trial as Client H -- that Sharkey had lied to Lassiter about returning the client's calls.[3] The client's representative called Sharkey a "phantom." That day, Lassiter told Green about the incident. Green then wrote to Kenney to inform him that there was an incident, and that the incident was viewed as a dischargeable offense. After consulting with her superiors and human resources, Lassiter terminated Sharkey's employment. Sharkey's employment ended on August 5, 2009. In her exit interview with Steve Grande of the Human Resources department, Sharkey made no reference whatsoever to a claim of retaliation. By contrast, Grande informed her, as Sharkey admitted she was so informed by both Lassiter and Grande, that she was discharged because of a significant lapse in judgment regarding Client H.

---

[3]  In the Fall of 2009, Lassiter learned that Sharkey had lied to her about contacting yet another client. The bank sought to admit this after-acquired evidence to establish that Sharkey would have in any event been fired by the Fall of 2009. The evidence was excluded for the defendants' failure to give timely notice of this defense.

Against the powerful documentary and testimonial evidence which showed that Sharkey was not performing her job adequately and that her employment was terminated because she lied to the very supervisor who had recently promoted and defended her, Sharkey offered a counter-narrative. Sharkey contended that her employment was terminated because of retaliation when she expressed concerns about a bank client known at trial as Client A.[4]

At trial, there was absolutely no evidence that Client A was engaged in any illegal activity and insufficient evidence to permit anyone to form a reasonable belief that he was. Instead, the primary issue was whether Client A was appropriately responsive to requests made of him in the course of the KYC inquiry. The bank's risk compliance department had, in March 2009, compiled a list of items that needed to be gathered from Client A as part of the bank's KYC protocol.

---

[4] Because of the nature of the concerns raised regarding Client A, and because his testimony would have been largely irrelevant to the issues in the case, his testimony was excluded and he was referred to pseudonymously. The trial of this action confirmed that anything Client A would have testified to would be largely irrelevant, and certainly outweighed by the prejudice, burden and distraction of requiring him to testify. During the course of the trial, Client A's name was inadvertently mentioned in open court, and the name of his business was reported in the press. Because Client A has already been effectively identified to the public, the parties and Client A will be given an opportunity to be heard on whether the redaction of his name should continue at the re-trial of this action.

Client A was assigned to Sharkey in early April 2009. Sharkey and others at the bank called Client A shortly thereafter to obtain the items identified by the risk department. The memorandum from this call recorded that Client A had good explanations for nearly all of the concerns raised in the risk department's memorandum. The next day, Sharkey sent an e-mail to Client A, telling him that the information he provided on the call was very helpful, and formally requesting the documentation they discussed. Within 8 days, Client A provided the documents that responded to all but three of the requests. Client A had explained in the telephone call and his responses that one of those three items was actually in the possession of Client A's law firm, and the two remaining items were an ID card and a document related to one of Client A's entities. There is no document or email reflecting that Sharkey or anyone working with Sharkey ever followed up with either Client A or his attorneys regarding the three items. While Sharkey testified that she and a colleague attempted to call the law firm multiple times, she never testified that they tried to reach Client A to obtain the two missing items in his possession. After Sharkey was fired, her successor obtained the outstanding items with little trouble.

At various points throughout the summer, Sharkey orally

recommended to Lassiter that Client A no longer be treated as a private wealth management client. Lassiter pressed Sharkey to explain why she was making this recommendation, and to put it in writing. Sharkey finally put her recommendation in writing in a July 24, 2009 e-mail. The key paragraphs in the e-mail read as follows:

> As you are aware, all of the information that we have accumulated during the KYC remediation process <u>feels uncomfortable</u> regarding the [A/Client A] family relationship and the nature of its businesses as well as its related entities . . . . After many conversations with the client(s) and attempts to acquire the proper documentation, <u>we still have not received all documentation</u> and Identification [sic] needed to satisfy our standard Know Your Client requirements.

> Since this is a complicated and long-term relationship that we inherited, I recommend that we discuss a simple way to <u>detach the relationship from the PWM metro business</u>. I want to be mindful of the fact that other LOB's[5] within the firm have relationships with this client and/or its related entities and may wish to retain some or all of their business.

(Emphasis supplied.)

Notably, in this document, Sharkey expressed discomfort primarily because she had been unable to complete all the outstanding KYC issues with Client A. Sharkey does not accuse Client A of engaging in illegality or recommend that the bank as a whole cease doing business with Client A.

---

[5] "LOB's" is an acronym for "Lines of Business."

Nonetheless, after receiving this memorandum, Lassiter began the process of terminating the entirety of the bank's relationship with Client A. Lassiter believed that if, as Sharkey represented, Client A was not being forthcoming in the KYC process, Client A should not be a customer of the bank, in any capacity. It was only later, after Sharkey's employment had been terminated, when the bank obtained the missing three items, and met with Client A in-person, that the bank reversed course and retained the relationship.

Sharkey's retaliation claim rested on her testimony that she believed and orally expressed to Lassiter that Client A may be engaged in illegal activity. But Sharkey's testimony was filled with contradictions and far from credible on this issue. For instance, at one point she testified that she expressed her concerns to Lassiter that Client A was engaged in violations of each of the enumerated statutes of SOX by actually naming each of those statutes in her conversation with Lassiter. That testimony was effectively undermined by defense counsel's examination of Sharkey.

In addition, Sharkey did not identify new concerns about Client A that she uncovered as a result of the KYC process. The concerns she listed to the jury were essentially the items that other bankers at J.P. Morgan had identified for Sharkey to

investigate as part of the KYC process.

In sum, not one document and no credible evidence linked Sharkey's firing to any report she voiced about Client A. Instead, the documents and credible testimony showed that (1) Sharkey was fired for her performance, capped by her lies regarding Client H, (2) Sharkey never told Lassiter that she believed that Client A was engaged in fraud or that the bank should terminate its relationship with him, and (3) it was Lassiter who decided to exit the Client A relationship and Lassiter's recommendation was accepted by Lassiter's superiors. Once a full investigation of the relationship was conducted, J.P. Morgan concluded that Client A was not committing any wrongdoing and kept the relationship.

The overwhelming evidence is also against the award of back pay in an amount of $563,000. At most, any award of back pay would reflect a payment through March 2010, which was roughly eight months after Sharkey's employment was terminated. Such a payment would have been a fraction of the amount awarded by the jury. The evidence at trial established that Sharkey stopped looking for new employment in March 2010. Indeed, the evidence strongly suggests that Sharkey never engaged in a serious job search after J.P. Morgan fired her. Since late 2009, Sharkey had worked without salary for, and held herself out as the

President of, Mint Cars on Demand, a business run by her then-fiancée, now husband.  Then, after a family tragedy in early 2010, she also began assisting her father in his business without compensation.  It was undisputed at trial that Sharkey left the work force altogether in 2012.

While Sharkey kept a notebook recording her attempts to find other employment, the last entry in that notebook was from March 2010.  The only documentary evidence touching on any job search after that time consists of an abbreviated e-mail chain from October 2010, in which a recruiter concludes that Sharkey is not interested in talking to him.[6]

Sharkey testified that she went about looking for work by "[c]ontacting my friends in the industry and old employers and recruiters and constantly asking was there anything that I could do knowing that the lawsuit is out there and everybody has read about it, because it was in the press."[7]  But she did not testify to an active job search, such as applying for jobs, making appointments with recruiters, or other similar activities after March 2010.

---

[6] Understandably, plaintiff's counsel made no mention of this document in his summation.

[7] The testimony regarding the presence of the lawsuit was initially admitted under a limiting instruction preventing it from being used for the truth of the statement.  Later in the trial, the ruling was reconsidered, and this portion of the testimony was stricken in its entirety.

Similarly, the jury award of an equal amount of $563,000 in emotional distress damages is without any basis in the record. Sharkey's evidence on her damages for her emotional distress consisted of approximately two transcript pages of her own testimony. That testimony, in its entirety, reads as follows:

Q. Ms. Sharkey, have you suffered emotionally as a result of your termination?

MR. SCHISSEL: Objection.

THE COURT: Overruled.

A. Definitely.

Q. Can you describe to the jury how that is.

A. I think anyone could understand. You're losing your job, being terminated for something you thought you were doing well. I had been in the field for 15 years. I had never had a situation at work with any supervisor. It's just very distressing, upsetting. You feel like your whole life is taken away from you.

It was a career. It wasn't just a job for me. I had worked my way up from being an administrative assistant in the bank to being a VP at City [sic] and then moving on to two other organizations. Just feeling that it was all taken away from me just like that.

Q. Did you have any physical symptoms that you believe were attributed to the termination?

MR. SCHISSEL: Objection.

THE COURT: Overruled.

A. I had extreme anxiety and I was not sleeping whatsoever.

> Q. At any point in time did you take any
> medication to help cope with that?
>
> A. Yes.
>
> Q. What was that and when?
>
> A. What medications?
>
> Q. Yes.
>
> A. Xanax and sleeping medications.
>
> Q. In what period of time?
>
> A. In '09 probably through 2010. Through 2010.

No corroborative evidence, medical testimony, or other documents were presented. There was testimony, however, that Sharkey suffered a family tragedy in early February 2010 that could have independently caused or exacerbated these reported symptoms from that day forward.

## DISCUSSION

The standard for granting judgment as a matter of law under Rule 50, Fed. R. Civ. P. is well-established. "Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in h[er] favor." Stevens v. Rite Aid Corp., 851 F.3d 224, 228 (2d Cir. 2017) (citation omitted). This standard "mirrors the standard for" summary judgment under Rule 56, Fed. R. Civ. P, except based on the trial record rather than the summary

judgment record. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
250 (1986); <u>see</u> <u>Piesco v. Koch</u>, 12 F.3d 332, 341 (2d Cir. 1993).

The standard for granting Rule 59 relief, Fed. R. Civ. P.,
by contrast, grants far more discretion to the trial judge. "It
is the judge's right, and indeed duty, to order a new trial if
it is deemed in the interest of justice to do so." Charles Alan
Wright and Arthur R. Miller, Fed. Prac. & Proc. § 2803 (3d ed.
2017). Among the grounds on which a new trial may be granted is
if the verdict is against the weight of the evidence. "A
decision is against the weight of the evidence if and only if
the verdict is (1) seriously erroneous or (2) a miscarriage of
justice." <u>Raedle v. Credit Agricole Indosuez</u>, 670 F.3d 411,
417-18 (2d Cir. 2012) (citation omitted); <u>see</u> <u>also</u> <u>DLC Mgmt.</u>
<u>Corp. v. Town of Hyde Park</u>, 163 F.3d 124, 134 (2d Cir. 1998) ("A
court considering a Rule 59 motion for a new trial . . . should
only grant such a motion when the jury's verdict is egregious."
(citation omitted)).

In evaluating a Rule 59 motion, "the trial judge may weigh
the evidence and the credibility of witnesses and need not view
the evidence in the light most favorable to the verdict winner."
<u>Raedle</u>, 670 F.3d at 418. "Where the resolution of the issues
depended on assessment of the credibility of the witnesses, it
is proper for the court to refrain from setting aside the

verdict." <u>Metromedia Co. v. Fugazy</u>, 983 F.2d 350, 363 (2d Cir. 1992).

A special case of the general power to order relief under Rule 59 arises in the context of excessive verdicts. A trial judge has "'discretion to grant a new trial if the verdict appears to the judge to be against the weight of the evidence . . . includ[ing] overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur).'" <u>Kirsch v. Fleet Street, Ltd.</u>, 148 F.3d 149, 165 (2d Cir. 1998) (quoting <u>Gasperini v. Center for Humanities, Inc.</u>, 518 U.S. 415, 433 (1996)). The "calculation of damages is the province of the jury," and a court may "not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages." <u>Turley v. ISG Lackawanna, Inc.</u>, 774 F.3d 140, 162 (2d Cir. 2014) (citation omitted). Review of a jury's verdict consists of determining "whether the award is so high as to shock the judicial conscience and constitute a denial of justice." <u>DiSorbo v. Hoy</u>, 343 F.3d 172, 183 (2d Cir. 2003) (citation omitted).

> But, when juries grant large compensatory awards for intangible and unquantifiable injuries, such as emotional distress, pain, and suffering, we are required to subject the trial court's discretion to substantial constraints. Awards for mental and emotional distress are inherently

17

> speculative.  There is no objective way to assign
> any particular dollar value to distress.
> Nonetheless, as we explained in discussing a
> claim of excessive punitive damages . . . a legal
> system has an obligation to ensure that such
> awards for intangibles be fair, reasonable,
> predictable, and proportionate.
>
> We must ensure proportionality, to control for
> the inherent randomness of jury decisions
> concerning appropriate compensation for
> intangible harm, and to reduce the burdensome
> costs on society of over-extensive damages
> awards.  Stampf v. Long Island R.R. Co., 761 F.3d
> 192, 205 (2d Cir. 2014) (noting that, if
> appellate courts regularly affirm large damages
> awards in the name of deference to the jury, the
> "baseline of reasonableness will be constantly
> forced upward").

Turley, 774 F.3d at 162 (citation omitted).  Determination of

what is fair, reasonable, predictable, and proportionate can

rely upon a survey of damages awards in comparable cases.

Stampf, 761 F.3d at 207.

If a damages verdict is deemed excessive, the Court must

determine whether the excessive amount is subject to remittitur,

or whether a new trial must be granted without remittitur.  "A

remittitur should be granted only where the trial has been free

of prejudicial error."  Ramirez v. New York City Off-Track

Betting Corp., 112 F.3d 38, 40 (2d Cir. 1997).  "[T]he size of a

jury's verdict may be so excessive as to be 'inherently

indicative of passion or prejudice' and to require a new trial,"

without remittitur.  Id. (citing Auster Oil & Gas, Inc. v.

Stream, 835 F.2d 597, 603 (5th Cir. 1988)).  "Influences such as caprice, passion, bias, and prejudice are antithetical to the rule of law.  If there is a fixture of due process, it is that a verdict based on such influences cannot stand."  TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 475-76 (1993) (O'Connor, J., dissenting) (collecting cases).  Prejudice may be found to exist where the appropriate amount of the remittitur "is totally out of proportion to the damages" awarded by the jury.  Ramirez, 112 F.3d at 41.

Calculation of the appropriate amount of a remittitur requires a judicial determination of the maximum amount of damages that the record can support.  Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1330 (2d Cir. 1990).  Such amounts are frequently determined with reference to other verdicts and the experience of the Court.  If, with the damages amount remitted, the verdict can be sustained, then a new trial motion may be denied conditioned on the plaintiff's acceptance of the remittitur.

Once a court makes a decision requiring a new trial on at least some issue in the case, the court must then determine whether a partial new trial is appropriate, or whether the whole case must be re-tried.  In the event the jury's verdict was the result of passion or prejudice, the whole matter must be re-

tried, as the prejudice that infected one aspect of the verdict may have affected the remainder of the verdict as well.  See generally Wagenmann v. Adams, 829 F.2d 196, 216-17 (1st Cir. 1987).  If the jury's verdict, although unsupportable in some aspects, was not incurably biased, the issue becomes whether the issues to be retried are separable.  See generally Wright & Miller § 2814.  For example, sometimes the amount of damages can be determined independently from the presentation of the evidence giving rise to liability.  See Mertens v. Flying Tiger Line, Inc., 341 F.2d 851, 857-58 (2d Cir. 1965).  In such a case, a retrial limited to damages is appropriate.  But, when the issues are inextricably intertwined, such that a proper determination of the amount of damages requires an evaluation of the same evidence that gave rise to liability, any retrial must be on all issues.  See Caskey v. Village of Wayland, 375 F.2d 1004, 1009-1010 (2d Cir. 1967) ("Partial new trials should not be resorted to 'unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.'" (quoting Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931)).

Sharkey's claim arises under 18 U.S.C. § 1514A, a portion of the much broader SOX statute.  Section 1514A was passed in

2002, in the wake of financial crises, to help protect

whistleblowers working at covered financial institutions from

retaliation.  "To accomplish this goal, § 1514A protects

employees when they take lawful acts to disclose information or

otherwise assist in detecting and stopping actions which they

reasonably believe to be fraudulent."  Bechtel, 710 F.3d at 446

(citation omitted).

> "To prevail under § 1514A, an employee must prove
> by a preponderance of the evidence that (1) she
> engaged in protected activity, (2) the employer
> knew that she engaged in the protected activity,
> (3) she suffered an unfavorable personnel action,
> and (4) the protected activity was a contributing
> factor in the unfavorable action."

Id. at 447 (citation omitted).   Protected activity

occurs when an employee:

> provides information, causes information to be
> provided, or otherwise assists in an
> investigation regarding any conduct with the
> employee reasonably believes constitutes a
> violation of section 1341 [mail fraud], 1343
> [wire fraud], 1344 [bank fraud], or 1348
> [securities fraud], any rule or regulation of the
> Securities and Exchange Commission, or any
> provision of Federal law relating to fraud
> against shareholders.

Nielsen, 762 F.3d at 219 (2d Cir. 2014) (alterations in

original) (citation omitted).  "A reasonable belief contains

both subjective and objective components."  Id. at 221.

> [T]he plaintiff must have a subjective belief
> that the challenged conduct violates a provision
> listed in § 1514A, and . . . this belief must be

> objectively reasonable. . . .  The objective
> component of the reasonable belief standard
> should be evaluated based on the knowledge
> available to a reasonable person in the same
> factual circumstances with the same training and
> experience as the aggrieved employee.

Id. (citation omitted).  Put another way, "[t]he objective

prong of the reasonable belief test focuses on the 'basis of

knowledge available to a reasonable person in the circumstances

with the employee's training and experience.'"  Id. (quoting

Sharkey v. J.P. Morgan Chase & Co., 805 F. Supp. 2d 45, 55

(S.D.N.Y. 2011)); cf. Federal Housing Finance Agency v. Nomura

Holding Am., Inc., 873 F.3d 85, 119 (2d Cir. 2017) ("A plaintiff

is charged with knowledge of any fact that 'a reasonably

diligent plaintiff would have discovered.'" (quoting Merck &

Co., Inc. v. Reynolds, 559 U.S. 633, 653 (2010))).  The

reasonable belief inquiry is context-dependent: for example, a

low-level employee of a covered institution may have no

authority to investigate potentially fraudulent activity, and

therefore a report of potentially fraudulent activity may be

reasonable for such an employee even if it would not be for an

employee with more ability and/or the duty to investigate.  Cf.

id. at 130 (citing In re WorldCom Sec. Litig., 346 F. Supp. 2d

628, 663 (S.D.N.Y. 2004)) (noting context-dependent nature of

inquiry).

Under SOX, an employer may assert as an affirmative defense

that it would have taken the same unfavorable personnel action in the absence of the protected activity.  <u>Bechtel</u>, 710 F.3d at 446.  The employer has the burden of proving this affirmative defense by clear and convincing evidence.  <u>Id.</u>

If an employee succeeds in proving their case, and the affirmative defense is not proven, the employee is entitled to "all relief necessary to make the employee whole."  18 U.S.C. § 1514A(c)(1).  Such relief "shall include" reinstatement, the amount of back pay, with interest, and compensation for any special damages, such as litigation costs, expert witness fees, and reasonable attorneys' fees.  <u>Id.</u> at § 1514A(c)(2).

Know Your Customer ("KYC") procedures are procedures employed by banks to ensure that their clients are not engaging in illegal or otherwise problematic activities through their banking relationships.  KYC procedures are intended to comply with various federal laws, such as the Bank Secrecy Act and the USA Patriot Act, and guidelines associated with those laws. Thus, 31 U.S.C. § 5318 provides that,

> [i]n order to guard against money laundering
> through financial institutions, each financial
> institution shall establish anti-money laundering
> programs, including, at a minimum--
> (A) the development of internal policies,
> procedures, and controls;
> (B) the designation of a compliance officer;
> (C) an ongoing employee training program; and
> (D) an independent audit function to test
> programs.

31 U.S.C. § 5318(h)(1).

Where the customer is not a United States person, the Patriot Act requires that

> [e]ach financial institution that establishes, maintains, administers, or manages a private banking account . . . in the United States for a non-United States person . . . shall establish appropriate, specific, and where necessary, enhanced <u>due diligence policies, procedures, and controls</u> that are reasonably designed to detect and report instances of money laundering through those accounts.

31 U.S.C. § 5318(i)(1) (emphasis supplied). These procedures must

> ascertain the identity of the nominal and beneficial owners of, and the source of funds deposited into, such account as needed to guard against money laundering and report any suspicious transactions . . . and conduct enhanced scrutiny of any such account that is requested or maintained by, or on behalf of, a senior foreign political figure, or any immediate family member or close associate of a senior foreign political figure, that is reasonably designed to detect and report transactions that may involve the proceeds of foreign corruption.

31 U.S.C. § 5318(i)(3).

Other provisions of the Bank Secrecy Act and its implementing regulations also require banks to have procedures in place to identify potentially suspicious transactions. <u>See generally</u> 31 U.S.C. § 5318(g)(1); 31 C.F.R. §§ 1020.210, 1010.610, 1010.620. The specific implementations of these

statutes and regulations, however, are left up to each individual bank, subject to audit and oversight by the bank's regulator, such as the Office of the Comptroller of the Currency.

## I. Liability

Defendants have moved for judgment as a matter of law on liability under Rule 50, Fed. R. Civ. P., on the grounds that Sharkey did not engage in protected activity, that her belief that Client A was committing any sort of fraud was neither objectively nor subjectively reasonable, that there was no evidence that defendants knew about Sharkey's protected activity, and that there was no evidence from which a reasonable jury could conclude that any protected activity contributed to her termination.

The questions raised by defendants are close ones. Many of the defendants' criticisms of the jury's verdict have merit, as already indicated. It was Sharkey's duty to perform the KYC process for Client A. Merely regurgitating questions -- identified by others in the bank -- that required investigation falls short of protected activity. The single document authored by Sharkey to express her concerns -- the July 24 e-mail -- seriously undermines her claim. It neither mentions fraud nor other criminal activity, and does not recommend that J.P. Morgan

terminate its banking relationship with the client.

Moreover, Sharkey's testimony that she voiced her concerns about fraud, even if credited, must still be compared against the "basis of knowledge available to a reasonable person" in her circumstances. Nielsen, 762 F.3d at 211. Had Sharkey done the KYC investigation she was charged with performing, as the bank later did, she would have developed information that dispelled any reasonable concerns that Client A was engaged in fraudulent or criminal activity. Because an objectively reasonable investigation would have developed this information, the strong weight of the evidence is against a finding that Sharkey had an objectively reasonable belief that Client A was committing fraud.

Defendants also presented powerful evidence to show that the bank had decided to fire Sharkey three days before she wrote the July 24 e-mail. Lassiter's superiors considered Manager T's complaint that Sharkey was a "phantom" and Sharkey's lies to Lassiter about her responsiveness to Manager T a firing offense.

Nonetheless, taken in the light most favorable to Sharkey, the evidence is sufficient, albeit barely so, to support the jury's verdict as to liability. Although belied by the documentary record, Sharkey testified that she in fact did report to Lassiter that she believed that Client A was engaged

in activity that would violate the statutes enumerated in Sarbanes-Oxley.  Lassiter was subject to a lengthy examination by plaintiff's counsel focusing repeatedly and in exquisite detail on inaccuracies or inconsistencies in Lassiter's prior statements.  While those matters may have been considered trivial, a jury was also entitled to find that were sufficiently serious to undermine Lassiter's credibility when she described her interactions with Sharkey.  Nor have defendants sustained their extremely heavy burden to prove that, as a matter of law, a reasonable jury must have found, by clear and convincing evidence, that they would have discharged Sharkey in the absence of her protected activity.  The defendants' renewed Rule 50 motion for judgment as a matter of law as to liability must be denied.

## II. Damages

### A. Back Pay

Defendants contend that as a matter of law, Sharkey's damages award for back pay is unsupportable because she failed to mitigate her damages after March 2010.  The jury found that Sharkey had never failed to mitigate her damages, and was entitled to $563,000 in back pay damages.

Employees discharged in violation of Sarbanes-Oxley have a duty to mitigate their damages.  Although this duty is not meant

to be "onerous," it still requires the employee to act with a "reasonable diligence" to obtain comparable employment.  Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1998) (citation omitted).  An employer who has acted wrongfully in discharging an employee does not thereby become obligated to continue paying that employee if that employee subsequently fails to take reasonable efforts to secure alternate employment.  Broadnax v. City of New Haven, 415 F.3d 265, 268-69 (2d Cir. 2005).  Two alternative paths exist for employers to prove failure to mitigate.  Under Dailey, an employer may prove that an employee failed to mitigate by "establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it."  108 F.3d at 456.  An exception to this rule applies, however, when an employer can "prove that the employee made no reasonable efforts to seek [suitable] employment."  Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998).

The burden of proving a defense of failure to mitigate rests, on either theory, squarely on the defendant.  Broadnax, 415 F.3d at 269.  Accordingly, in the context of a motion for judgment as a matter of law, an employer must show that no reasonable juror could have failed to find in their favor on the defense.

The defendants did not attempt to show that comparable work was available to Sharkey, and relied entirely on their contention that Sharkey failed to make any reasonable efforts to seek suitable employment. The testimony and documentary record permitted a jury to find that Sharkey did make some effort to seek alternative employment through March 2010. Although the evidence tended to show that these efforts were less than fulsome -- one document and Sharkey's own testimony showed that in October 2009, Sharkey told a recruiter she had accepted another offer when in fact she had not -- it cannot be said as a matter of law that any reasonable juror had to have found that Sharkey failed to make any reasonable effort to seek alternative employment during this eight-month period.

After March 2010, however, the evidence compels the conclusion as a matter of law that Sharkey ceased making any reasonable efforts to seek alternative employment. As Judge Sweet ruled on defendants' first motion in limine:

> [Sharkey's] claims for back pay will end at the date at which the jury determines she stopped actively applying for jobs and seeking employment. Merely maintaining contact with industry professionals will not suffice, and hearsay evidence regarding her search for employment offered for the truth of out of court statements will not be permitted. At that date, back pay will cease because Sharkey made no reasonable efforts to seek such employment when she was still capable of employment and failed to mitigate her damages.

(citation omitted).  That ruling was entirely correct.  The
trial evidence confirmed that after March 2010, Sharkey ceased
applying for jobs, and her testimony showed that she "merely
maintain[ed] contact with industry professionals," rather than
actively engaged in a real job search.  And her attempt to offer
hearsay out-of-court statements regarding the pending lawsuit to
justify her lack of effort cannot do so unless these statements
are credited for their truth, which they cannot be.[8]

The one document to which Sharkey points in opposition to
this motion to support the existence of a search for employment
after March 2010 does not in fact support her position.  That
document, Plaintiff's Exhibit 226, does not show a reasonable
effort to connect with the recruiter; it shows precisely the
opposite, to wit, that plaintiff rebuffed the recruiter.

Plaintiff's own testimony does not suffice, because the
content of that testimony merely establishes that she maintained
contact with professionals, rather than actually applying for a
job or otherwise making active efforts in a job search.  And in
2012, it is beyond dispute she left the work force altogether

---

[8] In any event, because the reasonableness of efforts are
governed by an objective, and not a subjective standard, as a
matter of law, a reasonable person would not cease making
essentially any effort to find suitable employment in light of a
few statements made by others.

and was no longer assisting even her husband or father.
Accordingly, judgment will be entered for the defendants to the
extent of holding that Sharkey failed to mitigate her damages
after April 1, 2010.  As a matter of law, Sharkey is eligible to
receive back pay only through March 2010.  Pursuant to Rule
50(c)(1), Fed. R. Civ. P., the defendants' motion for a new
trial is conditionally granted to the extent of requiring a new
trial on back pay damages for the period after April 1, 2010.

### B. Emotional Distress

Defendants challenge the award of $563,000 in emotional
distress damages as unwarranted by the evidence, and request a
new trial, or in the alternative, remittitur.  Damages available
under 18 U.S.C. § 1514A include all relief necessary to make the
plaintiff whole.  If a plaintiff has suffered emotional distress
as a result of being retaliated against in violation of
Sarbanes-Oxley, damages for that emotional distress are
recoverable.

Nonetheless, emotional distress damages, because of their
inherent malleability, are substantially limited in amount
unless the plaintiff presents objective evidence.  Annis v. Cty.
of Westchester, 136 F.3d 239, 249 (2d Cir. 1998).  In Annis,
addressing a claim for emotional distress damages under 42
U.S.C. § 1983, the Second Circuit held that damages for

31

emotional distress were unavailable absent physical manifestations of that distress, or corroborating testimony or independent medical evidence. Id. Reaffirming Annis, the Second Circuit has stated that:

> [a] plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. Rather, the plaintiff's testimony of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself. Evidence that a plaintiff has sought medical treatment for the emotional injury, while helpful, is not required.

Patrolmen's Benevolent Ass'n of City of New York v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002) (citation omitted).

If Sharkey is entitled to recover emotional distress damages at all, she at most would be entitled to a garden-variety award to reflect the emotional distress that typically accompanies a wrongful firing. The evidence of her emotional distress was limited to her own testimony, which was brief and largely conclusory.

After surveying other verdicts and taking into account the objective circumstances of her termination and Sharkey's testimony, the Court concludes that a damages award in the range of $20,000 to $50,000 would be the maximum award sustainable on this record. See generally Dotson v. City of Syracuse, 2011 WL

817499, at *16-21 (N.D.N.Y. Mar. 2, 2011) (collecting cases);

see also Legg v. Ulster Cty., 2017 WL 3668777, at *11-12

(N.D.N.Y. Aug. 24, 2017) (collecting cases).

The particular amount chosen for the emotional distress

damages award indicates that the jury did not follow its

instructions.  An award of $563,000 cannot be sustained because

it is far in excess of what a reasonable jury could have

awarded.  But, as significantly, the particular choice of amount

-- an amount equal to that it awarded back pay -- indicates that

the jury acted out of passion in favor of Sharkey, or prejudice

against J.P. Morgan, and not on the basis of the trial evidence

and the law provided in the jury charge.

### C. Remittitur or New Trial

As just described, the jury's verdict is vastly out of

proportion to the maximum supportable damages award.  The

excessiveness of these awards reflects a jury motivated by

passion or prejudice, or both.  As a consequence, there can be

no confidence in the integrity of the jury's verdict on

liability.  Moreover, because the issue of emotional distress

damages must be re-tried in any event, there is no way to fairly

try the issue of the emotional harm that Sharkey suffered

divorced from the issue of whether she was wrongfully

discharged.  Emotional distress damages necessarily include

consideration of the objective circumstances of the legal
violation that created the emotional injury.  See Patrolmen's
Benevolent Ass'n, 310 F.3d at 55.  Accordingly, the new trial as
to Lassiter and J.P. Morgan must be on all issues, and an offer
of remittitur is inappropriate.

**III. Reinstatement**

The final issue is whether Jennifer Sharkey is entitled to
reinstatement in her position.  SOX provides that relief for a
victorious employee "shall include . . . reinstatement with the
same seniority status that the employee would have had, but for
the discrimination."  18 U.S.C. § 1514A (c)(2).  While that
relief is available, it is not automatic.  At trial, the Court
ruled that the issue would be decided by the Court, and not the
jury.

Jennifer Sharkey stopped making reasonable efforts to
secure employment in early 2010, and removed herself from the
workforce altogether in 2012.  That decision on her part ended
the defendants' obligation to reinstate her.  For, even if she
is entitled to reinstatement at the same seniority and benefit
status she would have had but for the discrimination, when she
left the workforce she abandoned her claim for reinstatement.

Reinstatement must also be denied for an independent
reason.  Reinstatement, even when authorized as a remedy, is

inappropriate here as an equitable matter.  See Kirsch v. Fleet
Street, Ltd., 148 F.3d 149, 168-69 (2d Cir. 1998); Padilla v.
Metro-North Commuter R.R., 92 F.3d 117, 125-26 (2d Cir. 1996).
Sharkey struggled to perform her work as a private wealth
manager.  She lied to her superior about being in touch with the
clients the bank assigned to her.  Whether or not the jury was
allowed to hear the full extent of Sharkey's malfeasance, that
malfeasance forfeited Sharkey's right to reinstatement.

Finally, and again for an entirely independent reason,
reinstatement in this case is impractical if not impossible.
Through this hard fought litigation, Sharkey has impugned the
bank, and the bank has called her character for truthfulness and
reliability as an employee into serious question.  It would
simply place both Sharkey and J.P. Morgan into a completely
untenable position to order her reinstatement.

Normally, in the event that reinstatement is unavailable,
the alternative remedy is front pay.  As Judge Sweet held,
however, because Sharkey removed herself from the workforce,
front pay is also unavailable.  This Court had declined to
revisit that decision before the trial, and declines to do so
now.  Accordingly, reinstatement will not be awarded in this
case.

## CONCLUSION

The defendants' renewed Rule 50 motion for judgment as a matter of law is granted as to back pay only as of April 1, 2010, and denied in all other respects. A conditional new trial is granted as to back pay damages for the period after April 1, 2010. The defendants' alternative Rule 59 motion for a new trial as to Lassiter and J.P. Morgan is granted. Sharkey's request to be reinstated at J.P. Morgan in the event she ultimately prevails in this matter is denied.

SO ORDERED:

Dated:    New York, New York
          March 5, 2018

_____
                    DENISE COTE
        United States District Judge